## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAKEFRONT PICTURES, LLC, JENNIFER KARUM and THE CURSE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. _____ |
| JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, CANDICE ROSE, and DOE DEFENDANTS 1-20, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiffs, LAKEFRONT PICTURES, LLC ("LFP"), JENNIFER KARUM ("Karum") and THE CURSE, LLC ("The Curse"), by their attorneys, for their Complaint against Defendants JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, CANDICE ROSE and DOE DEFENDANTS 1-20, state as follows:

## NATURE OF ACTION

1.      This action has been commenced to redress an intense and coordinated campaign of smears, harassment and bullying directed primarily at Plaintiffs LFP and Karum, at which Defendant Jordan Ancel is at the center.

2.      Indeed, through Ancel's actions is merely making good on his brazen public threat to "burn her life down," and "ruin" Karum and her company, LFP, without impunity, taunting her via text "Bitch, you can't do shit to me." *See* **Group Exhibit C**, submitted herewith.

3.     As part of his campaign, Ancel has enlisted others who have shown an interest in currying favor with him as a potential Hollywood networking contact, that have been willing to engage in conduct that has been and continues to be wrongful and purposefully malicious, for which they must be held accountable.

**THE PARTIES**

4.     Plaintiff Karum is an individual who is a citizen of and domiciled in the State of Illinois, who works and resides in Cook County, Illinois.

5.     Plaintiff LFP is a limited liability company organized and existing under the laws of the state of Illinois, with its principal place of business located in Cook County, Illinois. Karum is a Member of LFP and at all relevant times has served as one of its Managers. Ryan Atkins ("Atkins") is the other Member and Manager of LFP.

6.     Plaintiff The Curse is a limited liability company organized and existing under the laws of the state of Illinois, with its principal place of business located in Cook County, Illinois. Karum and Atkins are members of The Curse and at all relevant times have served as its Managers. The remaining members of The Curse are citizens of and domiciled in the states of Illinois, New Jersey and Pennsylvania.

7.     Defendant Jordan Ancel ("Ancel") is an individual who is a citizen of and domiciled in the State of California.

8.     Defendant Jordan Ancel International, LLC, ("Ancel International") is a limited liability company organized and existing under the laws of the state of California located in Los Angeles. On information and belief, Ancel is the sole member of Ancel International.

9.     On information and belief, Defendant Rock City Road Films LLC ("Rock City") was an Illinois LLC, whose sole member was Ancel, formed for the sole purpose of contracting with and/or receiving payment for The Curse relating to services to be rendered by Ancel.

10. Defendant Candice Rose ("Rose") is an individual who is a citizen of and domiciled in the State of Wisconsin.

11. The Doe Defendants 1-20 are individuals, whose identities are not yet known with the requisite certainty (but the identities of some are strongly suspected), who have acted in concert with Ancel with the express intention to injure LFP and Karum, and who Plaintiffs Karum expect to add as named Defendants when their identities and actual malice are confirmed through initial discovery.

## JURISDICTION AND VENUE

12. Based upon the citizenship of their respective members (addressed above), LFP is deemed to be a citizen of the state of Illinois, and The Curse is deemed to be a citizen of the states of Illinois, New Jersey and Pennsylvania.

13. Based upon the citizenship of its respective members (addressed above), both Ancel International and Rock City are deemed to be citizens of the state of California.

14. None of the Plaintiffs are citizens of or domiciled in California or Wisconsin, and none of the Defendants are citizens of or domiciled in Illinois, New Jersey or Pennsylvania.

15. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

16. As set forth more fully below, Ancel, either individually or through Rock City and Ancel International, contracted with both LFP and The Curse in Illinois, stipulated to jurisdiction in Illinois on behalf of Ancel International, traveled repeatedly to Illinois, provided services in Illinois, directed tortious acts and conduct towards citizens of Illinois that have resulted in injury in Illinois, and Ancel has availed himself of the privilege of asserting claims in the Circuit Court of Cook County, Illinois.

17.     As set forth more fully below, Rose contracted with both LFP and The Curse, traveled repeatedly to Illinois and/or provided services in Illinois in connection with those contracts, directed tortious acts and conduct towards citizens of Illinois that have resulted in injury in Illinois.

18.     Venue is therefore proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## FACTS COMMON TO ALL COUNTS

19.     Karum is neuro-diverse, and on the autism spectrum. As a child on the autism spectrum, Karum was relentlessly teased and bullied in school by children who cruelly mocked her for not being "normal." These painful experiences during her youth fueled an interest in theater, which offered Karum a "safe space" where she could, at least *act* normal.

20.     Through theater, Karum began to develop a sense of confidence and belonging that eventually changed her outlook towards school and her ability to relate to and with her peers. Karum remained active in theater throughout high school. Karum is a 2005 graduate of Ohio Wesleyan University where she studied theater and dance.

21.     After graduating, Karum thrived in the workforce, harnessing her persistence to achieve success in various sales positions over the course of 18 years.

22.     Although Karum is open about being neuro-diverse, and how it has impacted her, both as a person and an artist, most people who meet Karum would not assume or realize that she was on the spectrum, although Karum still struggles at times with certain social cues and can become prone to a fixation on pleasing others.

23.     Despite her success in the workforce, Karum's passion remained in theater and a developing interest in film. Karum sought and booked acting opportunities, and while on set, she

carefully studied and engaged with directors, assistant directors and producers to learn about all aspects of the film industry.

24.     Eventually, Karum left her sales job in order to focus on her passion for acting and film, determined to support and promote other neuro-diverse artists, and give voice to a group that is underrepresented in the film industry.

25.     After landing several acting roles, Karum's interest in filmmaking intensified.

26.     Karum met Atkins when she auditioned for a role on a project he was spearheading. At the time, Atkins had film credits as a cinematographer, director, and editor over the course of several years in the industry.

27.     Karum and Atkins quickly developed a strong synergy, and they worked together to transform Atkins' working concept into a TV pilot for what came to be known as "*Conrad*," about a female detective on the autism spectrum.

28.     Determined to get the *Conrad* pilot made, Karum and Atkins joined forces to form their own production company, LFP, with the stated mission of sharing untold stories from voices normally unheard.

29.     After remaking the script for the *Conrad* pilot, Karum and Atkins, through their newly formed production company, LFP, developed a budget for the pilot, raised necessary capital, and aggressively promoted the script to various prominent actors, in an effort to best position the project to get "picked-up" by a studio.

30.     Yet, despite the relative inexperience of its principles in the role of the producers, the strong script drew the attention of Eric Roberts (who's extensive film and TV credits include *The Pope of Greenwich Village*, *The Expendables*, and *The Dark Knight*), and Harry Lennix (*The*

*Blacklist*, *The Matrix* series, *Ray*, etc.), and after speaking with Karum, learning about her story, and impressed by her passion and energy, both Roberts and Lennix signed onto the project.

31.     Karum's and Atkins' first attempt at producing was both exhilarating and humbling, as the duo benefited immensely from direct hands-on experience that accelerated their learning curve, but also made their share of mistakes as they learned "on the job." On balance, however, the experience producing *Conrad,* was invaluable, and validated the work of all of those involved with the project.

32.     Karum and Atkins (with the assistance of others) prepared materials to pitch *Conrad* as a series, developing a three-season arc and an extensive show bible. The *Conrad* pilot earned substantial acclaim, and Netflix expressed interest in the series, although those discussions fizzled during COVID and the long ensuing shutdown of nearly all projects.

33.     The experience and relative success of *Conrad*, however, became a springboard for new opportunities. Among other projects, Karum wrote, co-directed, and acted (supporting role) in a short film that LFP produced, a thriller released in 2018 called "*The Nest*," about a young woman who is tormented by premonitions about the fate of others around her.

34.     LFP was also engaged by filmmakers to produce and/or direct several award-wining short films, bringing the valued resource of a complete, experienced and carefully vetted production crew that has worked repeatedly with LFP (including on *The Unseen*, a feature film discussed in detail below).

35.     LFP also began offering and offers an array of services for aspiring actors and filmmakers, including writing, directing and producing demo-scenes.

### Karum and LFP Create "*The Unseen*"

36.     In 2020, Karum also began working on the script for her first feature length film, *The Unseen*, a supernatural thriller, on which she began working after completing the *Conrad* pilot.

Karum worked with Vincent Shade, a veteran producer and director, who mentored Karum through the script-writing process for a full-length film, and specifically with respect to scripts for the horror genre.

37.    Karum and Atkins, through LFP, worked as the producers for *The Unseen*, handling all of the many underlying tasks involved with taking a script and turning it into a movie.

38.    LFP successfully raised capital to cover more than half of the film's proposed budget from outside investors and began casting for actors, mostly from the Chicagoland area.

39.    But to best position the film to secure broader distribution, and in keeping with LFP's mission of creating opportunity for an under-represented segment of the industry, LFP pitched the script and lead role in *The Unseen* to RJ Mitte, best known for his recurring role as "Walt Jr." on the highly acclaimed series, *Breaking Bad*, who like his character on the show, has cerebral palsy.

40.    Through considerable effort, LFP secured Mitte's commitment to the film, and turned attention to the considerable work involved with planning, preparation and martialing the resources to make a movie. Karum reserved a small supporting role in the film for herself (as Mitte's character's older sister).

41.    LFP also pre-cast two of the other major roles, including Rose, with whom Karum had attended classes, become friendly (scenes from *Conrad* were even filmed at Rose's home), and for whom LFP had produced a scene for her demo reel, and Rebekah Kennedy, with whom Karum connected after seeing her work on *Law & Order,* and developed a friendship borne of their respective mutual admiration for the other's work.

42.     Among the lessons learned as newly minted producers on *Conrad,* Karum and Atkins experienced the challenges of wearing multiple hats in connection with a project, particularly in Karum's case, who juggled roles both in front of and behind the camera.

43.     Atkins and Karum concurred that for *The Unseen*, LFP would bring in a dedicated Director, eventually hiring Vincent Shade, with whom they had worked (and was familiar with the script), and collectively, they all agreed to bring in an extra producer to help to manage the set when Karum was acting, so that she could otherwise focus on her role as producer (when not acting), and so that Atkins could focus primarily on cinematography.

### LFP Contracts with Ancel to Serve as the Third Producer on The Unseen

44.     Eventually LFP reached out to Ancel to discuss the role of Producer.

45.     Karum knew of Ancel before they ever worked together. Karum was part of a "Thriving Actors" Facebook Group in which Ancel offered coaching/mentoring services and the like to aspiring actors and touting his experience as a producer.

46.     Ancel also touted to the Facebook Group that his wife was a prominent Hollywood agent, and he aggressively pitched himself as a valuable networking contact by members of the group seeking representation.

47.     At the time that LFP first reached out to Ancel about serving as a third producer on the film, Karum and Atkins had already been working on the project for well over a year, had completed the majority of the "development work" on the project, and had begun to focus on pre-production.

48.     When he was first approached, Ancel showed no interest in the project. In fact, it was not until he learned that Karum and Atkins had lined-up Mitte as the lead actor that Ancel did a complete about-face and expressed serious interest in a producer role, hyping all that he could do to assist and train Karum and Atkins as producers.

49.     In reality, on information and belief, Ancel had little meaningful experience with or reputation for producing feature films, and he actually saw *The Unseen* as an opportunity to pad his resume (which, at the time, featured mostly short films and commercials), as well as his opportunity to forge a relationship with a lead actor with established credits, that he could attempt to parlay into more opportunities to get involved with feature films.

50.     On or about May 31, 2021, Ancel, through Rock City, entered into a Producer Agreement with The Curse, a special purpose entity Managed by LFP that owned all of the intellectual property rights relating to *The Unseen,* to assist Karum/Atkins/LFP, the film's primary producers. A copy of the Producer Agreement is submitted herewith as **Exhibit A**.

51.     Pursuant to the express terms of the Producer Agreement, Ancel was to receive a flat fee, and *provided he/Rock City was not in material breach of the Production Agreement*, would also be eligible to receive a small percent of "Net Profits of the film (as that term was defined therein). *Id.* at par. 3.

52.     The Producer Agreement also made clear, however, that The Curse was not obligated to use Ancel's services, or the  results  of  such services in connection with the film, or to produce, release or distribute *The Unseen* after it was completed. *Id.* at par. 3.3.

53.     Significantly, the Producer Agreement also made clear that Ancel would only be entitled to earn third-producer credit, expressly stating that: "…provided Ancel performs all of his material services hereunder *and that neither [Rock City] nor Ancel is in material uncured breach hereof*, Production Company shall accord Ancel a "Producer" credit on-screen on either no less than the single third producers' card or, at Production Company's discretion, the second producers card, shared only with Ryan Atkins, in the main titles on all positive and/or digital prints of the Picture." (emphasis added). *Id.* at par. 4.

9

54.     Pursuant to the Producer Agreement, Ancel ceded to The Curse the sole and exclusive right to publicize Ancel's role with and services to the film, and to make any changes to the script for and characters in *The Unseen. Id.* at pars. 5, 6. Ancel further warranted that he would not "do anything which may impair any of the rights granted to [The Curse]." *Id.* at par. 10.

55.     Concurrently, Ancel, through Ancel International, also executed a Non-Disclosure Agreement with LFP (the "NDA"), a copy of which is submitted herewith as **Exhibit B.**

56.     Pursuant to Ancel's NDA, he agreed not to disclose "Confidential Information" (*id.* at p. 1) and "not to discuss any information about the project, disparage or reveal prejudice whether deemed factual or opinion to 3rd parties over phone, in person, emails, social media, or any other electronic form of communication…" *Id.* at p. 5.

57.     The NDA made clear that Ancel's breach thereof could result in his forfeiting credit for the film at the discretion of the primary producers. *Id.* Ancel actually initialed the referenced provision acknowledging that he understood that his credits could be forfeited.

**Ancel's Time on the Set of *The Unseen* was an Unmitigated Disaster**

58.     Ancel joined the film as a producer during the final portion of the "development phase" of the project and showed initial enthusiasm. Ancel introduced LFP to additional investors who contributed capital, and during script meetings, offered helpful ideas that Karum incorporated into the script.

59.     But after making a positive first impression, Ancel became largely disengaged, missing numerous calls and meetings, and neglecting his responsibilities, apologetically citing various ongoing personal issues he was having, leaving Karum and Atkins to shoulder an outsized burden relative to the production.

60.     Given the film's limited budget (developed and managed entirely by LFP), all of the filming was set to take place in the Greater Chicago Metropolitan area over a three-week

period, with one week of shooting in April 2022, after which they would resume and complete filming over a two-week period in June 2022.

61.     LFP identified and secured substantially all of the site locations (homes, offices, restaurants, school, etc.) at which scenes were to be filmed.

62.     In light of the aggressive filming schedule, Karum and Atkins anticipated that the days on sets would be long, and that coordination among the producers would be critical to staying on time and budget.

63.     Karum and Atkins reiterated to Ancel that his principal role would be to run the set on days when Karum would have to focus on her work in front of the camera, and reasonably expected that Ancel would conduct himself professionally.

64.     As set forth more fully below, however, Ancel failed to perform competently or professionally, and even in the third-producer role, Ancel became far more of a distraction (particularly on the set) than he was an asset.

65.     Shortly after they began working together, Ancel began to confide in Karum about unhappiness in his marriage, and about extra-marital affairs.

66.     While surprised that Ancel would only discuss personal and sensitive topics like his marriage and infidelity with anyone with whom he was supposed to have a professional relationship, Karum was not bothered by it at first, as she viewed it as a sign that Ancel trusted her enough to confide in her. Thus, Karum tried to be understanding and sympathetic when Ancel confided in her.

67.     During pre-production and thereafter, however, Ancel's continued talk about his affairs became almost boastful in nature and thus increasingly off-putting. Karum felt particularly

uneasy when Ancel told her about following a woman to a weekend yoga retreat in the hopes of rekindling an amorous relationship with her, which Karum considered "creepy" and "stalker-like."

68.     Karum asked Ancel to refrain from discussing his sex life with her any further, but after a brief respite, Ancel could not restrain himself and continued his objectionable chatter about sexual pursuits and conquests, which became particularly problematic when Ancel's inability to control his libido began impacting his work and the production set.

69.     As a producer, it is completely inappropriate to have *any* relationship, consensual or otherwise, with any member of crew or staff.  Yet while on set, Ancel flirted incessantly with a young woman (the props manager) on the crew, even after Karum asked him to stop.

70.     Without regard to Karum's admonition, Ancel continued his amorous pursuit of the female crew member, even leaving the set early on occasion so that he could accompany the crew member to her home, abdicating his responsibilities and leaving Karum and Atkins to handle the producers' responsibilities before filming resumed in the morning.

71.     Jordan also told Karum that he was "really attracted" to another young female staff member. Karum admonished Ancel to act professionally and asked him to focus on the work at hand, since all of the filming for *The Unseen* was going to be compressed into three weeks.

72.     Karum and Atkins continued to admonish Ancel about his behavior (and even privately considered terminating him for cause), prompting Jordan to threaten that "his investors" would pull their money out of the film if he were to be removed from his role as a producer.

73.     Given the already tight filming schedule, and the havoc that would result if investors even threatened to back out, Karum and Atkins elected not to terminate Ancel during filming.

74.     The text below was sent by Ancel to Karum, evidencing both that Ancel's discussed his affairs with Karum, as well as his threats (as the relationship soured) toward Karum discussed more fully below about telling anyone about his affairs.



75.     Once on set, Ancel showed almost no interest in fulfilling the third-producer role and responsibilities for which he was actually hired.

76.     While Ancel induced The Curse to hire him by touting his producer's experience as a valuable resource to Karum and Atkins, Ancel proved largely inept at anticipating even basic production needs or planning ahead for contingencies, instead spending most of his time away from the set glad-handing (rather than managing) the cast and crew.

77.     On one particular night on set at a suburban home location, Ancel simply decided to take a nap on the couch (alongside a young female member of the crew) during filming, while others worked into the night.

78.     Ancel took little initiative and routinely ignored basic administrative responsibilities of a producer. For instance, while shooting on location at a home, a door was damaged in Ancel's presence (Karum was acting, not producing on that date). Ancel was inexplicably combative with the homeowner, and rather than taking charge of the repair, he attempted to first push-off the responsibility to the crew, and then to LFP (without telling LFP), angering the home's owner when the door remained unrepaired for more than a month.

79.     Karum and/or Atkins had to prepare specific task lists for Ancel and regularly monitor his progress with respect to those tasks or they simply would not get done. And still, Karum, Atkins and sometimes Shade would have to pick up the slack from Ancel's neglect, making for extremely long days during pre-production and on set.

80.     On set, Ancel simply refused to accept the role of the third producer for which he was actually hired and looked for every opportunity to portray and comport himself as the film's primary producer.

81.     As with any low budget project with limited days allotted to film, Karum and Atkins anticipated that there would be mistakes, issues and frustrations, and they expected that collectively, the producers would discuss them privately and then present a united front in addressing the issues.

82.     Instead, when cast or crew approached Ancel with any issue, he reflexively blamed others, mostly Karum and/or Atkins (even when it was his fault), abdicating any semblance of leadership or a willingness to make necessary decisions that were unpopular.

14

83.     But other times, when Ancel was eager to portray himself as the one in charge, he would act unilaterally and impulsively, including with respect to personnel decisions.

84.     Moreover, when he did not get his way, Ancel would fly off the handle and get aggressively angry, which he described as "going nuclear."  On set, "You don't want to see me go nuclear," became a common and ominous refrain from Ancel in an effort to get his way, often threatening to have his minority investors "pull their funding" or to have the Screen Actors Guild (SAG) shut down the project.

85.     Ancel also displayed terrible professional judgment, by using marijuana on set—an express violation of SAG—and most disturbingly, giving cannabis-infused gummies to interns, including at least one who was below the legal age of consumption.

86.     Karum, who was not on location at the time of the incident, learned about it from other members of the crew, and she confronted Ancel about his actions. Ancel did not deny the allegations yet became indignant that Karum would even raise the issue, gaslighting her as if she was somehow wrong to insist upon compliance with SAG rules that otherwise put the entire production at risk.  Ancel's texts below reflect the same:




73.     Ancel seemed to have a particular problem taking direction from Karum as a woman.

73.     When Karum would stand her ground, Ancel was misogynistic and verbally abusive, frequently engaging in tirades laced with grotesque profanity that should never be tolerated in any work environment.

74.     Ancel also tried to weaponize Karum's autism, bullying her, and often doing so in front of the cast and crew to embarrass her and foment division on the set, creating an unnecessarily stressful work environment, and one that was particularly difficult for Karum (as someone who is neuro-diverse), who is hypersensitive about resolving conflict.

75.     Other times, Ancel would cruelly mock Karum's autism, telling her and others that Karum merely "uses" autism as a crutch to excuse or justify her actions.

76.     When he was not given access to budget details (to which he was not entitled), Ancel made deliberately false statements to investors and to Mitte's representation that Karum was

misappropriating funds from the production budget (which was carefully monitored by the Unit Production Manager), so that they would demand a review of the books, causing increasing tension and distrust. The investors' ensuing review of the books found no evidence of misappropriation.

77. Ancel's disruptive behavior peaked during the final week of filming. As the writer of *The Unseen,* Karum and the film's Director discussed modest additions to the script (relating to Karum's role) which is both common in the industry, and something that the Director felt was necessary to tie together the storyline.

78. When he learned that the script had been modified without his consultation, Ancel "went nuclear" (to use his term) even though he had contractually agreed that LFP had the exclusive rights with respect to the script, and script revisions.

79. After Karum tersely told Ancel that she would make the changes to the script that she deemed appropriate, Ancel began to spread false rumors among the cast that the script changes were merely driven by Karum's ego, and although the change only involved a *single line of dialogue*, Ancel convinced members of the cast that the change to the script would adversely impact their role and screen time.

80. Ancel's false rumors set-off a firestorm of concerns, which he stoked to make people believe that Karum's continued presence on set threatened production, the completion of the project, and payments to crew.

81. Blind-sided by these false rumors, Karum (unlike Ancel) chose to put the interests of her film before her own personal agenda and volunteered to step away from set for the day so as not to disrupt the already packed schedule for the final days.

82. Then, in the ultimate act of petulance by Ancel, and in an attempt to wrest control away from LFP so as to assume control over the final critical days of shooting, Ancel spread false

rumors, first among the cast (and to the lead actor's mother), and among the crew to make them all believe that that if Karum returned to the set, there would be an exodus of both cast and crew.

83.     Exploiting the chaos he created, Ancel effectively forced Karum to stay away from her own set for the final five days of filming.

84.     In her absence, Ancel relished the opportunity to curry favor with the crew, unilaterally approving overtime requests and hotel charges, without discussing it with Karum or Atkins, and without regard to the fact that the budget could not support such charges.

85.     Before filming concluded, Karum learned that the Director slept in his car after a late night on set and arranged to get him a hotel room (something Ancel should have done).

86.     Karum, who had booked a block of rooms at the Allerton Hotel for Ancel and cast members who hailed from outside the Chicago area, called the hotel to add another room to the block. At the same time, she thought it would be a nice gesture to drop-off goody bags of assorted snacks (that she purchased) to allay tensions regarding her ouster from the set.

87.     When Karum arrived at the hotel, she asked the front desk to deliver the bags to various rooms but was told that as the person who booked the rooms and named on the reservation, that she could be given access to each of the rooms to deliver them herself.

88.     Karum, however, did not want to enter anyone's room, and asked that security handle the deliveries. The hotel instead proposed that she accompany hotel security to the rooms and direct the desired deliveries, to which Karum acquiesced.

89.     The hotel security guard made the deliveries, but in doing so, erroneously used his keys to access the alternate door of the lead actor's hotel suite, startling people in the room. The guard apologized for his oversight and Karum (who was in the hall at the time) personally handed the bag to the person who greeted the security guard, and in the presence of the guard, was invited

into the room by the lead actor's mother. Karum accepted the invitation and the two had a short but pleasant conversation.

90.     When Ancel learned that Karum had engaged with the cast at the hotel, he texted Karum claiming that she had crossed the line, was a "psychopath," and threatened to call the police.

91.     In response, Karum advised Ancel that she had not entered any room, and that security had entered simply to deliver gifts, all of which the security guard confirmed.

92.     Nevertheless, despite knowing the truth, Ancel purposefully and falsely told the cast and crew that Karum had "broken into" cast hotel rooms, citing it as proof that she was vengeful and that her presence was "dangerous."

93.     Ancel also falsely advised the hotel that Karum was no longer involved with the project and that she should not be permitted to access any of the rooms in the block.

94.     Ancel then convinced cast and crew that it would be "dangerous" to attend official *The Unseen* "wrap-party" that had been planned, and decided to have his own unofficial wrap-party from which Karum and Atkins would be banned from attending in the interests of "safety."

95.     At his unofficial party, Ancel made new and unwelcomed advances towards at least one woman in the crew who complained to the film's Unit Production Manager that Ancel would not leave her alone at the party, even though the woman's boyfriend was present, and asked him to stay away from them.

96.     In his final act of sabotage, Ancel decided to fly home before filming had concluded, and rather than risk allowing Karum to speak directly to cast or crew outside his presence, announced that the final day of shooting (including a critically important scene) had been canceled, causing confusion among cast and crew that had planned to be on set to complete their final scenes/shots.

97.     Representatives of SAG had to intercede to make sure that cast and crew knew that shooting had not been cancelled, and that they were expected to be there to complete filming. Karum returned to the set without incident to oversee filming on that day.

**Karum Advises Ancel that his Services Would Not Be Needed During Post-Production**

98.     After filming ended, Ancel was advised by LFP that his services would no longer be necessary, relieving him of any post-production responsibilities.  Instead, Karum and Atkins, as lead producers, oversaw all aspects of post-production.

99.     Ancel demanded that he be included in the efforts to obtain distribution of the film but was again advised that his services were not necessary or desired and was expressly reminded that the Producer Agreement that he signed made clear that LFP had the exclusive right to control distribution.

100.     Ancel became irate at his *de facto* termination, sending Karum a barrage of profanity-laced texts that were as vile and offensive as they were threatening, referencing his desire to "burn her life down," and "ruin" her and her Company, including communications set forth in **Group Exhibit C**.

101.     Moreover, despite contractually ceding to LFP the exclusive control over publicity of the film, Ancel began to reach out directly to media touting his role in *The Unseen,* called it the film that *he* produced, a claim he would regularly repeat across social media over the coming months in complete and total disregard of the express provisions of the Producer Agreement.

102.     When *The Unseen's* actual publicist politely asked Ancel to refrain from contacting media on behalf of *The Unseen*, he attempted to bully her via texts submitted herewith as **Exhibit D.** She reported Ancel's attack to *The Unseen*'s counsel and refused to have any further contact with him.

103.     Notably, when Ancel learned that the film's publicist was also the publicist for a prominent and coveted Los Angeles film festival (to which *The Unseen* was invited, he sheepishly apologized for what he admitted was his embarrassing behavior, explaining that he believed that she was someone aligned with Karum, effectively admitting that his actions were driven by his animus toward Karum, and highlighting his malicious intentions in targeting Karum.

104.     Ancel then decided to make good on his threats to "ruin" Karum and LFP, and to "burn her life down."

105.     On information and belief, he responded by telling anyone who would listen that Karum was "dangerous," falsely telling people that she baselessly had accused him of sexual assault (which she did not).

106.     Ancel also commenced a suit against Karum sounding in False Light Invasion of Privacy and Defamation, specifically repeating the allegation that Karum wrongly accused him of sexual assault.

107.     While Ancel's complaint alleges that Karum made false statements that painted him in a "false light," the truth is that it was Ancel who widely disseminated the complaint on social media, and even (via his counsel) to at least one industry publication (Reel Chicago) to spread the lie that Karum had falsely accused him of sexual assault.

108.     Then, portraying himself as the victim, Ancel boasted publicly that he had a strategy for "taking down" Karum "in an epic way."

109.     Ancel began to falsely represent across social media that there was a class action suit against Karum and/or LFP in the works, in an effort to mislead people into believing that Karum had a history of making false accusations and encouraging people to spread the word about it.

110.     In the meantime, after rallying his sycophants to speak out against Karum on social media, Ancel was confronted in Court about the lack of any proof that Karum had ever made any such false allegation of assault against him.

111.     Tellingly, Ancel dropped the allegations about Karum's accusation of sexual assault, tacitly admitting that the claim was baseless, yet never took steps to correct or clarify his broad public statements to the contrary, causing severe and substantial reputational harm to Karum.

112.     Moreover, Karum has been harassed and cyber bullied by Ancel and his supporters.

113.     Any time that someone promotes an engagement or project with LFP, they are inundated with comments, messages and/or communications with a coordinated warning or theme—that working with Karum and LFP are "dangerous," and falsely claiming that Karum had been blackballed in the Chicago film community, myths that Ancel started and has actively promulgated directly, and through his proxies.

114.     Ironically, after the dust settled over Ancel's vicious rumors on set, substantially all of the cast and crew attended the premiers of The Unseen in both Los Angeles and Chicago with the allegedly "dangerous" Karum without any incident, while it was Ancel who was legally prohibited from attending either premier based upon the statements of multiple witnesses to his abusive and threatening behavior.

115.     And others have since come forward to relay similar accounts and experiences with Ancel citing his lack of professionalism, work ethic and volatile and otherwise inappropriate behavior.

116.     Yet Ancel and his followers have brazenly continued to harass and malign Karum and LFP in messages and across social media (including in groups with tens of thousands of

members).  A small representative sample of the orchestrated and far-reaching smear campaign directed at or about Karum and LFP is set forth in **Group Exhibit E** submitted herewith.

117.    As a result of Ancel's campaign, at least one Facebook Group has now begun expelling from its ranks any members that works with Karum or LFP, or even has Karum among their Facebook friends.

118.    Other smears have been sent anonymously to LFP clients, prospects and partners using Gmail accounts under fictitious or truncated names to avoid detection.

119.    And spoof emails sent via Gmail that are designed to appear to the recipient as if they had been sent by Karum or Atkins have been sent to one or more people, including at least one former LFP intern.

120.    On information and belief, Ancel is responsible for all or substantially all of the false and misleading smears against Karum and LFP, described above which have either been sent by him or at his express direction by those seeking favors or opportunities in return, including Rose.

121.    On information and belief, Ancel has stealthily orchestrated these attacks (using, among other things, communication applications that cannot be traced (at least without assistance of a forensic exam of the subject computer and mobile devices he uses).

122.    Among others, on information and belief, Ancel has encouraged Rose to attack and bad-mouth Karum on social media, and to Chicago area casting agents and/or agencies.

123.    As set forth above, Rose was an actor on *The Unseen* (cast by LFP), who had previously engaged LFP to create a scene for her demo reel, and for which she gave LFP a glowing review:

**Candice Rose, Demo Scene client**
The entire team at Lakefront Pictures is extremely efficient, accommodating and professional. Each department puts their heart and soul into the production, from start to finish. As an actor, I wanted a real on-set experience to perform to the best of my ability. Lakefront Pictures afforded me that opportunity, & I am pleased to say that I got what I paid for and more. If you need a demo reel clip that looks and feels like a real life experience and you don't know where to start, consider Lakefront Pictures! You'll feel like the you were born to be.

124. Notably, because their respective scenes were shot during different weeks, Rose *was never even on set with Karum*, yet has since taken to maliciously echo Ancel's false smears to casting directors and others about her experience, including that Karum is "dangerous."

125. As a result of the coordinated smear campaign against Karum and LFP, a number of LFP clients canceled their contracts with the company, including contracts to film and produce demo reels, contract to sponsor an industry event, and a contract for post-production editing.

126. At least one freelance engineer with which LFP had worked productively and without incident in the past, cut ties with LFP specifically citing what they heard (ostensibly by Ancel) was a lawsuit against LFP, when in fact, LFP had not been named in any suit, clearly suggesting that he had been told about a pending suit rather than having actually seen the complaint.

127. Another freelancer with which LFP had worked productively and without incident in the past, cut ties with LFP specifically citing threats that anyone who worked with LFP would be blackballed from work in the area.

128. Similarly, at least one prospective partner in a project, with which discussions regarding investment and assistance with distributions had substantially advanced, precipitously ended negotiations citing to pending litigation "against the company," again suggesting that it had been told about a pending suit rather than having actually seen any complaint.

129. LFP also was injured when interns that had accepted opportunities with the Company, reversed their acceptances, citing the allegations made against Karum.

130.     Moreover, one independent casting agency has suddenly distanced itself from LFP, again citing the concern over "safety."

131.     On information and belief, Ancel has directed, encouraged, incentivized and/or rewarded those who have piled on as part of his targeted smear campaign, including among others, Rose, Karel Ramirez, Rosaleah Gonzalez, Aaron Hawkins, and Samantha Spellman.

132.     As a result, Ancel and those working in coordination with him have caused substantial damages to LFP, namely hundreds of thousands of dollars in lost revenue and profits to date, and an untold number of lost professional opportunities.

133.     In addition, LFP and Karum have suffered substantial reputational harm that cannot be easily quantified or remediated and face the prospect of having to invest heavily in a lengthy public relation campaign to address the extensive disinformation propagated about LFP and Karum that has been spread by Ancel and/or his co-conspirators.

## COUNT I

### (Against Ancel for Defamation)

134.     Karum incorporates by reference the allegations of paragraphs 1-133 above.

135.     As set forth below, Ancel made false statements about Karum, with full knowledge of their falsity, first in an effort to gain control of the project so that he could claim to have had a larger role than the third producer he contracted to fill, and then out of spite to embarrass, harass and damage Karum's reputation after she excluded him from any post-production activities.

136.     Ancel's false representations to investors and others on set that Karum had misappropriated money from the budget was defamatory *per se*.

137.     Ancel's false statements to the cast that Karum had "broken into" hotel rooms were defamatory *per se.*

25

138.    And Ancel's false statements published to numerous third parties that Karum had wrongfully accused him of sexual assault, made before and after he filed his suit, were defamatory *per se*.

139.    All of these false and defamatory statements were made purposefully and with malice, with the intention of causing reputational and economic harm to Karum.

140.    Karum has been injured as a result of Ancel's defamatory statements.

141.    Ancel has acted willfully, justifying an award of punitive damages to punish him and dissuade such tortious conduct in the future.

WHEREFORE, Karum prays for judgment in her favor and against Ancel as to Count I, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

## **COUNT II**

### **(Against Ancel for False Light Invasion of Privacy)**

142.    Karum incorporates by reference the allegations of paragraphs 1-141 above.

143.    As set forth above, Ancel broadly published claims about Karum, including across multiple social media channels.

144.    Ancel's statements regarding Karum were false, and placed Karum in a false light that is both offensive and unprofessional.

145.    Ansel published these statements with knowledge of their falsity, and with the express intention of harming Karum's reputation.

146.    Ancel has acted willfully, justifying an award of punitive damages to punish him and dissuade such tortious conduct in the future.

WHEREFORE, Karum prays for judgment in her favor and against Ancel as to Count II, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

## COUNT III

### (Against Ancel International for Breach of the NDA)

147.    LFP incorporates by reference the allegations of paragraphs 1-146 above.

148.    The NDA is a valid and enforceable contract.

149.    As set forth above, Ancel materially breached the NDA, both through social media, and by filing an unsealed and unredacted complaint that gratuitously discuss the project and disparages parties associated therewith, which he, in turn, widely circulated via social media and for which he actively sought publicity.

150.    In addition to forfeiting producer credit, Ancel's material breach of the NDA has caused damage to LFP.

WHEREFORE, LFP prays for judgment in its favor and against Ancel International as to Count II, and an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

## COUNT IV

### (Against Ancel and Rock City for Recission of the Producer Agreement)

151.    The Curse incorporates by reference the allegations of paragraphs 1-150 above.

152.    The Producer Agreement is a valid and enforceable contract.

153.    The Curse performed its obligations due to date pursuant to the Agreement.

154.    As set forth above, Rock City and Ancel failed to perform duties under the Agreement in a workmanlike manner, including among other things, violating SAG Rules

regarding drug use on set, giving THC infused gummies to an underage intern, and disrupting production at every turn.

155.    There was a complete and total failure of consideration on Rock City's and Ancel's part with respect to the Producer Agreement, warranting a recission of the Agreement, disgorgement of sums paid to Rock City, stripping Ancel of third-producer credits, and relieving The Curse from making any future payments to Rock City.

WHEREFORE, The Curse prays for judgment in its favor and against Rock City as to Count IV, rescinding the Producer Agreement for the complete failure of consideration, and ordering the disgorgement of all compensation and credit received by Ancel to date, and for such additional relief that this Court deems just and appropriate.

## COUNT V

**(Against Rock City and Ancel for Breach of the Producer Agreement)**

156.    The Curse incorporates by reference the allegations of paragraphs 1-155 below.

157.    The Producer Agreement is a valid and enforceable contract.

158.    The Curse performed its obligations due to date pursuant to the Agreement.

159.    Rock City is a mere subterfuge formed by Ancel to shield himself from liability for his misconduct. There is a complete and total unity of interest between Rock City and Ancel.

160.    On information and belief, Rock City was at all times substantially undercapitalized, and the entity has since been dissolved.

161.    As set forth above, Ancel failed to perform his duties under the Agreement in a workmanlike manner, and otherwise breached the Producer Agreement in the manner described above.

162.    As a direct and proximate cause of Ancel's breaches, The Curse has been damaged as described above.

163.    The veil between Rock City and Ancel should be pierced, and they should be jointly and severally liable for the damages that they caused.

WHEREFORE, The Curse prays for judgment in its favor and against Rock City and Ancel, jointly and severally, as to Count V, and an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

## COUNT VI

### (Against Ancel and Doe Defendants 1-20 For Tortious Interference)

164.    LFP incorporates by reference the allegations of paragraphs 1-163 above.

165.    LFP is a party to valid and enforceable contracts described above, and was in pursuit of additional prospective contracts, and in forging networking and referral relationships from which it had a reasonable expectation of profiting.

166.    Ancel and the Doe Defendants, through their smear campaign and direct acts of interference described above, caused the termination of those contracts, and prevented the prospective contracts and relationships from being solidified.

167.    As a direct and proximate result of the referenced interference, LFP has been injured.

168.    Ancel and the Doe defendants have acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

WHEREFORE, LFP prays for judgment in its favor and against Ancel and the Doe Defendants as to Count VI, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

## COUNT VII

### (Against Ancel for Intentional Infliction of Emotional Distress)

169.    Karum incorporates by reference the allegations of paragraphs 1-168 above.

170.    Ancel's conduct towards and treatment of Karum described above was both extreme and outrageous.

171.    Ancel acted with actual malice, and as described above, acted with the express intention of causing severe emotional distress to Karum.

172.    Ancel was aware that Karum is on the autism spectrum, and he purposely exploited Karum's sensitivities and vulnerability associated with her being neuro-diverse.

173.    Ancel acted willfully, justifying an award of punitive damages to punish him and dissuade him from engaging in such tortious conduct in the future.

WHEREFORE, Karum prays for judgment in her favor and against Ancel as to Count VII, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

## COUNT VIII

### (Against Ancel, Rose and Doe Defendants 1-20 for Civil Conspiracy)

174.    LFP incorporates by reference the allegations of paragraphs 1-173 above.

175.    As set forth above, Ancel, Rose and the Doe Defendants conspired and agreed to engage in a coordinated tortious campaign of harassment against LFP and its principals, and interference with LFP's business with the express purpose of injuring LFP.

176.    Ancel, Rose and the Doe Defendants took acts, described above, in furtherance of the referenced conspiracy.

177.  LFP has suffered economic loss and reputational harm as a direct and proximate result of the referenced conspiracy.

178.  Ancel, Rose and the Doe Defendants acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

WHEREFORE, LFP prays for judgment in its favor and against Ancel, Rose and the Doe Defendants as to Count VIII, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

## COUNT IX

### (Against Ancel, Rose and Doe Defendants 1-20 for Civil Conspiracy)

179.  Karum incorporates by reference the allegations of paragraphs 1-178 above.

180.  As set forth above, Ancel and the Doe Defendants conspired and agreed to engage in a coordinated tortious campaign against Karum, personally, with the express purpose of causing her to suffer financial injury and emotional distress.

181.  Ancel and the Doe Defendants took acts, described above, in furtherance of the referenced conspiracy.

182.  Karum has suffered economic loss and reputational harm as a direct and proximate result of the referenced conspiracy.

183.  Ancel, Rose and the Doe Defendants acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

WHEREFORE, Karum prays for judgment in her favor and against Ancel, Rose and the Doe Defendants as to Count IX, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

31

## COUNT X

### (Against Rose for Breach of Contract)

184.    LFP incorporates by reference the allegations of paragraphs 1-183 below.

185.    Rose entered into a contract with LFP to create, write, produce, film, and edit a demo scene for her (the "Demo Agreement").   A copy of the Demo Agreement is submitted herewith as **Exhibit F.**

186.    Per the terms of the Demo Agreement, Rose agreed to, among other things, refrain from committing any act "which might tend to bring [LFP,] its members or owners into public disrepute, scandal or ridicule, or which might tend to reflect unfavorably on the company…or to injure the success of [LFP]."

187.    In 2021, Rose published a glowing review of LFP for its work on completed her demo scene.

188.    In 2023, however, and on information and belief, at Ancel's urging, Rose began to slander and malign LFP on social media, in express breach of her obligations under the Demo Agreement.

189.    As a direct and proximate result of Rose's breach of the Demo Agreement, LFP has been injured.

WHEREFORE, LFP prays for judgment in its favor and against Rose as to Count X, for an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

**JENNIFER KARUM, LFP PICTURES, LLC, and THE CURSE, LLC**

By: _____
          One of their Attorneys

George J. Spathis (No. 6204509)
LEVENFELD PEARLSTEIN, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
(312) 346-8380
gspathis@lplegal.com

# EXHIBIT A

As of March 9, 2022

Rock City Road Films LLC
c/o Jordan Ancel
_____
_____

**Re:      "THE UNSEEN" Producer Agreement**

Dear Jordan:

This agreement is made and entered into as of the date written above, by and between The Curse LLC ("Production Company") and Rock City Road Films LLC ("Lender") f/s/o Jordan Ancel ("Ancel") concerning Ancel's services as producer in connection with the feature-length motion picture presently known as THE UNSEEN (the "Picture").  The parties hereto agree as follows:

**1. Employment/Services.** Provided Ancel is available when and where reasonably required by Production Company, Production Company shall engage Ancel as Producer for the Picture, and Lender and Ancel accept such employment, upon the terms and conditions herein contained. Ancel shall render all services customarily rendered by producers in the motion picture industry with respect to the development, pre-production, production and post-production of the Picture as and when reasonably required by Production Company and in accordance with the terms hereof, including without limitation, attending all reasonably required pre-production meetings (which may be via videoconference or telephone conference, handling requests of other producers, attending producer meetings and rendering in-person on-set assistance as needed commencing one week in advance of principal photography (the "Services").

**2. Term.** Ancel's services hereunder shall commence on or about June 30, 2021 (in accordance with the pre-production and production schedule as determined by the Production Company  in consultation with Ancel) until and through complete delivery of the Picture including all delivery requirements provided by any sales agent and/or any applicable distributor. Such services shall be rendered on a non-exclusive basis during pre-production, exclusive during principal photography and non-exclusive during post-production on the Picture, provided however, that any services which Ancel may render for third parties or on Ancel's own account during non-exclusive periods shall not materially interfere with the timely performance of Ancel's services and obligations hereunder.

**3. Compensation.**

**3.1**  As full and complete consideration for all of the undertakings and services of Ancel and all rights and materials herein purchased, granted and agreed to be granted and upon the condition Ancel shall fully and faithfully complete all services that may be required hereunder and

1

provided that Ancel is not in material uncured breach hereof, Production Company shall pay to Lender, and Lender and Ancel shall accept, the following**:** a fee of $5,000 payable as follows: (a) $2,500 upon the commencement of principal photography on the Picture, April 17, 2022; (b) $2,000 upon commencement of June 06, 2022 photography on the Picture (c) $500 upon delivery of the final cut of the Picture to Production Company in accordance with the requirements of the sales agent and/or distributor(s) of the Picture. Lender and Ancel acknowledge and agree that the fee pursuant to this section 3.1 is on a "flat fee" basis and that neither Lender nor Ancel shall be entitled to any additional and/or so-called "overage" compensation for any services rendered by Ancel in connection with the Picture. No additional payments shall be or become payable to Lender Ancel for Ancel's rendering of services on behalf of the Picture at night, on weekends, or during holidays except as otherwise set forth herein.

**3.2** In addition to the Compensation as contained in 3.1 above and upon the condition Ancel shall fully and faithfully complete all services that may be required hereunder and provided that neither Lender nor Ancel is in material uncured breach hereof, Lender shall be entitled to receive Three Percent of One Hundred Percent (3% of 100%) of the "Net Profits" of the Picture, if any. The timing, manner of payment and definition of Net Profits (attached hereto as Exhibit A) will be no less favorable than that accorded to any other individual or entity receiving a share of Net Profits on the Picture.

**3.3** Nothing herein shall be deemed to obligate Production Company to use Ancel's services, or the results of such services in the Picture, to produce, release or distribute the Picture or to continue the release and distribution of the Picture if released or to otherwise exploit any rights granted to Production Company hereunder. Production Company shall have fully discharged its obligations hereunder by payment to Lender of the compensation as set forth herein.

**4. Credit.** In the event that the Picture is produced by Production Company and provided Ancel performs all of his material services hereunder and that neither Lender nor Ancel is in material uncured breach hereof, Production Company shall accord Ancel a "Producer" credit on-screen on either no less than the single third producers' card or, at Production Company's discretion, the second producers card, shared only with Ryan Atkins, in the main titles on all positive and/or digital prints of the Picture. Such credits shall be of the same size, type, duration, manner of placement and boldness as all other similar credits and shall appear wherever and whenever any other similar credits on the Picture appear or are otherwise listed. All other matters relating to credit shall be determined by Production Company in its sole and exclusive discretion and subject to the standards and operating policies and practices as established and determined by the network, studio or similar party. No inadvertent or casual failure by Production Company or any failure by a third party to accord the credit provided herein shall be deemed a breach of this Agreement.

**5. Use of Name, Voice and Likeness.** Lender and Ancel agree that Production Company shall have the right, but not the obligation, to use Ancel's name, approved voice and approved likeness, such approval not to be unreasonably withheld or delayed, in and in connection with the Picture and/or any other use or exploitation of the results and proceeds of Ancel's Services hereunder, and in connection with the advertising (including without limitation, trailers),

2

exhibition and/or other exploitation of any of the foregoing including commercial advertising and publicity tie-ups relating thereto provided, however, that no such use in connection with commercial advertising or publicity tie-ups other than in connection with the Picture shall be permitted without Ancel's prior written consent. Ancel agrees that Production Company shall have the sole and exclusive right to issue publicity concerning Ancel with respect to the Services hereunder provided that no use by Production Company of Ancel's name in connection with the Picture shall be in any way derogatory or defamatory.

**6. Results and Proceeds of Services.** Lender and Ancel understand and agree that Ancel is being employed on a work-for-hire basis (as that term is understood under Title 17 of the U.S. Code as the same may be amended from time to time), and that Production Company shall solely and exclusively own, and Lender and Ancel hereby transfer to Production Company, all rights, titles and interests in and to the Picture and all results and proceeds thereof and of all of Ancel's work product hereunder and otherwise associated with the Picture, in whatever stage of completion as may exist from time to time, including but not limited to all rights of whatever kind and character, throughout the universe, in perpetuity, in any and all languages, of copyright, trademark, patent, production, manufacture, recordation, reproduction, transcription, distribution, recreation, copying, performance, broadcast and exhibition by any art, technology, method or device now known or hereafter devised, including without limitation, radio broadcasting, electronic and/or digital download or streaming via the Internet or any other platform, technology or device now known or hereafter devised; theatrical and non-theatrical exhibition; and television exhibition or otherwise, whether such results and proceeds consist of literary, dramatic, musical, motion picture, digital, electronic, mechanical or any other form of works, themes, ideas, compositions, creations or products. Production Company's acquisition hereunder shall also include all rights generally known in the field of literary and musical endeavor as the "moral rights of authors" in and/or to the Picture and any musical and/or literary proceeds of Ancel's Services. Production Company shall have the right but not the obligation with respect to the Picture and the results and proceeds thereof, to add to, subtract from, change, arrange, revise, adapt, rearrange, make variations of,, modify, market, exploit and/or translate the same into any and all languages, change the sequence, change the characters and the descriptions thereof contained therein, change the title of same, record and photograph the same with or without sound, including spoken words, dialogue and/or music synchronously recorded, use said title or any of its components in connection with works or motion pictures wholly or partially independent thereof in new versions, adaptations, prequels, sequels and/or spin-offs in any and all languages and to obtain, register and renew copyright therein in Production Company's name throughout the universe. Lender and Ancel hereby expressly waive any and all rights which Lender and/or Ancel may have either in law, in equity or otherwise which Ancel may have or claim to have as a result of any alleged infringements of Ancel's so-called "droit moral" or "moral rights" of authors. Lender and Ancel acknowledge that the results and proceeds of Ancel's Services shall be considered to be works made for hire for Production Company and therefore, Production Company shall be the sole author and copyright owner of the results and proceeds of Ancel's Services hereunder. Notwithstanding the foregoing, if the Picture is determined not to be a work made for hire, whether by a court of competent jurisdiction or otherwise, any and all rights, titles and interests including without limitation the copyright and any renewal rights in and to the Picture and all of the results and proceeds of Ancel's Services

3

hereunder shall be deemed to have been transferred, conveyed and assigned to Production Company on the same terms as described above. All rights granted or agreed to be granted to Production Company hereunder shall vest in Production Company immediately and shall remain vested and survive whether this Agreement expires in normal course or is terminated for any cause or reason. Lender and Ancel acknowledge and agree that Ancel acquires no rights, titles or interest in or to the Picture or any portion thereof under this Agreement and/or from or as a result of any Services provided by Ancel hereunder. Lender and Ancel hereby irrevocably assign, license and grant to Production Company exclusively throughout the universe and in perpetuity, the rights, if any, of Lender and/or Ancel to authorize, prohibit and/or control the renting, lending, fixation, reproduction and/or other exploitation of any motion picture produced based on the Picture (or any rights therein) by any and all media and means now known or hereafter devised as may be conferred upon by Lender and/or Ancel under applicable laws, regulations or directives including without limitation any so-called "Rental Lending Rights" pursuant to any European Union or successor entity (the "EU") or pursuant to any individual (non-U.S.) country's directives and/or enabling or implementing legislation, laws or regulations enacted by the EU or such individual country.

**7. Indemnity:** Lender and Ancel will indemnify and hold harmless Production Company, its successors and assignees, from and against any and all damages, costs, expenses, liabilities, claims and causes of action in any way arising by reason of the breach of any warranty or representation by Lender and/or Ancel hereunder or any other provision in this Agreement including, without limitation, reasonable outside attorneys' fees and costs in the defense and disposition of such matters. Likewise, Production Company will defend, indemnify and hold harmless Lender and Ancel, their successors and assignees, from and against any and all damages, costs, expenses, liabilities, claims and causes of action in any way arising by reason of the breach of any warranty or representation by Production Company hereunder or any other provision in this Agreement and the development, production and exploitation of the Picture, including, without limitation, reasonable outside attorneys' fees and costs in the defense and disposition of such matters.

**8. Insurance.** At Production Company's expense, Production Company may secure life, accident, cast or other insurance on Ancel and Ancel shall furnish such information, fill out and sign such forms, and undergo such physical examinations as reasonably may be required. The proceeds and ownership of such insurance shall be solely Production Company's, and Ancel shall not have any right, title or interest therein.

**9. Remedies.** Lender and Ancel acknowledge and agree that the sole remedy available to them for Production Company's breach of or non-compliance with any of the provisions of this Agreement shall be an action at law for damages and in no event shall Lender and/or Ancel seek or be entitled to injunctive or other equitable relief for any such breach or non-compliance of this Agreement.

**10. Representations and Warranties**. Lender and Ancel represent and warrant that they have the right and power to enter into and fully perform this agreement and that she has not done and will not do anything which may impair any of the rights granted to Production Company. Lender and Ancel warrant and represent that the results and proceeds of Ancel's Services

4

hereunder shall be wholly original to Ancel except to the extent based on material in the public domain and, to the best of Lender and Ancel's knowledge, shall not infringe upon or violate the copyright, right of privacy, right against defamation, right of publicity, or any other personal or proprietary right of any person.

**11. Suspension and Termination:** Upon written notice to Lender and/or Ancel (which may be given by email) Ancel's Services and the accrual of compensation hereunder shall be suspended during all periods of Force Majeure (as defined in section 13 below) and/or when:

(a) Ancel's Incapacity: If, by reason of mental or physical disability, Ancel shall be unable to perform or comply with any of his respective duties or the applicable terms or conditions hereof ("Incapacity") for more than five (5) days in the aggregate during the principal photography of the Picture, or more than two (2) weeks in the aggregate during any time during the Term.

(b) Termination: The Term is not guaranteed and may be terminated by Production Company as follows without any further obligation to Ancel except as set forth in this Paragraph 11(b), Production Company may terminate this Agreement and the Term hereof for "Cause", which, as used herein, shall mean for a reason stated in Paragraph 11(b)(i) or 11(b)(ii) below, whereupon Production Company may terminate this Agreement at any time up until the completion of all Services provided hereunder, including all of Ancel's obligations and liabilities hereunder, upon written notice to Ancel. Alternatively, Production Company may terminate this Agreement and the Term hereof without Cause and without any further obligation to Ancel other than its obligation hereunder to pay Lender any Fees accrued and otherwise payable solely through the date prior to such termination in accordance with the terms of this Agreement. Except as provided above, Production Company shall have no further obligations to Lender and/or Ancel in the event of any termination hereof. The provisions of this Paragraph 12 are in addition to and not exclusive or in limitation of any other rights or remedies Production Company may have under this Agreement or at law or in equity.

(i) Of an Incapacity subject to the provisions of Section 11(a); or

(ii) If Ancel fails or refuses to perform or comply with any terms or conditions hereof other than by reason of Incapacity ("Default"), then prior to termination of this Agreement by Production Company based upon Default, Production Company shall notify Ancel in writing, specifying the nature of the Default, and Ancel shall have 24 hours after receipt of such notice to cure the Default. If the Default is not cured within the 24 hour period, Production Company may terminate this Agreement forthwith. Default shall not include any failure or refusal of Ancel to perform or comply with the material terms and conditions of this Agreement by reason of illness or incapacity of third parties, a Force Majeure Event as defined below, or a breach or action by Production Company which makes the performance by Ancel of the Services impossible, and Ancel shall set out in writing to Production Company within 24 hours of receipt of written notice

5

of termination for Default the basis of its reason (and justification therefor) for such breach or action or such termination shall become final.

(c) Further Effect Of Termination: Subject to limitations otherwise provided herein, and whereby Ancel has not been terminated for Cause, termination of this Agreement, Ancel's right to indemnification and insurance coverage shall survive termination hereby.

(d) Effect of Suspension: If any Force Majeure, Incapacity or Default should occur prior to the commencement of principal photography, the commencement of principal photography may be postponed by Production Company for a period equal to the duration of such Force Majeure, Incapacity or Default, not to exceed six (6) months in the aggregate and such postponement shall not be deemed a suspension of this Agreement or Ancel's Services; provided, that Production Company may reduce the period of postponement in Production Company's own discretion upon notice thereof to Lender and/or Ancel. In the case of such a suspension, Production Company agrees to meaningfully consult with Ancel regarding the rescheduling of the production period so long as Ancel's scheduling requirements result in no more than reasonable and non-material additional added expense for Production Company. Any suspension shall be for the duration of any such Force Majeure, Incapacity or Default plus such reasonable period of time as may be reasonably deemed necessary by Production Company to commence or recommence pre-production, production, or post-production of the Picture. A suspension shall not relieve Lender and/or Ancel of any of Ancel's obligations to perform hereunder.

**12. Force Majeure Event.** If, by reason of fire; earthquake; war; riot; labor dispute, pandemic, lock-out or strike; act of God or public enemy; accident; civil disturbance; law, enactment, rule, regulation, restraint, order or act of any governmental instrumentality or military authority; failure or inability to obtain any necessary permit or license; failure of technical facilities; inability to obtain sufficient labor, technical or other personnel (including without limitation cast or crew members); failure, delay or reduction in transportation facilities or water, electricity or other public utilities; death, disability or disfigurement (with respect to cast only), or unavailability of or inability to obtain life, accident, cast, or health insurance for, a principal cast member, the director, any other producer or key crew member or inability to obtain visas, labor permits or other governmental licenses for any such persons; or other cause beyond Production Company's control or which Production Company could not by reasonable due diligence have avoided, Production Company is prevented from or hampered in the development or production of the Picture, or if, Production Company's production of the Picture is postponed or suspended by reason of the closing of the production facility at which Production Company intends to film the Picture or because substantially all the theatres in the United States close or cease to exhibit motion pictures for any reason, or if, by reason of any of the aforesaid contingencies or any other cause or occurrence outside Production Company's control, the preparation, commencement, production or completion of the Picture is hampered, interrupted or interfered with, or if Production Company's normal business operations are hampered or otherwise interfered with by virtue of any disruptive events which are beyond Production Company's control (each a "Force Majeure Event"), then Production Company may postpone the commencement of or suspend the rendition of Services by Ancel and the running of time hereunder for such time as the Force

Majeure Event shall continue and no compensation shall accrue or become payable to Lender hereunder during the period of such suspension.

**13. Covid Protocols**.   Lender and Ancel acknowledge and agree that Ancel and all of Ancel's Production Company-approved guest(s) (if any) shall comply with all of Production Company's reasonable production guidelines, procedures, and protocols (including, without limitation, compliance and execution of Exhibits B and C, attached hereto and incorporated herein by this reference, and compliance with and execution of all of Production Company's COVID-19 safety and production guidelines, procedures, and protocols).

    a.  <u>COVID-19 Required Disclosures</u>: In addition to the above, Ancel acknowledges and agrees that it is of the essence of this Agreement that Ancel **IMMEDIATELY** notify (and requires all of Ancel's Company-approved guest[s] to immediately notify) Production Company in writing in the event Ancel and/or Ancel's Production Company-approved guest(s) know or have a good faith reason to believe any of the following has occurred (and to follow all CDC, government, legal, and medical orders, statutes, guidelines, and requirements in connection thereto [including, without limitation, mandated self-quarantine and isolation]):

        i.  Ancel and/or Ancel's Production Company-approved guest(s) experiences or has experienced symptoms commonly associated with COVID-19 (or mutations thereto) any time prior to, during, or within fourteen (14) days after providing services in connection with the Project and/or visiting the set and/or any other production location for the Project; or

        ii.  Ancel and/or Ancel's Production Company-approved guest(s) tests positive for or is diagnosed with COVID-19 (or a mutation thereof) at any time prior to, during, or within fourteen (14) days after providing services in connection with the Project and/or visiting the set and/or any other production location for the Project; or

        iii.  Ancel and/or Ancel's Production Company-approved guest(s) are apprised of facts or have good faith reason to believe that Ancel and/or Ancel's Production Company-approved guest(s) has come into contact with someone with a confirmed case of COVID-19 (or mutation thereof) or has symptoms commonly associated with COVID-19 at any time prior to, during, or within fourteen (14) days after providing services in connection with the Project and/or visiting the set and/or any other production location for the Project.

Violation by Ancel and/or Ancel's guest(s) of this Paragraph 13 shall be deemed a material breach of this Agreement.  Additionally, any failure by any of Ancel's Production Company-approved guest(s) (if any) to comply with this Paragraph 14 shall result in the immediate removal of any such guest(s).

**14**. **Assignment.**    Production Company shall have the right to assign this Agreement to third parties for the production of the Picture and/or shall have the right to loan Ancel's services out to such third party production company for the production of the Picture.  Upon such assignment, and on the condition that such third party production company assumes all of Production Company's obligations to Ancel herein in writing, Production Company shall be relieved of its obligations to Ancel hereunder.

**15.**    **Choice of Law.**  This Agreement will be governed by the internal substantive laws of the State of Illinois and the Federal laws of the United States applicable to agreements executed and to be wholly performed herein and will not be modified except by written amendment signed by both parties hereto.

**16.  Entire Agreement**.  This Agreement contains the full and complete understanding between the parties with reference to the within subject matter, supersedes all prior agreements and understandings whether written or oral pertaining thereto, and cannot be modified except by written instrument signed by each party.  Ancel acknowledges that in entering into this Agreement Ancel has not relied on any representation not expressly contained herein.

Very truly yours,


_____
The Curse LLC
By:
Its:

AGREED TO AND ACCEPTED


_____
Rock City Road Films LLC
By: Jordan Ancel
Its: Authorized Representative


**ARTIST'S INDUCEMENT**

In order to induce The Curse LLC ("Production Company") to enter into the foregoing agreement with Rock City Road Films LLC ( "Lender"), and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby consents and agrees to the execution and delivery of said agreement by Lender and hereby agrees to render all the required, material services therein provided to be rendered by the undersigned, to grant all the rights granted therein and to be bound by and duly perform and observe each and all of the terms and conditions of said agreement regarding performance or compliance on the undersigned's part, and

hereby joins in all warranties, representations, agreements and indemnities made by Lender and further confirms the rights granted to Production Company under said agreement and hereby waives any rights of droit moral or similar rights which the undersigned may have. The undersigned further waives any claim against Production Company for wages, salary or other compensation of any kind paid to Lender (f/s/o the undersigned) pursuant to said agreement or in connection with the motion picture and the exercise by Production Company of rights therein or derived therefrom (provided, however, that such waiver shall not relieve Production Company of any of its obligations to Lender under said agreement), and, unless the undersigned is deemed substituted as a direct party hereto, the undersigned agrees to look solely to Lender for any and all compensation that the undersigned may become entitled to receive in connection with the said agreement.

Dated as of March 1, 2022

_____
Jordan Ancel

## CERTIFICATE OF ENGAGEMENT

Reference is hereby made to that certain motion picture presently entitled *"The Unseen"* ("Picture") for which Jordan Ancel ("Ancel") is to perform certain services as a producer as further specified in and subject to the long form agreement (the "Agreement") currently being negotiated between Rock City Road Films LLC and The Curse LLC ("Production Company").

Lender and Ancel, for good and valuable consideration, receipt of which is hereby acknowledged, hereby certifies and agrees that (i) all of the results and proceeds of the services of every kind heretofore rendered by and hereafter to be rendered by Ancel in connection with the Picture, including, without limitation, any performance by Ancel and (ii) all ideas, suggestions, dialogue, plots, themes, stories, characterizations and any other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Ancel which in any way relate to the Picture or to the material on which the Picture will be based (collectively, "Material") are and shall be deemed works "made-for-hire" for Production Company. Ancel further acknowledges, certifies and agrees that as between Ancel, on the one hand, and Production Company, on the other, Production Company is and shall be deemed the sole author and/or exclusive owner of all of the Material for all purposes and the exclusive owner throughout the universe of all of the rights comprised in the copyright thereof, and of any and all other rights thereto ( collectively, "Rights"), and that Production Company shall have the right to exploit any or all of the foregoing in any and all media, now known or hereafter devised, throughout the universe, in perpetuity, in all languages as Production Company determines. If under any applicable law the Material is not deemed or otherwise considered a work "made-for-hire" for Production Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Ancel under such applicable law (including any and all renewals, extensions and revivals thereof), Ancel hereby assigns and transfers to Production Company the Rights and, in connection therewith, any and all right, title and interest of Ancel in the Picture and any other works now or hereafter created containing the Material. Ancel will, upon request, execute, acknowledge and deliver to Production Company such additional documents consistent herewith as Production Company may reasonably deem necessary to evidence and effectuate Production Company's rights hereunder, and hereby grant to Production Company the right as attorney-in-fact solely to execute, acknowledge, deliver and record any and all such documents if Ancel shall fail to execute same within five (5) business days after receipt from Production Company. Production Company shall promptly provide Ancel with copies of any such documents, provided that the inadvertent failure of Production Company to do so shall not be deemed a breach of this Certificate of Engagement or of the Agreement nor shall it affect the validity or effectiveness of such documents. Ancel hereby grants Production Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Production Company may in its sole discretion determine.

Lender and Ancel warrant that except as contained in material furnished to Ancel by and/or at direction of Production Company, all literary, dramatic, musical and other material and all ideas, designs and inventions of Ancel in connection with the Picture are or will be original with Ancel or in the public domain throughout the world, shall not infringe upon or violate any copyright of, shall not, to the best of Ancel's knowledge upon Ancel's exercise of due diligence, infringe upon or violate the right of privacy or any other right of any person and, are not the subject of any litigation or claim that might give rise to litigation, and that Ancel is free to grant all rights granted and make all agreements made by Ancel herein. Ancel agrees to hold Production Company and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Production Company or any of its successors, licensees or assigns may suffer or incur by reason of any uncured material breach of any of the warranties made in this paragraph.

10

Production Company hereby agrees to defend and indemnify and hold Ancel and against all liabilities, penalties, losses or expenses, including reasonable outside attorney's fees, imposed upon, sustained or incurred by Ancel arising out of the development, production, distribution, and exploitation of the Picture or any element thereof, except to the extent such claims, judgments, losses, expenses, and liabilities arise from Ancel's intentionally tortious acts or omissions, fraud or felony criminal matters, or which arise out of the breach of any of Ancel's material warranties, representations, agreements or obligations hereunder.

In the event of any breach by Production Company of the Agreement, the sole remedy of Ancel shall be an action for money damages, and Ancel shall not have any right to enjoin, restrict or otherwise interfere with Production Company's rights in the Material. Production Company may assign this Certificate (including, without limitation, any or all of its rights and obligations hereunder) to any person or entity without imitation.

Executed as of March ___, 2022

_____
ROCK CITY ROAD FILMS LLC
BY: JORDAN ANCEL
ITS: AUTHORIZED REPRESENTATIVE

_____
THE CURSE LLC
BY:
ITS: AUTHORIZED REPRESENTATIVE

_____
JORDAN ANCEL, Individually

11

## EXHIBIT A

### NET PROFITS

"Net Profits" shall be defined as gross receipts actually received by Production Company, its affiliates, licensees and assigns in connection with the worldwide licensing, sale, distribution and/or other exploitation of the Picture and/or any ancillary and/or subsidiary rights thereto in perpetuity in any and all media and all rights in connection therewith remaining, if any, after the deduction of only the following:  (a) all actual, direct, verifiable, out of pocket, unaffiliated third party costs, charges, expenses and liabilities reasonably incurred in connection with the acquisition, preparation, development, production, completion and delivery of the Picture, including without limitation, repayment of an amount equal to 120% of the financiers' at-risk capital contributions to the Production Company in connection with the Picture; (b) actual, direct, verifiable, out-of-pocket, unaffiliated third party distribution fees not previously charged or retained by the distributor(s); (c) actual, direct, verifiable, out-of-pocket, unaffiliated third-party distribution costs as charged to Production Company by distributor(s); (d) payments in connection with any deferrals or bonuses in connection with the Picture; (e) any actual, direct, verifiable, out-of-pocket unaffiliated third party collection fees and expenses charged by the collection agent for the Picture, if any; (f) actual, direct, verifiable, unaffiliated third-party out-of-pocket sales expenses and sales fees payable to the foreign and domestic sales agents for the Picture; (g) guild and union residuals payable in connection with the exploitation of the Picture, to the extent such residuals are not assumed by any third party distributor of the Picture; and (h) payment of any outstanding loans to the Production Company (including loans from affiliates of the Production Company) in connection with the financing of the Picture (including any interest thereon actually charged to Production Company) for the conduct of the authorized business of the Production Company in connection with the Picture, including but not limited to any loans in connection with the monetization of the Picture tax credits, whether or not payment is then due. All reasonable, third party, direct and customary "off-the-tops" (e.g. bank fees,) incurred in connection therewith shall also be deducted off-the-top from Net Profits.  Notwithstanding the foregoing, there shall be no cross-collateralization or double deductions of any kind, and no charges or deductions for Production Company overhead or administrative fees.

**EXHIBIT B**
**THE CURSE LLC / "THE UNSEEN"**
**Health & Safety Acknowledgment and Agreement**

**Name**:   Jordan Ancel

**Phone**: (310) 704-8804

**Address**:  528 N Vista Street

**Email**:   Jordan@JordanAncel.com

By signing each section of the Health and Safety Acknowledgment and Agreement, you acknowledge and represent that you have read it, understand it and sign it voluntarily; you are sufficiently informed about the risks involved in participation in this production; no oral representations, statements, or inducements, apart from the foregoing written agreement, have been made; you are at least eighteen (18) years of age and fully competent; and you execute this document for full, adequate, and complete consideration fully intending to be bound by the same.

**STATEMENT OF HEALTH**

Known symptoms of COVID-19 include the following:

- Cough
- Shortness of breath or difficulty breathing
- Fever
- Chills
- Fatigue
- Muscle pain or body aches
- Headache
- Sore throat
- New loss of taste or smell
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

You acknowledge that you are not currently, or in the past seven (7) days, have suffered from any known COVID-19 related symptoms.

You acknowledge that you have not (as far as you are aware) been in contact with anyone with COVID-19 symptoms within the previous fourteen (14) days.

You acknowledge that you have not (as far as you are aware) been in contact with anyone diagnosed with COVID-19 within the previous (14) days.

You acknowledge that you are not currently under advisement by a health care provider to shelter-at-home due to COVID-19 and/or that you have not been instructed to self-isolate within the previous fourteen (14) days.

You agree not to report to set unless the results of a test for COVID-19 has been received within forty-eight (48) hours prior to commencement of services.

You acknowledge that you will alert the safety coordinator immediately about any onset of symptoms or contact with anyone who has symptoms of COVID-19.

13

You accept that you will be asked to restate your confirmation of the above, verbally, to the safety coordinator at the beginning of each day on set, as well as may be requested to submit to a contactless temperature reading.

Furthermore, you agree to self-monitor for symptoms fourteen (14) days after completion of filming and will inform production of any onset of symptoms or confirmed positive COVID-19 test.

**SIGNATURE**
PRINT NAME: _____Jordan Ancel_____  DATE: ___5/31/2022_____

14

**EXHIBIT C**
**Safety Guidelines and Set Rules**

**CONFIRMATION OF ADHERENCE TO SAFETY GUIDELINES / SET RULES**

You acknowledge that you have read the Safety Guidelines / Set Rules below.

You agree to follow these Guidelines and Rules and all other applicable health and safety protocols. Any actions that constitute violation of the guidelines will result in your being asked to leave set immediately, and may result in the termination of future employment on the Project.

**SIGNATURE**
PRINT NAME:     Jordan Ancel          DATE:  5/31/2022

**SAFETY GUIDELINES / SET RULES**

**Our goal is to provide a working environment for our cast and crew whereby risk of transmission of COVID-19 (or other viruses) is as low as possible.**

This requires honesty, understanding, patience, and vigilance among the entire cast and crew. Anyone violating these rules will be asked to leave set immediately.

**MONITORING FOR SYMPTOMS**

It is vital that cast and crew self-monitors for symptoms commonly associated with COVID-19. **If you are feeling sick, or have any of the known symptoms of a COVID-19 related illness listed below, alert the safety coordinator immediately and depart from the shoot immediately.** Known COVID-19 related symptoms include the following:
- Cough
- Shortness of breath or difficulty breathing
- Fever
- Chills
- Muscle pain or body aches
- Headache
- Sore throat
- New loss of taste or smell
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

**DISTANCING**

- Stay six (6) or more feet away from other members of the cast and crew at all times when able. Verbally communicate before coming within shorter proximity of another cast or crew member and do not rush between areas of set, to not risk physically running in to another person.

**SHARED SPACES & SURFACES**

- Use gloves when touching equipment or surfaces shared with other members of the cast and crew. When gloves are used, they should be safely removed by rolling them inside out and off the hand from the wrist down to the fingertips, and should be safely and immediately disposed of in the trash. Crew Members should avoid removing gloves by pulling them off at the fingertips and should always wash

15

their hands after removing gloves.

- o Use your elbow or knuckle as opposed to fingers when possible.
- o Do not use other people's phones or personal work tools.

**GENERAL PRACTICES**

- o Wash hands frequently, especially after removing gloves, before & after sanitizing equipment, before & after eating.
- o If soap is not readily available, use hand sanitizer that is provided on set.
- o Wear a face covering, whenever possible but particularly when around other individuals.
- o Avoid touching your face.
- o Observe respiratory etiquette, including, without limitation, covering coughs and sneezes with your elbow or disposable tissue(s).
- o Keep all personal belongings in the designated area on set.
- o Food, dishes, and utensils should not be shared. Crew Members should use disposable utensils and dishes, and each person is responsible for disposing of his or her own trash.
- o If bringing your own mask, wash it daily and consider replacing or covering with a disposable mask for the length of the shoot.

**No Retaliation and Interactive Process**

- o The Curse LLC will engage in the interactive process in good faith and will not retaliate against any Crew Member who inquires about his or her rights with respect to safety and/or accommodation of any disability or medical condition.
- o Cast and crew members may report violations of any applicable guidelines, rules, or protocols related to COVID-19 or that a colleague is exhibiting signs of illness or symptoms of COVID-19 without fear of retaliation.
- o The Curse LLC will treat your private health and personal data with high confidentiality and sensitivity and according to the law.

16

# EXHIBIT B



# NON-DISCLOSURE AGREEMENT

THIS CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT (this "**Agreement**") is made and entered into as of ___6 May 2021___ (the "**Effective Date**") by and between Lakefront Pictures and ___Jordan Ancel International, LLC___ (the "**Recipient**"). This agreement covers proprietary information belonging to Lakefront (the "**Discloser**") that is made available or disclosed to the Recipient.

1. **PROJECT**. This Agreement is intended to prevent the unauthorized disclosure of Confidential Information (as defined below) regarding any and all Lakefront productions (the "**Subject Matter**").

2. **CONFIDENTIAL INFORMATION**. Confidential Information includes, but is not limited to, ideas exchanged during Lakefront writers breakout meetings, treatments written in preparation for any Lakefront production, scripts written in preparation for any Lakefront production, or story boards, synopsis, summaries, screenplays, pitches, documentation, and correspondences, all rights to which are owned or controlled by Discloser, that have not otherwise been made publicly available by the Discloser ("**Creative Confidential Information**"). Confidential Information shall also include, but not be limited to documents, records, information and data (whether verbal, electronic or written), drawings, models, apparatus, sketches, designs, schedules, product plans, marketing plans, technical procedures, analyses, compilations, studies, methodologies, formulations, know-how, and other business information, relating to Creative Confidential Information and to Lakefront's business, assets, operations or contracts, furnished to Recipient and/or Recipient's affiliates, employees, officers, owners, agents, consultants or representatives, in the course of their work contemplated in this Agreement, regardless of whether such Confidential Information has been expressly designated as confidential or proprietary. Confidential Information also includes any and all analyses, compilations, work product, studies and other data or material prepared by or in the possession or control of the Recipient, which contain, include, refer to or otherwise reflect or are generated from any Confidential Information. Confidential Information may be provided in written, oral, electronic or other form. Recipient acknowledges that no representation or warranty, express or implied, has been or is made by or on behalf of Lakefront as to the accuracy or completeness of any of the Confidential information furnished to the Recipient.

3. **EXCLUSIONS**. Confidential Information, however, does not include information: (a) generally available to the public through no wrongful act of Recipient and/or through no breach of any obligation to Lakefront; (b) rightfully in the possession of the Recipient prior to Lakefront's disclosure of such information to Recipient; (c) independently developed without the use of any of the provided Confidential Information, (d) rightfully received from a third party who is not subject to restrictions on the use and disclosure of such information in favor of Lakefront, or (e) approved for release by written authorization from Lakefront; provided that, unless notice of said prior knowledge and possession or receipt from a third party is given to Lakefront within thirty (30) days of receipt of the information from Lakefront or from a third party, respectively, it shall



be conclusively presumed that the said information was not previously in the Recipient's knowledge and possession or received from a third party.

4. **FORM OF DISCLOSURE**. Confidential Information may be oral, visual, or by demonstration, or in some other form not permanently recorded, and shall be considered Confidential Information regardless of whether such Confidential Information has been expressly designated as confidential or proprietary.

5. **PERIOD OF CONFIDENTIALITY AND NON-USE**. Recipient (including its affiliates, employees, agents and consultants) shall maintain in strict confidence for a period of five (5) years from the Effective Date and not disclose any Confidential Information it receives from Lakefront to any third party or use the Confidential Information for its own or any other party's benefit, except in furtherance of its obligations to Lakefront pursuant to any business transaction it may enter into with Lakefront. Recipient shall use, as a minimum, the same degree of care to avoid disclosure or use of the Confidential Information as it employs with respect to its own confidential, proprietary and secret information of like importance, but in any case using no less than a reasonable degree of care. Recipient shall limit access to all Confidential Information to only those of Recipient's personnel, agents and representatives who need to know such information for carrying out Recipient's obligations to Lakefront. Recipient shall insure that its affiliates, employees, officers, directors, owners, agents, consultants, and representatives who are given access to the Confidential Information by or on behalf of Recipient shall be bound by and shall comply with the terms of this Agreement.

5. **DISCLOSURES REQUIRED BY LAW**. In the event Recipient is requested or required by a government or court order, or similar process, to disclose any Confidential Information supplied to it by Lakefront, Recipient shall provide Lakefront with prompt notice of such request so that Lakefront may seek an appropriate protective order and/or waive Recipient's compliance with the provisions of this Agreement.

6. **INDEMNIFICATION**. Recipient shall reimburse, indemnify and hold harmless Lakefront and its affiliates, owners, employees, officers, directors, agents and representatives from any damage, loss, penalty, cost or expense incurred by Lakefront as a result of or in connection with the use or disclosure of the Confidential Information contrary to the terms of this Agreement by Recipient or its affiliates, employees, directors, officers, owners, consultants, agents or representatives or any others to whom such Confidential Information has been disclosed by any such persons or entities. The term "affiliates" as used in this Agreement shall mean any persons, corporations, partnerships, limited liability companies, or other business entities, which directly or indirectly control, are controlled by, or are in common control with such party to this Agreement. As used herein, the term "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities, by contract or otherwise).

7. **NO PUBLIC COMMENT**. Recipient shall not directly or indirectly make any public comment, statement, or communication with respect to, or otherwise disclose or permit the disclosure to



any third party of any Confidential Information or of any matter relating to the Subject Matter or purpose or any transactions contemplated by the parties in connection therewith, without the prior written consent of Lakefront.

8. **NOTICE OF UNAUTHORIZED USE OR DISCLOSURE**. Recipient shall notify Lakefront immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this Agreement by Recipient or any third party, and will cooperate with Lakefront in every reasonable way to help Lakefront regain possession of the Confidential Information and prevent its further unauthorized use or disclosure.

9. **OWNERSHIP AND RETURN OF CONFIDENTIAL INFORMATION**. All Confidential Information disclosed to Recipient shall be and remain the property of Lakefront. Upon Lakefront's written request, Recipient shall promptly return all Confidential Information (including all originals, copies, reproductions and summaries of such Confidential Information), or certify its destruction in writing, and keep the same confidential and secret in accordance with this Agreement.

10. **NO LICENSE**. Nothing contained in this Agreement shall be construed as granting or conferring to Recipient any rights or license or otherwise, either expressly or by implication, in or to any Confidential Information disclosed by Lakefront to Recipient as a result of this Agreement, including, without limitation, rights or license under any present or future copyright, trademark, service mark, trade secret or other proprietary information owned, licensed or controlled by Lakefront.

11. **SURVIVAL**. Recipient's obligations of non-disclosure pursuant to the terms of this Agreement shall survive until all Confidential Information has been returned to Lakefront or the destruction thereof has been certified to Lakefront in writing.

12. **RELATIONSHIP**. This Agreement shall not be construed as a joint venture, pooling arrangement, partnership, teaming effort or agency arrangement. The Recipient, unless otherwise stated in a separate agreement, shall have no ownership interest whatsoever in the Confidential Information being handed over to them.

13. **NO WAIVER**. Neither party waives any rights in invention or development lawfully possessed by it at the time of signing this Agreement. In addition, this Agreement does not imply any waiver of any rights or action under the trademark, copyright, trade secret, unfair competition, fair trade or related laws. Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof.

14. **BINDING AGREEMENT**. This Agreement shall be binding upon Recipient and its subsidiaries, successors, assigns, legal representatives, and all corporations controlling Recipient or controlled by Recipient and shall inure to the benefit of Lakefront and its subsidiaries, successors, assigns, legal representatives, and all corporations controlling Lakefront or controlled by Lakefront.



15. **INJUNCTIVE RELIEF**. Recipient understands and agrees that any use or dissemination of Confidential Information in violation of this Agreement will cause Lakefront irreparable harm, and that monetary damages may not be a sufficient remedy for unauthorized use or disclosure of Confidential Information, and that Lakefront may be left with no adequate remedy at law; therefore, Lakefront shall be entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction. Such remedies shall not be deemed to be the exclusive remedy for any breach of this Agreement but shall be in addition to all other remedies available at law or in equity.

16. **PREVAILING PARTY**. If either party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses.

17. **GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to principles of conflict or choice of laws, and Recipient consents to venue and jurisdiction in and by the state and federal courts in the jurisdiction of the Lakefront.

18. **ASSIGNMENT**. This Agreement may not be assigned by Recipient without the prior written consent of Lakefront.

19. **ENTIRE AGREEMENT**. This Agreement contains the entire understanding between the parties relative to the protection of Confidential Information and supersedes all prior and collateral communications, reports, and understanding between the parties in respect thereto. No change, modification, alteration or addition to any provision shall be binding unless it is in writing and signed by an authorized representative of both parties.

20. **SEVERABILITY**. If a court of competent jurisdiction makes a final determination that any provision of this Agreement (or any portion thereof) is invalid, illegal or unenforceable for any reason whatsoever, and all rights to appeal the determination have been exhausted or the period of time during which any appeal of the determination may be perfected has been exhausted, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby; and (ii) to the fullest extent possible, the provisions of this Agreement shall be construed so as to give effect to the intent manifested by the provisions held invalid, illegal or unenforceable.

21. **HEADINGS**. The headings in this Agreement are for reference purposes only and shall not limit or otherwise affect the meaning of the provisions.

22. **COUNTERPARTS**. This Agreement may be executed in one or more counterparts including signing a facsimile copy. Each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.



23. **MEDIA POLICY**. Recipient is not authorized to release media, footage, pictures and information to the media, including but not limited to broadcast, networks, print, radio, and social media, unless Lakefront provides advance written permission. Recipient shall provide Lakefront with at least seven (7) days notice in order to request such permission. Recipient is authorized to reshare any content that has been publicly posted by Lakefront or a Lakefront representative. Recipient is not authorized to share any content posted in the private Lakefront production Cast/Crew group without prior authorization.

Please initial below.

_____ JA    1. I understand that if I transmit any audio, video, photo, or text-based content to 3 rd parties not involved with "Lakefront Pictures", then all transmitted communications are subject for review and my involvement could be terminated immediately, and all media will be owned by Lakefront Pictures, LLC.

_____ JA    2. I understand that if I am hired, and am subsequently terminated or voluntarily resign, I am not to discuss any information about the project, disparage or reveal prejudice whether deemed factual or opinion to 3rd parties over phone, in person, emails, social media, or any other electronic form of communication and that any and all imdb credit, and title on production is at risk and could be forfeited at discretion of owners.

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

RECIPIENT
Address: 528 N. Vista
Los Angeles, CA 90036

**Recipient's Signature** _____

Print Name: Jordan Ancel, CEO, Jordan Ancel Interntional, LLC

LAKEFRONT PICTURES, LLC
545 N DEARBORN ST, #2403, CHICAGO, IL 60654

**Signature** _____

Print Name _____

# GROUP

# EXHIBIT C



Bitch, you can't do shit to me

Don't threaten me to get what you want

Bitch what's up

I'm not kidding around Jen, I will fucking ruin you.

I hope uo it e just joking

Then you're out

We aren't working with you

Intried

Fine, you still owe me my back and when it happens otherwise I will take you to the cleaners

Vince tried to encourage me despite the issues you've caused

4:58      5G 41

## Jordan     Cancel

To: Jordan Ancel

hand hold, then add us to so be
we are the producers too not just
you

We are the owners

I will never screw you out of what
you're owed

You are so fucking stupid, you
stupid, fucking Cunt! I know that!
I have said it fucking repeatedly
over and over again that I just
want to make the introduction.
But you're so fucking dense you
can't even let that information in.
I don't wanna hear from you.
Fuck off. You blew it.

Ok

Well there you go calling me cunt

blocking you

Sounds like you're screwing
yourself by doing that

iMessage



10:22

New iMessage                    Cancel

To: +1 (310) 704-8804

[document icon]                              4:24 PM

1 Reply

We've had enough you've crossed the line    4:24 PM

I really don't give a fuck. Fuck you both    4:24 PM

Where's your feature?    4:25 PM

27 years in industry and shorts    4:25 PM

So who's incompetent?    4:25 PM

Dumb motherfucker, this is the first feature you've ever done, and you've never made a film that's done any kind of business. When I was ahead of an ad agency, I was producing multi million dollar commercials every fucking month you dumb bitch.    4:26 PM

Plus, I'm the one with the connections, where the fuck are    4:27 PM

iMessage





# EXHIBIT D







# GROUP

# EXHIBIT E



**James Clayton Bowman**

I love it when previously unaccountable sociopaths get a very public comeuppance. What I absolutely hate about this is the damage done by people who lie about sexual assault/harassment to those who actually experience it. Disingenuous bad actors the world over use these rare exceptions to discredit those who try to report real and still-too-common instances of such abuse.

Key questions/issues that will determine how the preponderance of evidence will fall:
· prior to that film collaboration, has there ever been even a whisper of inappropriate behavior from Ancel, and more to the point, can the defense produce any evidence of such?
· prior to that film collaboration, has there ever been any reported problematic behavior by Karum/Goodman? The seeming fact that the crew took Ancel's side does not bode well for Karum/Goodman.
· the fact that Ryan has not been named a defendant yet indicates that he may get a pass as cooperating plaintiff witness if he is willing/able to produce private communications that indicate Goodman was knowingly lying and orchestrating a smear campaign.



**Aaron L Hawkins** [Top contributor]

WOW!!! I will never begin to understand how someone could do these things and think they can get away with it and have that untouchable attitude. It is unfortunate it had to get to this point but you have to protect yourself and your character. I really hope this goes well for you.

24w · **Love** · Reply · Edited                                       7



**Rosaleah Sunserra Gonzalez**

So, wow. I'm glad this is finally coming to light. Jennifer Karum has said this about another director apparently. She has threatened to sue me for warning people about her and then sent me a friend request months later like nothing happened. This comment section is about to blow up and it won't be good. And when I say that I mean she's about to get exposed by so many people. Jennifer and Ryan (because he is absolutely complicit) are finally getting what's coming to them..

As much as I want to share other stories of those harassed and abused by her, I cannot. I can only share mine. But I know there is enough evidence to back this up.

24w · **Love** · Reply · Edited                                      17



**Candice Rose**  Top contributor
DEFINITELY do not use LAKEFRONT PICTURES! They did a demo reel clip for me I could not even use bc it was more about the CAMERA work than it was about me. Ugh! I paid $1000, it was supposed to be $800 but I felt so bad for the crew I gave an extra $200. She coerced me into giving them a good review, and I am TRYING LIKE HELL NOW to get it taken down from their site because AFTER that I shot THE UNSEEN w Lakefront....and that was an absolute nightmare!! That company needs to close down, it is a complete sh*t show.

4w    Like    Reply                                                               👍 3



7:56

 **Ladie K Castings**
Jordan Ancel · 9h · 

•••

 **Samantha Jane**
**Oh yeah, this isn't the first director/ Producer she's accused of rape either. She told me the one from Conrad did that to her**

42m   Like   Reply                    1 👍

Today 12:02 PM

Hey hope you're well. Just saw a casting breakdown for a short Jen & Ryan are doing, that you're attached to.

As you know I filed a law suit against them and you'll most likely be deposed at some point.

🌙 Jordan has notifications silenced

   iMessage  

       



3:26   📞 14m                    ᐧ|||ᐧᐧ|ᐧᐧᐧᐧᐧ   📶 18  •

✕    **Chicago Film & Commercial**
        Jordan - posting in Chic...        💬   •••
        Sarah Giroux · 22h · 

**Jordan Ancel**
👋

Hi everyone. I'm the plaintiff. Thanks for all your support. I know Jennifer commented, but I can't see it since I've blocked her. I don't really care, though.

I cannot discuss details, obviously.

I have heard rumblings from close sources that there may be a class action suit, but I cannot verify that it's for certain at the moment. If it does come to fruition, I will have those who may be bringing the suit post about it here for those who wish to potentially be part of it.

In other news, I do look forward to returning to Chicago to film more, and hope that I get to work with as many of you as I can.

Cheers!

15h   Like   Reply                          15 



5/17/23, 11:21 AM            lady k castings - Search Results | Facebook

## Jordan's Post      ✕

**Ladie K Castings**
Jordan Ancel · 1d · ⊙

Hi everyone, I'm a Los Angeles-based Director and Producer, and I produced THE UNSEEN with Jennifer Karum and Ryan Atkins.

I cannot go into details, but I have filed a massive defamation lawsuit against them this past Friday.

I posted about it in this group yesterday but I took the post down when I saw a Screenshot of it being circulated among people I know, who then reached out to me to ask if it was true.

Yes, it is true. I am suing them, and they will be taken down in an epic way.

HOWEVER, right now I have the element of surprise because it takes a few weeks for them to be served papers by the sheriff.

I IMPLORE EVERYONE HERE to not circulate any info about the lawsuit because I don't want it getting back to them.

Right now I'm holding all the cards and I have the element of surprise, and I don't want them to have time to brace themselves nor prepare for an all-out war.

If you really want to see them taken down, please, be very very careful about who you share this information with.

I don't want them to have time to prepare. I want to hit them hard and fast, and I don't want them to see it coming.

That said, I appreciate K for starting this group and for inviting me.

I do know of a potential class action lawsuit against them that may be filed soon, so anyone who would like information about that or would like to be part of it, I will give you that information if you DM me. I would require at least getting on the phone together before I pass out any information about that.

I'm also available to listen to anyone else's grievances.

Thank you everyone for your support, and let's and the madness.

Cheers!

👍❤️😮 Victor Tan and 30 others         27 comments

▫ Like        ▫ Comment        ▫ Send





From: **chi-town-crusader** <chi-town-crusader@protonmail.com>
Date: Wed, 8 Nov 2023 at 17:41
Subject: Beware of Lakefront and Jennifer Karum/Ryan Atkins
To: ████████████████████████████████

Hi Ms. ████,

I'm reaching out because it's come to the Chicago Film Community's attention that you may be doing a film with Jennifer Karum (Goodman) & Ryan Atkins, aka Lakefront Pictures.

These are unsavory people.

I invite you to join some of the Chicago Filmmaker Groups on Facebook, where you will see that they are people you will regret working with.

There is even a lawsuit against them, as posted in this Facebook Group, and there may be more coming.

https://www.facebook.com/groups/109674265769579

In this group above, do a search for Jennifer Karum. Read ALL the comments on the posts.

Here is a link to an article regarding the lawsuit:

https://cookcountyrecord.com/stories/642330095-moviemaker-ancel-says-spat-over-control-of-horror-film-led-to-alleged-false-sex-assault-professional-incompetence-claims?fbclid=IwAR2ghZgdaUWAudNkGsjPy4UfFkSC7QjkAS19Vu65Q5luPxMdRoycGATomdA

Here is a link to the actual lawsuit:

https://casesearch.cookcountyclerkofcourt.org/CivilCaseSearchAPI.aspx

And this:

https://www.facebook.com/foolmanchu/posts/pfbid0MBYefSKAomdDW2gr2y9UpbqPujSoG4WTsXWPJ1gxjpJF8Z32nuvfwG6armYNGQrYl

Attached are screen grabs from:
https://trellis.law/case/17031/2023-l-004921/jordan-ancel-vs-jennifer-karum-goodman-et-al?fbclid=IwAR0I73vqnC1P3s0SN_OoR_625A77IjHy88eLOez6cekqYe5asoooYhe0Et0

Also attached are screenshots from another group called Lady K Castings, but that group is difficult to get into because Jennifer infiltrates groups by using fake profiles in order to spy on people.

You can certainly reach out to the people on Facebook who have made these comments via DM to verify the truth of these statements, and the truth about her.

Jennifer is banned from using interns from Columbia College.

She is know to stalk, bully, intimidate, and harass anyone that does not do what she wants or gives her what she wants. She is also know to use fake profiles to stalk people, and most of her "good reviews" are from fake profiles.

BEWARE

SHE IS DANGEROUS

# EXHIBIT F

# LAKEFRONT™
## PICTURES

### Demo Agreement

Lakefront Pictures, LLC to provide demo reel footage for ("client"), _CANDICE ROSE_ to use for demo reel content. Client signed below agrees they had a consult and agreed to have:

1) Script Scene Written (1)
2) **x1** Scenes Filming ( X ) High Powered Realtor (June 16)
3) On-Site Location ( X )
4) Footage Edited 1 edit round, sound mix, foley) ( X )
5) Props/Wardrobe ( X )

*PROPS available will be provided. Anything additional will be a charge
*ALL Demos will include script consultation

**TOTAL COST:** $450 **Additional fees will be added to pricing should requirements change. Down payment due upon receipt. Remaining payment is 48 hours prior to each film date.

Final delivery of the media will be a default of .MP4 @ 1920x1080 resolution file that can be editable in any common editing software. Lakefront Pictures will use the best file transfer method for Actors Access, and Casting Networks. Lakefront Pictures will work with client for any other media sites and sizing. Client agrees for full resolution ProRes4K. It's an additional $25 one-time fee to cover the cost of rendering and processing. For reel footage we utilize Wetransfer and/or Google Drive for all files and uploads and footage only archived for 30 days.

Client agrees they have been made aware of the rights of usage, the additional fees for any additional services rendered, refund policy, which is 25% restocking within 24 hours. And 50% thereafter, and that there is a 50% down payment at the time of booking for any services. Payments via Chase QuickPay/Zelle and Credit Cards are acceptable. CC fee will be included in priciong

Client agrees scenes sent to them are not to be shared outside acting promotion or circulated to 3rd parties separate from casting related purposes, and are solely for the purpose of their demo reel with Lakefront Pictures. Any festival submissions must be approved by Lakefront Pictures.

LOCATION AGREEMENT: **On-Set Behavior - **_Location requests are never guaranteed_.

a. Client shall not commit any act or do anything which might tend to bring Lakefront Pictures, LLC its members or owners into public disrepute, contempt, scandal, or ridicule, or which might tend to reflect unfavorably on the company, any stations broadcasting or to injure the success of Lakefront.

b. Clients shall conduct themselves with due regard to public conventions and morals. Client shall not commit an offense involving moral turpitude under Federal, state or local laws or ordinances. The client agrees not to commit any act or thing that will tend to degrade him in society or bring him into public hatred, public disrepute, contempt, scorn, or ridicule, or that will tend to shock, insult or offend the community or public morals or decency or prejudice of the location, its members, or Lakefront Pictures, LLC

c. Client is aware no alcohol or drugs will be permitted on set, and client is not to be under influence in any way subject to alcohol, drugs. Any behavior that could adversely affect Lakefront Pictures, LLC or the location in use during the time of filming is prohibited and the client will be removed from set should behavior occur.

SIGNED _____ NAME _CANDICE ROSE_ DATE 6/10/21