IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAKEFRONT PICTURES, LLC, ) <br> JENNIFER KARUM, and ) <br> THE CURSE, LLC, ) <br> ) <br>       **Plaintiffs,** ) <br> ) <br>       v. ) <br> ) <br> JORDAN ANCEL, JORDAN ANCEL ) <br> INTERNATIONAL, LLC, ROCK CITY ) <br> ROAD FILMS, LLC, CANDICE ROSE, ) <br> and DOES 1–20, ) <br> ) <br>       **Defendants.** ) | **No. 24-cv-1108** <br><br> **Judge Jeffrey I. Cummings** |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Lakefront Pictures, LLC ("Lakefront"), Jennifer Karum, and The Curse, LLC filed this case—which arises out of a business relationship gone wrong—against Jordan Ancel, Jordan Ancel International, LLC, Rock City Road Films, LLC, Candice Rose, and Does 1 through 20 alleging claims for defamation, false light invasion of privacy, breach of contract, tortious interference, intentional infliction of emotional distress, and civil conspiracy. Defendants have moved to dismiss plaintiffs' claims for tortious interference, intentional infliction of emotional distress, and civil conspiracy for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[1] For the reasons set forth below, defendants' motion, (Dckt. #7), is denied.

---

[1] In their motion, defendants also argued that this case should be stayed or dismissed under Federal Rule 12(b)(1) pursuant to the *Colorado River* abstention doctrine based on an action filed by Ancel in the Circuit Court of Cook County against Karum. The state court action was dismissed on March 4, 2025 and in their Joint Status Report dated June 6, 2025, (Dckt. #37), the parties agreed that the dismissal mooted the stay request and that this Court need not decide whether *Colorado River* abstention is warranted.

I.      **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and the complaint must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679 (2009). When considering a motion to dismiss under Rule 12(b)(6), the Court construes "the complaint in the light most favorable to the [non-moving party] accepting as true all well-pleaded facts and drawing reasonable inferences in [the non-moving party's] favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). Nonetheless, courts are permitted to consider "any facts set forth in the complaint that undermine the plaintiff's claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (cleaned up).

Moreover, "in addition to the allegations set forth in the complaint itself," the Court may consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Indeed, it is "well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff[s'] complaint and are central to [their] claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (cleaned up); *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021) (same, citing cases).

## II. BACKGROUND

The facts below are drawn from the allegations in the Complaint, (Dckt. #1), and the exhibits attached thereto.

### A. The Parties and Their Business Relationship.

Plaintiff Jennifer Karum ("Karum") is an actor, writer, and filmmaker, and is the founder of plaintiff Lakefront Pictures, LLC ("Lakefront")—a film production company. (Dckt. #1 ¶¶25, 28, 36). Through her work, Karum—who is neurodiverse and on the autism spectrum—seeks to support and promote other neurodiverse artists, who, as a group, are underrepresented in the film industry. (*Id.* ¶¶19, 24).

In 2020, Karum began working on the script for her first feature length film titled "The Unseen." (*Id.* ¶36). Lakefront pre-cast defendant Candice Rose ("Rose")—whom Karum knew and had worked with previously—as one of the major roles in the film. (*Id.* ¶41). Over a year after the project started, Lakefront reached out to defendant Jordan Ancel ("Ancel") about potentially serving as a film producer. (*Id.* ¶¶44, 47). Although Ancel initially expressed "no interest" in the project, on May 31, 2021 he (through his company, defendant Rock City Road Films, LLC) entered into a Producer Agreement with plaintiff The Curse, LLC, a special purpose entity managed by Lakefront that owned the intellectual property rights related to The Unseen. (*Id.* ¶¶48, 50). Ancel, through defendant Jordan Ancel International, LLC, also executed a non-disclosure agreement with Lakefront. (*Id.* ¶55).

### B. Ancel's Conduct After Joining the Project.

Despite Ancel's "positive first impression," plaintiffs allege that he became "largely disengaged" with the project and ultimately "failed to perform competently or professionally." (*Id.* ¶¶59, 64). For example, Ancel confided in Karum about his extra-marital affairs, (*id.* ¶65),

3

and abdicated his responsibilities on set to pursue a female crew member, (*id.* ¶70). Karum attempted to admonish Ancel for his behavior, (*id.* ¶72), and as the relationship soured, Ancel began to threaten Karum, (*id.* at 13).[2] For example, in a text message exchange, after Karum brought up whether Ancel's wife was aware of his extra-marital affairs, Ancel responded "If you bring that up, I'm gonna fly to Chicago and you're gonna fucking regret it." (*Id.*).

On other occasions, Ancel would try to "weaponize Karum's autism" by buylling her—often times in front of the cast and crew in an attempt to embarrass her and incite division on set. (*Id.* at 16). In still other instances, Ancel would "cruelly mock Karum's autism telling her and others" that Karum used her autism as "a crutch to excuse or justify her actions." (*Id.* at 17).

### C. Ancel's *De Facto* Termination and Subsequent Harassment and Cyberbullying.

After the filming of The Unseen ended, Lakefront advised Ancel that his services would no longer be necessary, relieving him of any post-production responsibilities. (*Id.* ¶98). Ancel became irate at his *de facto* termination and sent Karum a barrage of texts referencing his desire to "burn her life down" and "ruin" her company, (*see id.* ¶100), calling her a "fucking moron" and "stupid motherfucker," (*id.* at 58), telling her that her autism was an excuse for her "shitty behavior," "poor decision making," and "incompetence," (*id.*), and clarifying that he would "come after [Karum] for everything [she had]. Everything," (*id.* at 64).

Ancel further responded by "telling anyone who would listen that Karum was 'dangerous'" and that she had "baselessly accused him of sexual assault"—which Karum denies. (*Id.* ¶105). Ancel then commenced a lawsuit against Karum, repeating the allegation that Karum wrongly accused him of sexual assault. (*Id.* ¶106). Ancel disseminated his complaint on social

---

[2] The Court notes there is a numbering error in the Complaint which causes paragraph numbers 73–86 to be used on two occasions. To avoid confusion, the Court refers to the page number, rather than paragraph number, of the Complaint for these allegations.

4

media and boasted to third-parties that he had a strategy for "taking down Karum in an epic way." (*Id.* ¶108). Ancel also began to falsely represent across social media that there was a class action suit against Karum and Lakefront in the works, in an effort to mislead people into believing Karum had a history of making false accusations. (*Id.* ¶109).

Ancel and his supporters also launched a cyberbullying or "smear" campaign against Karum and Lakefront. (*Id.* ¶¶112–13, 116). For example, whenever someone promoted a project with Lakefront, they were bombarded with messages and/or communications claiming that Karum and/or Lakefront were "dangerous" and that Karum was disfavored in the Chicago film community. (*Id*. ¶113). Rose—who, again, was an actor in The Unseen—also contributed to the smears against Karum and Lakefront, despite the fact that she was never on set with Karum because their respective scenes were shot at different times. (*Id.* ¶124).

Similar smears were sent "anonymously to [Lakefront's] clients, prospects and partners using Gmail accounts under fictitious or truncated names to avoid detection." (*Id.* ¶118). As a result of the smear campaign, several Lakefront clients canceled their contracts with the company. (*Id.* ¶125). Per the Complaint, Ancel was behind these "orchestrated" attacks. (*Id.* ¶121).

   **D.**  **The Present Lawsuit.**

Plaintiffs filed this suit on February 8, 2024, alleging, among other things, tortious interference, intentional infliction of emotional distress, and civil conspiracy claims. (Dckt. #1). Defendants now seek to dismiss these claims under Rules 8 and 12(b)(6).

5

### III. DISCUSSION

#### A. Plaintiffs' Complaint Complies with Rule 8.

At the outset, defendants argue that plaintiffs' complaint should be dismissed because it runs afoul of Rule 8's requirement that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In support of their argument, defendants point out that the Complaint contains twenty pages of factual allegations, many of which defendants view as "irrelevant." (Dckt. #7 at 10).

But contrary to defendants' argument, the Seventh Circuit has made clear that "undue length alone ordinarily does not justify the dismissal of an otherwise valid complaint." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011). And where a complaint otherwise "puts the defendant on notice of the [plaintiffs'] claims, dismissal is inappropriate merely because of the presence of superfluous matter." *Id*. (cleaned up). In line with this precedent, the Court rejects defendants' argument that the Complaint does not comply with Rule 8 simply due to its length and defendants' own assertions that it contains "irrelevant" allegations. The Court thus turns to defendants' arguments under Rule 12(b)(6).

#### B. Plaintiffs Have Stated a Claim for Tortious Interference.

To prevail on a claim for tortious interference under Illinois law,[3] a plaintiff must show: "(1) they had a reasonable expectancy of entering into a valid business relationship, (2) the [defendants] knew of the expectancy, (3) the [defendants] intentionally and unjustifiably interfered with the expectancy, inducing or causing a breach or termination, and (4) they suffered damage as a result." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, No. 24-3163, 2025 WL

---

[3] As a federal court sitting in diversity, this Court applies state substantive law. *Horne v. Electric Eel Manufacturing Company, Inc.*, 987 F.3d 704, 713 (7th Cir. 2021).

6

2047901, at *4 (7th Cir. July 22, 2025). Defendants argue that plaintiffs' claims are insufficient for two reasons. Neither is availing.

First, defendants argue that plaintiffs' tortious interference claims must be dismissed because they are barred by the absolute litigation privilege. The privilege protects the written and oral communications of attorneys and private litigants pertaining to proposed or pending litigation. *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998) (cleaned up); *Libco Corp. v. Adams*, 426 N.E.2d 1130, 1132 (Ill.App.Ct. 1981).

At the outset, the Court notes that the absolute litigation privilege is an affirmative defense. While ordinarily the plaintiff "need not anticipate and attempt to plead around affirmative defenses . . . [a]n exception applies when the allegations of the complaint . . . set forth everything necessary to satisfy the affirmative defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2010) (cleaned up); *see also Holmes v. Marion County Sheriff's Office*, 141 F.4th 818, 822 (7th Cir. 2025) (same). Having reviewed plaintiffs' Complaint, the Court finds this is not such a case. Critically, the relevant messages, which are attached to the Complaint, demonstrate that the communications are all out-of-court communications between defendants and unrelated third-parties through social media applications or via email. (Dckt. #1, Ex. E). Because Illinois courts have declined to extend the absolute litigation privilege to third-parties not connected to the litigation, s*ee e.g.*, *August. v. Hanlon*, 975 N.E.2d 1234, 1248 (Ill.App.Ct. 2012); *Black v. Wrigley*, No. 17 C 101, 2017 WL 8186996, at *5 (N.D.Ill. Dec. 8, 2017), defendants have not shown that the Complaint sets forth everything necessary to satisfy the absolute litigation privilege affirmative defense. *Hyson*, 821 F.3d at 939. As such, it would be premature for the Court to further consider defendants' affirmative defense of absolute litigation privilege at the pleading stage.

Next, defendants argue that the "necessary allegations" regarding the third element of a tortious interference claim—the intent element—are "absent from the Complaint" because plaintiffs do not allege that defendants engaged in wrongful conduct which induced prospective customers to end their relationships with plaintiffs or that "Ancel acted with the purpose of injuring Karum's expectancies." (Dckt. #7 at 12). Plaintiffs argue in response that defendants' position ignores "specific and detailed factual allegations *and exhibits*" which reflect Ancel's wrongful conduct and the specific contracts and opportunities lost. (Dckt. #15 at 13) (emphasis in original).

The Court agrees with plaintiffs and finds that they have pleaded sufficient facts concerning the intent element of their claim for tortious interference. In particular, plaintiffs allege that Ancel sent "smears"—at times anonymously or through others—to Lakefront's "clients, prospects and partners." (Dckt. #1 ¶118). Plaintiff also attaches screenshots of various social media messages and emails that Ancel, or someone at his direction, sent to entities or individuals calling Karum and Lakefront "unsavory," warning them to "beware," and stating that they will "most likely be deposed" if they work on plaintiffs' projects. (Dckt. #1, Ex. E.). Ancel's "smear campaign and direct acts," plaintiffs allege, were "inten[ded] to cause "reputational and economic harm," and have "caused the termination of [plaintiffs'] contracts, and prevented the prospective contracts and relationships from being solidified." (*Id.* ¶¶66, 139).

As such, plaintiffs have sufficiently alleged that defendants intentionally and unjustifiably interfered with their expectation of entering into a valid business relationship and induced or caused a breach or termination. Nothing more is required. *Plaintiff, Inc. v. Slesinski*, No. 23-CV-03878, 2025 WL 1677497, at *13 (N.D.Ill. June 13, 2025) (finding allegations that "Defendants

8

purposefully targeted clients with whom Plaintiff had contracts and induced them to sever those contracts" sufficient to plead a tortious interference claim.).

Accordingly, the Court denies defendants' motion to dismiss plaintiffs' claim for tortious interference.

      **C.    Plaintiffs Have Stated a Claim for Intentional Infliction of Emotional Distress.**

To state a claim for intentional infliction of emotional distress under Illinois law, "a plaintiff must allege facts establishing: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that defendant's conduct was such that defendant knew that severe emotional distress would be certain or substantially certain to result." *Davis v. Pete's Fresh Mkt. 4700 Corp.*, No. 23-CV-14160, 2025 WL 672923, at *8 (N.D.Ill. Mar. 3, 2025), *quoting Heying v. Simonaitis*, 466 N.E.2d 1137, 1143 (Ill.App.Ct. 1984). In determining whether conduct is extreme and outrageous, courts can consider "whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition." *Honaker v. Smith*, 256 F.3d 477, 492 (7th Cir. 2001). Finally, "behavior that might otherwise be considered merely rude, abrasive or inconsiderate may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional turmoil." *Id.* (citing cases).

Defendants argue that plaintiffs have alleged, at best, that Karum was "angry," but that such an allegation does not rise to the level of extreme and outrageous conduct necessary to support her intentional infliction of emotional distress claim. (Dckt. #7 at 15). In response, plaintiffs disagree and point to their allegations that Ancel told Karum he desired to "burn her life down," (Dckt. #1 ¶100), that he would "fucking ruin [her]," (*id.* at 59), boasted to third-parties that plaintiffs would be "taken down in an epic way," (*id.* at 72), weaponized Karum's

9

autism against her by publicly mocking her in front of other cast and crew members on set and telling her and others that she used her autism "as an excuse for [her] shitty behavior," "poor decision making," and "incompetence," (*id.* ¶¶73–75, 58), organized a campaign of cyber-bullying against Karum, (*id.* ¶¶112–16; *generally* Ex. E), and told "anyone who would listen that Karum was 'dangerous,'" and that "she baselessly had accused him of sexual assault" which plaintiffs allege is untrue, (*id.* ¶105).

Contrary to defendants' argument, plaintiffs allege far more than mere "anger," "humiliation," or "embarrassment," (Dckt. #16 at 5), and their allegations are sufficient to state a claim for intentional infliction of emotional distress under Illinois law. *See e.g.*, *Summerland v. Constellation Energy Generation, LLC*, No. 24 C 6390, 2025 WL 1260829, at *8 (N.D.Ill. Apr. 30, 2025) (denying motion to dismiss an intentional infliction of emotional distress claim where plaintiff alleged defendants "threatened her and interfered with her treatment, despite knowing that she was particularly susceptible to emotional distress, given her known emotional disorders.") (cleaned up); *Graves v. Man Grp. USA, Inc.*, 479 F.Supp.2d 850, 857 (N.D.Ill. 2007) (finding plaintiff's allegations that his supervisors knew he was in and out of the hospital for alcoholism, told his wife and sister that he made death threats against his co-workers (which plaintiff alleged was false), and sent the police to his father's funeral sufficient to withstand a motion to dismiss on plaintiff's IIED claim); *see also Honaker*, 256 F.3d at 490 (tort of intentional infliction of emotional distress is judged on an objective standard of what is "intolerable in a civilized community").

Accordingly, the Court denies defendants' motion to dismiss plaintiffs' claim for intentional infliction of emotional distress.

D.  **Plaintiffs Have Stated a Claim for Civil Conspiracy.**

"Civil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means." *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020). To state a claim for civil conspiracy, a plaintiff must allege "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir.2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)).

Defendants contend that plaintiffs' civil conspiracy claims must be pleaded with particularity, and that their allegations are insufficient because they merely characterize a combination of acts as a "conspiracy" without setting forth the facts and circumstances constituting the alleged conspiracy. The Court disagrees. To begin, defendants' contention that plaintiffs' conspiracy claim must be pleaded with "particularity," (Dckt. #7 at 14), is contrary to Seventh Circuit precedent. *See Hoskins v. Poelstra*, 320 F.3d 761, 765 (7th Cir. 2003) ("Rule 9(b) has a short list of matters (such as fraud) that must be pleaded with particularity; conspiracy is not among them.") (cleaned up).

Furthermore, "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson,* 288 F.3d 1005, 1007 (7th Cir. 2002). In their Complaint, plaintiffs identify the parties to (Ancel, Rose, and the Doe defendants, (Dckt. #1, ¶131)), the general purpose of (to "attack" Karum and Lakefront with "false and misleading smears" to cause

11

financial and reputational damage, (*id.* ¶¶120–21, 125–32)), and the approximate date of the conspiracy (after Ancel's *de facto* termination, (*id.* ¶¶98, 100, 116)), which gives defendants sufficient notice of plaintiffs' conspiracy claim. Plaintiffs were not required to plead their conspiracy claim with any greater specificity to survive defendants' motion to dismiss. *Williams v. Metra Police Dep't*, No. 21-CV-02347, 2025 WL 1260825, at *5 (N.D.Ill. Apr. 30, 2025) (plaintiff stated a claim where she alleged the "who, what, and when" of the conspiracy) (cleaned up); *Boothe v. Sherman*, 66 F.Supp.3d 1069, 1078 (N.D.Ill. 2014) (finding allegations that identified the parties, general purpose, and approximate date of the conspiracy were sufficient to survive a motion to dismiss).

Accordingly, the Court denies defendants' motion to dismiss plaintiffs' civil conspiracy claims.

## CONCLUSION

For the reasons set forth above, defendants Jordan Ancel, Jordan Ancel International, LLC, Rock City Road Films, LLC, and Candice Rose's Motion to Dismiss, (Dckt. #7), is denied. Defendants shall answer by September 8, 2025.

**DATE: August 18, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**