**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| LAKEFRONT PICTURES, LLC, JENNIFER KARUM and THE CURSE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No: 24-cv-01108 |
| JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, CANDICE ROSE, and DOE DEFENDANTS 1-20, | ) ) ) ) ) | |
| Defendants. | ) | |
| JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, CANDICE ROSE, and DOE DEFENDANTS 1-20, | ) ) ) ) ) | |
| Counter-Plaintiff, | ) ) | |
| v. | ) ) | |
| LAKEFRONT PICTURES, LLC, JENNIFER KARUM and THE CURSE, LLC, | ) ) ) | |
| Counter-Defendants. | ) ) | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendants Jordan Ancel, Jordan Ancel International, LLC, Rock City Road Films LLC, and Candice Rose (collectively, "Defendants"), by and through their undersigned counsel, hereby submit their Answer, Affirmative Defenses, and Counterclaims to the Complaint filed by Plaintiffs Lakefront Pictures, LLC ("LFP"), Jennifer Karum ("Karum"), and The Curse, LLC ("The Curse") (collectively, "Plaintiffs"). Defendants respond to the numbered paragraphs of the Complaint as follows, restating each allegation verbatim prior to their response. As to Doe Defendants 1-20, no

1

response is provided at this time, as their identities remain unspecified. Defendants deny any allegation not expressly admitted herein.

1. This action has been commenced to redress an intense and coordinated campaign of smears, harassment and bullying directed primarily at Plaintiffs LFP and Karum, at which Defendant Jordan Ancel is at the center.

**ANSWER:** Denied.

2. Indeed, through Ancel's actions is merely making good on his brazen public threat to "burn her life down," and "ruin" Karum and her company, LFP, without impunity, taunting her via text "Bitch, you can't do shit to me." See Group Exhibit C, submitted herewith.

**ANSWER:** Denied.

3. As part of his campaign, Ancel has enlisted others who have shown an interest in currying favor with him as a potential Hollywood networking contact, that have been willing to engage in conduct that has been and continues to be wrongful and purposefully malicious, for which they must be held accountable.

**ANSWER:** Denied.

4. Plaintiff Karum is an individual who is a citizen of and domiciled in the State of Illinois, who works and resides in Cook County, Illinois.

**ANSWER:** Admitted.

5. Plaintiff LFP is a limited liability company organized and existing under the laws of the state of Illinois, with its principal place of business located in Cook County, Illinois. Karum is a Member of LFP and at all relevant times has served as one of its Managers. Ryan Atkins ("Atkins") is the other Member and Manager of LFP.

**ANSWER:** Admitted.

6. Plaintiff The Curse is a limited liability company organized and existing under the laws of the state of Illinois, with its principal place of business located in Cook County, Illinois. Karum and Atkins are members of The Curse and at all relevant times have served as its Managers. The remaining members of The Curse are citizens of and domiciled in the states of Illinois, New Jersey and Pennsylvania.

**ANSWER:** Admitted.

7. Defendant Jordan Ancel ("Ancel") is an individual who is a citizen of and domiciled in the State of California.

**ANSWER:** Admitted.

8. Defendant Jordan Ancel International, LLC, ("Ancel International") is a limited liability company organized and existing under the laws of the state of California located in Los Angeles. On information and belief, Ancel is the sole member of Ancel International.

**ANSWER:** Admitted.

9. On information and belief, Defendant Rock City Road Films LLC ("Rock City") was an Illinois LLC, whose sole member was Ancel, formed for the sole purpose of contracting with and/or receiving payment for The Curse relating to services to be rendered by Ancel.

**ANSWER:** Admitted that Rock City Road Films LLC was an Illinois LLC formed for contracting purposes; otherwise denied.

10. Defendant Candice Rose ("Rose") is an individual who is a citizen of and domiciled in the State of Wisconsin.

**ANSWER:** Admitted.

11. The Doe Defendants 1-20 are individuals, whose identities are not yet known with the requisite certainty (but the identities of some are strongly suspected), who have acted in concert with Ancel

with the express intention to injure LFP and Karum, and who Plaintiffs Karum expect to add as named Defendants when their identities and actual malice are confirmed through initial discovery.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

12. Based upon the citizenship of their respective members (addressed above), LFP is deemed to be a citizen of the state of Illinois, and The Curse is deemed to be a citizen of the states of Illinois, New Jersey and Pennsylvania.

**ANSWER:** Admitted.

13. Based upon the citizenship of its respective members (addressed above), both Ancel International and Rock City are deemed to be citizens of the state of California.

**ANSWER:** Admitted.

14. None of the Plaintiffs are citizens of or domiciled in California or Wisconsin, and none of the Defendants are citizens of or domiciled in Illinois, New Jersey or Pennsylvania.

**ANSWER:** Admitted.

15. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

**ANSWER:** Admitted that diversity jurisdiction exists; otherwise denied as a legal conclusion.

16. As set forth more fully below, Ancel, either individually or through Rock City and Ancel International, contracted with both LFP and The Curse in Illinois, stipulated to jurisdiction in Illinois on behalf of Ancel International, traveled repeatedly to Illinois, provided services in Illinois, directed tortious acts and conduct towards citizens of Illinois that have resulted in injury

in Illinois, and Ancel has availed himself of the privilege of asserting claims in the Circuit Court of Cook County, Illinois.

**ANSWER:** Admitted that contracts were entered and services provided in Illinois; otherwise denied.

17. As set forth more fully below, Rose contracted with both LFP and The Curse, traveled repeatedly to Illinois and/or provided services in Illinois in connection with those contracts, directed tortious acts and conduct towards citizens of Illinois that have resulted in injury in Illinois.

**ANSWER:** Admitted that contracts were entered; otherwise denied.

18. Venue is therefore proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**ANSWER:** Admitted as a legal conclusion.

19. Karum is neuro-diverse, and on the autism spectrum. As a child on the autism spectrum, Karum was relentlessly teased and bullied in school by children who cruelly mocked her for not being "normal." These painful experiences during her youth fueled an interest in theater, which offered Karum a "safe space" where she could, at least act normal.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

20. Through theater, Karum began to develop a sense of confidence and belonging that eventually changed her outlook towards school and her ability to relate to and with her peers. Karum remained active in theater throughout high school. Karum is a 2005 graduate of Ohio Wesleyan University where she studied theater and dance.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

21. After graduating, Karum thrived in the workforce, harnessing her persistence to achieve success in various sales positions over the course of 18 years.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

22. Although Karum is open about being neuro-diverse, and how it has impacted her, both as a person and an artist, most people who meet Karum would not assume or realize that she was on the spectrum, although Karum still struggles at times with certain social cues and can become prone to a fixation on pleasing others.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

23. Despite her success in the workforce, Karum's passion remained in theater and a developing interest in film. Karum sought and booked acting opportunities, and while on set, she carefully studied and engaged with directors, assistant directors and producers to learn about all aspects of the film industry.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

24. Eventually, Karum left her sales job in order to focus on her passion for acting and film, determined to support and promote other neuro-diverse artists, and give voice to a group that is underrepresented in the film industry.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

25. After landing several acting roles, Karum's interest in filmmaking intensified.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

26. Karum met Atkins when she auditioned for a role on a project he was spearheading. At the time, Atkins had film credits as a cinematographer, director, and editor over the course of several years in the industry.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

27. Karum and Atkins quickly developed a strong synergy, and they worked together to transform Atkins' working concept into a TV pilot for what came to be known as "Conrad," about a female detective on the autism spectrum.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

28. Determined to get the Conrad pilot made, Karum and Atkins joined forces to form their own production company, LFP, with the stated mission of sharing untold stories from voices normally unheard.

**ANSWER:** Admitted that LFP was formed; otherwise denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

29. After remaking the script for the Conrad pilot, Karum and Atkins, through their newly formed production company, LFP, developed a budget for the pilot, raised necessary capital, and aggressively promoted the script to various prominent actors, in an effort to best position the project to get "picked-up" by a studio.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

30. Yet, despite the relative inexperience of its principles in the role of the producers, the strong script drew the attention of Eric Roberts (who's extensive film and TV credits include The Pope of Greenwich Village, The Expendables, and The Dark Knight), and Harry Lennix (The Blacklist, The Matrix series, Ray, etc.), and after speaking with Karum, learning about her story, and impressed by her passion and energy, both Roberts and Lennix signed onto the project.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

31. Karum's and Atkins' first attempt at producing was both exhilarating and humbling, as the duo benefited immensely from direct hands-on experience that accelerated their learning curve, but also made their share of mistakes as they learned "on the job." On balance, however, the experience producing Conrad, was invaluable, and validated the work of all of those involved with the project.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

32. Karum and Atkins (with the assistance of others) prepared materials to pitch Conrad as a series, developing a three-season arc and an extensive show bible. The Conrad pilot earned substantial acclaim, and Netflix expressed interest in the series, although those discussions fizzled during COVID and the long ensuing shutdown of nearly all projects.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

33. The experience and relative success of Conrad, however, became a springboard for new opportunities. Among other projects, Karum wrote, co-directed, and acted (supporting role) in a short film that LFP produced, a thriller released in 2018 called "The Nest," about a young woman who is tormented by premonitions about the fate of others around her.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

34. LFP was also engaged by filmmakers to produce and/or direct several award-wining short films, bringing the valued resource of a complete, experienced and carefully vetted production crew that has worked repeatedly with LFP (including on The Unseen, a feature film discussed in detail below).

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

35. LFP also began offering and offers an array of services for aspiring actors and filmmakers, including writing, directing and producing demo-scenes.

**ANSWER:** Admitted.

36. In 2020, Karum also began working on the script for her first feature length film, The Unseen, a supernatural thriller, on which she began working after completing the Conrad pilot.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

37. Karum worked with Vincent Shade, a veteran producer and director, who mentored Karum through the script-writing process for a full-length film, and specifically with respect to scripts for the horror genre.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

38. Karum and Atkins, through LFP, worked as the producers for The Unseen, handling all of the many underlying tasks involved with taking a script and turning it into a movie.

**ANSWER:** Denied.

39. LFP successfully raised capital to cover more than half of the film's proposed budget from outside investors and began casting for actors, mostly from the Chicagoland area.

**ANSWER:** Denied.

40. But to best position the film to secure broader distribution, and in keeping with LFP's mission of creating opportunity for an under-represented segment of the industry, LFP pitched the script and lead role in The Unseen to RJ Mitte, best known for his recurring role as "Walt Jr." on the highly acclaimed series, Breaking Bad, who like his character on the show, has cerebral palsy.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

41. Through considerable effort, LFP secured Mitte's commitment to the film, and turned attention to the considerable work involved with planning, preparation and martialing the resources to make a movie. Karum reserved a small supporting role in the film for herself (as Mitte's character's older sister).

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

42. LFP also pre-cast two of the other major roles, including Rose, with whom Karum had attended classes, become friendly (scenes from Conrad were even filmed at Rose's home), and for whom LFP had produced a scene for her demo reel, and Rebekah Kennedy, with whom Karum connected after seeing her work on Law & Order, and developed a friendship borne of their respective mutual admiration for the other's work.

**ANSWER:** Admitted that Rose was cast; otherwise denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

43. Among the lessons learned as newly minted producers on Conrad, Karum and Atkins experienced the challenges of wearing multiple hats in connection with a project, particularly in Karum's case, who juggled roles both in front of and behind the camera.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

44. Atkins and Karum concurred that for The Unseen, LFP would bring in a dedicated Director, eventually hiring Vincent Shade, with whom they had worked (and was familiar with the script), and collectively, they all agreed to bring in an extra producer to help to manage the set when Karum was acting, so that she could otherwise focus on her role as producer (when not acting), and so that Atkins could focus primarily on cinematography.

**ANSWER:** Denied.

45. Eventually LFP reached out to Ancel to discuss the role of Producer.

**ANSWER:** Admitted.

46. Karum knew of Ancel before they ever worked together. Karum was part of a "Thriving Actors" Facebook Group in which Ancel offered coaching/mentoring services and the like to aspiring actors and touting his experience as a producer.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations.

47. Ancel also touted to the Facebook Group that his wife was a prominent Hollywood agent, and he aggressively pitched himself as a valuable networking contact by members of the group seeking representation.

**ANSWER:** Denied.

48. At the time that LFP first reached out to Ancel about serving as a third producer on the film, Karum and Atkins had already been working on the project for well over a year, had completed the majority of the "development work" on the project, and had begun to focus on pre-production.

**ANSWER:** Denied.

49. When he was first approached, Ancel showed no interest in the project. In fact, it was not until he learned that Karum and Atkins had lined-up Mitte as the lead actor that Ancel did a complete about-face and expressed serious interest in a producer role, hyping all that he could do to assist and train Karum and Atkins as producers.

**ANSWER:** Denied.

50. In reality, on information and belief, Ancel had little meaningful experience with or reputation for producing feature films, and he actually saw The Unseen as an opportunity to pad his resume (which, at the time, featured mostly short films and commercials), as well as his opportunity to forge a relationship with a lead actor with established credits, that he could attempt to parlay into more opportunities to get involved with feature films.

**ANSWER:** Denied.

51. On or about May 31, 2021, Ancel, through Rock City, entered into a Producer Agreement with The Curse, a special purpose entity Managed by LFP that owned all of the intellectual property rights relating to The Unseen, to assist Karum/Atkins/LFP, the film's primary producers. A copy of the Producer Agreement is submitted herewith as Exhibit A.

**ANSWER:** Admitted that a Producer Agreement was entered; otherwise denied.

52. Pursuant to the express terms of the Producer Agreement, Ancel was to receive a flat fee, and provided he/Rock City was not in material breach of the Production Agreement, would also be

eligible to receive a small percent of "Net Profits of the film (as that term was defined therein). Id. at par. 3.

**ANSWER:** Admitted as to the terms of the document, which speaks for itself.

53. The Producer Agreement also made clear, however, that The Curse was not obligated to use Ancel's services, or the results of such services in connection with the film, or to produce, release or distribute The Unseen after it was completed. Id. at par. 3.3.

**ANSWER:** Admitted as to the terms of the document, which speaks for itself.

54. Pursuant to the Producer Agreement, Ancel ceded to The Curse the sole and exclusive right to publicize Ancel's role with and services to the film, and to make any changes to the script for and characters in The Unseen. Id. at pars. 5, 6. Ancel further warranted that he would not "do anything which may impair any of the rights granted to [The Curse]." Id. at par. 10.

**ANSWER:** Admitted as to the terms of the document, which speaks for itself.

55. Concurrently, Ancel, through Ancel International, also executed a Non-Disclosure Agreement with LFP (the "NDA"), a copy of which is submitted herewith as Exhibit B.

**ANSWER:** Admitted.

56. Pursuant to Ancel's NDA, he agreed not to disclose "Confidential Information" (id. at p. 1) and "not to discuss any information about the project, disparage or reveal prejudice whether deemed factual or opinion to 3rd parties over phone, in person, emails, social media, or any other electronic form of communication…" Id. at p. 5.

**ANSWER:** Admitted as to the terms of the document, which speaks for itself.

57. The NDA made clear that Ancel's breach thereof could result in his forfeiting credit for the film at the discretion of the primary producers. Id. Ancel actually initialed the referenced provision acknowledging that he understood that his credits could be forfeited.

**ANSWER:** Admitted as to the terms of the document, which speaks for itself.

58. Ancel joined the film as a producer during the final portion of the "development phase" of the project and showed initial enthusiasm. Ancel introduced LFP to additional investors who contributed capital, and during script meetings, offered helpful ideas that Karum incorporated into the script.

**ANSWER:** Admitted.

59. But after making a positive first impression, Ancel became largely disengaged, missing numerous calls and meetings, and neglecting his responsibilities, apologetically citing various ongoing personal issues he was having, leaving Karum and Atkins to shoulder an outsized burden relative to the production.

**ANSWER:** Denied.

60. Given the film's limited budget (developed and managed entirely by LFP), all of the filming was set to take place in the Greater Chicago Metropolitan area over a three-week period, with one week of shooting in April 2022, after which they would resume and complete filming over a two-week period in June 2022.

**ANSWER:** Admitted.

61. LFP identified and secured substantially all of the site locations (homes, offices, restaurants, school, etc.) at which scenes were to be filmed.

**ANSWER:** Denied.

62. In light of the aggressive filming schedule, Karum and Atkins anticipated that the days on sets would be long, and that coordination among the producers would be critical to staying on time and budget.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations regarding Plaintiffs' anticipation.

63. Karum and Atkins reiterated to Ancel that his principal role would be to run the set on days when Karum would have to focus on her work in front of the camera, and reasonably expected that Ancel would conduct himself professionally.

**ANSWER:** Denied.

64. As set forth more fully below, however, Ancel failed to perform competently or professionally, and even in the third-producer role, Ancel became far more of a distraction (particularly on the set) than he was an asset.

**ANSWER:** Denied.

65. Shortly after they began working together, Ancel began to confide in Karum about unhappiness in his marriage, and about extra-marital affairs.

**ANSWER:** Denied.

66. While surprised that Ancel would only discuss personal and sensitive topics like his marriage and infidelity with anyone with whom he was supposed to have a professional relationship, Karum was not bothered by it at first, as she viewed it as a sign that Ancel trusted her enough to confide in her. Thus, Karum tried to be understanding and sympathetic when Ancel confided in her.

**ANSWER:** Denied.

67. During pre-production and thereafter, however, Ancel's continued talk about his affairs became almost boastful in nature and thus increasingly off-putting. Karum felt particularly uneasy when Ancel told her about following a woman to a weekend yoga retreat in the hopes of rekindling an amorous relationship with her, which Karum considered "creepy" and "stalker-like."

**ANSWER:** Denied.

68. Karum asked Ancel to refrain from discussing his sex life with her any further, but after a brief respite, Ancel could not restrain himself and continued his objectionable chatter about sexual pursuits and conquests, which became particularly problematic when Ancel's inability to control his libido began impacting his work and the production set.

**ANSWER:** Denied.

69. As a producer, it is completely inappropriate to have any relationship, consensual or otherwise, with any member of crew or staff. Yet while on set, Ancel flirted incessantly with a young woman (the props manager) on the crew, even after Karum asked him to stop.

**ANSWER:** Denied.

70. Without regard to Karum's admonition, Ancel continued his amorous pursuit of the female crew member, even leaving the set early on occasion so that he could accompany the crew member to her home, abdicating his responsibilities and leaving Karum and Atkins to handle the producers' responsibilities before filming resumed in the morning.

**ANSWER:** Denied.

71. Jordan also told Karum that he was "really attracted" to another young female staff member. Karum admonished Ancel to act professionally and asked him to focus on the work at hand, since all of the filming for The Unseen was going to be compressed into three weeks.

**ANSWER:** Denied.

72. Karum and Atkins continued to admonish Ancel about his behavior (and even privately considered terminating him for cause), prompting Jordan to threaten that "his investors" would pull their money out of the film if he were to be removed from his role as a producer.

**ANSWER:** Denied.

73. Given the already tight filming schedule, and the havoc that would result if investors even threatened to back out, Karum and Atkins elected not to terminate Ancel during filming.

**ANSWER:** Denied.

74. The text below was sent by Ancel to Karum, evidencing both that Ancel's discussed his affairs with Karum, as well as his threats (as the relationship soured) toward Karum discussed more fully below about telling anyone about his affairs.

**ANSWER:** Admitted that texts were sent; otherwise denied as to characterization.

75. Once on set, Ancel showed almost no interest in fulfilling the third-producer role and responsibilities for which he was actually hired.

**ANSWER:** Denied.

76. While Ancel induced The Curse to hire him by touting his producer's experience as a valuable resource to Karum and Atkins, Ancel proved largely inept at anticipating even basic production needs or planning ahead for contingencies, instead spending most of his time away from the set glad-handing (rather than managing) the cast and crew.

**ANSWER:** Denied.

77. On one particular night on set at a suburban home location, Ancel simply decided to take a nap on the couch (alongside a young female member of the crew) during filming, while others worked into the night.

**ANSWER:** Denied.

78. Ancel took little initiative and routinely ignored basic administrative responsibilities of a producer. For instance, while shooting on location at a home, a door was damaged in Ancel's presence (Karum was acting, not producing on that date). Ancel was inexplicably combative with the homeowner, and rather than taking charge of the repair, he attempted to first push-off the

responsibility to the crew, and then to LFP (without telling LFP), angering the home's owner when the door remained unrepaired for more than a month.

**ANSWER:** Denied.

79. Karum and/or Atkins had to prepare specific task lists for Ancel and regularly monitor his progress with respect to those tasks or they simply would not get done. And still, Karum, Atkins and sometimes Shade would have to pick up the slack from Ancel's neglect, making for extremely long days during pre-production and on set.

**ANSWER:** Denied.

80. On set, Ancel simply refused to accept the role of the third producer for which he was actually hired and looked for every opportunity to portray and comport himself as the film's primary producer.

**ANSWER:** Denied.

81. As with any low budget project with limited days allotted to film, Karum and Atkins anticipated that there would be mistakes, issues and frustrations, and they expected that collectively, the producers would discuss them privately and then present a united front in addressing the issues.

**ANSWER:** Denied for lack of sufficient knowledge to form a belief as to the truth of the allegations regarding Plaintiffs' anticipation.

82. Instead, when cast or crew approached Ancel with any issue, he reflexively blamed others, mostly Karum and/or Atkins (even when it was his fault), abdicating any semblance of leadership or a willingness to make necessary decisions that were unpopular.

**ANSWER:** Denied.

83. But other times, when Ancel was eager to portray himself as the one in charge, he would act unilaterally and impulsively, including with respect to personnel decisions.

**ANSWER:** Denied.

84. Moreover, when he did not get his way, Ancel would fly off the handle and get aggressively angry, which he described as "going nuclear." On set, "You don't want to see me go nuclear," became a common and ominous refrain from Ancel in an effort to get his way, often threatening to have his minority investors "pull their funding" or to have the Screen Actors Guild (SAG) shut down the project.

**ANSWER:** Denied.

85. Ancel also displayed terrible professional judgment, by using marijuana on set—an express violation of SAG—and most disturbingly, giving cannabis-infused gummies to interns, including at least one who was below the legal age of consumption.

**ANSWER:** Denied.

86. Karum, who was not on location at the time of the incident, learned about it from other members of the crew, and she confronted Ancel about his actions. Ancel did not deny the allegations yet became indignant that Karum would even raise the issue, gaslighting her as if she was somehow wrong to insist upon compliance with SAG rules that otherwise put the entire production at risk. Ancel's texts below reflect the same.

**ANSWER:** Denied.

87. Ancel seemed to have a particular problem taking direction from Karum as a woman.

**ANSWER:** Denied.

88. When Karum would stand her ground, Ancel was misogynistic and verbally abusive, frequently engaging in tirades laced with grotesque profanity that should never be tolerated in any work environment.

**ANSWER:** Denied.

89. Ancel also tried to weaponize Karum's autism, bullying her, and often doing so in front of the cast and crew to embarrass her and foment division on the set, creating an unnecessarily stressful work environment, and one that was particularly difficult for Karum (as someone who is neuro-diverse), who is hypersensitive about resolving conflict.

**ANSWER:** Denied.

90. Other times, Ancel would cruelly mock Karum's autism, telling her and others that Karum merely "uses" autism as a crutch to excuse or justify her actions.

**ANSWER:** Denied.

91. When he was not given access to budget details (to which he was not entitled), Ancel made deliberately false statements to investors and to Mitte's representation that Karum was misappropriating funds from the production budget (which was carefully monitored by the Unit Production Manager), so that they would demand a review of the books, causing increasing tension and distrust. The investors' ensuing review of the books found no evidence of misappropriation.

**ANSWER:** Denied.

92. Ancel's disruptive behavior peaked during the final week of filming. As the writer of The Unseen, Karum and the film's Director discussed modest additions to the script (relating to Karum's role) which is both common in the industry, and something that the Director felt was necessary to tie together the storyline.

**ANSWER:** Denied.

93. When he learned that the script had been modified without his consultation, Ancel "went nuclear" (to use his term) even though he had contractually agreed that LFP had the exclusive rights with respect to the script, and script revisions.

**ANSWER:** Denied.

94. After Karum tersely told Ancel that she would make the changes to the script that she deemed appropriate, Ancel began to spread false rumors among the cast that the script changes were merely driven by Karum's ego, and although the change only involved a single line of dialogue, Ancel convinced members of the cast that the change to the script would adversely impact their role and screen time.

**ANSWER:** Denied.

95. Ancel's false rumors set-off a firestorm of concerns, which he stoked to make people believe that Karum's continued presence on set threatened production, the completion of the project, and payments to crew.

**ANSWER:** Denied.

96. Blind-sided by these false rumors, Karum (unlike Ancel) chose to put the interests of her film before her own personal agenda and volunteered to step away from set for the day so as not to disrupt the already packed schedule for the final days.

**ANSWER:** Denied.

97. Then, in the ultimate act of petulance by Ancel, and in an attempt to wrest control away from LFP so as to assume control over the final critical days of shooting, Ancel spread false rumors, first among the cast (and to the lead actor's mother), and among the crew to make them all believe that that if Karum returned to the set, there would be an exodus of both cast and crew.

**ANSWER:** Denied.

98. Exploiting the chaos he created, Ancel effectively forced Karum to stay away from her own set for the final five days of filming.

**ANSWER:** Denied.

99. In her absence, Ancel relished the opportunity to curry favor with the crew, unilaterally approving overtime requests and hotel charges, without discussing it with Karum or Atkins, and without regard to the fact that the budget could not support such charges.

**ANSWER:** Denied.

100. Before filming concluded, Karum learned that the Director slept in his car after a late night on set and arranged to get him a hotel room (something Ancel should have done).

**ANSWER:** Denied.

101. Karum, who had booked a block of rooms at the Allerton Hotel for Ancel and cast members who hailed from outside the Chicago area, called the hotel to add another room to the block. At the same time, she thought it would be a nice gesture to drop-off goody bags of assorted snacks (that she purchased) to allay tensions regarding her ouster from the set.

**ANSWER:** Denied.

102. When Karum arrived at the hotel, she asked the front desk to deliver the bags to various rooms but was told that as the person who booked the rooms and named on the reservation, that she could be given access to each of the rooms to deliver them herself.

**ANSWER:** Denied.

103. Karum, however, did not want to enter anyone's room, and asked that security handle the deliveries. The hotel instead proposed that she accompany hotel security to the rooms and direct the desired deliveries, to which Karum acquiesced.

**ANSWER:** Denied.

104. The hotel security guard made the deliveries, but in doing so, erroneously used his keys to access the alternate door of the lead actor's hotel suite, startling people in the room. The guard apologized for his oversight and Karum (who was in the hall at the time) personally handed the

bag to the person who greeted the security guard, and in the presence of the guard, was invited into the room by the lead actor's mother. Karum accepted the invitation and the two had a short but pleasant conversation.

**ANSWER:** Denied.

105. When Ancel learned that Karum had engaged with the cast at the hotel, he texted Karum claiming that she had crossed the line, was a "psychopath," and threatened to call the police.

**ANSWER:** Denied.

106. In response, Karum advised Ancel that she had not entered any room, and that security had entered simply to deliver gifts, all of which the security guard confirmed.

**ANSWER:** Denied.

107. Nevertheless, despite knowing the truth, Ancel purposefully and falsely told the cast and crew that Karum had "broken into" cast hotel rooms, citing it as proof that she was vengeful and that her presence was "dangerous."

**ANSWER:** Denied.

108. Ancel also falsely advised the hotel that Karum was no longer involved with the project and that she should not be permitted to access any of the rooms in the block.

**ANSWER:** Denied.

109. Ancel then convinced cast and crew that it would be "dangerous" to attend official The Unseen "wrap-party" that had been planned, and decided to have his own unofficial wrap-party from which Karum and Atkins would be banned from attending in the interests of "safety."

**ANSWER:** Denied.

110. At his unofficial party, Ancel made new and unwelcomed advances towards at least one woman in the crew who complained to the film's Unit Production Manager that Ancel would not leave her alone at the party, even though the woman's boyfriend was present, and asked him to stay away from them.

**ANSWER:** Denied.

111. In his final act of sabotage, Ancel decided to fly home before filming had concluded, and rather than risk allowing Karum to speak directly to cast or crew outside his presence, announced that the final day of shooting (including a critically important scene) had been canceled, causing confusion among cast and crew that had planned to be on set to complete their final scenes/shots.

**ANSWER:** Denied.

112. Representatives of SAG had to intercede to make sure that cast and crew knew that shooting had not been canceled, and that they were expected to be there to complete filming. Karum returned to the set without incident to oversee filming on that day.

**ANSWER:** Denied.

113. After filming ended, Ancel was advised by LFP that his services would no longer be necessary, relieving him of any post-production responsibilities. Instead, Karum and Atkins, as lead producers, oversaw all aspects of post-production.

**ANSWER:** Denied.

114. Ancel demanded that he be included in the efforts to obtain distribution of the film but was again advised that his services were not necessary or desired and was expressly reminded that the Producer Agreement that he signed made clear that LFP had the exclusive right to control distribution.

**ANSWER:** Denied.

115. Ancel became irate at his de facto termination, sending Karum a barrage of profanity-laced texts that were as vile and offensive as they were threatening, referencing his desire to "burn her life down," and "ruin" her and her Company, including communications set forth in Group Exhibit C.

**ANSWER:** Denied.

116. Moreover, despite contractually ceding to LFP the exclusive control over publicity of the film, Ancel began to reach out directly to media touting his role in The Unseen, called it the film that he produced, a claim he would regularly repeat across social media over the coming months in complete and total disregard of the express provisions of the Producer Agreement.

**ANSWER:** Denied.

117. When The Unseen's actual publicist politely asked Ancel to refrain from contacting media on behalf of The Unseen, he attempted to bully her via texts submitted herewith as Exhibit D. She reported Ancel's attack to The Unseen's counsel and refused to have any further contact with him.

**ANSWER:** Denied.

118. Notably, when Ancel learned that the film's publicist was also the publicist for a prominent and coveted Los Angeles film festival (to which The Unseen was invited, he sheepishly apologized for what he admitted was his embarrassing behavior, explaining that he believed that she was someone aligned with Karum, effectively admitting that his actions were driven by his animus toward Karum, and highlighting his malicious intentions in targeting Karum.

**ANSWER:** Denied.

119. Ancel then decided to make good on his threats to "ruin" Karum and LFP, and to "burn her life down."

**ANSWER:** Denied.

120. On information and belief, he responded by telling anyone who would listen that Karum was "dangerous," falsely telling people that she baselessly had accused him of sexual assault (which she did not).

**ANSWER:** Denied.

121. Ancel also commenced a suit against Karum sounding in False Light Invasion of Privacy and Defamation, specifically repeating the allegation that Karum wrongly accused him of sexual assault.

**ANSWER:** Admitted that a suit was filed; otherwise denied as to characterization.

122. While Ancel's complaint alleges that Karum made false statements that painted him in a "false light," the truth is that it was Ancel who widely disseminated the complaint on social media, and even (via his counsel) to at least one industry publication (Reel Chicago) to spread the lie that

**ANSWER:** Denied.

123. Then, portraying himself as the victim, Ancel boasted publicly that he had a strategy for "taking down" Karum "in an epic way."

**ANSWER:** Denied.

124. Ancel began to falsely represent across social media that there was a class action suit against Karum and/or LFP in the works, in an effort to mislead people into believing that Karum had a history of making false accusations and encouraging people to spread the word about it.

**ANSWER:** Denied.

125. In the meantime, after rallying his sycophants to speak out against Karum on social media, Ancel was confronted in Court about the lack of any proof that Karum had ever made any such false allegation of assault against him.

**ANSWER:** Denied.

126. Tellingly, Ancel dropped the allegations about Karum's accusation of sexual assault, tacitly admitting that the claim was baseless, yet never took steps to correct or clarify his broad public statements to the contrary, causing severe and substantial reputational harm to Karum.

**ANSWER:** Denied.

127. Moreover, Karum has been harassed and cyber bullied by Ancel and his supporters.

**ANSWER:** Denied.

128. Any time that someone promotes an engagement or project with LFP, they are inundated with comments, messages and/or communications with a coordinated warning or theme—that working with Karum and LFP are "dangerous," and falsely claiming that Karum had been blackballed in the Chicago film community, myths that Ancel started and has actively promulgated directly, and through his proxies.

**ANSWER:** Denied.

129. Ironically, after the dust settled over Ancel's vicious rumors on set, substantially all of the cast and crew attended the premiers of The Unseen in both Los Angeles and Chicago with the allegedly "dangerous" Karum without any incident, while it was Ancel who was legally prohibited from attending either premier based upon the statements of multiple witnesses to his abusive and threatening behavior.

**ANSWER:** Denied.

130. And others have since come forward to relay similar accounts and experiences with Ancel citing his lack of professionalism, work ethic and volatile and otherwise inappropriate behavior.

**ANSWER:** Denied.

131. Yet Ancel and his followers have brazenly continued to harass and malign Karum and LFP in messages and across social media (including in groups with tens of thousands of members). A small representative sample of the orchestrated and far-reaching smear campaign directed at or about Karum and LFP is set forth in Group Exhibit E submitted herewith.

**ANSWER:** Denied.

132. As a result of Ancel's campaign, at least one Facebook Group has now begun expelling from its ranks any members that works with Karum or LFP, or even has Karum among their Facebook friends.

**ANSWER:** Denied.

133. Other smears have been sent anonymously to LFP clients, prospects and partners using Gmail accounts under fictitious or truncated names to avoid detection.

**ANSWER:** Denied.

134. And spoof emails sent via Gmail that are designed to appear to the recipient as if they had been sent by Karum or Atkins have been sent to one or more people, including at least one former LFP intern.

**ANSWER:** Denied.

135. On information and belief, Ancel is responsible for all or substantially all of the false and misleading smears against Karum and LFP, described above which have either been sent by him or at his express direction by those seeking favors or opportunities in return, including Rose.

**ANSWER:**  Denied.

136. On information and belief, Ancel has stealthily orchestrated these attacks (using, among other things, communication applications that cannot be traced (at least without assistance of a forensic exam of the subject computer and mobile devices he uses).

**ANSWER:**  Denied.

137. Among others, on information and belief, Ancel has encouraged Rose to attack and bad-mouth Karum on social media, and to Chicago area casting agents and/or agencies.

**ANSWER:**  Denied.

138. As set forth above, Rose was an actor on The Unseen (cast by LFP), who had previously engaged LFP to create a scene for her demo reel, and for which she gave LFP a glowing review.

**ANSWER:**  Admitted.

139. Notably, because their respective scenes were shot during different weeks, Rose was never even on set with Karum, yet has since taken to maliciously echo Ancel's false smears to casting directors and others about her experience, including that Karum is "dangerous."

**ANSWER:**  Denied.

140. As a result of the coordinated smear campaign against Karum and LFP, a number of LFP clients canceled their contracts with the company, including contracts to film and produce demo reels, contract to sponsor an industry event, and a contract for post-production editing.

**ANSWER:**  Denied.

141. At least one freelance engineer with which LFP had worked productively and without incident in the past, cut ties with LFP specifically citing what they heard (ostensibly by Ancel) was a lawsuit against LFP, when in fact, LFP had not been named in any suit, clearly suggesting that he had been told about a pending suit rather than having actually seen the complaint.

**ANSWER:** Denied.

142. Another freelancer with which LFP had worked productively and without incident in the past, cut ties with LFP specifically citing threats that anyone who worked with LFP would be blackballed from work in the area.

**ANSWER:** Denied.

143. Similarly, at least one prospective partner in a project, with which discussions regarding investment and assistance with distributions had substantially advanced, precipitously ended negotiations citing to pending litigation "against the company," again suggesting that it had been told about a pending suit rather than having actually seen any complaint.

**ANSWER:** Denied.

144. LFP also was injured when interns that had accepted opportunities with the Company, reversed their acceptances, citing the allegations made against Karum.

**ANSWER:** Denied.

145. Moreover, one independent casting agency has suddenly distanced itself from LFP, again citing the concern over "safety."

**ANSWER:** Denied.

146. On information and belief, Ancel has directed, encouraged, incentivized and/or rewarded those who have piled on as part of his targeted smear campaign, including among others, Rose, Karel Ramirez, Rosaleah Gonzalez, Aaron Hawkins, and Samantha Spellman.

**ANSWER:** Denied.

147. As a result, Ancel and those working in coordination with him have caused substantial damages to LFP, namely hundreds of thousands of dollars in lost revenue and profits to date, and an untold number of lost professional opportunities.

**ANSWER:** Denied.

148. In addition, LFP and Karum have suffered substantial reputational harm that cannot be easily quantified or remediated and face the prospect of having to invest heavily in a lengthy public relation campaign to address the extensive disinformation propagated about LFP and Karum that has been spread by Ancel and/or his co-conspirators.

**ANSWER:** Denied.

**COUNT I (Against Ancel for Defamation)**

149. Karum incorporates by reference the allegations of paragraphs 1-133 above.

**ANSWER:** Denied as incorporated.

150. As set forth below, Ancel made false statements about Karum, with full knowledge of their falsity, first in an effort to gain control of the project so that he could claim to have had a larger role than the third producer he contracted to fill, and then out of spite to embarrass, harass and damage Karum's reputation after she excluded him from any post-production activities.

**ANSWER:** Denied.

151. Ancel's false representations to investors and others on set that Karum had misappropriated money from the budget was defamatory per se.

**ANSWER:** Denied.

152. Ancel's false statements to the cast that Karum had "broken into" hotel rooms were defamatory per se.

**ANSWER:** Denied.

153. And Ancel's false statements published to numerous third parties that Karum had wrongfully accused him of sexual assault, made before and after he filed his suit, were defamatory per se.

**ANSWER:** Denied.

154. All of these false and defamatory statements were made purposefully and with malice, with the intention of causing reputational and economic harm to Karum.

**ANSWER:** Denied.

155. Karum has been injured as a result of Ancel's defamatory statements.

**ANSWER:** Denied.

156. Ancel has acted willfully, justifying an award of punitive damages to punish him and dissuade such tortious conduct in the future.

**ANSWER:** Denied.

**COUNT II (Against Ancel for False Light Invasion of Privacy)**

157. Karum incorporates by reference the allegations of paragraphs 1-141 above.

**ANSWER:** Denied as incorporated.

158. As set forth above, Ancel broadly published claims about Karum, including across multiple social media channels.

**ANSWER:** Denied.

159. Ancel's statements regarding Karum were false, and placed Karum in a false light that is both offensive and unprofessional.

**ANSWER:** Denied.

160. Ansel published these statements with knowledge of their falsity, and with the express intention of harming Karum's reputation.

**ANSWER:** Denied.

161. Ancel has acted willfully, justifying an award of punitive damages to punish him and dissuade such tortious conduct in the future.

**ANSWER:** Denied.

**COUNT III (Against Ancel International for Breach of the NDA)**

162. LFP incorporates by reference the allegations of paragraphs 1-146 above.

**ANSWER:** Denied as incorporated.

163. The NDA is a valid and enforceable contract.

**ANSWER:** Admitted.

164. As set forth above, Ancel materially breached the NDA, both through social media, and by filing an unsealed and unredacted complaint that gratuitously discuss the project and disparages parties associated therewith, which he, in turn, widely circulated via social media and for which he actively sought publicity.

**ANSWER:** Denied.

165. In addition to forfeiting producer credit, Ancel's material breach of the NDA has caused damage to LFP.

**ANSWER:** Denied.

**COUNT IV (Against Ancel and Rock City for Recission of the Producer Agreement)**

166. The Curse incorporates by reference the allegations of paragraphs 1-150 above.

**ANSWER:** Denied as incorporated.

167. The Producer Agreement is a valid and enforceable contract.

**ANSWER:** Admitted.

168. The Curse performed its obligations due to date pursuant to the Agreement.

**ANSWER:** Denied.

169. As set forth above, Rock City and Ancel failed to perform duties under the Agreement in a workmanlike manner, including among other things, violating SAG Rules regarding drug use on set, giving THC infused gummies to an underage intern, and disrupting production at every turn.

**ANSWER:** Denied.

170. There was a complete and total failure of consideration on Rock City's and Ancel's part with respect to the Producer Agreement, warranting a recission of the Agreement, disgorgement of sums paid to Rock City, stripping Ancel of third-producer credits, and relieving The Curse from making any future payments to Rock City.

**ANSWER:** Denied.

**COUNT V (Against Rock City and Ancel for Breach of the Producer Agreement)**

171. The Curse incorporates by reference the allegations of paragraphs 1-155 below.

**ANSWER:** Denied as incorporated.

172. The Producer Agreement is a valid and enforceable contract.

**ANSWER:** Admitted.

173. The Curse performed its obligations due to date pursuant to the Agreement.

**ANSWER:** Denied.

174. Rock City is a mere subterfuge formed by Ancel to shield himself from liability for his misconduct. There is a complete and total unity of interest between Rock City and Ancel.

**ANSWER:** Denied.

175. On information and belief, Rock City was at all times substantially undercapitalized, and the entity has since been dissolved.

**ANSWER:** Denied.

176. As set forth above, Ancel failed to perform his duties under the Agreement in a workmanlike manner, and otherwise breached the Producer Agreement in the manner described above.

**ANSWER:** Denied.

177. As a direct and proximate cause of Ancel's breaches, The Curse has been damaged as described above.

**ANSWER:** Denied.

178. The veil between Rock City and Ancel should be pierced, and they should be jointly and severally liable for the damages that they caused.

**ANSWER:** Denied.

**COUNT VI (Against Ancel and Doe Defendants 1-20 For Tortious Interference)**

179. LFP incorporates by reference the allegations of paragraphs 1-163 above.

**ANSWER:** Denied as incorporated.

180. LFP is a party to valid and enforceable contracts described above, and was in pursuit of additional prospective contracts, and in forging networking and referral relationships from which it had a reasonable expectation of profiting.

**ANSWER:** Denied.

181. Ancel and the Doe Defendants, through their smear campaign and direct acts of interference described above, caused the termination of those contracts, and prevented the prospective contracts and relationships from being solidified.

**ANSWER:**   Denied.

182. As a direct and proximate result of the referenced interference, LFP has been injured.

**ANSWER:**   Denied.

183. Ancel and the Doe defendants have acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:**   Denied.

**COUNT VII (Against Ancel for Intentional Infliction of Emotional Distress)**

184. Karum incorporates by reference the allegations of paragraphs 1-168 above.

**ANSWER:**   Denied as incorporated.

185. Ancel's conduct towards and treatment of Karum described above was both extreme and outrageous.

**ANSWER:**   Denied.

186. Ancel acted with actual malice, and as described above, acted with the express intention of causing severe emotional distress to Karum.

**ANSWER:**   Denied.

187. Ancel was aware that Karum is on the autism spectrum, and he purposely exploited Karum's sensitivities and vulnerability associated with her being neuro-diverse.

**ANSWER:**   Denied.

188. Ancel acted willfully, justifying an award of punitive damages to punish him and dissuade him from engaging in such tortious conduct in the future.

**ANSWER:**   Denied.

**COUNT VIII (Against Ancel, Rose and Doe Defendants 1-20 for Civil Conspiracy)**

189. LFP incorporates by reference the allegations of paragraphs 1-173 above.

**ANSWER:** Denied as incorporated.

190. As set forth above, Ancel, Rose and the Doe Defendants conspired and agreed to engage in a coordinated tortious campaign of harassment against LFP and its principals, and interference with LFP's business with the express purpose of injuring LFP.

**ANSWER:** Denied.

191. Ancel, Rose and the Doe Defendants took acts, described above, in furtherance of the referenced conspiracy.

**ANSWER:** Denied.

192. LFP has suffered economic loss and reputational harm as a direct and proximate result of the referenced conspiracy.

**ANSWER:** Denied.

193. Ancel, Rose and the Doe Defendants acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:** Denied.

**COUNT IX (Against Ancel, Rose and Doe Defendants 1-20 for Civil Conspiracy)**

194. Karum incorporates by reference the allegations of paragraphs 1-178 above.

**ANSWER:** Denied as incorporated.

195. As set forth above, Ancel and the Doe Defendants conspired and agreed to engage in a coordinated tortious campaign against Karum, personally, with the express purpose of causing her to suffer financial injury and emotional distress.

**ANSWER:** Denied.

196. Ancel and the Doe Defendants took acts, described above, in furtherance of the referenced conspiracy.

**ANSWER:** Denied.

197. Karum has suffered economic loss and reputational harm as a direct and proximate result of the referenced conspiracy.

**ANSWER:** Denied.

198. Ancel, Rose and the Doe Defendants acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:** Denied.

**COUNT X (Against Rose for Breach of Contract)**

199. LFP incorporates by reference the allegations of paragraphs 1-183 below.

**ANSWER:** Denied as incorporated.

200. Rose entered into a contract with LFP to create, write, produce, film, and edit a demo scene for her (the "Demo Agreement"). A copy of the Demo Agreement is submitted herewith as Exhibit F.

**ANSWER:** Admitted.

201. Per the terms of the Demo Agreement, Rose agreed to, among other things, refrain from committing any act "which might tend to bring [LFP,] its members or owners into public disrepute, scandal or ridicule, or which might tend to reflect unfavorably on the company…or to injure the success of [LFP]."

**ANSWER:** Admitted as to the terms of the document, which speaks for itself.

202. In 2021, Rose published a glowing review of LFP for its work on completed her demo scene.

**ANSWER:** Admitted.

203. In 2023, however, and on information and belief, at Ancel's urging, Rose began to slander and malign LFP on social media, in express breach of her obligations under the Demo Agreement.

**ANSWER:** Denied.

204. As a direct and proximate result of Rose's breach of the Demo Agreement, LFP has been injured.

**ANSWER:** Denied.

## AFFIRMATIVE DEFENSES

The following affirmative defenses are asserted on behalf of all Defendants (Jordan Ancel, Jordan Ancel International, LLC, Rock City Road Films LLC, and Candice Rose in response to the Complaint. Each defense references specific allegations in the Complaint by paragraph number to substantiate its applicability. These defenses assume, for purposes of argument, the truth of the factual allegations but provide independent grounds for defeating or mitigating liability.

1.    **Truth**: Defendants assert that any statements made about Plaintiffs were substantially true, thereby defeating claims of defamation (Count I), false light invasion of privacy (Count II), tortious interference (Count VI), intentional infliction of emotional distress (Count VII), and civil conspiracy (Counts VIII and IX). For instance, allegations in paragraphs 136-138 claim defamatory statements regarding misappropriation of funds, breaking into hotel rooms, and false accusations of sexual assault, but these reflect accurate accounts of Plaintiffs' conduct, including Karum's unauthorized access to hotel premises (paragraphs 86-92) and financial mismanagement during production (paragraphs 77, 84). Similarly, statements about Karum being "dangerous" (paragraphs 92, 113, 124) are supported by her disruptive behavior on set, such as juggling roles that led to production challenges (paragraphs 42, 63, 79), and her neuro-diverse traits contributing to fixation and conflict (paragraphs 22, 74-75), which were observed and reported by cast and crew.

2.    **Privilege (Absolute Litigation Privilege)**: Defendants' statements made in the context of judicial proceedings are absolutely privileged and immune from liability for defamation (Count I), false light (Count II), tortious interference (Count VI), emotional distress (Count VII), and conspiracy (Counts VIII and IX). Paragraphs 106-107 and 111 allege that Ancel disseminated a complaint accusing Karum of false sexual assault claims, but such statements were part of a

legitimate lawsuit filed by Ancel, as referenced in paragraphs 106 and 111, and shared with relevant parties like media for reporting purposes, falling within the privilege for communications preliminary to or during litigation.

3.     **Privilege (Qualified Privilege)**: Certain statements were made under a qualified privilege, such as communications to protect shared interests among film industry participants, defeating claims in Counts I, II, VI, VII, VIII, and IX. For example, warnings about Karum being "dangerous" (paragraphs 105, 113, 124) were shared with cast, crew, and investors to safeguard production safety and financial interests, as supported by allegations of her on-set disruptions (paragraphs 72, 77-82, 90-92) and conflicts arising from her dual roles as producer and actor (paragraphs 40, 42-43, 63). This privilege applies to intra-industry discussions, as evidenced by the collaborative nature of the project described in paragraphs 34, 44-49, and was not abused given the reasonable belief in the statements' truth.

4.     **Opinion**: Many alleged statements constitute non-actionable opinion rather than verifiable fact, barring recovery under defamation (Count I) and false light (Count II). References to Karum as "dangerous" (paragraphs 92, 105, 113, 124), "psychopath" (paragraph 90), or using autism as a "crutch" (paragraph 75) are subjective opinions based on observed behaviors, such as her fixation on pleasing others (paragraph 22), hypersensitivity to conflict (paragraph 74), and actions leading to set chaos (paragraphs 77-82, 90-92), rather than factual assertions.

5.     **Statute of Limitations**: Claims based on statements or acts occurring more than one year before the filing of the Complaint on February 8, 2024, are barred by the one-year statute of limitations for defamation (Count I), false light (Count II), and related torts under 735 ILCS 5/13-201. For example, events during filming in April-June 2022 (paragraphs 60-96), including alleged defamatory statements about misappropriation (paragraph 136) and hotel incidents

41

(paragraph 137), and post-production conduct in 2022 (paragraphs 98-102), fall outside the limitations period, as do initial breaches of agreements executed in May 2021 (paragraphs 50, 55).

6. **First Breach by Plaintiffs**: For contract claims (Counts III, IV, V, X), Plaintiffs' prior material breaches excuse Defendants' performance. The Curse and LFP breached the Producer Agreement by failing to accord Ancel proper credit and involvement (paragraphs 53, 98-99), despite his contributions like securing investors and script ideas (paragraph 58), and by excluding him from distribution efforts contrary to the agreement's intent (paragraphs 99, 101). Similarly, LFP's mismanagement, such as unauthorized script changes (paragraphs 77-79) and role conflicts (paragraphs 42-43), constituted first breaches, relieving Ancel International of NDA obligations (paragraphs 149-150) and Rock City of Producer Agreement duties (paragraphs 154, 161).

7. **Unclean Hands**: Plaintiffs are barred from equitable relief (Counts IV for recission, and injunctive aspects of other counts) due to their own misconduct. Karum's actions, including exploiting her neuro-diversity for sympathy while causing set disruptions (paragraphs 19-22, 74-75), unauthorized hotel access (paragraphs 86-92), and excluding Ancel post-production despite his role (paragraphs 98-99), demonstrate unclean hands, as do LFP's failures to manage budget and production effectively (paragraphs 60, 77, 84), precluding recission or other equitable remedies.

8. **Waiver and Estoppel**: Plaintiffs waived rights and are estopped from asserting claims by their conduct. For instance, Karum and LFP continued working with Ancel despite knowledge of his alleged shortcomings (paragraphs 59, 67-73, 79), including personal disclosures (paragraphs 65-67) and on-set behavior (paragraphs 69-72), and elected not to terminate him during filming (paragraph 73), waiving breach claims (Counts III, V, X) and estopping tort claims

42

(Counts I, II, VI, VII). Additionally, Karum's sympathetic responses to Ancel's confidences (paragraph 66) estop her from claiming distress therefrom.

9. **Failure to Mitigate Damages**: Plaintiffs failed to mitigate alleged damages, reducing recovery across all counts. Despite awareness of rumors and smears (paragraphs 113, 116, 124-129), Plaintiffs did not promptly issue public corrections, pursue internal resolutions, or engage in damage control, such as addressing investor concerns directly (paragraph 77) or clarifying hotel incidents (paragraphs 90-92), allowing harms to escalate unnecessarily.

10. **Lack of Causation/Proximate Cause**: Defendants' actions were not the proximate cause of Plaintiffs' alleged injuries, defeating all counts. Damages claimed, such as lost contracts and reputational harm (paragraphs 125-133, 140, 150, 162, 167, 177, 182, 189), stem from Plaintiffs' own conduct, including production mismanagement (paragraphs 60-64, 77-84), Karum's on-set conflicts (paragraphs 74-75, 81), and independent industry perceptions of her neuro-diversity challenges (paragraphs 19-22, 172), rather than Defendants' statements or acts.

## COUNTERCLAIMS

Counter-Plaintiffs Jordan Ancel ("Ancel"), Jordan Ancel International, LLC ("JAI"), JAI Road Films LLC ("JAI Road"), and Candice Rose ("Rose") (collectively, "Counter-Plaintiffs") bring these counterclaims against Lakefront Pictures, LLC ("LFP"), Jennifer Karum ("Karum"), The Curse, LLC ("The Curse"), and Does 1–20 (collectively, "Counter-Defendants"), and allege as follows:

### I. PARTIES

1.      Ancel is a California resident who works nationwide as a film producer and career coach with extensive experience in the entertainment industry.

2.      Ancel has built a successful career helping filmmakers navigate the complex landscape of independent film production and distribution.

3.      JAI is a California limited liability company of which Ancel is the sole member.

4.      JAI operates as a film production company specializing in independent feature films and other entertainment related services, including coaching and entertainment consulting services, including film packaging.

5.      JAI has established a reputation for providing high-quality career coaching and consulting services to entertainment industry professionals.

6.      Rock City Road Films is a former Illinois based LLC created at Karum's request to include another corporate entity in the Illinois Tax Credit program, which she never did.

7.      Rose is an Illinois-based actor and creative professional with an established career in independent film and theater.

8.      Rose has worked collaboratively with Ancel on various projects and maintains professional relationships throughout the Chicago entertainment community.

9. LFP is an Illinois limited liability company that developed the independent feature film The Unseen.

10. LFP held itself out as a professional film production company capable of managing complex independent film projects.

11. Karum is an Illinois resident who serves as LFP's managing member.

12. Karum is also a managing member of The Curse.

13. The Curse is an Illinois special-purpose entity that owns The Unseen.

14. The Curse was the contracting entity that engaged JAI's services through the Producer Agreement.

15. Does 1–20 are presently-unidentified individuals or online accounts acting in concert with Karum to execute a systematic campaign of defamation and business interference against Counter-Plaintiffs.

16. Upon information and belief, these Doe defendants include individuals who operated pseudonymous social media accounts to amplify Karum's defamatory statements.

## II. JURISDICTION AND VENUE

17. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because these counterclaims arise out of the same nucleus of operative facts as Plaintiffs' claims in this action.

18. The counterclaims and the original claims share common questions of law and fact relating to the production of The Unseen and the parties' conduct in connection therewith.

19. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these counterclaims occurred in this District.

20. Venue is also proper because Plaintiffs chose this forum and Counter-Defendants conduct business in this District.

## III. FACTUAL ALLEGATIONS

### A. The Producer Agreement and Ancel's Exemplary Performance

21.     On May 31, 2021, JAI and The Curse executed a comprehensive written Producer Agreement for The Unseen.

22.     In that agreement, The Curse promised JAI three specific forms of compensation: (a) a fixed producer fee, (b) three percent of The Unseen's defined "Net Profits," and (c) appropriate screen credit.

23.     The Producer Agreement also contained a critical protection for JAI: The Curse was required to provide 24-hour written notice and an opportunity to cure any alleged breach before The Curse could terminate JAI's engagement.

24.     This cure provision was negotiated specifically to prevent arbitrary termination and ensure JAI would have an opportunity to address any concerns.

25.     After this agreement was in place, Ancel—through JAI—began rendering extensive and professional producing services for The Unseen.

26.     Ancel's contributions to the project were substantial and went far beyond typical producer responsibilities.

27.     Among his critical contributions, Ancel single-handedly raised $150,000 in equity financing for the project.

28.     This financing was essential to the project's viability and represented a significant portion of the film's total budget.

29.     Ancel personally negotiated a deal with lead actor R.J. Mitte to star in the film.

30.     R.J. Mitte's attachment to the project significantly enhanced its commercial prospects and marketability.

31.     Ancel secured appropriate hotels and catering arrangements for the cast and crew during the Chicago-area shoot.

32.     These logistical arrangements were crucial to maintaining cast and crew morale during the intensive filming schedule.

33.     Ancel successfully managed the film's principal photography, which took place in April and June 2022.

34.     Under Ancel's management, the production proceeded on schedule and within budget parameters.

35.     JAI fully performed all material obligations under the Producer Agreement through the completion of filming.

36.     At no time during the production did The Curse provide any notice of alleged breach or deficiency in JAI's performance.

37.     JAI delivered exactly what was promised in the Producer Agreement and exceeded expectations in many respects.

**B. Karum's Disruptive On-Set Conduct and Immediate Retaliation**

38.     During the second week of filming, tensions arose on set due to Karum's increasingly disruptive and unprofessional conduct.

39.     Karum's behavior created a hostile work environment that interfered with the creative process and production schedule.

40.     On or about June 20, 2022, both lead actors, including star R.J. Mitte, expressed serious concerns about Karum's conduct.

41.     Multiple department heads also raised complaints about Karum's interference with their work.

42.     These complaints escalated to the point where both lead actors and multiple department heads threatened to walk off the production if Karum remained on set.

43.     The potential departure of key talent and crew members would have resulted in a complete shut-down of the production.

44.     Facing this crisis, Ancel was forced to make the difficult but necessary decision to have Karum relieved of on-set duties.

45.     This decision was made solely to preserve the production and protect the significant investments made by all parties.

46.     A mediation process was proposed to address the underlying conflict in a professional manner.

47.     That evening at approximately 6:32 PM on June 20, 2022, a crew member sent an email to an investor named Lisa G. to report what had transpired on set.

48.     The crew member's email stated that Karum had falsely claimed to the investor's family that she had been on set "all day" and that there was "no drama."

49.     The crew member wrote that "all of that is a lie," directly contradicting Karum's misrepresentations.

50.     The crew member further wrote that Karum "will never set foot on the site again" due to the severity of the situation.

51.     The crew member predicted that production would wrap that very night because "I don't think tomorrow's gonna happen."

52.     Principal photography ultimately wrapped on or about June 24, 2022—a day earlier than originally scheduled—in part to avoid further conflict caused by Karum's behavior.

53.     Within minutes of being rightfully removed from set on June 20, 2022, Karum sent Ancel a threatening and retaliatory text message.

54.     Karum's text message read: "I'm going to make sure nobody in this town will work with you again."

55.     This threat demonstrated Karum's immediate intent to retaliate against Ancel for the legitimate decision to remove her from set.

56.     Later that same evening, Karum escalated her retaliation by sending a crew-wide message containing false accusations.

57.     In this crew-wide message, Karum falsely accused Ancel of having "caused delays, blown [the] budget, and terrorized women on set."

58.     Each of these accusations was completely false and contradicted by the actual facts of the production.

59.     Ancel had not caused any delays; rather, he had kept the production on schedule despite various challenges.

60.     Ancel had not blown the budget; the production remained within its financial parameters under his management.

61.     Ancel had not terrorized anyone on set; the complaints about disruptive behavior had been directed at Karum herself.

62.     These retaliatory statements by Karum were entirely fabricated and were clearly calculated to destroy Ancel's reputation among the cast and crew.

63.     Karum's false statements were designed to deflect attention from her own misconduct and to poison the working relationship between Ancel and other members of the production team.

## C. Karum's Calculated "Gatekeeper" Communications Campaign

64.     As The Unseen neared completion in 2023, it was accepted to screen at the prestigious Dances With Films festival in Los Angeles.

65.     The festival acceptance represented a significant achievement and marketing opportunity for the film.

66.     A world premiere was scheduled for June 30, 2023, at the TCL Chinese Theatre.

67.     This premiere would be attended by distributors, investors, industry press, and other key stakeholders.

68.     In the weeks leading up to the festival, Karum began actively working to exclude Ancel from attending or being involved in the premiere.

69.     Karum's efforts demonstrated a vindictive and obsessive determination to prevent Ancel from benefiting from the success of a project he had been instrumental in creating.

70.     On June 7, 2023, Karum's attorney sent a letter via email to Michael Trent, the festival's Executive Director.

71.     This letter was carefully crafted to paint Ancel as a dangerous and unstable individual.

72.     The letter contained fabricated allegations designed to alarm festival organizers and encourage them to exclude Ancel.

73.     Specifically, the letter falsely asserted: "Mr. Ancel's involvement was a consistent source of tension and strife, as he was misogynistic and verbally abusive, frequently engaging in tirades laced with grotesque profanity that should never be tolerated in any work environment."

74.     These allegations were completely false and were contradicted by the actual experiences of cast and crew members who worked professionally with Ancel.

75.    The next day, June 8, 2023, Karum herself directly emailed the festival's publicity team to reinforce the false narrative.

76.    In this email, Karum made additional false statements designed to portray Ancel as dangerous.

77.    Karum stated: "I do not feel safe with him there … He threatened to ruin careers if anyone spoke badly about him."

78.    These statements were fabricated and designed to create fear and concern among festival organizers.

79.    Through these coordinated communications to festival "gatekeepers," Karum aimed to convince them that Ancel was an abusive and dangerous person.

80.    Karum's goal was to have festival organizers take affirmative steps to exclude Ancel from The Unseen's premiere.

81.    These communications represented a calculated attempt to weaponize false allegations to achieve a competitive advantage.

**D. Strategic Exclusion from Industry Events and Manipulation of Legal Process**

82.    As The Unseen's premiere date approached, Karum escalated her campaign through calculated manipulation of the legal system to ensure Ancel would be excluded from key industry events and networking opportunities.

83.    On June 15, 2023, Karum filed an ex parte Petition for a Temporary Restraining Order in Los Angeles Superior Court under California's civil harassment statute.

84.    In her TRO application, Karum deliberately misrepresented communications by cherry-picking threatening language while strategically omitting exculpatory context that would have revealed the true nature of the exchanges.

85. Specifically, Karum quoted a phrase from a text exchange ("I will burn your life down") but deliberately concealed Ancel's immediate clarification: "I will come after you financially … I was very clear that the threats I make are against your finances."

86. This selective editing constituted a fraud upon the court designed to obtain a tactical advantage through deception.

87. On information and belief, Karum desperately solicited cast or crew members to provide supporting statements for her TRO request, but tellingly, none were given except from Karum's business partner, Ryan Atkins, and her paid publicist, Samanntha Waranch—both of whom had financial incentives to support her false narrative.

88. Based on these calculated misrepresentations, the court granted the TRO, which barred Ancel from attending the premiere at the TCL Chinese Theatre.

89. Once the premiere concluded and Karum had achieved her vindictive goal, she immediately allowed the TRO to lapse without seeking permanent relief, and even wrote a letter to the Judge admitting as much—confirming that the entire proceeding was a tactical abuse of the legal system.

**E. Systematic and Pervasive Industry Defamation Campaign with Fraudulent Social Media Accounts**

90. From June 2022 through the present, Karum has conducted a systematic campaign of defamation against Ancel throughout the entertainment industry, employing both direct communications and sophisticated fraudulent social media operations.

91. This campaign has involved repeatedly telling numerous industry peers and influential gatekeepers malicious and fabricated falsehoods about Ancel's character and professional competence.

92.    Karum has consistently and falsely described Ancel as "unsafe" to work with in professional settings.

93.    Karum has maliciously characterized Ancel as a "Harvey Weinstein type," deliberately invoking the notorious disgraced producer to suggest predatory behavior she knows never occurred.

94.    Karum has falsely portrayed Ancel as professionally incompetent and toxic to film productions.

95.    Karum has falsely claimed that Ancel was abusive toward women on set—a particularly vicious lie given that it was Karum's own conduct that led to complaints from female crew members.

96.    Karum has falsely alleged that Ancel mismanaged the budget of The Unseen, when in fact the production came in on budget under his management.

97.    Each of these characterizations is completely false and contradicted by the actual facts of Ancel's professional conduct.

98.    These false statements were communicated to at least the following individuals in the film community: Mike Wallace, Amanda Gecewicz, Seth Chitwood, Jen Rudolph, Megan Henry, Helene Galek, Stephen Ruminski, Kelli Tidmore, Krisit Gescheidler, Sarah Quinn, Adam Smestad, Stan Miskiewicz, Joshua Schilling, Ron Kwasman, Joe Tello, Joseph Ford, Alex Cirillo, Jeremy Applebaum, Grayson Rieth, Andrew Calvo, Adam Greiner, Matthew Heritz, Andrew Ford, Serge Martinenko, Sam Bauer, Heather Vogt, Rose, Liz Schroeder, Alexis Jania, Shannon McKinnon, Sam Hubbard, LJ Tian, Ben Lasher, Karel Ramirez, Wren Farrell, Caitlin McFadden, Shana Olivero, Justin Mendoza, Kristian Schmutz, Jade Bailey, Josie Lunn, Maika Shibata, Patty Bell, Chantelly Johnson, Barry Brecheisen, Jeffrey Moy, Kelli Victoria Scarangello, Greg Blaskey,

Chris Jones, Joseph Bowes, Ryan Croft, Mike Nehs, Matt Gogal, Mark McCollough, Oscar Mansky, Martin Davis, John-Victor Allen, Heather Olofson, Ellie Weing, Sara Kamoo, Sarah Charipar, Chantelly Johnson, Bessie Athans, Christian Martinez, Guy Mars, James Cole, Bev Moore, Rebekah Kennedy, Lisa Gal, Ava Bianchini, Evan J. Cholfin, Neil Book, Charlse Miller, and Kimberly Michelle Vaugn.

99.    Many of these individuals are producers, actors, casting directors, investors, festival organizers, and other professionals who wield significant influence in the independent film world.

100.    Karum specifically targeted these influential individuals because she knew that poisoning Ancel's reputation in their eyes would devastate his career prospects.

101.    For example, in or around late 2022, Karum told Chicago-based director and producer Vincent Shade, who directed The Unseen, that Ancel was "dangerous" to work with and not to be trusted.

102.    Karum told casting professional Helene Galek that Ancel was essentially a predatory "Weinstein" figure who posed a threat to women in the industry—a particularly malicious lie designed to ensure Ancel would be blacklisted.

103.    Karum told filmmaker Seth Chitwood that Ancel had ruined The Unseen's budget and had been effectively fired from the project, both complete fabrications.

104.    Each of these specific examples illustrates Karum's deliberate strategy to spread different but consistently damaging false narratives about Ancel to various industry contacts.

**F. Fraudulent Social Media Campaign Using Fake Accounts**

105.    In addition to her personal defamation campaign, Karum orchestrated an elaborate scheme of creating and operating fraudulent social media accounts to amplify her defamatory narrative while concealing her identity as the source.

106.    Investigation has revealed that Karum created and operated multiple pseudonymous accounts across Instagram and Facebook platforms, confirmed through Meta's own records and digital forensics.

107.    These fraudulent accounts included Instagram accounts operating under the false handles "FilmTruths" and Facebook accounts under "IndieProtect"—names deliberately chosen to suggest credibility and industry expertise while concealing Karum's identity.

108.    Additional fraudulent "personal profiles" created and operated by Karum included: Megan Elizabeth, Elizabeth Meegan, Ellie Lanta, Elise Lanta, Liz Ponter, Lizzie Pont, and artlady002.

109.    Through these fraudulent accounts, Karum posted defamatory content throughout 2022 and 2023, including false statements such as "Ancel preys on women" and "JAI blew the Unseen budget."

110.    The creation and operation of these fake accounts constitutes wire fraud under federal law, as Karum used interstate electronic communications to execute a scheme to defraud by misrepresenting her identity to damage Ancel's business interests.

111.    By using these fraudulent accounts, Karum sought to create the false impression of multiple independent sources corroborating her defamatory narrative—a sophisticated form of astroturfing designed to maximize reputational damage while avoiding accountability.

112.    These posts were strategically timed to coincide with Ancel's business negotiations and festival submissions, demonstrating their calculated nature as tools of economic sabotage.

113.    The fraudulent social media campaign was designed to and did dissuade other industry professionals from working with Ancel or hiring his companies.

114.    Upon information and belief, Karum also coordinated with Does 1-20 to further amplify these fraudulent posts through additional fake accounts and coordinated engagement.

115.    This systematic use of fraudulent social media accounts represents a particularly egregious form of defamation that exploits modern technology to inflict maximum harm while evading detection.

## G. Deliberate Withholding of Contractual Payments and Accounting Information

116.    After The Unseen completed principal photography and entered post-production, the film began the process of securing distribution agreements.

117.    The film successfully secured distribution deals with reputable companies in the industry.

118.    Despite these successful distribution agreements, LFP and The Curse have deliberately and systematically withheld all proceeds and accounting information from JAI.

119.    Internal LFP emails dated July 12, 2023, provide concrete evidence of the film's revenue generation.

120.    These emails confirm that Gravitas Ventures, the North American distributor, paid the contractually promised minimum guarantee.

121.    The minimum guarantee was paid in two separate installments as specified in the distribution agreement.

122.    The same emails confirm that The Coven, the international sales agency, successfully closed multiple foreign licensing deals for the film.

123.    These foreign licensing deals generated additional revenue streams for the project.

124.    In a formal update provided to the film's investors, LFP explicitly stated that "Quarterly reports will show producer gross in Q3 [2023]."

125.    This statement to investors constituted an acknowledgment that significant revenue had begun flowing from the various distribution agreements.

126.    By mid-2023, the film was generating income sufficient to put the project "in the black" with respect to distributors' advance payments.

127.    Despite the clear evidence of revenue generation, JAI has received absolutely no accounting information from The Curse or LFP.

128.    JAI has also received no payment whatsoever of its contractually guaranteed 3% share of net profits.

129.    Neither The Curse nor LFP has provided any explanation for this complete failure to honor contractual obligations.

130.    Counter-Defendants have provided no notice of any alleged breach that might purportedly justify withholding payments.

131.    Counter-Defendants have provided no timeline for payment of amounts clearly due.

132.    This conduct violates both the express terms of the Producer Agreement and basic principles of contractual good faith.

133.    Notably, even before distributor payments began flowing, LFP's own principals had effectively acknowledged JAI's entitlement to backend participation.

134.    In a group chat conversation in January 2023, LFP's co-producer specifically noted that Ancel had been paid "100% of all he was promised" up front.

135.    The same LFP principal acknowledged that Ancel was simply "owed a deferred percentage of [the] backend, when available."

136.    By late 2023, that backend revenue was clearly available, as demonstrated by LFP's own communications with investors.

137.    Despite this availability of funds, JAI has not received a single penny of its contractual share.

138.    JAI has also not received any profit statement or accounting that would allow it to verify the amounts due.

139.    Counter-Defendants have effectively collected all the fruits of Ancel's and JAI's labor while deliberately keeping JAI in the dark about the project's financial performance.

140.    This conduct represents a calculated effort to deprive JAI of its contractual rights while retaining all benefits of JAI's contributions to the project.

**H. Immediate and Concrete Business Harm: Lost Projects and Clients**

141.    Karum's systematic smear campaign had swift and devastating consequences for Counter-Plaintiffs' business endeavors throughout 2023.

142.    Multiple third parties who had been in advanced discussions or negotiations with Counter-Plaintiffs suddenly reconsidered or canceled their business relationships after being exposed to Karum's false allegations.

**Final Boss Productions Lost Opportunity**

143.    In mid-2023, JAI was in serious and advanced discussions with Final Boss Productions regarding a producing role on an upcoming independent feature film project.

144.    The project was described as a "murder mystery" feature film with significant commercial potential.

145.    Based on the scope of the project and JAI's proposed involvement, JAI stood to earn a producing fee of approximately $35,000.

146.    The negotiations had progressed to the point where both parties were discussing specific terms and implementation details.

147. However, on July 14, 2023, Final Boss Productions abruptly and unexpectedly informed Ancel that they would "be stepping back" from their tentative agreement.

148. This sudden reversal was completely inconsistent with the positive trajectory of the prior negotiations.

149. Sources at Final Boss Productions subsequently indicated that their decision was directly influenced by negative information they had received about Ancel.

150. Upon investigation, this negative information was traced back to statements originating from Karum's defamation campaign.

151. Final Boss Productions specifically cited concerns about Ancel's professional reputation as the reason for their withdrawal.

152. As a direct result of Karum's false statements, JAI lost this substantial business opportunity.

**"Girl Boxer" Feature Film Lost Engagement**

153. In July 2023, the producers of an independent film titled Girl Boxer had extended a formal offer to JAI for a comprehensive packaging and consulting engagement.

154. The engagement would have involved JAI providing services to attach talent to the project and assist with distribution strategy development.

155. Based on the scope of services required, this engagement would have paid JAI approximately $12,500 in consulting fees, plus additional directing and producing fees totaling $200,000, plus any post-release profit sharing.

156. The Girl Boxer producers had specifically sought out JAI based on Ancel's reputation and track record in the industry.

157.    Initial discussions had been extremely positive, with both parties expressing enthusiasm about the collaboration.

158.    However, on July 28, 2023, the Girl Boxer team suddenly and without warning withdrew their offer.

159.    A representative of the Girl Boxer team mentioned diplomatically that they were "pursuing a different direction."

160.    Ancel later learned that this euphemistic explanation was influenced by reputational concerns that had been sparked by Karum's false statements about his character and professional conduct.

161.    The Girl Boxer producers had been led to believe, based on Karum's false allegations, that it would be safer and more prudent not to work with Ancel's company.

162.    This decision represented a direct interference with JAI's prospective business relationship caused entirely by Karum's defamatory campaign.

163.    Ancel also lost out on producing and directing a romantic comedy feature "The Dream Guy"- $350,000 plus any post-release profit sharing.

164.    Another project by the same writer Ancel lost out on was a TV series called "Salvation Ship" which would have been a network show where Ancel would have made $35,000-50,000 per episode over 22 episodes per year.

**Loss of JAI Coaching Clients**

165.    Over the summer of 2023, JAI experienced an unprecedented exodus of paying clients from its one-on-one career coaching service.

166.    No fewer than five established clients abruptly canceled their ongoing coaching sessions or decided not to renew their coaching packages.

167. The aggregate loss of these clients resulted in approximately $9,000 in lost anticipated revenue.

168. These were individuals who had actively sought out Ancel's mentorship to help them break into or advance within the entertainment industry.

169. Many of these clients had previously expressed high satisfaction with JAI's coaching services and had indicated their intention to continue long-term relationships.

170. In June and July 2023, several of these previously enthusiastic clients suddenly became distant and unresponsive.

171. The timing of these cancellations corresponded directly with the intensification of Karum's defamation campaign during the period leading up to The Unseen's premiere.

172. JAI's annual coaching revenue was between $50,000 and $75,000, and he has lost this business entirely.

173. One long-time client, film investor Randy Stringer, provided explicit confirmation of the connection between his departure and Karum's false statements.

174. On July 21, 2023, Stringer sent Ancel a direct text message stating: "I'm stepping back — too much noise about you being dangerous."

175. This "noise" referenced by Stringer was directly traceable to the wave of warnings and false allegations being spread by Karum throughout the industry.

176. Stringer's text message provided concrete evidence of how Karum's defamatory statements were directly causing clients to terminate their relationships with JAI.

177. In effect, Karum's campaign of false statements not only derailed major corporate deals but also spooked individual customers who had previously valued and benefited from Ancel's expertise and guidance.

## I. Vindictive Targeting of Candice Rose for Association with Ancel

178.    Karum's malicious campaign extended beyond targeting Ancel directly to include vindictive attacks on those who associated with him professionally.

179.    This expansion of her campaign demonstrated both the breadth of Karum's malice and her strategic intent to isolate Ancel by punishing his professional relationships.

180.    Counter-Plaintiff Candice Rose became a specific target of Karum's retaliation due to her professional association with Ancel and her public support for him.

181.    Rose is an accomplished actress and creative professional with an established reputation in both the Chicago and Los Angeles entertainment markets.

182.    Rose had worked collaboratively with Ancel on various projects and had maintained a positive professional relationship with him.

183.    Rose had been publicly supportive of Ancel during the period when Karum's false allegations began circulating in the industry.

184.    Karum viewed Rose's continued association with Ancel as a threat to the effectiveness of her defamation campaign.

185.    Accordingly, Karum deliberately targeted Rose in a calculated attempt to isolate Ancel and punish Rose for her loyalty.

186.    On August 9, 2023, Karum made a public Instagram post that explicitly named Rose and made false accusations about her professional conduct.

187.    The post declared: "Anyone working with Candice Rose is condoning harassment tactics and blacklisting."

188.    This statement explicitly identified Rose by name and falsely accused her of engaging in unethical professional conduct.

189.     By claiming that Rose "condones harassment tactics," Karum was falsely suggesting that Rose supports or enables abusive behavior in the workplace.

190.     By claiming that Rose engages in "blacklisting," Karum was falsely suggesting that Rose improperly interferes with others' employment opportunities.

191.     Both of these accusations were completely fabricated and had no basis in fact.

192.     The structure of Karum's statement was calculated to maximize damage: by telling the world that "anyone" working with Rose was effectively endorsing bad behavior, Karum was plainly warning industry professionals to avoid Rose entirely.

193.     This public post was designed to function as a professional death sentence for Rose by making her radioactive within the industry.

194.     On the same day as the Instagram post, Rose received additional confirmation of Karum's vindictive campaign through a direct message from a colleague named Bev Moore.

195.     Moore's message to Rose read: "Jen is bragging she got a TRO and you guys will be shut out of festivals."

196.     This message revealed that Karum was actively boasting about her manipulation of the legal system and her broader campaign to exclude both Ancel and Rose from industry opportunities.

197.     The statements about Rose were completely false—Rose has never engaged in any harassment tactics or blacklisting behavior in her professional career.

198.     These false statements were made with the specific intent to destroy Rose's professional reputation through guilt by association with Ancel.

199.     In the aftermath of Karum's targeted attack, Rose began to experience a concrete chilling effect on her professional opportunities.

200.    Several independent film producers in Rose's professional network became noticeably less responsive to her communications.

201.    Theater directors who had previously included Rose in casting considerations ceased extending audition invitations.

202.    The pattern of professional isolation corresponded directly with the timing and content of Karum's defamatory attack on Rose's reputation.

**J. Systematic Exclusion and Manipulation of Screen Credits**

203.    The Unseen premiered as scheduled on June 30, 2023, and thereafter received distribution on various platforms as planned.

204.    However, throughout this process, Counter-Defendants continued their systematic campaign to marginalize Ancel's and JAI's role in the project.

205.    Counter-Defendants deliberately sought to deprive JAI of the contractual recognition it had earned and was entitled to receive.

206.    In the film's final end credits as released, JAI was deliberately listed third among the producers, appearing after both LFP and The Curse.

207.    This credit placement directly violated Section 8 of the Producer Agreement, which had guaranteed JAI a second-position or co-equal producer credit.

208.    The Producer Agreement's credit provision had been negotiated specifically to ensure that JAI would receive appropriate recognition for its substantial contributions to the project.

209.    By deliberately downgrading JAI's credit position, Counter-Defendants breached this explicit contractual commitment.

210. The practical effect of this credit manipulation was to make Ancel's name less prominent than contractually agreed and to diminish the recognition he would receive for his work.

211. For example, the Internet Movie Database (IMDb) entry for The Unseen lists producers alphabetically within their respective credit positions.

212. Because of Counter-Defendants' manipulation of the credit order, JAI's placement as third producer resulted in Ancel's name appearing last in the IMDb listing.

213. This last-place positioning significantly reduced the visibility and professional benefit that Ancel would derive from the project.

214. In addition to manipulating the film's actual credits, Counter-Defendants extended their exclusion campaign to promotional materials and social media publicity.

215. In materials leading up to the premiere, Karum and her team systematically omitted or downplayed Ancel's involvement in the project.

216. This exclusion from promotional materials further reduced the professional benefit that JAI was entitled to receive.

217. A particularly egregious example occurred on May 16, 2023, when LFP's co-manager posted a "Big News" graphic announcement about The Unseen's festival selection.

218. This announcement prominently named the film's producers as part of celebrating the festival acceptance.

219. However, the announcement conspicuously omitted Ancel and JAI entirely from the list of producers.

220. This omission was not accidental—it was a deliberate decision approved by Karum as part of her campaign to erase Ancel's contribution to the project.

221.  Through these systematic actions, Counter-Defendants denied JAI the very credit prominence that had been an essential part of the original bargain for Ancel's work on the project.

222.  Throughout this entire period of credit manipulation and exclusion, neither The Curse nor LFP ever provided JAI with the contractually required 24-hour cure notice of any supposed breach or performance deficiency.

223.  The absence of any cure notice confirmed that Counter-Defendants' conduct was not based on legitimate performance concerns but rather on their systematic campaign to exclude and marginalize JAI.

224.  In summary, the film was successfully completed and released, began earning substantial revenue, yet JAI was systematically cut out of both the financial participation it was promised and the screen credit recognition it had contractually earned.

**IV. CLAIMS FOR RELIEF**

<u>COUNT I</u>
**BREACH OF CONTRACT**
**(JAI v. The Curse)**

225.     Counter-Plaintiff JAI incorporates by reference all preceding paragraphs as if fully set forth herein.

226.     As alleged in paragraphs 21-24, JAI and The Curse entered into a valid and enforceable written Producer Agreement effective May 31, 2021, for JAI's services on The UnsEEN

227.     As alleged in paragraphs 25-37, JAI fully performed all of its material obligations under the Producer Agreement, including securing financing, managing production, and delivering all required services through completion of filming.

228.     As alleged in paragraphs 35-36, at no time during JAI's performance did The Curse provide any notice of alleged breach or deficiency, confirming JAI's satisfactory performance.

229.     The Curse has materially breached the Producer Agreement in multiple fundamental ways: a. Failure to Pay Net Profits: As alleged in paragraphs 116-140, The Curse has completely failed to provide any accounting to JAI or pay JAI its contractually guaranteed three-percent share of net profits, despite clear evidence that the film has generated substantial revenue through distribution agreements with Gravitas Ventures, The Coven, and other distributors. b. Failure to Provide Required Cure Notice: As alleged in paragraphs 222-223, The Curse never provided JAI with the contractually mandated 24-hour written notice of any alleged breach or opportunity to cure before effectively terminating JAI's participation in the project's benefits, in direct violation of the agreement's protective provisions. c. Failure to Accord Proper Screen Credit:

As alleged in paragraphs 203-224, The Curse, in concert with LFP, deliberately failed to give JAI the contractually guaranteed second-position or co-equal producer credit, instead relegating JAI to third position and systematically excluding JAI from promotional materials.

230.    Each of these breaches has directly and substantially harmed JAI by depriving it of the financial benefits, professional recognition, and contractual protections for which it bargained.

231.    As a result of The Curse's material breaches, JAI has suffered damages including lost profit participation, diminished professional reputation, and reduced future earning capacity.

232.    JAI is entitled to recover all damages resulting from The Curse's breaches, in an amount to be proven at trial, including but not limited to its unpaid profit share, lost promotional value, and consequential damages.

WHEREFORE, Counter-Plaintiff JAI respectfully requests that this Court award all unpaid net profits owed under the Producer Agreement, order The Curse to provide complete accounting of all film revenues and expenses, award damages for breach of credit provisions, order correction of screen credits in all future distributions, award consequential damages exceeding $500,000 for lost business opportunities, award pre-judgment and post-judgment interest, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

**COUNT II**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**
**(JAI v. The Curse)**

233.    Counter-Plaintiff JAI incorporates by reference all preceding paragraphs as if fully set forth herein.

234.    The Producer Agreement between JAI and The Curse contained an implied covenant of good faith and fair dealing that required both parties to act in a manner that would not unfairly interfere with the other party's right to receive the benefits of the contract.

235.    As alleged in paragraphs 116-140, The Curse, through its managing members including Karum, systematically acted in bad faith to deny JAI the benefits of its contractual bargain.

236.    This bad faith conduct included deliberately withholding all financial information and profit participation from JAI while collecting and retaining the benefits of JAI's substantial contributions to the project.

237.    As alleged in paragraphs 203-224, The Curse also acted in bad faith by deliberately sidelining JAI from the screen credit and promotional recognition that was essential to JAI's professional benefit from the project.

238.    As alleged in paragraphs 222-223, The Curse orchestrated pretextual reasons to justify excluding JAI from contractual benefits without providing the required cure notice, demonstrating a deliberate intent to circumvent the contract's protective provisions.

239.    The Curse's conduct was undertaken with the specific intent to deny JAI the fruits of its bargain while retaining all benefits of JAI's work and investment.

240.    This pattern of conduct constitutes a breach of the implied covenant of good faith and fair dealing inherent in every contract under applicable law.

241.    As a result of The Curse's breach of the implied covenant, JAI has suffered substantial damages in the form of lost revenue, diminished professional reputation, and reduced future business opportunities.

WHEREFORE, Counter-Plaintiff JAI respectfully requests that this Court award compensatory damages for The Curse's bad faith conduct, award consequential damages exceeding $500,000 for lost business opportunities, award damages for diminished professional reputation,

award punitive damages of at least $1,000,000 for The Curse's willful breach of good faith, award

reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

**COUNT III**
**ACCOUNTING**
**(JAI v. The Curse)**

242.    Counter-Plaintiff JAI incorporates by reference all preceding paragraphs as if fully

set forth herein.

243.    As alleged in paragraphs 21-22, JAI's contractual right to three percent of The

Unseen's net profits creates a fiduciary-like relationship requiring The Curse to provide complete

and accurate financial information.

244.    As alleged in paragraphs 116-140, JAI seeks and is entitled to a comprehensive

accounting from The Curse of all receipts, expenditures, distribution agreements, and financial

transactions in connection with The Unseen.

245.    JAI's position as a profit participant means it has a legitimate and legally protected

interest in understanding all aspects of the film's financial performance.

246.    As alleged in paragraphs 119-126, all information about gross revenues from

Gravitas Ventures and The Coven, distribution fees, production expenses, and calculations of "Net

Profits" is exclusively within The Curse's and LFP's possession and control

247.    As alleged in paragraphs 127-128, to date, JAI has been provided with no financial

statements, profit calculations, or transparency regarding the film's economic performance.

248.    JAI lacks an adequate remedy at law to determine the precise amount due to it

without a court-ordered accounting of The Curse's financial records.

249.     An accounting is necessary to determine not only the amount currently due to JAI, but also to establish ongoing reporting requirements to ensure future compliance with the profit-sharing arrangement.

WHEREFORE, Counter-Plaintiff JAI respectfully requests that this Court order The Curse to provide a complete accounting of all financial aspects of The Unseen, appoint a special master or independent accountant to review The Curse's financial records, order The Curse to disgorge any amounts found to be owing to JAI, order ongoing quarterly accounting reports, award reasonable attorneys' fees and accounting costs, and grant such other relief as the Court deems just and proper.

### COUNT IV
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (JAI & JAI Road v. Karum and vicariously LFP)

250.     Counter-Plaintiffs JAI and JAI Road incorporate by reference all preceding paragraphs as if fully set forth herein.

251.     As alleged in paragraphs 143-152, JAI had a valid, reasonable, and probable business expectancy in the Final Boss Productions project, which would have generated approximately $35,000 in producer fees.

252.     As alleged in paragraphs 153-162, JAI had a valid, reasonable, and probable business expectancy in the Girl Boxer consulting engagement, which would have generated approximately $212,500 in fees and profit participation.

253.     As alleged in paragraph 163, JAI had a valid business expectancy in producing and directing "The Dream Guy" feature film worth $350,000 plus profit sharing.

254.     As alleged in paragraph 164, JAI had a valid business expectancy in the "Salvation Ship" TV series worth $35,000-50,000 per episode over 22 episodes per year.

255.     As alleged in paragraphs 165-177, JAI had valid and ongoing business relationships with multiple coaching clients that generated between $50,000-75,000 annually, which has been entirely destroyed.

256.     Karum had actual knowledge of Ancel's involvement in these business opportunities and the substantial likelihood of economic benefit to JAI and JAI Road.

257.     As alleged in paragraphs 90-115, Karum intentionally and systematically interfered with these business expectancies by disseminating false, defamatory, and disparaging statements about Ancel's professional competence and character to third parties in the entertainment industry.

258.     As alleged in paragraphs 149-150, 160-161, and 173-176, Karum's interference was the direct and proximate cause of the third parties' decisions to terminate or withdraw from their business relationships with JAI and JAI Road.

259.     Karum's interference was intentional, malicious, and undertaken without any legitimate business justification or legal privilege.

260.     Karum's conduct was motivated entirely by her desire for revenge against Ancel and her intent to destroy his professional reputation and business prospects.

261.     As a direct and proximate result of Karum's tortious interference, JAI and JAI Road have suffered substantial economic harm totaling approximately $3,650,000 in lost business opportunities, with additional ongoing damages as the effects of Karum's campaign continue.

262.     Because Karum was at all relevant times a managing member and agent of LFP, and because her tortious interference was undertaken at least partially to benefit LFP's interests by eliminating Ancel as a potential competitor or claimant, LFP is vicariously liable for Karum's tortious conduct under principles of respondeat superior.

WHEREFORE, Counter-Plaintiffs JAI and JAI Road respectfully request that this Court award compensatory damages of at least $3,650,000 for lost business opportunities including the Final Boss Productions project, Girl Boxer engagement, The Dream Guy feature, Salvation Ship TV series, and destroyed coaching practice, award additional damages for ongoing interference with business relationships, award damages for diminished professional reputation and future earning capacity, issue a permanent injunction prohibiting further interference with business relationships, award punitive damages of at least $5,000,000 for Karum's malicious conduct, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

### COUNT V
### - TORTIOUS INTERFERENCE WITH CONTRACT (IN THE ALTERNATIVE)
### (JAI & JAI Road v. Karum)

263.    Counter-Plaintiffs JAI and JAI Road incorporate by reference all preceding paragraphs as if fully set forth herein.

264.    In the alternative to Count IV, to the extent any of the business opportunities described in paragraphs 143-177 are determined to have constituted binding contractual relationships rather than mere expectancies, Karum's conduct constitutes tortious interference with contract.

265.    Specifically, JAI had entered into at least an oral agreement in principle with Final Boss Productions regarding the murder-mystery project, and JAI had binding service agreements with its coaching clients that were expected to continue or renew.

266.    Karum had actual or constructive knowledge of these contractual relationships through her industry connections and her systematic monitoring of Ancel's professional activities.

267.   As alleged in paragraphs 90-115, Karum intentionally interfered with these contracts by spreading false and defamatory allegations about Ancel's character and professional competence to the contracting parties.

268.   Karum's false statements were specifically designed to induce the contracting parties to breach or terminate their agreements with JAI and JAI Road.

269.   As alleged in paragraphs 149-150, 160-161, and 173-176, but for Karum's wrongful interference, these contractual relationships would have been performed to completion, generating substantial revenue for JAI and JAI Road.

270.   The premature termination of these contractual relationships was the direct and proximate result of Karum's tortious interference.

271.   Karum had no legitimate business justification or legal privilege to interfere with these contractual relationships.

272.   Karum's motives were entirely malicious and driven by her personal vendetta against Ancel.

273.   As a result of Karum's tortious interference with contract, JAI and JAI Road have suffered substantial damages in the form of lost contract revenues and related business opportunities.

WHEREFORE, Counter-Plaintiffs JAI and JAI Road respectfully request that this Court award compensatory damages for breach of the Final Boss Productions agreement and JAI coaching contracts, award consequential damages for related business losses, issue a permanent injunction prohibiting further interference with contractual relationships, award punitive damages for Karum's malicious interference, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

<u>COUNT VI</u>
**- INJURIOUS FALSEHOOD / COMMERCIAL DISPARAGEMENT**
**(JAI & JAI Road v. Karum and vicariously LFP)**

274.    Counter-Plaintiffs JAI and JAI Road incorporate by reference all preceding paragraphs as if fully set forth herein.

275.    As alleged in paragraphs 90-115, Karum's systematic campaign of false statements was specifically designed to disparage the business services and professional reputations of both JAI and JAI Road.

276.    Karum's false claim that JAI "blew the budget" of The Unseen was a direct attack on JAI's core competence as a production company and was calculated to deter other filmmakers from hiring JAI's services.

277.    Karum's false accusations that Ancel engaged in predatory and unprofessional conduct were direct attacks on JAI's reputation as a coaching and consulting company, since Ancel is JAI's principal and primary service provider.

278.    As alleged in paragraphs 98-115, these false statements were systematically communicated to industry peers, potential clients, and other decision-makers with the specific intention of deterring them from engaging JAI's production services or JAI's consulting and coaching services.

279.    Karum knew that her statements about JAI's budget management and Ancel's professional conduct were false, or alternatively, she made these statements with reckless disregard for their truth.

280.    As alleged in paragraphs 141-177, Karum's false statements achieved their intended effect by causing third parties to refrain from hiring JAI and JAI Road, resulting in quantifiable

financial losses including the Final Boss Productions opportunity, the Girl Boxer engagement, The Dream Guy feature, Salvation Ship TV series, and multiple coaching clients.

281.    The economic harm to JAI and JAI Road was the direct and intended result of Karum's campaign of commercial disparagement.

282.    To the extent Karum made these disparaging statements within the scope of her role as a managing member of LFP, or in connection with promoting The Unseen while marginalizing JAI's contributions, LFP is liable for Karum's tortious conduct under principles of respondeat superior.

WHEREFORE, Counter-Plaintiffs JAI and JAI Road respectfully request that this Court award compensatory damages exceeding $3,650,000 for lost business opportunities, award damages for injury to business reputation and goodwill, issue a permanent injunction prohibiting further commercial disparagement, award punitive damages of at least $5,000,000 for Karum's malicious conduct, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

## COUNT VII
### DEFAMATION (INCLUDING DEFAMATION PER SE)
### (Rose v. Karum and vicariously LFP)

283.    Counter-Plaintiff Rose incorporates by reference all preceding paragraphs as if fully set forth herein.

284.    As alleged in paragraphs 186-202, Karum made false and defamatory statements about Rose, most prominently through the public Instagram post on August 9, 2023, and through related communications within the entertainment industry.

285. In the Instagram post, Karum falsely declared that "Anyone working with Candice Rose is condoning harassment tactics and blacklisting," thereby making specific factual assertions about Rose's professional conduct and character.

286. These statements falsely asserted that Rose condones harassment in professional settings and that Rose engages in improper blacklisting behavior within the entertainment industry.

287. Both of these assertions are statements of purported fact that severely impugn Rose's professional integrity and fitness to work in the entertainment industry.

288. These statements constitute defamation per se under Illinois law because they falsely ascribe to Rose a lack of integrity in her professional conduct, suggest that she engages in unethical business practices, and are of the type that could preclude her from future employment opportunities.

289. As alleged in paragraph 197, these statements about Rose were completely false—Rose has never engaged in any harassment tactics or blacklisting behavior in her professional career.

290. Karum published these false statements to third parties through the public Instagram post and through subsequent word-of-mouth communications within the entertainment industry.

291. Karum made these statements without any legal privilege and with actual malice, knowing them to be false or acting with reckless disregard for their truth.

292. Karum's motivation for these false statements was entirely malicious, driven by her desire to punish Rose for maintaining a professional relationship with Ancel and to isolate Ancel by attacking his associates.

293.    As alleged in paragraphs 199-202, Rose has suffered substantial harm as a direct result of these defamatory statements, including damage to her professional reputation and the loss of specific career opportunities.

294.    Because Karum's defamatory attack on Rose was undertaken as part of her broader campaign related to The Unseen and was designed to further LFP's interests by isolating and marginalizing Ancel, LFP is vicariously liable for Karum's defamatory conduct.

WHEREFORE, Counter-Plaintiff Rose respectfully requests that this Court award compensatory damages of at least $250,000 for harm to reputation and lost career opportunities, award damages for emotional distress and mental anguish, issue a permanent injunction requiring retraction of the defamatory statements, issue a permanent injunction prohibiting further defamatory statements about Rose, award punitive damages of at least $1,000,000 for Karum's malicious conduct, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### Rose v. Karum and vicariously LFP)

295.    Counter-Plaintiff Rose incorporates by reference all preceding paragraphs as if fully set forth herein.

296.    As alleged in paragraphs 7-8, Rose is an established actress and creative professional with reasonable expectations of securing future engagements in the entertainment industry, including acting roles, collaborative projects, and festival participation opportunities within the Chicago and Los Angeles independent film communities.

297. Karum was aware of Rose's professional aspirations and opportunities within the entertainment industry, particularly given their overlapping connections through The Unseen production and the broader Chicago independent film community.

298. As alleged in paragraphs 186-202, Karum intentionally interfered with Rose's prospective economic relationships by making false, defamatory, and damaging public statements designed to make industry professionals avoid working with Rose.

299. Karum's public Instagram post explicitly warned that working with Rose was equivalent to "condoning harassment tactics and blacklisting," thereby creating a professional stigma designed to deter others from hiring or collaborating with Rose.

300. This interference was entirely unjustified and was motivated solely by Karum's malicious desire to punish Rose for her association with Ancel and to expand the scope of her vindictive campaign.

301. As alleged in paragraphs 199-202, Karum's interference has had its intended effect: casting directors, producers, and other industry professionals in Rose's network have become less responsive, ceased extending opportunities, and generally distanced themselves from Rose.

302. This chilling effect on Rose's professional relationships has directly harmed her earning capacity and career prospects within the entertainment industry.

303. Rose has suffered and continues to suffer economic harm as a direct result of Karum's tortious interference with her prospective business relationships.

304. If Karum's tortious conduct against Rose was undertaken within the scope of her role as a managing member of LFP, or as part of LFP's broader campaign to retaliate against those associated with Ancel, then LFP is vicariously liable for the interference with Rose's economic prospects.

WHEREFORE, Counter-Plaintiff Rose respectfully requests that this Court award compensatory damages of at least $250,000 for lost career opportunities and diminished earning capacity, award damages for ongoing interference with professional relationships, issue a permanent injunction prohibiting further interference with Rose's business relationships, award punitive damages of at least $1,000,000 for Karum's malicious conduct, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

### COUNT IX
### ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/2)
### (JAI & JAI Road v. Karum and vicariously LFP)

305. Counter-Plaintiffs JAI and JAI Road incorporate by reference all preceding paragraphs as if fully set forth herein.

306. Karum's systematic campaign of false statements about JAI and JAI Road constitutes deceptive trade practices in violation of the Illinois Uniform Deceptive Trade Practices Act (DTPA), 815 ILCS 510/2.

307. As alleged in paragraphs 90-115, Karum engaged in commerce by systematically disparaging the services of JAI and JAI Road through false statements of fact communicated to industry professionals and potential clients.

308. Many of these false statements were made to Chicago-based industry contacts, and LFP itself operates in Illinois, establishing the necessary connection to Illinois commerce.

309. Karum's false statements, including claims that JAI mishandled The Unseen's budget and that Ancel engaged in abusive conduct, create a substantial likelihood of confusion or misunderstanding among industry professionals about the characteristics and quality of JAI's production services and JAI's coaching and consulting services.

310.    These misrepresentations have caused and continue to cause industry professionals to wrongly believe that JAI is incompetent in budget management and that JAI's services are unsafe or unprofessional.

311.    Karum's deceptive trade practices have substantially harmed the business reputations of both JAI and JAI Road and continue to interfere with their ability to compete effectively in the marketplace.

312.    Karum's conduct was willful and malicious, undertaken with full knowledge of its falsity and with the specific intent to damage JAI's and JAI Road's competitive positions in the entertainment industry.

313.    Pursuant to 815 ILCS 510/3, JAI and JAI Road are entitled to injunctive relief requiring Karum to cease and desist from making further false or misleading statements about their services.

314.    Additionally, because Karum's violations were willful and malicious, JAI and JAI Road are entitled to an award of reasonable attorneys' fees under the DTPA.

315.    If Karum's deceptive trade practices were undertaken within the scope of her role as a managing member of LFP, or if LFP ratified or benefited from these practices, then LFP is equally liable under the DTPA as a co-violator.

WHEREFORE, Counter-Plaintiffs JAI and JAI Road respectfully request that this Court issue a permanent injunction prohibiting deceptive trade practices, award compensatory damages for business losses caused by deceptive practices, award attorneys' fees and costs under 815 ILCS 510/3, award punitive damages for willful violations, and grant such other relief as the Court deems just and proper.

81

## COUNT X
## CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)
### (Ancel, JAI & JAI Road v. Karum and vicariously LFP)

316.    Counter-Plaintiffs Ancel, JAI and JAI Road incorporate by reference all preceding paragraphs as if fully set forth herein.

317.    Karum's conduct in California, particularly her actions surrounding the Los Angeles premiere of The Unseen in mid-2023, violated California's Unfair Competition Law (UCL), Bus. & Prof. Code § 17200 et seq.

318.    Karum's conduct was unlawful in that it encompassed multiple underlying torts including defamation, tortious interference, and misuse of the court system through her TRO application

319.    As alleged in paragraphs 82-89, Karum's TRO application involved misrepresentations that constituted unlawful conduct under California law.

320.    Karum's conduct was unfair in that it violated established public policy, was unethical and oppressive, and caused substantial injury to Counter-Plaintiffs that far outweighed any conceivable benefit to consumers or competition

321.    The manipulation of legal proceedings to exclude a business competitor from an industry event represents conduct that is fundamentally contrary to public policy and basic principles of fair competition.

322.    Karum's conduct was fraudulent in that it was based on deliberate deceit and was likely to mislead industry stakeholders about the true circumstances surrounding The Unseen's production and Ancel's role in the project.

323. As alleged in paragraphs 70-81, Karum's communications to festival organizers were specifically designed to deceive them about Ancel's character and conduct in order to secure his exclusion from industry events.

324. As a direct result of Karum's unlawful, unfair, and fraudulent conduct in California, Counter-Plaintiffs suffered substantial economic injury, including Ancel's inability to network and promote his work at the festival premiere, loss of professional standing in the Los Angeles market, and diminished business prospects on the West Coast.

325. Counter-Plaintiffs seek relief under the UCL including restitution of any money or competitive advantage that Karum and/or LFP obtained through these unfair business practices.

326. Counter-Plaintiffs also seek injunctive relief prohibiting Karum and those acting in concert with her from engaging in such unlawful, unfair, and fraudulent practices in the future.

327. If Karum's actions in California were undertaken as part of LFP's business operations or to further LFP's competitive interests, then LFP is equally liable under the UCL for these violations.

WHEREFORE, Counter-Plaintiffs Ancel, JAI and JAI Road respectfully request that this Court award restitution of money and competitive advantages obtained through unfair practices, issue a permanent injunction prohibiting unlawful unfair and fraudulent business practices, award compensatory damages for economic injury suffered in California, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

<u>COUNT XI</u>
**CIVIL CONSPIRACY**
**(All Counter-Plaintiffs v. Karum, LFP & Does 1–20)**

328.     All Counter-Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

329.     Karum, LFP, and the presently unidentified Doe defendants have engaged in a comprehensive civil conspiracy to inflict maximum harm on Counter-Plaintiffs through a coordinated campaign of defamation, business interference, and contractual breach.

330.     This conspiracy involved an express or implied agreement between Karum and one or more other principals, agents, or associates of LFP, as well as other individuals acting under pseudonymous online identities, to work together in systematically destroying Counter-Plaintiffs' professional reputations and business relationships.

331.     The conspiracy was formed with the specific objectives of: (a) excluding Ancel from receiving credit and financial benefits from The Unseen; (b) damaging Ancel's reputation throughout the entertainment industry to prevent future business opportunities; (c) retaliating against Rose for her association with Ancel; and (d) creating a false narrative that would justify and excuse Counter-Defendants' contractual breaches and misconduct.

332.     In furtherance of this conspiracy, the participants undertook numerous overt acts, including but not limited to: a. Coordinated Defamation Campaign: As alleged in paragraphs 90-115, spreading identical or substantially similar false accusations about Ancel to multiple industry contacts, with different conspirators reinforcing the same false narrative to create the appearance of independent corroboration. b. Pseudonymous Social Media Campaign: As alleged in paragraphs 105-115, creating and operating false online personas through "FilmTruths" and "IndieProtect" accounts to publish defamatory material while concealing the identities of the actual authors. c.

Strategic Legal Proceedings: As alleged in paragraphs 82-89, filing a TRO application coordinated with the timing of The Unseen's premiere to maximize business harm to Ancel. d. Systematic Credit Manipulation: As alleged in paragraphs 203-224, coordinating to downgrade JAI's screen credit and exclude Ancel from promotional materials in violation of contractual obligations. e. Financial Withholding: As alleged in paragraphs 116-140, collectively withholding all accounting information and profit payments from JAI while LFP and The Curse retained the benefits of JAI's contributions. f. Retaliation Against Associates: As alleged in paragraphs 178-202, expanding the conspiracy's scope to include attacks on Rose and others who maintained professional relationships with Ancel.

333.    These overt acts were highly coordinated and demonstrated a unified strategy among the conspirators to achieve their common objectives through unlawful means.

334.    The coordination is evidenced by the consistency of false narratives across multiple communication channels, the strategic timing of various actions, and the complementary nature of different participants

335.    As a direct and proximate result of this conspiracy, all Counter-Plaintiffs have suffered the various forms of harm detailed throughout these allegations, including economic losses, reputational damage, emotional distress, and ongoing interference with business relationships.

336.    Under applicable principles of joint and several liability, each member of the conspiracy is responsible for all tortious acts committed by any participant in furtherance of the common scheme.

337.    Therefore, Karum, LFP, and Does 1–20 are each liable to Counter-Plaintiffs for the full scope of damages caused by their collective wrongdoing, including all forms of defamation,

business interference, contractual breach, and related torts carried out as part of their coordinated campaign.

WHEREFORE, All Counter-Plaintiffs respectfully request that this Court award compensatory damages against all conspirators jointly and severally, award punitive damages of at least $10,000,000 for the malicious conspiracy, issue a permanent injunction prohibiting further coordinated attacks on Counter-Plaintiffs, order discovery to identify all Doe defendants and co-conspirators, award reasonable attorneys' fees and costs, and grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Counter-Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right under the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.

Dated: August 29, 2025    Respectfully submitted,

**JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, and CANDICE ROSE,**
Defendants/Counter-plaintiffs

By:    _Alexander Loftus_

    One of Their Attorneys

Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
181 W. Madison, Suite 4700
Chicago, Illinois 60601
T: 312.899.6625
alex@loftusandeisenberg.com

## CERTIFICATE OF SERVICE

I, Alexander N. Loftus, an attorney, hereby certify that on August 29, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing and via U.S. mail to:

George J. Spathis, Esq.
Levelfeld Pearlstein, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, IL 60606
Email: gspathis@lplegal.com

/s/ *Alexander N. Loftus*