**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAKEFRONT PICTURES, LLC, JENNIFER KARUM and THE CURSE, LLC, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Case No. 1:24-cv-01108 |
| vs. | ) | |
| | ) | Hon. Mag. Judge M. David Weisman |
| JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, CANDICE ROSE, and DOE DEFENDANTS 1-20, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS COUNTERCLAIMS

George J. Spathis (6204509)
LEVENFELD PEARLSTEIN, LLC
120 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
312.346.8380
gspathis@lplegal.com

Plaintiffs/Counter-Defendants, LAKEFRONT PICTURES, LLC ("Lakefront"), JENNIFER KARUM ("Karum") and THE CURSE, LLC ("TCL"), by their counsel, submit this Memorandum of Law in Support of their Motion to Dismiss the Counterclaims asserted against them by Defendants/Counter-Plaintiffs JORDAN ANCEL ("Ancel"), JORDAN ANCEL INTERNATIONAL, LLC ("Ancel International"), ROCK CITY ROAD FILMS LLC ("Rock City"), and CANDICE ROSE ("Rose").

## I.     THE RELEVANT PLEADING STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must satisfy Fed. R. Civ. P. 8(a) by pleading "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, plaintiff must allege facts, that if accepted as true "allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ritacca v. Storz Medical, A.G.*, 291 F.R.D. 176, 178-79 (N.D. Ill. 2013)(citing *Iqbal*, 556 U.S. at 678). Put another way, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). Purported "facts" that are merely legal conclusions or elements of the cause of action must be disregarded on a motion to dismiss. *McCauley v. City of Chicago*, 2011 WL 4975644 (7th Cir. Oct. 20, 2011).

At the motion to dismiss stage, the Court may consider the complaint, as well as "documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Moreover, "when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*,

163 F.3d 449, 454 (7th Cir. 1998); *see also City of Rockford v. Mallinckrodt ARD, Inc*., 360 F.Supp.3d 730, 768 (N.D. Ill. 2019)("… if the language of the contract is plainly inconsistent with the plaintiff's representations, the court may decline to afford the presumption of truth.").

## II.     LEGAL ARGUMENT

As set forth more fully below, when applying the aforementioned standards, dismissal of the Counterclaim, in its entirety, is plainly warranted.

### A.     Counts I, II and III of the Counterclaim Must Be Dismissed

Ancel International has asserted counterclaims claims against TCL for alleged breach of written Producer Agreement[1] (Count I), breach of the implied covenant of good faith and fair dealing (Count II) and an Accounting (Count III).  Each of these claims must be dismissed.

Before addressing the merits (or lack thereof), Counts I, II and III must be dismissed because Ancel International lacks standing to assert any such claims, as it is *NOT* a party to the Producer Agreement.  The Agreement is between TCL and Rock City.[2]  Lack of standing aside, the claims fail regardless of which Defendant is asserting it.  Count I contends that TCL breached the Agreement in three ways, by allegedly: (a) failing to pay a share of net profits generated by the film; (b) failing to give a required 24-hour cure notice before excluding [Rock City] from post-production work and promotion of the film; and (c) failing to accord [Rock City or Ancel] "proper

---

[1]  The Producer Agreement was submitted as Exhibit A to Plaintiffs' Complaint (Dkt. 1, at p. 34 of 77).  For the Court's convenience, an additional copy of the Agreement is submitted as **Exhibit A** to this Memorandum.

[2]   Simply amending the Counterclaim will not solve this problem as Ancel International lacks capacity to pursue claims in any Illinois Court.  Federal District Courts apply the laws of the state in which they sit (unless there is an identified conflict between two bodies of state law which could apply).  *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.,* 136 F.3d 1116, 1120 (7th Cir. 1998).  The Illinois statute governing the "Transaction of business without admission" provides in pertinent part, that "[a] foreign limited liability company transacting business in this State may not maintain a civil action in any court of this State until the limited liability company is admitted to transact business in this State.  805 ILCS 180/45-45(a). Defendants have admitted that Ancel International is a foreign LLC, formed and located in California.  *See*  Answer (Dkt. 43) at ¶ 2. A search of the publicly available records using the database accessible through the Illinois Secretary of State's website (Business Entity Search) indicates that Ancel International has never been admitted to transact business in Illinois, therefore lacks the requisite capacity required to pursue claims in Illinois.  *See A Plus Janitorial Company, Inc. v. Group Fox, Inc.,* 2013 IL App (1st) 120245.

screen credit." *See* Counterclaim (Dkt. 43) at ¶ 229. The actual terms of the Agreement, however, make clear that there were no such breaches. First, with respect to the alleged failure to pay "Net Profits" the Court need only look to the agreed definition of that term as:

> [G]ross receipts actually received by [TCL], its affiliates, licensees and assigns in connection with the worldwide licensing, sale, distribution and/or other exploitation of the Picture and/or any ancillary and/or subsidiary rights thereto in perpetuity in any and all media and all rights….*after the deduction of only the following: (a) all actual, direct, verifiable, out of pocket, unaffiliated third party costs, charges, expenses and liabilities reasonably incurred in connection with the acquisition, preparation, development, production, completion and delivery of the Picture, including without limitation, repayment of an amount equal to 120% of the financiers' at-risk capital contributions to the Production Company in connection with the Picture*.

Agreement at ¶ 3.2, and Ex. A (emphasis added). In industry parlance, this means Rock City may receive "back-end royalty" if and when, among other things, investors have been fully repaid, a condition that has not yet happened.[3] Carefully parsing their words, Defendants allege that there is "clear evidence that the film has generated substantial revenue." While that may be true, the repayment of investors is a condition precedent to any obligation to share net profits with Rock City. *See Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.,* 962 F.2d 628, 633 (7th Cir.1992)("Under Illinois law, a condition precedent is some act that must be performed or event that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform."). Defendants have not alleged and cannot, in good faith, allege that the condition precedent has been satisfied, there can be no breach of contract based on an alleged failure to perform. *Id*.

With respect to the allegation that TCL failed to give a notice and opportunity to "cure" before excluding [Rock City/Ancel] from post-production work and promotion of the film, that too simply ignores the agreed upon terms of the Agreement, which expressly provides:

- "Nothing herein shall be deemed to obligate [TCL] to use Ancel's services, or the results of such services in the Picture, to produce, release or distribute the Picture or to

---

[3] Ancel is fully aware that the film's investors, some of which are his friends, have not been repaid.

3

continue the release and distribution of the Picture if released or to otherwise exploit any rights granted to [TCL] hereunder." [Par. 3.3]

- "Ancel agrees that [TCL] shall have the sole and exclusive right to issue publicity concerning Ancel with respect to the Services hereunder." [Par. 5], and

- "…[TCL] may terminate this Agreement and the Term hereof without Cause and without any further obligation to Ancel other than its obligation hereunder to pay Lender any Fees accrued and otherwise payable solely through the date prior to such termination in accordance with the terms of this Agreement. [Par. 11(b)].

That Agreement speaks loudly for itself; this claim of breach must also fail.

Finally, the fact that Ancel was given third-producer credit is not a breach of the Agreement. The allegation that Ancel was guaranteed second producer credit is perplexing, raising a fair question as to whether Ancel or his counsel even read the actual Agreement which expressly states:

> [TCL] shall accord Ancel a "Producer" credit on-screen on either ***no less than the single third producers' card or, at [TCL's] discretion***, the second producers' card, shared only with Ryan Atkins, in the main titles on all positive and/or digital prints of the Picture.

Agreement, at ¶ 4. In short, Ancel received the exact credit to which he was entitled, and he cannot state a claim for breach of the Agreement. Count I should be dismissed with prejudice.

Count II, which purports to add a separate claim for violation of the implied covenant of good faith fares no better. It is well settled law that breach of the implied covenant is not a stand-alone claim upon which relief can be granted. *See, e.g., Shed v. Bredemann*, 2024 WL 1637544, at *3 (7th Cir. 2024)("Under Illinois law, breach of the implied covenant is not a standalone cause of action…"); *Barwin v. Village of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022)("[T]he obligation is not a source of rights independent of the parties' contract, nor does the duty supply a [plaintiff] with a separate cause of action."); *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006)("This doctrine is a rule of construction, not a stand-alone obligation."). But to be clear, regardless of *how* it is asserted, the implied covenant cannot rescue Defendants' contract claim eviscerated above.

"The purpose of this [implied] duty is to ensure that parties do not take advantage of each other in a way *that could not have been contemplated at the time the contract was drafted* or do anything that will destroy the other party's right to receive the benefit of the contract." *Id.* (emphasis added)(internal citation and quotation omitted); *see also* (*Shed v. Fraternal Enterprises LP,* 2023 WL 3074876, *7 (N.D. Ill. April 25, 2023)(in dismissing claim, the Court held: "[Plaintiff] points to no language in the contract that the dealership exploited *in a way that the parties would not have expected*.")(emphasis added). In this case, TCL is alleged to have done nothing more than exercise rights clearly and expressly afforded by the Agreement. The fact that Defendants would have strongly preferred otherwise is irrelevant. *Id.* at *8 ("The implied covenant of good faith does not create an enforceable legal duty to be nice or to behave decently in a general way.")(internal quotations omitted). As the Seventh Circuit has succinctly held:

> Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). Count II must also be dismissed with prejudice.

Finally, Defendants are not entitled to an Accounting (Count III). Illinois courts that have addressed this issue have dismissed claims for accounting where the plaintiff has pled a claim for breach of contract, which generally provides an adequate remedy at law. *See 3Com Corp. v. Electronic Recovery Specialists, Inc.*, 104 F. Supp.2d 932, 941 (N.D. Ill. 2009)("in Illinois, plaintiff must allege the absence of an adequate remedy at law and either a breach of a fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts which are of a complex nature."); *see also Drake Enterprises vs. Colloid Environmental Technologies Company*, 2009 WL 1789355 (N.D. Ill. 2009)("Although an accounting cause of action was traditionally utilized as a means of obtaining access to relevant records, the need for a party to pursue an

5

accounting cause of action in order to obtain such access has been greatly minimized in light of the modern federal discovery rules."). In this case, no Defendant has even *requested* information regarding film generated revenue (because Ancel assuredly already obtained the information from his investor friends, as he seemingly admits in Counterclaim par. 124). There is no basis for ordering an accounting. *Zell v. Jacoby-Bender, Inc.*, 542 F.2d 34, 36 (7th Cir. 1976)("legal remedies should not be characterized as inadequate merely because the measure of damages may necessitate a look into the plaintiff's business records."). Count III must be dismissed.

**B.** **The Doctrine of *Res Judicata* Mandates the Dismissal of Counts IV, V, VI, IX, X and XI of the Counterclaim With Prejudice**

Ancel International and Rock City purport to assert claims against Karum and Lakefront for Tortious Interference with Prospective Economic Advantage (Count IV), Tortious Interference with Contract (Count V), Injurious Falsehood and Commercial Disparagement (Count VI), Violation of Illinois Deceptive Trade Practices Act (Count IX), and Civil Conspiracy (Count X). Ancel, Ancel International and Rock City also purport to assert a claim for violation of the California Unfair Competition Law (Count X), and all Defendants claim that they are victims of a Civil Conspiracy to cause them harm (Count XI). All of these causes of action rest tenuously on allegations that Karum made defamatory statements about Ancel having "caused delays," on the set of the film, "blown the budget" and/or "terrorized women" while on set (Counterclaims, at ¶¶ 57-62), that Ansel was "unsafe to work with," a "Harvey Weinstein Type," was "toxic" on the set, "abusive toward women," and "posed a threat to women in the industry" *Id.* at ¶¶ 92-113. Ancel International and Rock City claim in the wake of being "exposed to Karum's false allegations," they lost various clients and business opportunities, although the causal connection is devoid of factual support, and wildly speculative). *Id.* at ¶¶ 141-177. Even if the foregoing allegations were true—*and they are not*—these claims must be dismissed with prejudice.

To begin with, Rock City, like Ancel International, has a capacity issue.[4] Neither Rock City nor Ancel International can pursue any of these Counterclaims unless and until they establish or restore the right through filings and fees owed to the Illinois Secretary of State. The lack of capacity, however, is the least of Defendants' problems with respect to these claims. Instead, it is the doctrine of *res judicata* that mandates dismissal of these claims with prejudice,[5] based upon a July 17, 2024, Order entered by the Circuit Court of Cook County, Illinois in which it dismissed some of these exact same claims asserted by Ancel against Karum (the "Dismissal Order"), based upon virtually the same allegations. True and correct copies of the Dismissal Order, as well as Ancel's October 16, 2023, Amended Complaint that was the subject of the Dismissal Order, are submitted herewith as **Exhibit B** and **Exhibit C.**

Simply stated, *res judicata* is a doctrine that "requires parties to litigate, in one case, all the rights that arise out of the same set of operative facts, and "protects a party from being forced to relitigate what is essentially the same case" thereby minimizing the waste of judicial resources. *River Park, Inc. v. City of Highland Park,* 184 Ill.2d 290, 319 (1998)[6]; *see also Baird & Warner, Inc. v. Addison Industrial Park, Inc.,* 70 Ill.App.3d 59, 64 (1979) (*res judicata* is "founded upon the plainest and most substantial justice, that litigation should have an end and that no person

---

[4] While organized in Illinois, Rock City is not in good standing with the State, having been terminated in 2023. This lack of "good standing" should preclude it from maintaining any action in this Court unless and until it is brought back into good standing. *See* 805 ILCS 5/13.7. The same rule regarding corporations should logically apply with respect to any juridical entity, including LLCs.

[5] Although deciding whether *res judicata* applies will require this Court to consider matters outside the Counterclaim, the Seventh Circuit has held that "the district court may also take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment." *Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir.1994) Thus, "[w]hen a defendant raises *res judicata* as a defense and it is clear from the complaint's face, and matters of which the district court may take judicial notice[,] that the plaintiff's claims are barred as a matter of law, dismissal under Rule 12(b)(6) is proper." *Arthur Anderson LLP v. Federal Ins. Co.,* 2007 WL 844632, at *7 (N.D. Ill. March 16, 2007)(quoting *Wilson v. Bob Watson Chevrolet, Inc.,* 2004 WL 432493, at *2 (N.D. Ill. Mar. 02, 2004)).

[6] Since a state court in Illinois rendered the Dismissal Order, this Court must apply Illinois preclusion law to determine whether *res judicata* bars the subject Counterclaims. *Whitaker v. Ameritech Corp.,* 129 F.3d 952, 955–56 (7th Cir.1997)(citing 28 U.S.C. § 1738).

should be unnecessarily harassed with a multiplicity of suits"). Under Illinois law, "*res judicata* extends to all questions actually decided in a previous action as well as to all grounds of recovery and defenses which might have been presented in the prior litigation." *Id.* (citing *La Salle National Bank v. County Board of School Trustees,* 61 Ill.2d 524, 529 (1975)). *Res judicata* applies where, as here: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause[s] of action; and (3) there is an identity of parties or their privies." *Whitaker,* 129 F.3d at 956 (quoting *Downing v. Chi. Transit Auth.,* 162 Ill.2d 70, 73-74 (1994)). Each of these elements are met in this case.

First, the Dismissal Order operated as a final judgment as to Ansel's claims against Karum for defamation, false light/invasion of privacy and tortious interference. Illinois Supreme Court Rule 273 provides that, unless otherwise specified, an involuntary dismissal of an action, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits. *See also Kostecki v. Dominick's Finer Foods, Inc. of Ill.,* 361 Ill. App. 3d 362, 373 (1st Dist. 2005)("It is of little importance in this case that the trial court's order granting defendants' section 2–619 motion did not indicate it was 'with prejudice,' as it is the substance of the dismissal order that controls….Where a dismissal order does not specify that it is 'without prejudice' and does not grant the plaintiff leave to file an amended complaint, the judgment is a final adjudication on the merits under Supreme Court Rule 273). The Dismissal Order does *not* specify that it is 'without prejudice' and did *not* grant Ancel leave to file amended claims for defamation, false light/invasion of privacy or tortious interference. The Dismissal Order was a final judgment as to those claims, satisfying the first element.

The second element is also met, as there was also an identity of causes of action between State Court action and the subject counterclaims. The Illinois Supreme Court has made it quite clear that the question of whether there's an identity of claims turns on the commonality of alleged

facts rather than the label placed on the various counts. *Rein v. David A. Noyes & Co*., 172 Ill.2d 325, 338 (1996) (citing *People Ex Rel. Burris v. Progressive Land Developers, Inc.,* 151 Ill.2d 285, 295 (1992). In *Progressive Land Developers*, the Court held:

> A cause of action is defined by the facts which give the plaintiff a right to relief. While one group of facts may give rise to a number of different theories of recovery, there remains only a single cause of action. If the same facts are essential to the maintenance of both proceedings or the same evidence is needed to sustain both, then there is identity between the allegedly different causes of action asserted and *res judicata* bars the latter action.

*Id.* at 295 (internal quotation omitted). This expansive view regarding the identity of claims is intended to prohibit claims across multiple proceedings. *See Rein,* 172 Ill.2d at 339-40; *see also Hudson v. City of Chicago,* 228 Ill.2d 462, 474 (2008)("A plaintiff is not permitted to engage in claim splitting."). The rule against claim-splitting is based upon the principle that litigation should have an end and that no person should be unnecessarily harassed with a multiplicity of lawsuits. *Rein,* 172 Ill.2d at 340.

The facts proffered in support of the Counterclaim are virtually identical to those that Ancel asserted in his State Court action, which allege that: (1) Karum sent texts or direct messages (and used fake accounts) to "tell anyone that would listen:" that Ancel "sexually assaulted her" and also "sexually harassed her" as well as "other female cast and crew;" that "Ancel was not to be trusted, that he did little for the Project, that he caused numerous problems on set… that he was 'having problems' with other producers in Los Angeles…[and] did not really have high level contacts in the industry; that Ancel was a "bad person," "terrible human," was "vicious," that he "screws people and manipulated women," that he is "NOT one of the best producers out there" that he is "Terrible with women" that he goes "off his rocket when he doesn't get what he wants; and that Ancel "was the "sole cause of problems on set" (Ex. C, at ¶ 35-39, 50); (2) that Karum submitted false or misleading evidence to obtain an *ex parte* order of protection to wrongfully deprive him of the opportunity to attend the Los Aneles premier of the film (*id.,* at ¶¶ 53-57), and (3) that

Karum's "ongoing publication of…false statements" were causing Ancel "irreparable harm," with "clients choosing to go elsewhere because of [Karum's] retaliatory lies," and her "interference with existing business relationships," and preventing other "legitimate expectancies from ripening." (*id.,* at ¶¶ 52, 65, 99-102). The identity of claims, as defined by the Illinois Supreme Court, between Ancel's State Court allegations and those in the Counterclaim is clear, and compelling, easily satisfying the second element for the application of *res judicata*. *See Progressive Land*, 151 Ill.2d at 295 ("While one group of facts may give rise to a number of different theories of recovery, there remains only a single cause of action.").

Finally, the third element is satisfied, as there is clearly an "identity of parties or their privies." The State Court action was filed against Karum, and the subject Counterclaims were also asserted against Karum, as well as "vicariously" against Lakefront, of which Karum is a founder, 50% owner and Manager. Ancel filed the State Court action, and the subject Counterclaims were asserted in the name of Ancel's two business entities that he owns and controls, making them his privies. The doctrine of *res judicata* therefore mandates the dismissal of Counts IV, V, VI, IX and X, all of which were, or could have been asserted as part of the State Court action.

For good measure, however, Count X of the Counterclaim for alleged violation of California's Unfair Competition Law can also be dismissed on the merits. For starters, it is unclear how an Illinois citizen, who is *not* alleged to have committed any wrongful act in California and is *not* generally subject to the jurisdiction in California courts, can somehow be bound by a California statute. California does not permit the extra-territorial application of its Unfair Competition law. *See Sullivan v. Oracle Corp.,* 51 Cal.4th 1191, 1207 (2011)(California's

Supreme Court held that "the presumption against extraterritoriality applies to the UCL in full force.").[7] As one Court succinctly held:

> If the conduct that 'creates liability' occurs in California, California law properly governs that conduct. **By contrast, if the liability-creating conduct occurs outside of California, California law generally should not govern that conduct**…

*Oman v. Delta Air Lines, Inc.,* 889 F.3d 1075, 1079 (9th Cir. 2018)(emphasis added)(internal citations omitted); *see also In re Arthur J. Gallagher Data Breach Litigation,* 631 F.Supp.3d 573, 596 (N.D. Ill. 2022)(quoting *Oman v. Delta Air Lines*); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999)(in rejecting extra-territorial scope of California's Unfair Competition law, the Court held: "we do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute."). This Court should not even consider Ancel's claim under California law. *See Barbara's Sales, Inc. v. Intel Corp*., 227 Ill.2d 45, 63 (2007)(in rejecting the application of California unfair competition law, the Illinois Supreme Court held: "'Illinois courts have an interest in not being burdened with applying foreign law in the absence of strong policy reasons and a strong connection to the case.' … We can identify no strong policy reasons or strong connection to direct us to apply California law")(quoting *Gridley v. State Farm Mutual Automobile Insurance Co.,* 217 Ill.2d 158, 175 (2005).[8]

Second, even assuming, for sake of argument, that due process and basic fairness would not be effectively eviscerated by the application of California law in this case, Illinois' conflict of laws rules that would similarly suggest that Illinois' unfair competition laws, and *not* those of

---

[7]  *Accord, Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 184-85 (2005)("we note the long-standing rule of construction in Illinois which holds that a "statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.")(internal citations omitted).

[8]  Apart from a handful of class action cases, the undersigned's research revealed no applicable reported Illinois cases that involve claims asserted under California's Unfair Competition law asserted against an Illinois citizen.

California, should apply to this dispute. As the United States Supreme Court has noted, consumer fraud laws of the states differ in material respects. *BMW of N. America, Inc. v. Gore,* 517 U.S. 559, 569-70 (1996)("…the States need not, and in fact do not, provide such protection in a uniform manner... The result is a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States."). Because Illinois' and California's respective unfair competition "laws conflict and this conflict may have an outcome-determinative difference," Illinois' conflict of law rules would be necessarily invoked. *Barbara's Sales, Inc.*, 227 Ill.2d at 60. As all of the alleged wrongful acts were committed by an Illinois citizen in/from Illinois, Illinois is the jurisdiction that has the "most significant relationship" to this dispute, notwithstanding the alleged injury that Ancel or his privies claim to have suffered in California. *Id.* at 61 ("We have jettisoned the *lex loci delicti* rule—also termed the place-of-the-injury rule."). Count X invoking California law must fail.[9]

### C. Rose Cannot State a Cause of Action for Defamation *Per Se* or Civil Conspiracy, thus Counts VIII and XI of the Counterclaim Must Be Dismissed

Rose's Defamation *per se* claim is riddled with flaws and must be dismissed. Count VIII is based upon an alleged Instagram post in August 2023 in which Karum is to have stated "Anyone working with Candice Rose is condoning harassment tactics and blacklisting." Counterclaim, at ¶¶ 186-87. Rose contends that the post constitutes an accusation of "unethical professional conduct" and "support[ing] abusive behavior in the workplace" which she concludes qualifies as

---

[9]    Finally, while it may be overkill, proposed Count X would fail *even if* California law somehow applied. Section 17200 of the California Business and Professional Code prohibits business acts or practices that meets one of three criteria—unlawful, unfair, or fraudulent. *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.,* 2013 WL 3460707, *7 (N.D. Ill. Cal. 2013). The Counterclaim has not adequately pled and cannot plead any such conduct. Under its 'unlawful' prong, Section 17200 "borrows violations of other laws ... and makes those unlawful practices actionable." *Berryman v. Merit Prop. Mgmt.,*152 Cal.App.4th 1544, 1554 (2007). Defendants have not identified any unlawful act, or even an actionable tort committed by Karum. There can be no claim under the "unlawful" prong. Similarly, "non-defamatory opinion[s] casting a competitor in a negative light" is not sufficient to state a claim under either the "unfair" or "fraudulent" prongs, which otherwise require substantial *consumer injury* and actual deception of the public, respectively. *Amaretto Ranch Breedables*, 2013 WL 3460707, *8 ("…Blog Entry itself contained mere statements of opinion that the public was likely to view as such, and so the statements were not likely to deceive.").

defamation *per se*, obviating the need to demonstrate the requisite special damages. *Id.* at ¶¶ 188-89. She is wrong.

First, the alleged post is not defamatory, as it cannot "reasonably [be] interpreted as stating actual facts" and thus protected under the First Amendment, and is more akin to an opinion that cannot support an action for defamation in the interest of "provid[ing] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co,* 497 U.S. 1, 20 (1990); *see also Lifton v. Bd. of Educ. of the City of Chicago,* 416 F.3d 571, 579 (7th Cir.2005)(holding that Illinois law requires that an allegedly defamatory statement must contain an objectively verifiable factual assertion); *Pease v. Int'l Union of Operating Engineers Local 150, et al.,* 208 Ill.App.3d 863, 70 (2d Dist. 1991)(statements found to be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable.").

Even an alleged direct statement that Rose, herself, was directly engaged in "harassment tactics and blacklisting," is "too vague and unprovable…to give rise to a defamation claim." *Madison v. Frazier*, 539 F.3d 646, 655 (7th Cir. 2008). *See also Wilkow v. Forbes, Inc.,* 241 F.3d 552, 555 (7th Cir.2001)(finding under Illinois law that "[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.")(quoting *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993)). This is particularly where the post offers *nothing* in terms of factual context. *See Dubinsky v. United Airlines Master Executive Council,* 303 Ill.App.3d 317, 329 (1st Dist. 1999) (finding that calling someone a "crook" was not an actionable statement because it was not made in any specific factual context, and "[o]ne cannot rely on an assumption that those who heard the statement were completely apprised of all the

developments in the ... controversy so as to create a definitive factual context for the use of the word 'crook'"). The post simply is not defamatory.

Even assuming that the post could be deemed defamatory, it is not defamatory *per se*. Illinois treats as defamatory *per se*, those statements that impute "an inability to perform or want of integrity in the discharge of one's duties of office or employment" or that impute a "lack of ability, in his or her trade, profession or business." *Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008). Rose is an actress; she is *not* a casting director, talent agent or producer that would be in a natural position to dictate professional opportunities. Thus, the alleged post clearly does not speak to Rose's ability or aptitude as a performer. At best, it speaks, generally, to her character or integrity. That is not sufficient. *Id.* at 655-65 ("In order to qualify as defamation *per se* in this case, a plaintiff must have been accused of lacking *ability in his trade* or doing something bad *in the course of carrying out his job*." (emphasis in original). As the Seventh Circuit espoused in *Madison:* "…statements deemed to be defamatory *per se* in Illinois under these categories have been related to job performance, as opposed to attacks related to personal integrity and character…" citing to both the case of *Clarage v. Kuzma,* 342 Ill.App.3d 573, 581 (3d Distt. 2003) in which accusations of lying to government officials were defamatory *per se,* where the plaintiff was not accused of lying to family and friends, but rather to government officials with whom it was his *job* to communicate honestly, and to the case of *Heying v. Simonaitis,* 126 Ill.App.3d 157, 164-65 (1st Dist. 1984), in which statements made by doctors regarding personality conflicts between the plaintiff nurse and her fellow employees were deemed not to have impugned her ability as a nurse). Applying this cogent reasoning, the post cannot be deemed defamatory *per se.*

But even assuming for sake of argument that the post could be fit into either of the relevant *per se* categories, "this fact, standing alone, 'has no bearing on whether the alleged defamatory statement is actionable'" because, as in this case, it is "capable of an innocent, nondefamatory

14

construction." *See Madison*, 539 F.3d at 653 (quoting *Hopewell v. Vitullo,* 299 Ill.App.3d 513, 518 (2d Dist. 1998). The post neither states nor suggests that Rose engaged in any conduct (including harassment or blacklisting). Given the fact that she has chosen (as her counterclaim admits) to publicly side with Ancel (who admits he threatened to "burn [Karum's] life down"), the statement can easily be construed to simply mean that Rose supports Ancel and his actions toward Karum. As misguided as it may be, that is Rose's prerogative. *See Madison v. Frazier*, 539 F.3d at 657 ("Free speech is not restricted to compliments.... [M]embers of a free society must be able to express candid opinions and make personal judgments. And those opinions and judgments may be harsh or critical—even abusive—yet still not subject the speaker or writer to civil liability.")(quoting *Van Duyn v. Smith,* 173 Ill.App.3d 523, 538 (3d Dist. 1988). The post, however, is not actionable and thus, Count VIII must be dismissed. Since the post is the only thing to which Rose cites to support her claim of Civil Conspiracy, Count XI must also be dismissed.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff's Motion to Dismiss the Counterclaims should be granted, and this Court should award Plaintiffs such additional relief as it deems just and equitable.

RESPECTFULLY SUBMITTED,

**LAKEFRONT PICTURES, LLC,**
**JENNIFER KARUM and THE CURSE, LLC.**

By:  *       /s/ George J. Spathis       *
          One of their Attorneys

George J. Spathis (6204509)
LEVENFELD PEARLSTEIN, LLC
120 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
312.346.8380
gspathis@lplegal.com

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2025, I caused the foregoing pleading to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants of record in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system on the following persons:

**1:24-cv-01108 Notice has been electronically mailed to:**

George J. Spathis    nbailey@lplegal.com, gspathis@lplegal.com, kpatton@lplegal.com, druiz@lplegal.com, ikropiewnicka@lplegal.com

David Alan Eisenberg    david@loftusandeisenberg.com

Alexander Nicholas Loftus    alex@loftusandeisenberg.com, alexander.nicholas.loftus@gmail.com

*George J. Spathis*

# EXHIBIT A

As of March 9, 2022

Rock City Road Films LLC
c/o Jordan Ancel
_____
_____

**Re:     "THE UNSEEN" Producer Agreement**

Dear Jordan:

This agreement is made and entered into as of the date written above, by and between The Curse LLC ("Production Company") and Rock City Road Films LLC ("Lender") f/s/o Jordan Ancel ("Ancel") concerning Ancel's services as producer in connection with the feature-length motion picture presently known as THE UNSEEN (the "Picture").  The parties hereto agree as follows:

**1. Employment/Services.** Provided Ancel is available when and where reasonably required by Production Company, Production Company shall engage Ancel as Producer for the Picture, and Lender and Ancel accept such employment, upon the terms and conditions herein contained. Ancel shall render all services customarily rendered by producers in the motion picture industry with respect to the development, pre-production, production and post-production of the Picture as and when reasonably required by Production Company and in accordance with the terms hereof, including without limitation, attending all reasonably required pre-production meetings (which may be via videoconference or telephone conference, handling requests of other producers, attending producer meetings and rendering in-person on-set assistance as needed commencing one week in advance of principal photography (the "Services").

**2. Term.** Ancel's services hereunder shall commence on or about June 30, 2021 (in accordance with the pre-production and production schedule as determined by the Production Company  in consultation with Ancel) until and through complete delivery of the Picture including all delivery requirements provided by any sales agent and/or any applicable distributor. Such services shall be rendered on a non-exclusive basis during pre-production, exclusive during principal photography and non-exclusive during post-production on the Picture, provided however, that any services which Ancel may render for third parties or on Ancel's own account during non-exclusive periods shall not materially interfere with the timely performance of Ancel's services and obligations hereunder.

**3. Compensation.**

**3.1**  As full and complete consideration for all of the undertakings and services of Ancel and all rights and materials herein purchased, granted and agreed to be granted and upon the condition Ancel shall fully and faithfully complete all services that may be required hereunder and

1

provided that Ancel is not in material uncured breach hereof, Production Company shall pay to Lender, and Lender and Ancel shall accept, the following**:** a fee of $5,000 payable as follows: (a) $2,500 upon the commencement of principal photography on the Picture, April 17, 2022; (b) $2,000 upon commencement of June 06, 2022 photography on the Picture (c) $500 upon delivery of the final cut of the Picture to Production Company in accordance with the requirements of the sales agent and/or distributor(s) of the Picture. Lender and Ancel acknowledge and agree that the fee pursuant to this section 3.1 is on a "flat fee" basis and that neither Lender nor Ancel shall be entitled to any additional and/or so-called "overage" compensation for any services rendered by Ancel in connection with the Picture. No additional payments shall be or become payable to Lender Ancel for Ancel's rendering of services on behalf of the Picture at night, on weekends, or during holidays except as otherwise set forth herein.

**3.2** In addition to the Compensation as contained in 3.1 above and upon the condition Ancel shall fully and faithfully complete all services that may be required hereunder and provided that neither Lender nor Ancel is in material uncured breach hereof, Lender shall be entitled to receive Three Percent of One Hundred Percent (3% of 100%) of the "Net Profits" of the Picture, if any. The timing, manner of payment and definition of Net Profits (attached hereto as Exhibit A) will be no less favorable than that accorded to any other individual or entity receiving a share of Net Profits on the Picture.

**3.3** Nothing herein shall be deemed to obligate Production Company to use Ancel's services, or the results of such services in the Picture, to produce, release or distribute the Picture or to continue the release and distribution of the Picture if released or to otherwise exploit any rights granted to Production Company hereunder. Production Company shall have fully discharged its obligations hereunder by payment to Lender of the compensation as set forth herein.

**4. Credit.** In the event that the Picture is produced by Production Company and provided Ancel performs all of his material services hereunder and that neither Lender nor Ancel is in material uncured breach hereof, Production Company shall accord Ancel a "Producer" credit on-screen on either no less than the single third producers' card or, at Production Company's discretion, the second producers card, shared only with Ryan Atkins, in the main titles on all positive and/or digital prints of the Picture. Such credits shall be of the same size, type, duration, manner of placement and boldness as all other similar credits and shall appear wherever and whenever any other similar credits on the Picture appear or are otherwise listed. All other matters relating to credit shall be determined by Production Company in its sole and exclusive discretion and subject to the standards and operating policies and practices as established and determined by the network, studio or similar party. No inadvertent or casual failure by Production Company or any failure by a third party to accord the credit provided herein shall be deemed a breach of this Agreement.

**5. Use of Name, Voice and Likeness.** Lender and Ancel agree that Production Company shall have the right, but not the obligation, to use Ancel's name, approved voice and approved likeness, such approval not to be unreasonably withheld or delayed, in and in connection with the Picture and/or any other use or exploitation of the results and proceeds of Ancel's Services hereunder, and in connection with the advertising (including without limitation, trailers),

exhibition and/or other exploitation of any of the foregoing including commercial advertising and publicity tie-ups relating thereto provided, however, that no such use in connection with commercial advertising or publicity tie-ups other than in connection with the Picture shall be permitted without Ancel's prior written consent. Ancel agrees that Production Company shall have the sole and exclusive right to issue publicity concerning Ancel with respect to the Services hereunder provided that no use by Production Company of Ancel's name in connection with the Picture shall be in any way derogatory or defamatory.

**6. Results and Proceeds of Services.** Lender and Ancel understand and agree that Ancel is being employed on a work-for-hire basis (as that term is understood under Title 17 of the U.S. Code as the same may be amended from time to time), and that Production Company shall solely and exclusively own, and Lender and Ancel hereby transfer to Production Company, all rights, titles and interests in and to the Picture and all results and proceeds thereof and of all of Ancel's work product hereunder and otherwise associated with the Picture, in whatever stage of completion as may exist from time to time, including but not limited to all rights of whatever kind and character, throughout the universe, in perpetuity, in any and all languages, of copyright, trademark, patent, production, manufacture, recordation, reproduction, transcription, distribution, recreation, copying, performance, broadcast and exhibition by any art, technology, method or device now known or hereafter devised, including without limitation, radio broadcasting, electronic and/or digital download or streaming via the Internet or any other platform, technology or device now known or hereafter devised; theatrical and non-theatrical exhibition; and television exhibition or otherwise, whether such results and proceeds consist of literary, dramatic, musical, motion picture, digital, electronic, mechanical or any other form of works, themes, ideas, compositions, creations or products. Production Company's acquisition hereunder shall also include all rights generally known in the field of literary and musical endeavor as the "moral rights of authors" in and/or to the Picture and any musical and/or literary proceeds of Ancel's Services. Production Company shall have the right but not the obligation with respect to the Picture and the results and proceeds thereof, to add to, subtract from, change, arrange, revise, adapt, rearrange, make variations of,, modify, market, exploit and/or translate the same into any and all languages, change the sequence, change the characters and the descriptions thereof contained therein, change the title of same, record and photograph the same with or without sound, including spoken words, dialogue and/or music synchronously recorded, use said title or any of its components in connection with works or motion pictures wholly or partially independent thereof in new versions, adaptations, prequels, sequels and/or spin-offs in any and all languages and to obtain, register and renew copyright therein in Production Company's name throughout the universe. Lender and Ancel hereby expressly waive any and all rights which Lender and/or Ancel may have either in law, in equity or otherwise which Ancel may have or claim to have as a result of any alleged infringements of Ancel's so-called "droit moral" or "moral rights" of authors. Lender and Ancel acknowledge that the results and proceeds of Ancel's Services shall be considered to be works made for hire for Production Company and therefore, Production Company shall be the sole author and copyright owner of the results and proceeds of Ancel's Services hereunder. Notwithstanding the foregoing, if the Picture is determined not to be a work made for hire, whether by a court of competent jurisdiction or otherwise, any and all rights, titles and interests including without limitation the copyright and any renewal rights in and to the Picture and all of the results and proceeds of Ancel's Services

hereunder shall be deemed to have been transferred, conveyed and assigned to Production Company on the same terms as described above. All rights granted or agreed to be granted to Production Company hereunder shall vest in Production Company immediately and shall remain vested and survive whether this Agreement expires in normal course or is terminated for any cause or reason. Lender and Ancel acknowledge and agree that Ancel acquires no rights, titles or interest in or to the Picture or any portion thereof under this Agreement and/or from or as a result of any Services provided by Ancel hereunder. Lender and Ancel hereby irrevocably assign, license and grant to Production Company exclusively throughout the universe and in perpetuity, the rights, if any, of Lender and/or Ancel to authorize, prohibit and/or control the renting, lending, fixation, reproduction and/or other exploitation of any motion picture produced based on the Picture (or any rights therein) by any and all media and means now known or hereafter devised as may be conferred upon by Lender and/or Ancel under applicable laws, regulations or directives including without limitation any so-called "Rental Lending Rights" pursuant to any European Union or successor entity (the "EU") or pursuant to any individual (non-U.S.) country's directives and/or enabling or implementing legislation, laws or regulations enacted by the EU or such individual country.

**7. Indemnity:** Lender and Ancel will indemnify and hold harmless Production Company, its successors and assignees, from and against any and all damages, costs, expenses, liabilities, claims and causes of action in any way arising by reason of the breach of any warranty or representation by Lender and/or Ancel hereunder or any other provision in this Agreement including, without limitation, reasonable outside attorneys' fees and costs in the defense and disposition of such matters. Likewise, Production Company will defend, indemnify and hold harmless Lender and Ancel, their successors and assignees, from and against any and all damages, costs, expenses, liabilities, claims and causes of action in any way arising by reason of the breach of any warranty or representation by Production Company hereunder or any other provision in this Agreement and the development, production and exploitation of the Picture, including, without limitation, reasonable outside attorneys' fees and costs in the defense and disposition of such matters.

**8. Insurance.** At Production Company's expense, Production Company may secure life, accident, cast or other insurance on Ancel and Ancel shall furnish such information, fill out and sign such forms, and undergo such physical examinations as reasonably may be required. The proceeds and ownership of such insurance shall be solely Production Company's, and Ancel shall not have any right, title or interest therein.

**9. Remedies.** Lender and Ancel acknowledge and agree that the sole remedy available to them for Production Company's breach of or non-compliance with any of the provisions of this Agreement shall be an action at law for damages and in no event shall Lender and/or Ancel seek or be entitled to injunctive or other equitable relief for any such breach or non-compliance of this Agreement.

**10. Representations and Warranties**. Lender and Ancel represent and warrant that they have the right and power to enter into and fully perform this agreement and that she has not done and will not do anything which may impair any of the rights granted to Production Company. Lender and Ancel warrant and represent that the results and proceeds of Ancel's Services

hereunder shall be wholly original to Ancel except to the extent based on material in the public domain and, to the best of Lender and Ancel's knowledge, shall not infringe upon or violate the copyright, right of privacy, right against defamation, right of publicity, or any other personal or proprietary right of any person.

**11. Suspension and Termination:** Upon written notice to Lender and/or Ancel (which may be given by email) Ancel's Services and the accrual of compensation hereunder shall be suspended during all periods of Force Majeure (as defined in section 13 below) and/or when:

(a) Ancel's Incapacity: If, by reason of mental or physical disability, Ancel shall be unable to perform or comply with any of his respective duties or the applicable terms or conditions hereof ("Incapacity") for more than five (5) days in the aggregate during the principal photography of the Picture, or more than two (2) weeks in the aggregate during any time during the Term.

(b) Termination: The Term is not guaranteed and may be terminated by Production Company as follows without any further obligation to Ancel except as set forth in this Paragraph 11(b), Production Company may terminate this Agreement and the Term hereof for "Cause", which, as used herein, shall mean for a reason stated in Paragraph 11(b)(i) or 11(b)(ii) below, whereupon Production Company may terminate this Agreement at any time up until the completion of all Services provided hereunder, including all of Ancel's obligations and liabilities hereunder, upon written notice to Ancel. Alternatively, Production Company may terminate this Agreement and the Term hereof without Cause and without any further obligation to Ancel other than its obligation hereunder to pay Lender any Fees accrued and otherwise payable solely through the date prior to such termination in accordance with the terms of this Agreement. Except as provided above, Production Company shall have no further obligations to Lender and/or Ancel in the event of any termination hereof. The provisions of this Paragraph 12 are in addition to and not exclusive or in limitation of any other rights or remedies Production Company may have under this Agreement or at law or in equity.

(i) Of an Incapacity subject to the provisions of Section 11(a); or

(ii) If Ancel fails or refuses to perform or comply with any terms or conditions hereof other than by reason of Incapacity ("Default"), then prior to termination of this Agreement by Production Company based upon Default, Production Company shall notify Ancel in writing, specifying the nature of the Default, and Ancel shall have 24 hours after receipt of such notice to cure the Default. If the Default is not cured within the 24 hour period, Production Company may terminate this Agreement forthwith. Default shall not include any failure or refusal of Ancel to perform or comply with the material terms and conditions of this Agreement by reason of illness or incapacity of third parties, a Force Majeure Event as defined below, or a breach or action by Production Company which makes the performance by Ancel of the Services impossible, and Ancel shall set out in writing to Production Company within 24 hours of receipt of written notice

5

of termination for Default the basis of its reason (and justification therefor) for such breach or action or such termination shall become final.

(c) Further Effect Of Termination: Subject to limitations otherwise provided herein, and whereby Ancel has not been terminated for Cause, termination of this Agreement, Ancel's right to indemnification and insurance coverage shall survive termination hereby.

(d) Effect of Suspension: If any Force Majeure, Incapacity or Default should occur prior to the commencement of principal photography, the commencement of principal photography may be postponed by Production Company for a period equal to the duration of such Force Majeure, Incapacity or Default, not to exceed six (6) months in the aggregate and such postponement shall not be deemed a suspension of this Agreement or Ancel's Services; provided, that Production Company may reduce the period of postponement in Production Company's own discretion upon notice thereof to Lender and/or Ancel. In the case of such a suspension, Production Company agrees to meaningfully consult with Ancel regarding the rescheduling of the production period so long as Ancel's scheduling requirements result in no more than reasonable and non-material additional added expense for Production Company. Any suspension shall be for the duration of any such Force Majeure, Incapacity or Default plus such reasonable period of time as may be reasonably deemed necessary by Production Company to commence or recommence pre-production, production, or post-production of the Picture. A suspension shall not relieve Lender and/or Ancel of any of Ancel's obligations to perform hereunder.

**12. Force Majeure Event.** If, by reason of fire; earthquake; war; riot; labor dispute, pandemic, lock-out or strike; act of God or public enemy; accident; civil disturbance; law, enactment, rule, regulation, restraint, order or act of any governmental instrumentality or military authority; failure or inability to obtain any necessary permit or license; failure of technical facilities; inability to obtain sufficient labor, technical or other personnel (including without limitation cast or crew members); failure, delay or reduction in transportation facilities or water, electricity or other public utilities; death, disability or disfigurement (with respect to cast only), or unavailability of or inability to obtain life, accident, cast, or health insurance for, a principal cast member, the director, any other producer or key crew member or inability to obtain visas, labor permits or other governmental licenses for any such persons; or other cause beyond Production Company's control or which Production Company could not by reasonable due diligence have avoided, Production Company is prevented from or hampered in the development or production of the Picture, or if, Production Company's production of the Picture is postponed or suspended by reason of the closing of the production facility at which Production Company intends to film the Picture or because substantially all the theatres in the United States close or cease to exhibit motion pictures for any reason, or if, by reason of any of the aforesaid contingencies or any other cause or occurrence outside Production Company's control, the preparation, commencement, production or completion of the Picture is hampered, interrupted or interfered with, or if Production Company's normal business operations are hampered or otherwise interfered with by virtue of any disruptive events which are beyond Production Company's control (each a "Force Majeure Event"), then Production Company may postpone the commencement of or suspend the rendition of Services by Ancel and the running of time hereunder for such time as the Force

Majeure Event shall continue and no compensation shall accrue or become payable to Lender hereunder during the period of such suspension.

**13. Covid Protocols**.   Lender and Ancel acknowledge and agree that Ancel and all of Ancel's Production Company-approved guest(s) (if any) shall comply with all of Production Company's reasonable production guidelines, procedures, and protocols (including, without limitation, compliance and execution of Exhibits B and C, attached hereto and incorporated herein by this reference, and compliance with and execution of all of Production Company's COVID-19 safety and production guidelines, procedures, and protocols).

    a. <u>COVID-19 Required Disclosures</u>: In addition to the above, Ancel acknowledges and agrees that it is of the essence of this Agreement that Ancel **IMMEDIATELY** notify (and requires all of Ancel's Company-approved guest[s] to immediately notify) Production Company in writing in the event Ancel and/or Ancel's Production Company-approved guest(s) know or have a good faith reason to believe any of the following has occurred (and to follow all CDC, government, legal, and medical orders, statutes, guidelines, and requirements in connection thereto [including, without limitation, mandated self-quarantine and isolation]):

        i. Ancel and/or Ancel's Production Company-approved guest(s) experiences or has experienced symptoms commonly associated with COVID-19 (or mutations thereto) any time prior to, during, or within fourteen (14) days after providing services in connection with the Project and/or visiting the set and/or any other production location for the Project; or

        ii. Ancel and/or Ancel's Production Company-approved guest(s) tests positive for or is diagnosed with COVID-19 (or a mutation thereof) at any time prior to, during, or within fourteen (14) days after providing services in connection with the Project and/or visiting the set and/or any other production location for the Project; or

        iii. Ancel and/or Ancel's Production Company-approved guest(s) are apprised of facts or have good faith reason to believe that Ancel and/or Ancel's Production Company-approved guest(s) has come into contact with someone with a confirmed case of COVID-19 (or mutation thereof) or has symptoms commonly associated with COVID-19 at any time prior to, during, or within fourteen (14) days after providing services in connection with the Project and/or visiting the set and/or any other production location for the Project.

Violation by Ancel and/or Ancel's guest(s) of this Paragraph 13 shall be deemed a material breach of this Agreement.  Additionally, any failure by any of Ancel's Production Company-approved guest(s) (if any) to comply with this Paragraph 14 shall result in the immediate removal of any such guest(s).

**14**. **Assignment.** Production Company shall have the right to assign this Agreement to third parties for the production of the Picture and/or shall have the right to loan Ancel's services out to such third party production company for the production of the Picture. Upon such assignment, and on the condition that such third party production company assumes all of Production Company's obligations to Ancel herein in writing, Production Company shall be relieved of its obligations to Ancel hereunder.

**15.** **Choice of Law.** This Agreement will be governed by the internal substantive laws of the State of Illinois and the Federal laws of the United States applicable to agreements executed and to be wholly performed herein and will not be modified except by written amendment signed by both parties hereto.

**16. Entire Agreement**. This Agreement contains the full and complete understanding between the parties with reference to the within subject matter, supersedes all prior agreements and understandings whether written or oral pertaining thereto, and cannot be modified except by written instrument signed by each party. Ancel acknowledges that in entering into this Agreement Ancel has not relied on any representation not expressly contained herein.

Very truly yours,

_____
The Curse LLC
By:
Its:

AGREED TO AND ACCEPTED

_____
Rock City Road Films LLC
By: Jordan Ancel
Its: Authorized Representative

**ARTIST'S INDUCEMENT**

In order to induce The Curse LLC ("Production Company") to enter into the foregoing agreement with Rock City Road Films LLC ( "Lender"), and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby consents and agrees to the execution and delivery of said agreement by Lender and hereby agrees to render all the required, material services therein provided to be rendered by the undersigned, to grant all the rights granted therein and to be bound by and duly perform and observe each and all of the terms and conditions of said agreement regarding performance or compliance on the undersigned's part, and

hereby joins in all warranties, representations, agreements and indemnities made by Lender and further confirms the rights granted to Production Company under said agreement and hereby waives any rights of droit moral or similar rights which the undersigned may have. The undersigned further waives any claim against Production Company for wages, salary or other compensation of any kind paid to Lender (f/s/o the undersigned) pursuant to said agreement or in connection with the motion picture and the exercise by Production Company of rights therein or derived therefrom (provided, however, that such waiver shall not relieve Production Company of any of its obligations to Lender under said agreement), and, unless the undersigned is deemed substituted as a direct party hereto, the undersigned agrees to look solely to Lender for any and all compensation that the undersigned may become entitled to receive in connection with the said agreement.

Dated as of March 1, 2022

_____
Jordan Ancel

9

## CERTIFICATE OF ENGAGEMENT

Reference is hereby made to that certain motion picture presently entitled *The Unseen"* ("Picture") for which Jordan Ancel ("Ancel") is to perform certain services as a producer as further specified in and subject to the long form agreement (the "Agreement") currently being negotiated between Rock City Road Films LLC and The Curse LLC ("Production Company").

Lender and Ancel, for good and valuable consideration, receipt of which is hereby acknowledged, hereby certifies and agrees that (i) all of the results and proceeds of the services of every kind heretofore rendered by and hereafter to be rendered by Ancel in connection with the Picture, including, without limitation, any performance by Ancel and (ii) all ideas, suggestions, dialogue, plots, themes, stories, characterizations and any other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Ancel which in any way relate to the Picture or to the material on which the Picture will be based (collectively, "Material") are and shall be deemed works "made-for-hire" for Production Company. Ancel further acknowledges, certifies and agrees that as between Ancel, on the one hand, and Production Company, on the other, Production Company is and shall be deemed the sole author and/or exclusive owner of all of the Material for all purposes and the exclusive owner throughout the universe of all of the rights comprised in the copyright thereof, and of any and all other rights thereto ( collectively, "Rights"), and that Production Company shall have the right to exploit any or all of the foregoing in any and all media, now known or hereafter devised, throughout the universe, in perpetuity, in all languages as Production Company determines. If under any applicable law the Material is not deemed or otherwise considered a work "made-for-hire" for Production Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Ancel under such applicable law (including any and all renewals, extensions and revivals thereof), Ancel hereby assigns and transfers to Production Company the Rights and, in connection therewith, any and all right, title and interest of Ancel in the Picture and any other works now or hereafter created containing the Material. Ancel will, upon request, execute, acknowledge and deliver to Production Company such additional documents consistent herewith as Production Company may reasonably deem necessary to evidence and effectuate Production Company's rights hereunder, and hereby grant to Production Company the right as attorney-in-fact solely to execute, acknowledge, deliver and record any and all such documents if Ancel shall fail to execute same within five (5) business days after receipt from Production Company. Production Company shall promptly provide Ancel with copies of any such documents, provided that the inadvertent failure of Production Company to do so shall not be deemed a breach of this Certificate of Engagement or of the Agreement nor shall it affect the validity or effectiveness of such documents. Ancel hereby grants Production Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Production Company may in its sole discretion determine.

Lender and Ancel warrant that except as contained in material furnished to Ancel by and/or at direction of Production Company, all literary, dramatic, musical and other material and all ideas, designs and inventions of Ancel in connection with the Picture are or will be original with Ancel or in the public domain throughout the world, shall not infringe upon or violate any copyright of, shall not, to the best of Ancel's knowledge upon Ancel's exercise of due diligence, infringe upon or violate the right of privacy or any other right of any person and, are not the subject of any litigation or claim that might give rise to litigation, and that Ancel is free to grant all rights granted and make all agreements made by Ancel herein. Ancel agrees to hold Production Company and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Production Company or any of its successors, licensees or assigns may suffer or incur by reason of any uncured material breach of any of the warranties made in this paragraph.

10

Production Company hereby agrees to defend and indemnify and hold Ancel and against all liabilities, penalties, losses or expenses, including reasonable outside attorney's fees, imposed upon, sustained or incurred by Ancel arising out of the development, production, distribution, and exploitation of the Picture or any element thereof, except to the extent such claims, judgments, losses, expenses, and liabilities arise from Ancel's intentionally tortious acts or omissions, fraud or felony criminal matters, or which arise out of the breach of any of Ancel's material warranties, representations, agreements or obligations hereunder.

In the event of any breach by Production Company of the Agreement, the sole remedy of Ancel shall be an action for money damages, and Ancel shall not have any right to enjoin, restrict or otherwise interfere with Production Company's rights in the Material. Production Company may assign this Certificate (including, without limitation, any or all of its rights and obligations hereunder) to any person or entity without imitation.

Executed as of March ___, 2022

_____
ROCK CITY ROAD FILMS LLC
BY: JORDAN ANCEL
ITS:  AUTHORIZED REPRESENTATIVE

_____
THE CURSE LLC
BY:
ITS:  AUTHORIZED REPRESENTATIVE

_____
JORDAN ANCEL, Individually

11

## EXHIBIT A

### NET PROFITS

"Net Profits" shall be defined as gross receipts actually received by Production Company, its affiliates, licensees and assigns in connection with the worldwide licensing, sale, distribution and/or other exploitation of the Picture and/or any ancillary and/or subsidiary rights thereto in perpetuity in any and all media and all rights in connection therewith remaining, if any, after the deduction of only the following: (a) all actual, direct, verifiable, out of pocket, unaffiliated third party costs, charges, expenses and liabilities reasonably incurred in connection with the acquisition, preparation, development, production, completion and delivery of the Picture, including without limitation, repayment of an amount equal to 120% of the financiers' at-risk capital contributions to the Production Company in connection with the Picture; (b) actual, direct, verifiable, out-of-pocket, unaffiliated third party distribution fees not previously charged or retained by the distributor(s); (c) actual, direct, verifiable, out-of-pocket, unaffiliated third-party distribution costs as charged to Production Company by distributor(s); (d) payments in connection with any deferrals or bonuses in connection with the Picture; (e) any actual, direct, verifiable, out-of-pocket unaffiliated third party collection fees and expenses charged by the collection agent for the Picture, if any; (f) actual, direct, verifiable, unaffiliated third-party out-of-pocket sales expenses and sales fees payable to the foreign and domestic sales agents for the Picture; (g) guild and union residuals payable in connection with the exploitation of the Picture, to the extent such residuals are not assumed by any third party distributor of the Picture; and (h) payment of any outstanding loans to the Production Company (including loans from affiliates of the Production Company) in connection with the financing of the Picture (including any interest thereon actually charged to Production Company) for the conduct of the authorized business of the Production Company in connection with the Picture, including but not limited to any loans in connection with the monetization of the Picture tax credits, whether or not payment is then due. All reasonable, third party, direct and customary "off-the-tops" (e.g. bank fees,) incurred in connection therewith shall also be deducted off-the-top from Net Profits. Notwithstanding the foregoing, there shall be no cross-collateralization or double deductions of any kind, and no charges or deductions for Production Company overhead or administrative fees.

**EXHIBIT B**
**THE CURSE LLC / "THE UNSEEN"**
**Health & Safety Acknowledgment and Agreement**

**Name**:  Jordan Ancel
**Phone**: (310) 704-8804
**Address**:  528 N Vista Street
**Email**:  Jordan@JordanAncel.com

By signing each section of the Health and Safety Acknowledgment and Agreement, you acknowledge and represent that you have read it, understand it and sign it voluntarily; you are sufficiently informed about the risks involved in participation in this production; no oral representations, statements, or inducements, apart from the foregoing written agreement, have been made; you are at least eighteen (18) years of age and fully competent; and you execute this document for full, adequate, and complete consideration fully intending to be bound by the same.

**STATEMENT OF HEALTH**
Known symptoms of COVID-19 include the following:
- Cough
- Shortness of breath or difficulty breathing
- Fever
- Chills
- Fatigue
- Muscle pain or body aches
- Headache
- Sore throat
- New loss of taste or smell
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

You acknowledge that you are not currently, or in the past seven (7) days, have suffered from any known COVID-19 related symptoms.

You acknowledge that you have not (as far as you are aware) been in contact with anyone with COVID-19 symptoms within the previous fourteen (14) days.

You acknowledge that you have not (as far as you are aware) been in contact with anyone diagnosed with COVID-19 within the previous (14) days.

You acknowledge that you are not currently under advisement by a health care provider to shelter-at-home due to COVID-19 and/or that you have not been instructed to self-isolate within the previous fourteen (14) days.

You agree not to report to set unless the results of a test for COVID-19 has been received within forty-eight (48) hours prior to commencement of services.

You acknowledge that you will alert the safety coordinator immediately about any onset of symptoms or contact with anyone who has symptoms of COVID-19.

13

You accept that you will be asked to restate your confirmation of the above, verbally, to the safety coordinator at the beginning of each day on set, as well as may be requested to submit to a contactless temperature reading.

Furthermore, you agree to self-monitor for symptoms fourteen (14) days after completion of filming and will inform production of any onset of symptoms or confirmed positive COVID-19 test.

**SIGNATURE**
PRINT NAME: _____Jordan Ancel_____  DATE: __5/31/2022_____

14

**EXHIBIT C**
**Safety Guidelines and Set Rules**

**CONFIRMATION OF ADHERENCE TO SAFETY GUIDELINES / SET RULES**

You acknowledge that you have read the Safety Guidelines / Set Rules below.

You agree to follow these Guidelines and Rules and all other applicable health and safety protocols. Any actions that constitute violation of the guidelines will result in your being asked to leave set immediately, and may result in the termination of future employment on the Project.

**SIGNATURE**
PRINT NAME: _____ Jordan Ancel _____ DATE: _5/31/2022_

**SAFETY GUIDELINES / SET RULES**

**Our goal is to provide a working environment for our cast and crew whereby risk of transmission of COVID-19 (or other viruses) is as low as possible.**

This requires honesty, understanding, patience, and vigilance among the entire cast and crew. Anyone violating these rules will be asked to leave set immediately.

**MONITORING FOR SYMPTOMS**

It is vital that cast and crew self-monitors for symptoms commonly associated with COVID-19. **If you are feeling sick, or have any of the known symptoms of a COVID-19 related illness listed below, alert the safety coordinator immediately and depart from the shoot immediately.** Known COVID-19 related symptoms include the following:
- o Cough
- o Shortness of breath or difficulty breathing
- o Fever
- o Chills
- o Muscle pain or body aches
- o Headache
- o Sore throat
- o New loss of taste or smell
- o Congestion or runny nose
- o Nausea or vomiting
- o Diarrhea

**DISTANCING**

- o Stay six (6) or more feet away from other members of the cast and crew at all times when able. Verbally communicate before coming within shorter proximity of another cast or crew member and do not rush between areas of set, to not risk physically running in to another person.

**SHARED SPACES & SURFACES**

- o Use gloves when touching equipment or surfaces shared with other members of the cast and crew. When gloves are used, they should be safely removed by rolling them inside out and off the hand from the wrist down to the fingertips, and should be safely and immediately disposed of in the trash. Crew Members should avoid removing gloves by pulling them off at the fingertips and should always wash

15

their hands after removing gloves.

o   Use your elbow or knuckle as opposed to fingers when possible.

o   Do not use other people's phones or personal work tools.

**GENERAL PRACTICES**

o   Wash hands frequently, especially after removing gloves, before & after sanitizing equipment, before & after eating.

o   If soap is not readily available, use hand sanitizer that is provided on set.

o   Wear a face covering, whenever possible but particularly when around other individuals.

o   Avoid touching your face.

o   Observe respiratory etiquette, including, without limitation, covering coughs and sneezes with your elbow or disposable tissue(s).

o   Keep all personal belongings in the designated area on set.

o   Food, dishes, and utensils should not be shared.  Crew Members should use disposable utensils and dishes, and each person is responsible for disposing of his or her own trash.

o   If bringing your own mask, wash it daily and consider replacing or covering with a disposable mask for the length of the shoot.

**No Retaliation and Interactive Process**

o   The Curse LLC will engage in the interactive process in good faith and will not retaliate against any Crew Member who inquires about his or her rights with respect to safety and/or accommodation of any disability or medical condition.

o   Cast and crew members may report violations of any applicable guidelines, rules, or protocols related to COVID-19 or that a colleague is exhibiting signs of illness or symptoms of COVID-19 without fear of retaliation.

o   The Curse LLC will treat your private health and personal data with high confidentiality and sensitivity and according to the law.

16

# EXHIBIT B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

Jordan Ancel,

       Plaintiff,

v.

Jennifer Karum & Monica
Ruiz,

       Defendants,

    &

Ryan Atkins,

       Respondent in
       Discovery.

No. 23 L 4921

Calendar S

Judge Jerry A. Esrig

**ORDER**

The matter before the court is defendants Jennifer Karum
and Monica Ruiz's motion to dismiss plaintiff Jordan Ancel's
verified first amended complaint ("FAC") pursuant to section 2-
615 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-615. For
the reasons articulated below, the motion to dismiss is granted-
in-part and denied-in-part.

I.

A section 2-615 motion to dismiss attacks the sufficiency of a
complaint and raises the question of whether a complaint states
a cause of action upon which relief can be granted. *Fox v. Seiden*,
382 Ill. App. 3d 288, 294 (1st Dist. 2008). All well-pleaded facts
must be taken as true and any inferences should be drawn in
favor of the non-movant. 735 ILCS 5/2-615; *Hammond v. S.I.
Boo, LLC*, 386 Ill. App. 3d 906, 908 (1st Dist. 2008). Plaintiffs
are not required to prove their case at the pleading stage; they
are merely required to allege sufficient facts to state all elements
which are necessary to constitute each cause of action in their
complaint. *Visvardis v. Eric P. Ferleger, P.C.*, 375 Ill. App. 3d
719, 724 (1st Dist. 2007). A section 2-615 motion should not be
granted unless no set of facts could be proved that would entitle
the plaintiff to relief. *Beacham v. Walker*, 231 Ill. 2d 51, 58
(2008).

## II.

The FAC advances six Counts against defendants Karum and Ruiz: 1) false light invasion of privacy against Karum (Count I); 2) false light invasion of privacy against Ruiz (Count II); 3) defamation *per se* against Karum (Count III); 4) defamation *per se* against Ruiz (Count IV);[1] 5) malicious prosecution against Karum (Count V);[2] and 6) tortious interference with economic advantage against Karum (Count VI).[3] There is also a seventh Count against nonmovant Atkins as a respondent in discovery; this Count against Atkins is not at issue in the instant section 2-615 motion to dismiss. Movants Karum and Ruiz seek section 2-615 dismissal of all claims advanced against them in the FAC.

### A.

The court first addresses the defamation *per se* claims against Karum and Ruiz, Counts III and IV respectively. At the outset, the court notes that the motion advances arguments with respect to the dismissal of both defamation *per se* and defamation *per quod* actions. Based on the express allegations in the FAC, the court will regard both Counts III and IV as defamation *per se* causes of action and not as defamation *per quod* causes of action. *See* FAC ¶¶ 81 & 87 ("[t]he false statements were defamatory *per se*..."). Thus, the court will address only the arguments germane to defamation *per se* actions.

To state a claim for defamation, "a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009) (internal citation omitted). Regarding defamation *per se*:

> In Illinois, there are five categories of statements that are considered defamatory *per se*: (1) words that impute a person has committed a crime; (2)

---

[1] The FAC incorrectly labels this defamation *per se* claim against Ruiz as "Count III," despite the fact that the preceding defamation *per se* claim against Karum is already labeled "Count III." For the sake of clarity, the court will label the defamation *per se* action against Ruiz as Count IV.

[2] Similarly to the defamation *per se* cause of action against Ruiz, the malicious prosecution claim against Karum is mislabeled in the FAC as "Count IV." As before for clarity, the court will label this claim as "Count V."

[3] Again, the FAC mislabels this tortious interference with economic advantage claim against Karum as "Count V." The court will label this cause of action as "Count VI."

2

words that impute a person is infected with a loath-
some communicable disease; (3) words that impute
a person is unable to perform or lacks integrity in
performing her or his employment duties; (4) words
that impute a person lacks ability or otherwise
prejudices that person in her or his profession; and
(5) words that impute a person has engaged in
adultery or fornication.

*Id.* at 491-92.

Defamation *per se* claims must be pled with a heightened
level of precision and particularity. *Id.* at 495. The preliminary
construction of an allegedly defamatory statement is a question
of law. *Id.* at 492.

For the various reasons discussed below, all allegedly defam-
atory statements published by Karum and Ruiz are non-action-
able, and the court therefore grants dismissal of both Counts III
and IV.

i.

First, most of the alleged defamatory statements are reason-
ably construed as non-actionable expressions of opinion and/or
may be innocently construed.

a.

The Illinois Supreme Court has provided guidance regarding
expressions of opinion in the context of defamation *per se* claims:

[T]here is no artificial distinction between opinion
and fact: a false assertion of fact can be defamatory
even when couched within apparent opinion or rhe-
torical hyperbole. ... The test is restrictive: a de-
famatory statement is constitutionally protected
only if it cannot be reasonably interpreted as stat-
ing actual fact. [Citation.] Several considerations
aid our analysis: whether the statement has a pre-
cise and readily understood meaning; whether the
statement is verifiable; and whether the state-
ment's literary or social context signals that it has
factual content. [Citations.] If a statement is fac-
tual, and it is false, it is actionable.

*Solaia Tech., LLC v. Specialty Publ. Co.*, 221 Ill. 2d 558, 581-82
(2006) (internal citations and quotation marks omitted).

3

Additionally, the statement is evaluated from the perspective of the ordinary reader. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 398 (2008) (internal citation omitted).

Here, the court has identified several alleged defamatory statements in the FAC that are reasonably construed as non-actionable expressions of opinion. Many of these statements are alleged in paragraph 39 of the FAC: that Ancel is a "bad person;" that plaintiff is "not one of the best producers out there;" Ancel is "terrible with women;" that Ancel is "a terrible human;" that Ancel is "vicious;" that Ancel is a "predator many women and some men can attest;" and that Ancel "screws people." FAC ¶ 39. According to the FAC, all of these statements allegedly were published by defendant Karum via electronic means; the images alleged in paragraph 39 of the FAC appear to be text message conversations between Karum and third parties. *See id.* Aside from Karum, defendant Ruiz also allegedly published the following statements, also via electronic means: that Ancel is "not to be trusted and has screwed over people in the industry;" that Ancel is "vulgar" and that he lacks a "good moral compass." FAC ¶ 43.

Applying the considerations articulated in *Solaia Tech.*, all of the foregoing statements are not statements of actual fact. First, all of the alleged defamatory statements cited above lack a precise and readily understood meaning. These statements have unclear, ambiguous meanings that fail to convey a particular, concrete fact regarding Ancel. Second, these statements cannot be verified, primarily because the statements fail to convey some actual, objective fact about Ancel. And finally, third, the literary and social context of the statements do not indicate that any of these statements provide factual content. The statements alleged in the FAC appear to be excerpts of text message conversations between defendants and third parties. Nothing about the context of these informal electronic communications signals that the alleged statements contain factual content. Ultimately, the subject statements are reasonably interpreted as non-actionable expressions of opinion that cannot support a defamation *per se* action.

b.

Next, several of the alleged defamatory statements are non-actionable because these statements can reasonably be allocated

an innocent construction. The Illinois Supreme Court has artic-
ulated the law governing the innocent construction rule in the
context of defamation *per se* actions:

> [A] written or oral statement is to be considered in
> context, with the words and the implications there-
> from given their natural and obvious meaning; if,
> as so construed, the statement may reasonably be
> innocently interpreted or reasonably be interpreted
> as referring to someone other than the plaintiff it
> cannot be actionable *per se*.

*Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 412 (1996) (internal
citation and quotation marks omitted).

Additionally, the "rigorous standard of the modified innocent
construction rule favors defendants in *per se* actions in that a
[non-defamatory] interpretation must be adopted if it is *reason-
able*. The tougher standard is warranted because of the pre-
sumption of damages in *per se* actions." *Id.* at 412-13 (internal
quotation marks and citation omitted).

Here, the alleged defamatory statements that reflect on An-
cel's work as a film producer or on Ancel's behavior in work set-
tings can reasonably be innocently construed. These allegations
include the statements alleged in paragraph 37 of the FAC:

> 37. Karum told anyone who would listen that Ancel
> was not to be trusted, that he did little for the Pro-
> ject, that he caused numerous problems on set, that
> he was "having problems" with other producers in
> Los Angeles, that he did not really have high level
> contacts in the industry, and that he is a terrible
> person.

FAC ¶ 37.

Aside from the foregoing statements, Karum also allegedly
stated: that Ancel "has been fired from many people's projects;"
and that Ancel "is off his rocket when he doesn't get what he
wants[.]" FAC ¶ 39.

First, pursuant to the case law described above, many of
these statements are statements of opinion, particularly that
Ancel was "not to be trusted," "did little," "did not really have
high level contacts" and "is off his rocket." Second, analogous to
the Illinois Supreme Court's analysis in *Anderson*, 172 Ill. 2d at
413-15, this court finds that all of these alleged statements pub-
lished by Karum indicate, when considered in their context, that

5

either Karum and Ancel had a poor professional relationship or
that Ancel did not fit in with the film project's production staff.
Although the FAC fails to specify exactly to whom Karum made
each of the alleged defamatory statements, Karum purportedly
published these statements to other individuals in the film pro-
duction industry. Karum's alleged statements, viewed in the
context of being published to third parties in the same industry
as plaintiff and defendants, do not necessarily imply that Ancel
lacks qualifications or skill in his profession. Rather, these state-
ments can reasonably be innocently construed to mean that An-
cel and Karum had a poor professional relationship or that Ancel
did not fit in with the film project's production staff. The *Ander-
son* Court, like several other Courts cited to in the *Anderson* de-
cision, found that a previous employer's criticisms of a former
employee's job performance could be innocently construed to in-
dicate simply that the former employee did not fit in with the
employer or that the employee failed to perform adequately in
that particular work setting, and that the comments did not nec-
essarily impute an inability to perform in other future positions.
*See id.* (discussing Illinois cases where the Courts innocently
construed alleged defamatory statements pertaining to the def-
amation *per se* plaintiff's job performance or professional compe-
tency). The same reasoning applies here such that Karum's al-
leged statements can reasonably be innocently construed and
thus be deemed non-actionable.

Specifically, regarding the alleged statement that Ancel "has
been fired from many people's projects," Illinois Courts have in-
nocently construed statements pertaining to a former em-
ployee's termination on the basis that a variety of possible rea-
sons could explain the termination of an employee. *See id.* at 414
(internal citation omitted). Potential reasons for termination
could include: conditions in the industry, assessment of the em-
ployee's performance against unrealistic standards, and the ex-
istence of some other conflict that prevents the employee from
meeting the employer's standards. *See id.* Another possible rea-
son could be that the employee's services simply were no longer
needed. *See id.* at 414-15 (internal citation omitted). None of
these potential reasons give rise to a defamation *per se* action.
Here, Karum's alleged statement that Ancel was "fired" fails to
support a defamation *per se* claim because, based solely on this
statement alleged in paragraph 39 of the FAC, the circum-
stances of Ancel's alleged termination remain unknown and
thus could have been for any number of non-defamatory expla-

6

nations. Moreover, the context of the alleged statement is some-
what unclear from the FAC because the statement appears to be
derived from an excerpt of a text message conservation that
Karum purportedly had with a third-party, whose identity is not
specified in the FAC. Ultimately, this statement is reasonably
subject to an innocent construction.

Moreover, some of these statements also lack the requisite
specificity and particularly required to plead defamation *per se*
actions. *See Green*, 234 Ill. 2d at 495. In particular, the allega-
tions in paragraph 37 of the FAC are vague and fail to suffi-
ciently allege the substance of the purported defamatory state-
ments and also fail to specify exactly to whom the statements
were published. For all the foregoing reasons, none of these
statements are actionable in the context of defamation *per se*.

ii.

The court next addresses the alleged defamatory statements
that Ancel sexually harassed women. Paragraph 39 of the FAC
contains excerpts of an electronic conversation that Karum had
with a third-party in which Karum wrote that Ancel sexually
harassed women. *See* FAC ¶ 39. This court finds persuasive fed-
eral case law that, in the application of Illinois defamation *per
se* law, determined that statements that the plaintiff engaged in
sexual harassment fail to comport with any of the five recog-
nized defamation *per se* categories and thus statements of this
sort fail to state a defamation *per se* claim. *See Gryga v. Henkels
& McCoy Grp., Inc.*, No. 19 C 1276, 2019 U.S. Dist. LEXIS
131521, at *16 (N.D. Ill. Aug. 6, 2019) (internal citation omitted).
Plaintiff fails to cite any law to the contrary to persuade this
court not to follow the federal precedent. Accordingly, all alleged
defamatory statements pertaining to plaintiff engaging in sex-
ual harassment are not actionable in the context of a defamation
*per se* action and thus fail to state a claim for defamation *per se*.

iii.

Finally, paragraphs 36 and 50 of the FAC refer to purported
defamatory statements made by Karum that Ancel committed
sexual assault. *See* FAC ¶¶ 36 & 50. These allegations pertain-
ing to Karum's statements that Ancel committed sexual assault
lack the specificity required to satisfy the heightened pleading
standard for defamation *per se* actions. *See Green*, 234 Ill. 2d at
495. Here, all the FAC's allegations pertaining to Karum's al-
leged statements asserting that Ancel committed sexual assault
are too vague to plead defamation *per se*. None of the subject

7

allegations contain any specificity about what Karum particularly published with respect to stating that Ancel committed sexual assault. All these allegations merely state vague, non-specific references to statements that Karum published wherein she stated that Ancel committed sexual assault. Such vague allegations are insufficient to comport with the heightened specificity standard required to state a claim for defamation *per se*.

For all the foregoing reasons, the FAC fails to state a claim for defamation *per se* against either Karum or Ruiz. Consequently, the motion to dismiss is granted with respect to Counts III and IV.

## B.

The court next turns to Counts I and II, the false light invasion of privacy claims against Karum and Ruiz, respectively. To state a claim for false light, a plaintiff must allege: "(1) plaintiff was placed in a false light before the public as a result of defendant's actions; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, with knowledge of or reckless disregard for the falsity of the statements." *Wynne v. Loyola Univ. of Chi.*, 318 Ill. App. 3d 443, 454 (1st Dist. 2000). Notably, however, when a false light claim is premised upon the same allegations of an unsuccessful defamation *per se* claim, the false light claim also fails. *See Madison v. Frazier*, 539 F.3d 646, 659 (7th Cir. 2008) (applying Illinois defamation and false light law); *see also Gracia v. Sigmatron Int'l, Inc.*, 986 F.3d 1058, 1062 (7th Cir. 2021). Here, plaintiff's false light claims rely upon the same alleged defamatory statements as the defamation *per se* claims.

For both Counts I and II, plaintiff alleges that Karum and Ruiz, respectively, falsely portrayed plaintiff as a "sexual harasser and incompetent producer[.]" *See* FAC ¶¶ 67, 70, 73, & 76. These are the same alleged defamatory statements that this court deemed non-actionable in Counts III and IV. Accordingly, because the defamation *per se* actions failed to state a claim, the false light invasion of privacy actions also fail to state a claim because the false light claims are premised upon the same non-actionable statements from Karum and Ruiz. Consequently, the court grants the motion to dismiss with respect to Counts I and II.

## C.

Turning next to Count V, plaintiff advances a malicious prosecution claim against Karum. Plaintiff alleges that on June 15,

2023, Karum initiated a judicial proceeding in a California court seeking a civil harassment restraining order against plaintiff. Karum and plaintiff had collaborated to produce a movie and Karum sought the restraining order to prevent plaintiff from attending the premier of the movie in Los Angeles. The California court granted Karum's request for the restraining order against plaintiff on an *ex parte* emergency basis. Because of the restraining order, plaintiff was judicially prohibited from attending the premier of the film that he co-produced with Karum.

Plaintiff alleges that there existed no probable cause for the underlying judicial proceeding. Further, plaintiff alleges that Karum misrepresented the facts when Karum presented evidence in support of the restraining order request. Specifically, the FAC alleges that Karum presented limited text message evidence that purported to demonstrate that plaintiff represented a threat of physical harm toward Karum. According to the FAC, Karum did not present the entire text message conversation to the California court but instead only presented text messages that portrayed plaintiff as someone who intended to inflict physical harm upon Karum. Plaintiff alleges that the text messages from plaintiff that Karum failed to present to the California court demonstrate that plaintiff had no intention of physically harming Karum. Regardless, the text messages that plaintiff alleges in paragraphs 56 and 57 of the FAC demonstrate that plaintiff adopted a hostile tone toward Karum. *See* FAC ¶¶ 56-57.

The California court scheduled a hearing after granting the restraining order on an *ex parte* emergency basis. The hearing was scheduled after the film premier that the restraining order prohibited plaintiff from attending. Prior to the hearing but after the film premier, Karum voluntarily withdrew from the proceedings. Plaintiff alleges that the underlying proceedings terminated in plaintiff's favor because Karum failed to appear at the hearing. Plaintiff also alleges that he suffered "extraordinary harms" because the *ex parte* restraining order deprived him of his liberty interest in attending and participating in the film premier.

To state a claim for malicious prosecution, a plaintiff must allege: "(1) the commencement of judicial proceedings by the defendant, (2) a lack of probable cause for the proceedings, (3) malice in instituting the proceedings, (4) termination of the prosecution in the plaintiff's favor, and (5) damage or injury to the plaintiff." *St. Paul Fire & Marine Ins. Co. v. City of Zion*, 2014

IL App (2d) 131312, ¶ 15 (internal citations omitted). The motion challenges two of the necessary elements required to allege a malicious prosecution claim: that plaintiff fails to adequately allege that the termination of the underlying proceedings occurred in plaintiff's favor; and that plaintiff fails to adequately allege the special injury required to state a claim for malicious prosecution. The court disagrees and instead concludes that the FAC satisfactorily alleges all of the necessary elements to state a malicious prosecution claim, including the two elements expressly challenged by the movants.

i.

The court first addresses the termination of the underlying proceedings in favor of the plaintiff element. The Illinois Supreme Court has adopted the standard articulated in the Restatement (Second) of Torts regarding whether a voluntary withdrawal or abandonment of the underlying litigation constitutes a favorable termination of the proceedings for plaintiff. In *Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill. 2d 267, 276 (1997), the Supreme Court cites to the following excerpt from the Restatement:

> Whether a withdrawal or an abandonment constitutes a final termination of the case in favor of the person against whom the proceedings are brought and whether the withdrawal is evidence of a lack of probable cause for their initiation, depends upon the circumstances under which the proceedings are withdrawn. Restatement (Second) of Torts § 674, Comment j (1977).

*Cult Awareness Network*, 177 Ill. 2d at 276.

The *Cult Awareness Network* Court further stated that "a favorable termination is limited to only those legal dispositions that can give rise to an inference of lack of probable cause." *Id.* at 278. Here, the FAC adequately alleges that the underlying proceedings in the California court terminated in plaintiff's favor. The circumstances of Karum's withdrawal from the underlying proceedings give rise to an inference of lack of probable cause. The FAC alleges that Karum voluntarily withdrew from the underlying proceedings to avoid facing any questioning about the restraining order proceedings that she initiated in California. Paragraph 62 of the FAC alleges, "Karum abandoned her petition prior to any hearing on it and it was terminated in Ancel's favor because Karum did not appear at the hearing."

10

FAC ¶ 62. Further, paragraph 95 of the FAC alleges, "[t]he judicial proceedings were terminated in Ancel's favor when Karum refused to appear at hearing and face any questioning of her wild false allegations." *Id.* ¶ 95. The FAC's allegations that the underlying proceedings were terminated in Ancel's favor because Karum failed to appear at the hearing and voluntarily withdrew from the proceedings prior to the hearing to avoid any questioning about the underlying action are sufficient to allege that the underlying prosecution terminated in Ancel's favor because these circumstances give rise to an inference of lack of probable cause.

ii.

The court next addresses the special injury requirement to state a claim for malicious prosecution. In the context of malicious prosecution actions, "special injury generally means a deprivation of liberty or an interference with property." *Alswang v. Claybon*, 40 Ill. App. 3d 147, 150 (1st Dist. 1976) (internal citation and quotation marks omitted). Here, Ancel alleges that the restraining order that Karum obtained in the underlying proceeding prohibited Ancel from attending or participating in the film premier. Ancel suffered a liberty deprivation because the restraining order prohibited Ancel from attending the premier of the film that he co-produced with Karum. Consequently, Ancel has sufficiently alleged a special injury from the deprivation of his liberty when the restraining order prevented him from attending the film premier; Count V sufficiently alleges the special injury element and therefore survives the motion to dismiss. The motion is denied with respect to Count V.

D.

Finally, the court addresses Count VI, the tortious interference with economic advantage action against Karum. "To state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional and malicious interference inducing or causing a breach of termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted." *Advantage Mktg. Grp. v. Keane*, 2019 IL App (1st) 181126, ¶ 47 (internal citation and quotation marks omitted). Here, the FAC fails to allege any injury suffered by plaintiff with the factual specificity required in Illinois. Illinois plaintiffs are required to

allege facts sufficient to bring a claim within a legally recognized cause of action. *See Barnett v. Apple Inc.*, 2022 IL App (1st) 220187, ¶ 30 (internal citation omitted). Threadbare conclusory allegations without sufficient factual support are insufficient to state a claim under the fact-pleading standard in Illinois. *See id.* ¶ 31 (internal citation omitted).

Paragraph 102 of the FAC alleges that "Ancel has suffered damages caused by Karum's interference with his existing business relationships," but the FAC fails to specify what existing business relationships Karum interfered with or what particular damages Ancel suffered because of Karum's alleged interferences. Moreover, paragraph 65 of the FAC alleges that Ancel's business is suffering and that clients are opting "to go elsewhere because of the retaliatory lies spread by Karum," but plaintiff fails to allege any facts pertaining to which clients specifically have opted not to transact business with plaintiff. FAC ¶ 65. The FAC fails to adequately allege facts to demonstrate that plaintiff suffered any injury because of Karum's alleged interference with plaintiff's business relationships or expectancies. Thus, Count VI fails to state a claim and the motion to dismiss is granted with respect to this cause of action.

* * * *

Based on the foregoing,

(1) Defendants Karum and Ruiz's section 2-615 motion to dismiss the FAC is granted-in-part and denied-in-part. The motion to dismiss is granted with respect to Counts I, II, III, IV, and VI. The motion to dismiss is denied with respect to Count V;

(2) Defendants must file an answer to Count V on or before August 12, 2024;

(3) The parties must issue written discovery by August 26, 2024;

(4) The July 26, 2024, case-management conference is stricken; and

(5) The case is continued for a status on written discovery and entry of a comprehensive case management order on October 16, 2024 at 9:30 a.m. Parties may attend the case management conference either in-person in Courtroom 2006 or online through the use of Zoom Video Communications, Inc. Login information for the case management conference is as follows:

a. To view and join other participants at the case management conference, please visit the following link:

https://circuitcourtofcookcounty.zoom.us/j/9505 3221634?pwd=QjJwT1AyaUp0MWdBNlN0R2J pT0U5UT09

When prompted, please enter the following credentials:

Meeting I.D. Number: 950 5322 1634

Password: 335113

b. To join the case management conference by phone, please dial in to either of the following numbers:

One tap mobile:

+13126266799, 95053221634#, 1#, 335113# US (Chicago)

+13017158592, 95053221634#, 1#, 335113# US (Germantown)

Dial by your location:

    +1 312 626 6799 US (Chicago)
    +1 301 715 8592 US (Germantown)
    +1 646 558 8656 US (New York)
    +1 346 248 7799 US (Houston)
    +1 669 900 9128 US (San Jose)
    +1 253 215 8782 US (Tacoma)

Meeting ID: 950 5322 1634

Password: 335113

Find your local number:

https://zoom.us/u/aPn5GOS6v

When prompted, please enter the Meeting I.D. Number: 950 5322 1634.

The case management conference must not be recorded other than by court reporting personnel pursuant to Illinois Supreme Court Rule 46. The court does not supply court reporting personnel; parties must make their own arrangements for court reporting personnel to participate via Zoom.

13

(6)   All counsel of record or self-represented parties shall be included on any email communication with the Court Coordinator and Law Clerk.

Failure to comply may result in dismissal for want of prosecution or entry of a default order.

ENTERED:



ENTERED
Judge Jerry A. Esrig - 2101
JUL 1 9 2024
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

Honorable Jerry A. Esrig
Circuit Judge, Law Division

Dated:     July 19, 2024

14

# EXHIBIT C

FILED
10/16/2023 6:34 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L004921
Calendar, R
24809820

FILED DATE: 10/16/2023 6:34 PM   2023L004921

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JORDAN ANCEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2023L004921 |
| | ) | |
| JENNIFER KARUM and | ) | |
| MONICA RUIZ, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| RYAN ATKINS, | ) | |
| | ) | |
| Respondent in Discovery. | ) | |

## VERIFIED FIRST AMENDED COMPLAINT

Plaintiff, JORDAN ANCEL, by and through his undersigned attorneys, LOFTUS & EISENBERG, LTD., complains against Defendants, Jennifer Karum, and Monica Ruiz, as follows:

## I. PARTIES

1.      Plaintiff, Jordan Ancel ("Ancel"), is an individual and resident of California.

2.      Defendant, Jennifer Karum ("Karum"), is a resident of Cook County, Illinois.

3.      Defendant, Monica Ruiz ("Ruiz"), is a resident of Cook County, Illinois.

4.      Respondent in Discovery, Ryan Atkins ("Atkins"), is a resident of Cook County, Illinois

## II. JURISDICTION AND VENUE

5.      Jurisdiction over the Defendants is proper in the State of Illinois pursuant to 735 ILCS 5/2-209(b)(2) in that, at all relevant times, she has been a resident of Illinois.

6.      Venue is proper in this county by virtue of 735 ILCS 5/2-101 in that Defendant is a resident of Cook County, Illinois, and that the cause of action alleged herein occurred in this County.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

## III. ALLEGATIONS COMMON TO ALL COUNTS

7.      Ancel is a multi-award winning filmmaker.

8.      Ancel had a national reputation in the entertainment industry for his work over fifteen years in producing, directing, and writing television programs, commercials, and movies, and coaching clients in acting, writing, and filmmaking, and as a commercial and voiceover actor for 15 years prior.

9.      Ancel was hired by Karum and Atkins to co-produce Karum's feature film "The Unseen" (hereinafter "the Project") along with them.



10.      Ancel is a warm gregarious man who is adept at working with challenging creative people and bringing them together to work as teams.

11.     Ancel's responsibilities on the Project included, but were not limited to, raising production funds, negotiating contracts with talent, negotiating rates for location rental and hotels, and overseeing operations on set during filming to ensure a smooth and easy film shoot.

12.     Ancel raised $150,000 for production from private equity investors, negotiated the contract for the star of the film, R.J. Mitte ("Mitte"), and negotiated low rates for hotels and a restaurant location which included meal catering for cast and crew.

13.     Ancel took charge of running the production while on and off set.

14.     Karum holds herself out as being "neurodiverse" and on the autism spectrum. As a result of these disabilities, she lacks emotional control and cannot perceive the world around her as others would.

15.     As a result of Karum's claimed disabilities she was unable to comport herself like a professional while working on the Project, irrationally and outrageously lashed out at Ancel in retaliation for his control of the Project, and misperceived Ancel's anger over her lack of competency as a threat of physical violence.

16.     While it's apparent that Karum suffers some emotional disability that does not absolve her of the legal consequences of her irrational out of control behavior.

17.     Karum has not been adjudicated disabled or otherwise incompetent.

18.     Atkins served as the film's Cinematographer while Karum was also a supporting actress in the film and were both unavailable to manage the operations and handle the challenges of producing a film.

19.     The film came together neatly and was released on June 30, 2023, with a total budget of $700,000.

FILED DATE: 10/16/2023 6:34 PM   2023L004921

FILED DATE: 10/16/2023 6:34 PM   2023L004921

20.     The Project includes celebrated actors including RJ Mitte (*Breaking Bad*), Christian Stolte (*Chicago Fire*), William Mark McCullough (*The Walking Dead*), Sue Cremin (*FBI*), Candice Rose (*Stranger Things*), Kimberly Michelle Vaughn (*Empire*), Ava Bianchi, and Rebekah Kennedy (*Law & Order: Special Victims Unit*).

21.     On April 17, 2022, the first day of the shoot, it was readily apparent that Karum and Atkins were neither sufficiently experienced nor equipped to manage the full scope of production.

22.     Karum and Atkins had not budgeted properly to feed the cast and crew; they misrepresented the budget of the film to Ancel; they refused to address safety concerns on set; and Karum focused her efforts on playing the part of a movie star rather than doing the work of producing a film. Accordingly, the burden of managing the operations fell on Ancel.

23.     In the first round of production in April 2022, while Karum's role in producing the film fell off and Ancel's picked up, a rift developed between the two. The rift between them was exacerbated by Karum's hostility towards the crew which, unfortunately, resulted in the crew taking sides in the dispute and aligning with Ancel.

24.     During the second part of the film shoot in June 2022, Karum's behavior grew even more extreme, and she engaged in fierce verbal altercations with cast, cast's family members, and crew.

25.     In mid-June 2022, Mitte, Kennedy, numerous crew members, and their family members told Ancel that if Karum was not banned from set, then a walkout would occur, thus jeopardizing the completion of the film and the investments by all the investors.

26.     Ancel was able to convince Karum to absent herself from the set and the work was completed without her emotional outbursts derailing the production.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

27.     Despite consenting to leave the set, Karum peppered staff and cast with vicious text messages airing her grievances for being excluded from the production due to her inability to control her emotions.

28.     Karum's erratic and uncontrolled emotional outbursts continued into the night and she gained illegal entry into three hotel rooms belonging to Mitte, the Director, Vincent Shade, and Jeffrey Yearwood, an investor in the film whom Karum had never met personally and who was visiting Chicago to check out the production, by convincing hotel security that she was dropping off gifts which turned out to be small bags of chips and popcorn she took from set which were meant for cast and crew.

29.     When Karum was confronted about entering the hotel rooms she told Ancel, "If no one likes me, then I will end myself. I will end myself." Ancel immediately called Karum's husband Paul Karum to warn him of the terrible state of his wife's mental condition and to seek help.

30.     The threat was quickly discounted by those who know Karum because she habitually threatens suicide to try and manipulate those around her.

31.     The production concluded in June with scenes filmed at a Chicago law firm without Karum being physically present.

32.     Ancel and Mitte hosted a wrap party when production concluded which Karum and Atkins were excluded from.

33.     Ancel was content to shepherd the production to completion and move forward with no further discord with Karum nor Atkins.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

34.      Karum was incensed that she was not invited to the party or allowed to come on set and directed her anger at Ancel via a series of coordinated attacks on his reputation sent via text messages, social media direct messages, and upon information and belief verbally.

35.      The statements were made with malice to retaliate for Ancel saving the production from Karum's outrageous behavior and make sure she was the only one who received credit for its later success.

36.      Beginning in June 2022 and continuing to date, Karum published statements to numerous colleagues of Ancel on both coasts and elsewhere stating that he sexually assaulted her, that he sexually harassed her, and that Ancel sexually harassed other female cast and crew members.

37.      Karum told anyone who would listen that Ancel was not to be trusted, that he did little for the Project, that he caused numerous problems on set, that he was "having problems" with other producers in Los Angeles, that he did not really have high level contacts in the industry, and that he is a terrible person.

38.      Karum, via text messages, direct messages, and phone calls further diminished Ancel's role as producer by stating that she did everything for the production. She also had conversations with Ancel's colleague, writer/director Amanda Gecewicz, who hired Ancel to produce a film of hers, stating the same. Karum further demanded of certain colleagues of Ancel that they not hire him nor refer him career coaching clients.

39.      Karum communicated the following false statements among many others:

FILED DATE: 10/16/2023 6:34 PM    2023L004921





40.    The attack on Ancel continues to date. When the Project is publicized on social media people will comment on the posts with some reference to Ancel, Karum them "friends" them and sends the derogatory direct messages about Ancel.

41.    Karum will also employ fake accounts to send the direct messages, so it appears as if there is a legion of individuals who despise Ancel as Karum does.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

42.     Ruiz came to her friend's assistance and published the same wild claims about Ancel, calling him an abuser of women who could not be trusted.

43.     Ruiz published the following false statements, among others:





44.     Atkins is, at all times relevant, Karum's right hand man and, upon information and belief, published defamatory statements, echoing his compatriot's claims.

45.     The accusations against Ancel can be easily disproven by documents inaccessible to Defendants at the time of publication of the statements.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

46.     The reality is that Karum cannot control her emotions, Ancel protected the Project from her wild emotions, and, in retaliation, she made up some wild stories to try and make herself look better after being kicked off her own production because she was impossible to deal with.

47.     Defendants made the defamatory statements with actual malice.

48.     Defendants' statements about Ancel, whether defamatory or just malicious opinions, were published to at least: Jennifer Rudolph, Serge Martinenko, Lacianne Carriere, Dyna Mitte, Matt Gogal, Heather Vogt, Amanda Gecewicz, Vincent Shade, Karel Ramirez, Seth Chitwood, Kristie Gescheidler, Mike Wallace, Samantha "Sammi Robin" Waranch, Helene Galek, Chris Jones, Kelli Tidmore, Candice Rose, Mike Wallace  and the investigation continues as to how far their false statements spread.

49.     Defendants' actions were taken in reckless disregard for the truth and resulted in defamatory statements.

50.     By alleging that Ancel sexually assaulted Karum, sexually harassed Karum and other female cast and crew members, and was the sole cause of any and all problems on set to turn the cast and crew against Karum, that he verifiably did not commit, Karum and Ruiz have committed defamation *per se*.

51.     The statements imputing the commission of a crime were made by Karum and Ruiz.

52.     The continued publication of these false statements causes Plaintiff ongoing irreparable harm.

53.     On June 15, 2023, Karum brought a Petition for a Civil Harassment restraining order against Ancel for the purpose of preventing him from attending the Los Angeles premier of The Unseen.

54.     There was no probable cause for the Petition.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

55.   The Order was entered *ex parte* based on false evidence.

56.   The key piece of evidence presented in support of the petition was a text message exchange between Ancel and Karum that provided in full:



FILED DATE: 10/16/2023 6:34 PM    2023L004921

57.    Karum speciously omitted the very next line of the text message which provided:



58.    Karum does not interact with the world as a normal person would and erroneously perceived Ancel's justified anger about her incompetence costing him money as a physical threat to her safety.

59.    Karum cherry-picked the text message that looked like a threat of violence and omitted the next message from what was presented to the Court.

60.    The Order was entered *ex parte* on an emergency basis and set for hearing **after** the premier.

11

FILED DATE: 10/16/2023 6:34 PM    2023L004921

61.     The Order was entered *ex parte* on a temporary basis with an opportunity for Ancel to be heard or present the remainder of the text conversation making clear that while he was very angry that an inexperienced, incompetent person was costing him his livelihood he was not about to cause her bodily harm and instead intended to bring suit when the venture failed as a result of Karum's inability to manage the Project.

62.     Karum abandoned her petition prior to any hearing on it and it was terminated in Ancel's favor because Karum did not appear at the hearing.

63.     Ancel suffered extraordinary harms as a result of the *ex parte* order that deprived him of his liberty and ability to participate in the premier.

64.     Ancel maintained an exemplary reputation in the community prior to these defamatory statements being made.

65.     Defendants' statements have not only caused extensive mental anguish, humiliation, and embarrassment, but Ancel's business is suffering as well with clients choosing to go elsewhere because of the retaliatory lies spread by Karum.

## IV. CLAIMS

### <u>COUNT I</u>
### (False Light Invasion of Privacy)
### *Karum*

66.     Plaintiff repeats and realleges Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 66 of the First Amended Verified Complaint.

67.     Karum's actions in falsely portraying Plaintiff as a sexual harasser and incompetent producer placed the Plaintiff in a false light before the public.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

68.     The false light in which Karum's conduct placed Plaintiff would be highly offensive to a reasonable person.

69.     Karum acted with reckless disregard for whether the statements were true or false.

70.     Karum had reason to know that Ancel was not a sexual harasser and incompetent producer and, instead, made the statements in retaliation for Ancel protecting the production from her wild emotional outbursts.

71.     As a result of Karum's conduct, Plaintiff was harmed and continues to be harmed in that he has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career.

WHEREFORE, Plaintiff, JORDAN ANCEL, respectfully requests that this Court enter judgment in his favor and against Defendant, JENNIFER KARUM for compensatory damages in an amount not currently ascertainable but believed to be in excess of $1,000,000 plus punitive damages in an amount sufficient to punish and deter Defendant from engaging in such misconduct in the future, prejudgment interest, expenses, costs, and for any and all other relief that this Court deems necessary and appropriate under the circumstances.

## COUNT II
### (False Light Invasion of Privacy)
### *Ruiz*

72.     Plaintiff repeats and realleged Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 72 of the First Amended Verified Complaint.

73.     Ruiz's actions in falsely portraying Plaintiff as a sexual harasser and incompetent producer placed the Plaintiff in a false light before the public.

FILED DATE: 10/16/2023 6:34 PM    2023L004921

74.     The false light in which Ruiz's conduct placed Plaintiff would be highly offensive to a reasonable person.

75.     Ruiz acted with reckless disregard for whether the statements were true or false.

76.     Ruiz had reason to know Ancel was not a sexual harasser and incompetent producer and, instead, made the statements in retaliation for Ancel protecting the production from her friend's wild emotional outbursts.

77.     As a result of Ruiz's conduct, Plaintiff was harmed and continues to be harmed in that he has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career.

WHEREFORE, Plaintiff, JORDAN ANCEL, respectfully requests that this Court enter judgment in his favor and against Defendant, MONICA RUIZ for compensatory damages in an amount not currently ascertainable but believed to be in excess of $1,000,000 plus punitive damages in an amount sufficient to punish and deter Defendant from engaging in such misconduct in the future, prejudgment interest, expenses, costs, and for any and all other relief that this Court deems necessary and appropriate under the circumstances.

## COUNT III
### (Defamation)
### *Karum*

78.     Plaintiff repeats and realleged Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 78 of the First Amended Verified Complaint.

79.     Karum made false statements of fact, not opinions, about the Plaintiff: that he was a sexual harasser, that other crew members complained about him, he has other "victims", that other women besides defendants complained about his "harassment", that "man women and some

men can attest" to him being a terrible human and predator, Ancel sexually harassed her, and Ancel sexually assaulted her.

80.     The statements were defamatory because they harmed Plaintiff's reputation by lowering him in the eyes of the community and deterring the community from associating with him.

81.     The false statements were defamatory *per se* because the harm to Plaintiff's reputation is obvious and apparent on its face by claiming he was incompetent at his job and treated women poorly.

82.     Karum made an unprivileged publication of the statements to third parties.

83.     As a result of Karum's publication of false statements about Plaintiff, Plaintiff was harmed and continues to be harmed in that he has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career, and harm to his education.

WHEREFORE, Plaintiff, JORDAN ANCEL, respectfully requests that this Court enter judgment in his favor and against Defendant, JENNIFER KARUM for compensatory damages in an amount not currently ascertainable but believed to be in excess of $1,000,000 plus punitive damages in an amount sufficient to punish and deter Defendant from engaging in such misconduct in the future, prejudgment interest, expenses, costs, and for any and all other relief that this Court deems necessary and appropriate under the circumstances.

FILED DATE: 10/16/2023 6:34 PM   2023L004921

FILED DATE: 10/16/2023 6:34 PM    2023L004921

## COUNT III
### (Defamation)
### *Ruiz*

84.     Plaintiff repeats and realleged Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 84 of the First Amended Verified Complaint.

85.     Ruiz made false statements about the Plaintiff including that "he has screwed over people in the industry" and Ancel was rude to other producers besides Karum in Los Angeles.

86.     The statements were defamatory because they harmed Plaintiff's reputation by lowering him in the eyes of the community and deterring the community from associating with him.

87.     The false statements were defamatory *per se* because the harm to Plaintiff's reputation is obvious and apparent on its face by claiming he was incompetent at his job and treated woman poorly.

88.     Ruiz made an unprivileged publication of the statements to third parties.

89.     As a result of Ruiz's publication of false statements about Plaintiff, Plaintiff was harmed and continues to be harmed in that he has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career, and harm to his education.

WHEREFORE, Plaintiff, JORDAN ANCEL, respectfully requests that this Court enter judgment in his favor and against Defendant, MONICA RUIZ for compensatory damages in an amount not currently ascertainable but believed to be in excess of $1,000,000 plus punitive damages in an amount sufficient to punish and deter Defendant from engaging in such misconduct

FILED DATE: 10/16/2023 6:34 PM   2023L004921

in the future, prejudgment interest, expenses, costs, and for any and all other relief that this Court deems necessary and appropriate under the circumstances.

<u>**COUNT IV**</u>
**(Malicious Prosecution)**
*Karum*

90.     Plaintiff repeats and realleged Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 90 of the First Amended Verified Complaint.

91.     Karum initiated an action for a protective order against Ancel without probable cause.

92.     Karum misrepresented facts to the Court and gave up on the proceeding before a hearing but after using it to harm Ancel.

93.     Karum caused Ancel to be subjected improperly to judicial proceedings for which there was no probable cause.

94.     These judicial proceedings were instituted and continued maliciously, resulting in injury.

95.     The judicial proceedings were terminated in Ancel's favor when Karum refused to appear at hearing and face any questioning of her wild false allegations.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Ancel's clear innocence.

97.     As a result of the Defendants' misconduct described in this Count, Ancel suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other continuing injuries and damages as set forth above.

WHEREFORE, Plaintiff, JORDAN ANCEL, respectfully requests that this Court enter judgment in his favor and against Defendant, JENNIFER KARUM for compensatory damages in an amount not currently ascertainable but believed to be in excess of $1,000,000 plus punitive damages in an amount sufficient to punish and deter Defendant from engaging in such misconduct

FILED DATE: 10/16/2023 6:34 PM    2023L004921

in the future, prejudgment interest, expenses, costs, and for any and all other relief that this Court deems necessary and appropriate under the circumstances.

## COUNT V
### (Tortious Interference with Economic Advantage)
#### *Karum*

98.     Plaintiff repeats and realleges Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 98 of the First Amended Verified Complaint.

99.     Ancel had a reasonable expectation that he would be retained as a producer and coach from the individuals Karum broadcasted her vengeance to.

100.    Karum knew Ancel had a reasonable expectation of earning money from producing and coach from ventures with: Jennifer Rudolph, Serge Martinenko, Lacianne Carriere, Dyna Mitte, Matt Gogal, Heather Vogt, Amanda Gecewicz, Vincent Shade, Karel Ramirez, Seth Chitwood, Kristie Gescheidler, Mike Wallace, Samantha "Sammi Robin" Waranch, Helene Galek, Chris Jones, Kelli Tidmore, and Candice Rose.

101.    Karum interfered in a way that prevented Ancel's legitimate expectancies from ripening into valid business relationships both directly and via pseudonym accounts she operated including: (i) telling professionals in the industry not to do business with Ancel, (ii) telling potential customers and producers that Ancel is a sexual harasser, and (iii) telling potential customers and producers that Ancel is a bad person.

102.    Ancel has suffered damages caused by Karum's interference with his existing business relationships.

FILED DATE: 10/16/2023 6:34 PM  2023L004921

**COUNT V**
**Respondent in Discovery**
***Atkins***

103.    Plaintiff repeats and realleged Paragraphs 1 through 65 of the First Amended Verified Complaint as if fully restated herein as paragraph 103 of the First Amended Verified Complaint.

104.    Atkins has information essential to the determination of who should properly be named as additional defendants in this action.

105.    735 ILCS 5/2-402 provides in pertinent part:

> "The plaintiff in any civil action may designate as respondents in discovery in his or her pleading those individuals or other entities, other than the named defendants, believed by the plaintiff to have information essential to the determination of who should properly be named as additional defendants in the action.
>
> Persons or entities so named as respondents in discovery shall be required to respond to discovery by the plaintiff in the same manner as are defendants and may, on motion of the plaintiff, be added as defendants if the evidence discloses the existence of probable cause for such action.
>
> A person or entity named a respondent in discovery may upon his or her own motion be made a defendant in the action, in which case the provisions of this Section are no longer applicable to that person."

106.    Plaintiff respectfully requests that the Court order Respondent in Discovery Ryan Atkins to answer the attached summons for discovery.

19

FILED DATE: 10/16/2023 6:34 PM   2023L004921

Respectfully submitted,

**JORDAN ANCEL,**
Plaintiff

By:

One of His Attorneys

Alexander N. Loftus, Esq.
Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St. Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

Firm No: 64600

Dated October 16, 2023

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to §1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he or she verily believes the same to be true.

JORDAN ANCEL