**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAKEFRONT PICTURES, LLC, JENNIFER KARUM and THE CURSE, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:24-cv-01108 |
| | ) | |
| vs. | ) | Hon. Mag. Judge M. David Weisman |
| | ) | |
| JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC and CANDICE ROSE, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS</u>

George J. Spathis (ARDC # 6204509)
LEVENFELD PEARLSTEIN, LLC
120 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
(312) 346-8380
gspathis@lplegal.com

Ilya G. Zlatkin (ARDC # 6314344)
ZLATKIN CANN ENTERTAINMENT
4245 N. Knox Ave.
Chicago, Illinois 60641
(312) 809-8022
Ilya@zce.law

*Attorneys for Plaintiffs*

LP 26792106.1 \ 48288.140226

Plaintiffs Lakefront Pictures, LLC ("Lakefront"), Jennifer Karum ("Karum") and The Curse, LLC (collectively, the "Plaintiffs"), respond as follows in opposition to the Partial Motion to Dismiss filed by Defendants Jordan Ancel ("Ancel"), Jordan Ancel International, LLC ("Ancel International"), and Rock City Road Films LLC (collectively, the "Ancel Defendants").

## INTRODUCTION

Stripped to its core, the Partial Motion to Dismiss (the "Motion") asks this Court to disregard the well-established principles governing Rule 12(b)(6) motions and to resolve disputed factual and legal issues that are not appropriate for determination at the pleading stage. Accepting the well-pled allegations as true, it is clear that the Amended Complaint more than adequately states claims upon which relief may be granted. Defendants' Motion relies on an unduly restrictive view of Illinois law concerning rescission, alter ego liability, the litigation privilege, tortious interference, civil conspiracy, and intentional infliction of emotional distress, while ignoring the reasonable inferences that must be drawn in Plaintiffs' favor. Put simply, the Ancel Defendants' Motion seeks dismissal by contesting the merits of Plaintiffs' allegations rather than testing their legal sufficiency. Defendants' Motion should be denied in its entirety.

## LEGAL ARGUMENT

The Ancel Defendants bear a heavy settled burden in seeking dismissal under Rule 12(b)(6). A Rule 12(b)(6) motion merely challenges the sufficiency of the complaint rather than the merits of the claim. *See Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). To state a claim under the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not be laden with details, and the factual allegations need only suffice "to raise a right of relief above a speculative level." *Bell. Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see also Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)("a plaintiff must provide

only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible…").

In considering a Rule 12(b)(6) motion to dismiss, the Court is not to engage in fact-finding. *In re Consolidated Indust.,* 360 F.3d 712, 717 (7th Cir. 2004). Rather, it is axiomatic that the Court accepts as true all of the factual allegations in a plaintiff's complaint and draws all inferences from those facts in favor of the plaintiffs. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). As the Seventh Circuit succinctly held: "[A] plaintiff's claim need not be probable, only plausible: a well pled complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable…" *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Financial Servs.,* 536 F. 3d 663, 668 (7th Cir. 2008)(citing *Twombly*, 550 U.S. at 556 (internal quotations omitted)). In order to meet this plausibility standard, a complaint must merely supply "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence supporting plaintiff's allegations." *Id.*

As set forth more fully below, the referenced allegations, when accepted as true and coupled with the inferences drawn therefrom, are more than sufficient to state claims.

### A. Count V Properly States a Claim for Rescission of the Producer Agreement.

Although the Ancel Defendants answered Count V in the original complaint (tacitly acknowledging that the Claim was well pled), they now seek dismissal of the *same* claim (and based on the *same* facts) in the Amended Complaint, arguing that the Plaintiffs' allegations and exhibits negate the "complete and total failure of consideration" that they contend is *required* for rescission of the Producer Agreement under Illinois law. The Ancel Defendants also argue that Plaintiffs' acknowledgement in the Amended Complaint that Ancel made introductions to investors (who contributed capital) and offered script ideas that were incorporated into the film also prohibit a finding of a *total* failure of consideration that they contend preclude any claim for rescission. The Ancel Defendants are wrong.

Indeed, the Motion mischaracterizes both the standard for rescission and the significance of the nominal acts of "performance" for which Ancel lauds himself. Under Illinois law, rescission is available not only for a 'total failure of consideration' in the strict sense, but also where the consideration provided is so fundamentally deficient that it defeats the essential purpose of the contract. *See Facility Wizard Software, Inc. v. Southeastern Technical Services, LLC.*, 647 F.Supp.2d 938, 948-49 (N.D. Ill. 2009)(any alleged material breach that "substantially deprived [Plaintiff] of the benefit of its bargain" was sufficient to state a claim for rescission); *see also MAN Roland Inc., v. Quantum Color Corp.,* 57 F.Supp.2d 568, 570 (N.D. Ill. 1999)(a party may seek rescission of a contract when the other party to the contract "fails to perform an element of the agreement without which the contract would not have been made."); *Ahern v. Knecht,* 202 Ill.App.3d 709, 715 (2d. Dist. 1990)("[S]ubstantial nonperformance or breach of contract warrants rescission where the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it.").[1]

It follows, therefore, that Ancel's nominal acts of alleged performance—introducing investors and offering script ideas (neither of which were required under the Producer Agreement) do not conclusively establish that Ancel delivered the services that were the essential bargained-for

---

[1] The Ancel Defendants' premise – that the attached Producer Agreement "controls" and negates the rescission claim – misapprehends the standard. An attached exhibit displaces a well-pleaded allegation only where it *incontrovertibly* contradicts that allegation and reveals facts that foreclose recovery as a matter of law. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). Where the document is fairly susceptible to a reading consistent with the complaint, the allegations prevail and the dispute cannot be resolved at the pleading stage. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004). The Producer Agreement forecloses the Ancel Defendants' reading on its own terms. The provision on which they rely – that the company "shall have fully discharged its obligations" by paying Ancel's fee – operates only "upon the condition" that Ancel "fully and faithfully complete[s] all services" required of him. (Am. Compl., Ex. A, § 3.1.) The Amended Complaint alleges that Ancel did not satisfy this condition. (*Id.* ¶ 194.) Defendants thus cannot wield the discharge clause to negate rescission, because, as alleged in the Amended Complaint, the very condition on which any discharge depends is unmet. (*Id.* ¶¶ 194–195.) Nor does the Producer Agreement's notice-and-cure provision alter the analysis. Independent of any contractual default mechanism, Illinois recognizes the general right of all contracting parties to terminate for a material breach. *E.E.O.C. v. N. Knox Sch. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998). Furthermore, whether Ancel's nonperformance was material "is a complicated question of fact"– turning on the parties' intent and "the equitable factors and circumstances surrounding the breach" – that cannot be resolved on the pleadings. *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir. 1993); *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002).

exchange in the Producer's Agreement, and certainly do not mandate dismissal of the rescission claim. *See Facility Wizard*, 647 F.Supp.2d at 948-49 (motion to dismiss plaintiff's rescission counterclaim was denied even though some performance had occurred under the dealer agreement, holding that "the ability to exercise a reserved right to terminate a contract and to seek rescission of a contract can co-exist."); *see also MAN Roland Inc.,* 57 F.Supp.2d at 570 (court denied a 12(b)(6) motion to dismiss rescission claim even though the seller had delivered and partially installed the press, albeit not in accordance with its design specifications). In any case, issues like the adequacy of consideration and substantial non-performance are not something that is decided at the pleading stage. *See Oxford Clothes XX, Inc., v. Expeditors Inter. of Washington, Inc.,* No. 94-cv-7734, 1995 WL 408193, *5 (N.D. Ill. June 12, 1995)(court declined to resolve the adequacy of consideration question at the pleading stage, finding that the issue was fact-dependent and not amenable to dismissal without a fuller evidentiary record); *Horbach v. Kaczmarek,* 988 F.Supp. 1126, 1127 (N.D, Ill. 1997)("The determination of what constitutes substantial nonperformance justifying rescission is for the trier of fact.")(quoting *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.,* 58 Ill.App.3d 100, 103-04 (3d Dist.1978)).

Finally, the Ancel Defendants argue that because the parties cannot be returned to their precise precontract positions, rescission is foreclosed as a matter of law. They are again wrong. The inability to restore a perfect status quo does not categorically bar rescission under Illinois law. *See Facility Wizard*, 647 F.Supp.2d at 948 ("The inability to return the parties to their pre-contract positions, however, is not necessarily a bar to a claim for rescission."); *International Ins. Co., v. Sargent & Lundy,* 242 Ill.App.3d 614, 629 (1st Dist. 1993)("Where such restoration [of the *status quo* following contract rescission] is impossible, however, it does not necessarily preclude granting of rescission. Restoration of the *status quo ante* will not be required when restoration has been rendered impossible by circumstances not the fault of the party seeking rescission, and the party opposing the rescission has obtained a benefit from the contract."). Indeed, Courts have consistently

recognized that rescission may be granted even where complete restoration is impossible, so long as substantial restoration can be achieved and equity so demands. *See, e.g., Northwestern Memorial Hospital v. Virtual Imaging, Inc.,* No. 12-cv-9201, 2013 WL 6382988, *3 (N.D. Ill. Dec. 5. 2013) ("while it is true that [Plaintiff] may have obtained some benefit from the use of the x-ray machines for a period of time, to the extent that [Plaintiff] ultimately prevails on its rescission claim, it is within the Court's equitable powers to adjust the amount of any credit to Plaintiff's account for this usage."); *Roston Investments v. Opus Corp.,* No. 90-cv-2524, 1990 WL 139140, *3 (N.D. Ill. Sept. 13, 1990) ("Illinois law merely requires that the parties be *capable* of being returned to the status quo in order for the relief to be granted. There is no pleading requirement in this regard and, even more importantly, under Illinois contract law, the duty to return any consideration already received by the rescinding party does not even arise until the court finds the relief to be appropriate. If rescission turns out to be appropriate in this case, it will be this court's duty to see that the parties are returned to the status quo and we will see that this is accomplished.")(internal citations omitted). Simply put, in assessing a right to rescission, Courts view restoration of the parties to the status quo through the lens of equitable feasibility rather than categorical impossibility. The Partial Motion to Dismiss should be denied as to Count V.

**B.** **Count IV Adequately States a Claim Against Ancel Under an Alter Ego Theory.**

With respect to Count IV of the Amended Complaint, styled as a claim for breach of the NDA, Ancel now argues (after previously answering the same claim in the original Complaint) that there are insufficient allegations to assert a claim against him personally as the alter ego of Ancel International (of which he was the only member), through which he signed the NDA (and which he has since dissolved). Ancel overstates the pleading burden with respect to the claim at the Rule 12(b)(6) stage. Ancel's Motion also trivializes as "conclusory labels" the specific allegations in the Amended Complaint that Ancel International was created as a "subterfuge," that there is a "unity of interest" between Ancel and Ancel International, which company was at all times

5

"undercapitalized," and was quickly "dissolved" to avoid liability for the clear breach of the NDA." (Am. Compl. ¶¶ 184–85). These are not merely conclusory labels—they are factual predicates that, taken together with the allegation that Ancel signed the NDA solely in his capacity as CEO of an entity he wholly controlled, support a plausible (if not compelling) inference that Ancel International was used solely as an instrumentality to shield Ancel from personal obligation for his personal wrongdoing. The dissolution of the entity after the dispute arose is itself a concrete fact that, combined with the other allegations, supports an inference of bad faith and the inequitable result required to state a claim for alter ego under California law.[2] *H.C. Duke & Son,* 2012 WL 2792443, *5 (N.D. Ill. July 9, 2012) ("Under California law, Plaintiff must demonstrate two elements to prove an alter ego theory: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.") (quoting *Automotriz Del Golfo De California S.A. De C.V. v. Resnick,* 306 P.2d 1, 3 (Cal.1957)). And while the failure to maintain corporate records or adhere to corporate formalities are bases for establishing alter ego liability, they are not required to state or prove such a claim under California law. *See Fed. Reserve Bank of San Francisco v. HK Sys.,* No. C–95–1190, 1997 WL 227955, at *6 (N.D. Cal. Aug. 24, 1997) (noting that various factual allegations may satisfy California's two-prong alter ego test, including the manipulation of assets, the failure to adequately capitalize, the use of one corporation as a shell, and the failure to maintain corporate records and legal formalities). *H.C. Duke* is squarely on point, as the Court denied a 12(b)(6) Motion upon similar factual allegations as those in the Amended Complaint. *H.C. Duke,* 2012 WL 2792443 at *5 ("the Court finds no material shortcoming in the allegations set forth in Plaintiff's Second Amended Complaint in light of California's legal standard

---

[2]  As to the internal contradictions in Count IV regarding the Producer Agreement and The Curse, these are mere pleading oversights that can be cured by amendment rather than grounds for with-prejudice dismissal, and they do not go to the fundamental viability of the alter ego theory itself, and it seems quite clear that Ancel understands the nature of the claims asserted.

for demonstrating that one entity is the alter ego of another.").[3] The Partial Motion to Dismiss should also be denied as to Count IV.

### C. Ancel's Reliance on the Attorney Litigation Privilege for Statements Made in Judicial Proceedings is Misplaced and Inappropriate.

Ancel attempts to cloak himself in the Attorney Litigation Privilege, arguing that the defamation claim against him (Count I) should be at least partially dismissed to the extent it is premised on Ancel's false statements in his complaint filed in Circuit Court (which was dismissed with prejudice) that Karum falsely accused him of sexual assault. Ancel's reliance on the privilege is misplaced and inappropriate. The attorney litigation privilege is designed to further the important policy of ensuring that attorneys enjoy "the utmost freedom in their efforts to secure justice for their clients," the ability to "fully and fearlessly communicate with his client" and to facilitate "the free flow of truthful information to the courts." *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 24 (July 8, 2015).

Put more simply, the litigation privilege's application is limited to "instances where the administration of justice and public service require immunity." *Id.* (citing *Kurczaba v. Pollock*, 318 Ill.App.3d 686, 706 (1st Dist. 2000)). "In light of the complete immunity provided by an absolute privilege, the classification of absolute is necessarily narrow." *Thompson v. Frank,* 313 Ill.App.3d 661, 664 (1st Dist. 2000). *See also Stein v. Krislov*, 2013 IL App (1st) 113806 (Sept. 13, 2013)("the privilege is not applicable under circumstances for which there are no safeguards against abuse of the privilege, i.e., where the authorities do not have the ability to discipline the attorney and strike from the record any statements exceeding the bounds of permissible conduct."). *O'Callaghan,* 2015

---

[3]  Ancel's reliance on *Sonora Diamond Corp., v. Superior Court*, 83 Cal.App. 4th 523 (2000), is wholly unavailing. First, *Sonora* involved a question as to whether a Plaintiff could establish *personal jurisdiction* over a Canadian corporation by alleging that it was the alter ego of its California subsidiary. *Id.* at 535-38. The case is, thus inapposite and has no bearing on a Rule 12(b)(6) challenge for failure to state a claim. Moreover, *Sonora* makes clear that alter ego liability is not governed by rigidly applying a checklist of factors. Although the Court identified the myriad elements and characteristics that can be considered in assessing alter ego liability, it expressly held that "[n]o one characteristic governs, but the courts must look at all the circumstances to determine whether the [alter ego] doctrine should be applied." *Id.* at 538. If anything, therefore, the case supports Plaintiff's position, *not* Ancel's.

IL App (1st) 142152, ¶ 25. The privilege has, at times, been extended to the litigants as well, provided doing so furthers the policy interests delineated above and terms similar to those applicable to counsel (*see Thompson,* 313 Ill.App.3d at 664), although Courts within this District have declined to extend the privilege beyond the attorneys. *See Sanders v. JGWPT Holdings, Inc.,* No. 14 C 9188, 2016 WL 4009941, \*11 (N.D. Ill. July 26, 2016) ("the privilege appears to be interpreted in Illinois solely as a bar against litigating defamatory statements made by an attorney during litigation. The Court will not expand the privilege beyond its common interpretation to protect the Mack Defendants from charges of fraud, not defamation."); *see also See MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC*, 730 F. Supp. 3d 740, 753 (N.D. Ill. 2024) (declining to apply the litigation privilege to dismiss a defamation claim when defamatory statements were made in DMCA takedown notifications, because the party was "neither an attorney nor a law firm.")

Even if, however, this Court were inclined to extend the privilege to Ancel, the Motion to partially dismiss Count I must fail. Ancel's decision to go public and vigorously promote his false allegations on social media and to the press cannot be deemed to have been either "pertinent to" or "in furtherance of" the litigation,[4] thus, protecting these false statements as privileged in this case would *not* serve *any* legitimate public interest. More fundamentally, what appears to have been entirely lost upon Ancel is that with respect to out-of-court statements (like his statements on social media and to the press detailed in the Amended Complaint), the absolute litigation privilege is limited to communications between opposing counsel, between attorney and client, and between attorneys representing other parties pursuing claims against the same litigants but has *not* been extended beyond such class of recipients. *See Thompson,* 313 Ill.App.3d at 664. Illinois courts have long and consistently held that the litigation privilege does *not* extend to the publication of defamatory matter outside of court to persons with no connection to the litigation. *See Kurczaba,*

---

[4] Indeed, having also asserted claims in his Circuit Court complaint for False Light Invasion of Privacy, Ancel's media blitz was actually antithetical to his litigation and claims.

8

318 Ill.App.3d at 703 ("Illinois has never extended the privilege to cover out-of-court communications and other persons"); *Edelman, Combs and Latturner v. Hinshaw and Culbertson*, 338 Ill.App.3d 156, 166 (1st Dist. 2003)("Illinois has never extended the privilege to other persons without a connection to the lawsuit.); *August v. Hanlon*, 2012 IL App (2d) 111252, ¶ 37 (2012)("our research reveals that Illinois courts have expressly declined to extend the attorney-litigation privilege to third parties not connected with the litigation…"); *Rosenbaum v. Samler*, 2025 IL App (1st) 240039, ¶ 56 ("A communication with a third party can be protected under the absolute litigation privilege when that third party has some interest in the litigation. Conversely, the privilege may not apply when a third-party communication is unrelated to the case.")(internal citation omitted); *Qualizza v. Freeman,* 2024 IL App (1st) 231534-U, ¶ 32 (July 26, 2024)("…when a third-party communication is unrelated to the case, the privilege may not apply.")

Even more pertinent for purposes of this case and Motion, "Illinois courts routinely decide that a statement is not covered [by the litigation privilege] when that statement is published to the public at large, either directly or via the press." *Id.* at ¶ 41. *See also August*, 2012 IL App (2d) 111252, ¶ 36 (no privilege should be extended to "defamatory statements [that] were made outside of the judicial proceeding to a newspaper reporter who was not connected to the lawsuit"); *Lykowski v. Bergman,* 299 Ill.App.3d 157, 166, (1st Dist. 1998) (noting that statements made to the media concerning a case are not part of the judicial proceeding and therefore are not privileged (citing *Prosser and Keeton on Torts* § 114, at 819–20 (W. Page Keeton *et al.* eds. 5th ed. 1984))); *Kurczaba*, 318 Ill App. 3d at 691 (rejecting the privilege as to publication of otherwise defamatory statements to three Polish newspapers and Chicago Tribune"). Ancel's Motion fails to cite a single case in which any Illinois Court (or any Court applying Illinois law) has extended an absolute privilege to such mass publication of an out-of-court statement. Because there are no such cases. The mass publication of any out-of-court statement simply ***is not privileged***. Ancel's decision to publish his

defamatory statement to the public at large, through various media outlets and platforms, sounds the death knell for his invocation of the litigation privilege.

In any event, the litigation privilege is an affirmative defense, around which a plaintiff need not plead. Dismissal on that basis is proper only where the complaint's allegations unambiguously establish every element of the defense – something a fact-dependent defense will rarely permit at the pleading stage. *See Hyson USA, Inc. v. Hyson 2U, Ltd.,* 821 F.3d 935, 939 (7th Cir. 2016). This conclusion follows a fortiori from the Court's own prior ruling. In denying the Ancel Defendants' first motion to dismiss, the Court already declined to resolve the absolute-litigation-privilege defense at the pleading stage, holding that the privilege is an affirmative defense and that the Complaint did not "set forth everything necessary to satisfy" it. (Dkt. 42 at 7.) Nothing about the Amended Complaint changes that analysis. Thus, partial dismissal of Count I is a non-starter.

### D. **Count VIII Adequately States a Claim for Tortious Interference by Karum.**

In Count VIII of the Amended Complaint, Karum seeks damages for Defendants' tortious interference with her established relationships with casting directors and talent agencies, who were directly persuaded to drop Karum as a client, and/or now refuse to work with her.[5] Ancel argues that the claim should be dismissed against him, basing his position upon a series of fatally flawed arguments, each addressed separately below. For starters, Ancel cavalierly alleges that Karum has only pled "a generalized hope" of landing unidentified future acting roles rather than a reasonable expectancy of a specific, valid business relationship.[6] The argument is both legally and factually

---

[5] Perplexingly, the Motion suggests that this claim should be brought by Lakefront Pictures—not Karum—to the extent it involves lost clients and internship pipelines. Plaintiffs agree but wonder whether the Ancel Defendants have bothered to carefully read the Amended Complaint, since Count VII involves Lakefront's claim for interference with respect to lost clients, internship pipelines and networking relationships, while Karum's claim in Count VIII relates solely to her work as an actor.

[6] The authorities the Ancel Defendants invoke prove the opposite of what the Ancel Defendants argue. *Soderlund Bros., Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615 (1st Dist. 1995), a case decided on summary judgment, withheld the tort only where a business relationship afforded "no enforceable expectations, but only the hope of continued benefits" – not where, as here, the plaintiff identifies specific, existing relationships that the defendant destroyed. Meanwhile, *Kapotas v. Better Gov't Ass'n*, 2015 IL App (1st) 140534, ¶ 80, merely recites the elements of the tort. Nowhere does it require a plaintiff to name a hoped-for role in advance. Karum has pleaded far more than a hope. She identifies the very agencies

meritless. Illinois courts have recognized that tortious interference with prospective economic advantage does *not* require that a plaintiff identify a specific contract or transaction by name. *See Cook v. Winfrey,* 141 F.3d 322, 328 (7th Cir. 1998) ("The Federal Rules do not require that [a] complaint allege[s] the specific third party or class of third parties with whom [the plaintiff] claims to have had a valid business expectancy."); *Labor Ready, Inc., v. Williams Staffing, LLC,* 149 F.Supp.2d 398, 410 (N.D. Ill. 2001) (in denying motion to dismiss claim for tortious interference with prospective business relations, the Court succinctly held: "According to Staffing Network, plaintiff must allege 'specific customers for which it had this 'reasonable expectation' of gaining future business and 'specific facts establishing this expectation.' Staffing Network is mistaken."); *Cranberry Prod., Inc. v. Maharishi Ayur Veda University,* No. 00-cv-1953, 2000 WL 1745278, at [*]4 (N.D. Ill. Nov. 12, 1999) (in denying motion to dismiss, Court held that an "identifiable, existing relationship" is not necessary in order to state a claim for this type of tortious interference). Rather, all that is required is a reasonable expectancy grounded in an existing relationship. *Gorgonz Group, Inc. v. Marmon Holdings, Inc.,* No. 00-cv-2992, 2001 U.S. Dist. LEXIS 1045, *7, 2001 WL 103406, *2 (N.D. Ill. Jan.30, 2001) (to survive a motion to dismiss, "[a]ll that is necessary is that [plaintiff] allege a reasonable expectancy to enter into future business relations.").

And from a factual perspective, the Court need only read the actual allegations of the Amended Complaint to find the multiple allegations reflecting Karum's specific and tangible opportunities with which Ancel and Rose have interfered. (Am. Complaint at ¶¶ 136, 138-144, 156-57, 211-13). Even before drawing reasonable inferences in Plaintiff's favor, there is more than enough alleged in the Amended Complaint to state a claim for tortious interference.

For good measure, Ancel wishfully reads the Amended Complaint as an acknowledgment that most of the "sustained interference" lies at the feet of others (somehow ignoring the allegations

---

and casting professionals – Bankston Talent, ERIS Talent, Erica Arvold, and Shari Shaw – with whom she had established relationships and who severed ties with Karum at Defendants' urging. (Am. Compl. ¶¶ 136-141, 211-13.)

that he was the source of malicious lies about Karum "breaking into hotel rooms," and that she misappropriated investors funds for personal use, that others amplified and spread throughout the industry) and argues that Karum's tortious interference claim against him should be "narrowed" (whatever *that* means) to account for the role of others who also interfered.[7] This argument simply ignores Illinois law, which imposes joint and several liability upon tortfeasors committing intentional torts, making each fully liable for the harm caused by the concerted wrongful conduct. *See Roberts v. Alexandria Transportation, Inc.,* 2021 IL 126249, ¶ 32 ("Illinois adheres to the rule of joint and several liability [which] … provides that when two or more individuals tortiously contribute to the same indivisible injury, each individual may be held jointly and severally liable for the entire injury."). Ancel should reap what he sowed.[8]

Finally, and equally flawed, Ancel argues that the tortious interference claim against him should be narrowed to preclude evidence of his trumpeting warnings to the industry that Karum was "dangerous," which he dismisses as simply *his opinion.* Illinois holds otherwise. Illinois courts apply a three-factor test to determine whether a statement is an actionable statement of fact or protected opinion. Courts consider: (1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or social context signals that it has factual content. *See Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 832 (7th Cir. 2019). Indeed, the word "dangerous" has a precise and readily

---

[7] Not surprisingly, the Motion cites no authority or even a cogent rationale that supports "narrowing" a claim on a Motion to Dismiss. At this stage, the only issue for the Court is whether Karum has stated a claim for interference against Ancel. As set forth above, she clearly has.

[8] To the extent Ancel contends that Plaintiffs allege only a temporal sequence rather than causation, the argument misstates the law. The tort does not require direct inducement of the breaching party; "[a]llegations that a defendant's behavior caused a third party not to perform its contract suffice." *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 161 F. Supp. 2d 876, 885 (N.D. Ill. 2001) (citing Restatement (Second) of Torts § 766). And any suggestion that Ancel's interference was privileged or "justified" fails at this stage as well: a business privilege is an affirmative defense that a plaintiff need not anticipate or plead around, and it is unavailable to a defendant whose conduct is "motivated solely by spite or ill will." *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 836 (N.D. Ill. 2019) (citing *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999)).

understood meaning—it implies that a person poses a specific risk of harm to others. It is verifiable: either Karum had engaged in conduct that made her dangerous, or she had not (she did not). That is especially so because Ancel did not float the word 'dangerous' in the abstract; he paired it with concrete, checkable factual assertions — that Karum had 'broken into' cast hotel rooms, misappropriated production funds, and falsely accused him of sexual assault. Those are precisely the kind of objectively verifiable statements that qualify as actionable fact, not the vague, unverifiable characterizations Illinois treats as protected opinion. And the context in which Ancel made the statement about Karum — publicly urging others to join him in helping to "take [Karum] down in an epic way" and to "burn her life down" — signals that the statement was intended to convey factual content about Karum's character and conduct, not merely to express a personal or abstract viewpoint. *Id.* (holding that with respect to alleged opinions, "Context is key, as it matters not only what was said, but who said it, where it was said, and the broader setting of the challenged statements.").

The Northern District of Illinois addressed a closely analogous situation in *Bogosian v. Bd. of Educ. of Cmty. Unit Sch. Dist. 200*, 73 F. Supp. 2d 949 (N.D. Ill. 1999), in which defendants argued that their descriptions of a colleague's physical behavior were mere expressions of opinion. The Court rejected this argument as "ridiculous," holding that a description of observable physical behavior is the epitome of an empirical statement capable of valuation as true or false. Similarly, calling someone "dangerous" in the context of an industry-wide smear campaign implies specific, verifiable conduct — not a mere subjective impression or opinion. In short, there is no legal basis to limit or narrow any of the intentional tort claims against Ancel at this stage of the proceedings.

### E. There is No Basis for Dismissing the Conspiracy Claims Against Ancel.

Ancel offers a half-hearted, one-paragraph argument that the Court should dismiss the Civil Conspiracy claims against him. Ancel's argument is easily dispatched. To be clear, and as the authority upon which Ancel purports to rely confirms—civil conspiracy is not an independent tort, but it *is* an independent claim, requiring both an agreement and a tortious act in furtherance of that

agreement. *See Tri-Plex Tech Servs., Ltd. v. Jon-Don, LLC,* 2024 IL 129183, ¶¶ 40-41 ("The essence of a conspiracy claim is not the agreement but rather the tortious acts performed in furtherance of the agreement."). Ancel's Motion relies on a straw-man "timing" argument, suggesting that Ancel's only actionable conduct took place in 2022, which he claims predates the alleged 2023 agreement with Defendant Rose. "The gist of a civil conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." *Yost v. Carroll*, No. 20 C 5393, 2022 WL 185199, at *4 (N.D. Ill. Jan. 20, 2022) (quoting *Scott v. Aldi, Inc.*, 301 Ill. App. 3d 459, 703 N.E.2d 526, 529 (1998)). "[A]ny act in the furtherance of or implementation of the conspiracy agreement creates the liability." *Lenard v. Argento*, 699 F.2d 874, 894 (7th Cir. 1983). The Amended Complaint alleges a sustained campaign that unfolded after Ancel turned on Karum and enlisted Rose and others – including the inducement of Bankston Talent and ERIS Talent to drop Karum, the interference with the DePaul internship pipeline, and a barrage of anonymous "spoof" emails to Plaintiffs' prospects. (Am. Compl. ¶¶ 116, 139-147.) Those post-agreement acts are the acts in furtherance the tort requires. In all events, when any agreement was reached and what it encompassed are questions of fact. Circumstantial evidence may provide adequate proof of conspiracy. *Lenard*, 699 F.2d at 883. Even under the higher pleading standard required by Illinois state courts, a plaintiff "cannot be required to plead with specificity the very facts that can only be proven by circumstantial evidence." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 66 (1994). The Court has already rejected a materially identical challenge. In denying the first motion to dismiss, it held that Plaintiffs adequately pleaded civil conspiracy by identifying the conspiracy's parties, general purpose, and approximate date – "after Ancel's de facto termination." (Dkt. 42 at 11-12.) The Amended Complaint does not disturb that holding, and the Ancel Defendants' repackaged "timing" argument fails for the same reasons. The Motion to Dismiss the civil conspiracy claims against Ancel must be denied.

**F. There is No Basis to Dismiss the Intentional Infliction Claims Against Ancel.**

Finally, doubling down on the arguments already eviscerated above, Ancel seeks dismissal of the claim against him for intentional infliction of emotional distress (Count IX) because he believes (albeit incorrectly) that the claim is based entirely on "protected litigation activity" and because his "opinions" are protected speech. Even if that were the only alleged support for the claims set forth in Count IX (and it is not), as this Response has already demonstrated above, Ancel is jointly and severally liable for the distress intentionally inflicted upon Karum, Ancel is *not* protected by the litigation privilege, and Ancel's so called opinion about Karum being "dangerous" is actionable.[9] The Motion must be denied as to Count IX.

---

[9] Independent of the two arguments Ancel raises, the Amended Complaint affirmatively pleads each element of the tort: (1) extreme and outrageous conduct, (2) intent to cause, or knowledge of a high probability of causing, severe emotional distress, and (3) conduct that in fact causes severe distress. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). In assessing outrageousness, courts weigh, among other factors, whether the defendant reasonably had a "legitimate objective"; a defendant who pursues no legitimate purpose but instead acts to "ruin" the plaintiff forfeits the latitude the law reserves for legitimate conduct. *Kibbons v. Taft Sch. Dist. 90*, 563 F. Supp. 3d 798, 814 (N.D. Ill. 2021)(internal quotation omitted). Abusive conduct that "serves no legitimate purpose" is extreme and outrageous. *Kibbons*, 563 F. Supp. 3d at 814. That is exactly what is alleged here.

As set forth above, Ancel pursued no legitimate end. He publicly urged others to "take [Karum] down in an epic way" and to "burn her life down," and he orchestrated an industry-wide campaign to brand Karum as "dangerous" and to strip her of her representation, her teaching opportunities, and her professional standing. And because Ancel broadcast his attacks across the film community rather than airing a private grievance, the conduct is all the more egregious: conduct "may become extreme and outrageous by virtue of its publication to the community at large." *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 607 N.E.2d 201, 212 (1992). Courts in this District have sustained IIED claims on materially similar allegations of a malicious campaign of harassment, even absent any position of power over the plaintiff. *See Rusinowski v. Vill. of Hillside*, 835 F. Supp. 2d 641, 655 (N.D. Ill. 2011).

Nor can Ancel find refuge in *Sun v. Xu*, 99 F.4th 1007 (7th Cir. 2024), in which the Seventh Circuit set aside an IIED verdict against a defendant because his online accusations served a genuine, legitimate purpose – warning others – and because he held no position over a plaintiff he "barely knew"; that ruling, however, came after a full trial, on a motion for judgment as a matter of law, not on the pleadings. Neither circumstance is present here, where Ancel is alleged to have acted out of personal animus to "ruin" a former colleague. If anything, the same decision confirms Plaintiffs' theory: as to the co-defendant who fabricated and broadcast reputation-destroying accusations, the court held that such conduct – "which could – and did – jeopardize [the plaintiff's] career and reputation" – is extreme and outrageous under Illinois law.

Finally, to the extent Ancel again seeks shelter in the litigation privilege, courts have declined to import the defamation privilege into the tort of intentional infliction of emotional distress. *Rusinowski*, 835 F. Supp. 2d at 656. And because Plaintiffs have adequately pleaded extreme and outrageous conduct, the severity of Karum's distress follows: Illinois courts "merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress," so that the extreme character of the conduct is itself evidence that severe distress existed. *Honaker*, 256 F.3d at 496 (internal quotation marks omitted).

## **CONCLUSION**

For the foregoing reasons, the Motion to Dismiss should be denied in its entirety, and the

Court should grant such additional relief as the Court deems just and appropriate.

Dated: July 23, 2026

RESPECTFULLY SUBMITTED,

**LAKEFRONT PICTURES, LLC,
JENNIFER KARUM and THE CURSE LLC**

By:       */s/ George J. Spathis*
One of Their Attorneys

George J. Spathis (ARDC # 6204509)
LEVENFELD PEARLSTEIN, LLC
120 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
(312) 346-8380
gspathis@lplegal.com

Ilya G. Zlatkin (ARDC # 6314344)
ZLATKIN CANN ENTERTAINMENT
4245 N. Knox Ave.
Chicago, Illinois 60641
(312) 809-8022
Ilya@zce.law

*Attorneys for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2026, I caused the foregoing pleading to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants of record in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system on all counsel of record.

**1:24-cv-01108 Notice has been electronically mailed to:**

Alexander Nicholas Loftus      alex@loftusandeisenberg.com

Christian Novay      Christian.Novay@lewisbrisbois.com, angela.miller@lewisbrisbois.com

David Alan Eisenberg      david@loftusandeisenberg.com

George J. Spathis      gspathis@lplegal.com, druiz@lplegal.com, gnegrete@lplegal.com, ikropiewnicka@lplegal.com, kpatton@lplegal.com, mlockhart@lplegal.com, nbailey@lplegal.com

Ilya Zlatkin      ilya@zce.law, 8940587420@filings.docketbird.com, clerk@zce.law, zce@recap.email

Jack Thomas Grochowski      jgrochowski@bbp-chicago.com

Mark S. Jamil      mjamil@bbp-chicago.com

Megan DeMarco      mdemarco@rshc-law.com, docketdept@rshc-law.com

Sean P. Patrick      spatrick@rifkindpatrick.com

Vincent Dominick Pinelli      vpinelli@bbp-chicago.com, aposluns@bbp-chicago.com

_____/s/ George J. Spathis_____

17