**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAKEFRONT PICTURES, LLC, JENNIFER KARUM, and THE CURSE, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, ROCK CITY ROAD FILMS LLC, and CANDICE ROSE,<br><br>Defendants.<br><br>JORDAN ANCEL,<br>Counter-Plaintiff,<br>v.<br>THE CURSE, LLC,<br>Counter-Defendant. | ) | Case No. 1:24-cv-01108<br><br>Magistrate Judge M. David Weisman |

**ANCEL DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO THE AMENDED COMPLAINT AND SECOND AMENDED COUNTERCLAIMS**

Defendants Jordan Ancel ("Ancel"), Jordan Ancel International, LLC ("Ancel International"), and Rock City Road Films LLC ("Rock City") (together, the "Ancel Defendants") answer the Amended Complaint (Dkt. 130) filed by Plaintiffs Lakefront Pictures, LLC ("Lakefront"), Jennifer Karum ("Karum"), and The Curse, LLC ("The Curse"). Defendant Candice Rose ("Rose") is separately represented, and the Ancel Defendants do not answer for her.

## NATURE OF ACTION

**1.** This action has been commenced to redress an intense and coordinated campaign of smears, harassment and bullying directed primarily at Plaintiffs Lakefront and Karum, at which Defendants Jordan Ancel and Rose are at the center.

**ANSWER:** Denied.

**2.** Indeed, Ancel and Rose are merely making good on Ancel's brazen public threat to "burn [Karum's] life down," and "ruin" Karum and her company, Lakefront, without impunity, as evidenced by Ancel's taunting text to Karum, "Bitch, you can't do shit to me." See Group Exhibit C, submitted herewith.

**ANSWER:** The text messages in Group Exhibit C speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them and any characterization of them taken out of context. The Ancel Defendants deny that Ancel made any "public" threat, deny that Ancel and Rose acted together to carry out any threat, and deny the remaining allegations in paragraph 2.

**3.** As part of their campaign, Ancel and Rose have enlisted others who have shown an interest in currying favor with them, and have been willing to engage in conduct that has been and continues to be wrongful and purposefully malicious, for which they must be held accountable.

**ANSWER:** Denied.

## THE PARTIES

**4.** Plaintiff Karum is an individual who is a citizen of and domiciled in the State of Illinois, who works and resides in Cook County, Illinois.

**ANSWER:** Admitted.

**5.** Plaintiff Lakefront is a limited liability company organized and existing under the laws of the state of Illinois, with its principal place of business located in Cook County, Illinois. Karum is a Member of Lakefront and at all relevant times has served as one of its Managers. Ryan Atkins ("Atkins") is the other Member and Manager of Lakefront.

**ANSWER:** Admitted.

**6.** Plaintiff The Curse is a limited liability company organized and existing under the laws of the state of Illinois, with its principal place of business located in Cook County, Illinois. Karum and Atkins are members of The Curse and at all relevant times have served as its Managers. The remaining members of The Curse are citizens of and domiciled in the states of Illinois, New Jersey and Pennsylvania.

**ANSWER:** Admitted.

**7.** Defendant Jordan Ancel ("Ancel") is an individual who is a citizen of and domiciled in the State of California.

**ANSWER:** Admitted.

**8.** Defendant Jordan Ancel International, LLC, ("Ancel International") is a limited liability company organized and existing under the laws of the state of California located in Los Angeles. On information and belief, Ancel is the sole member of Ancel International.

**ANSWER:** Admitted.

**9.** On information and belief, Defendant Rock City Road Films LLC ("Rock City") was an Illinois LLC, whose sole member was Ancel, formed for the sole purpose of contracting with and/or receiving payment for The Curse relating to services to be rendered by Ancel.

**ANSWER:** Admitted that Rock City was organized as an Illinois limited liability company on March 29, 2022; that Ancel was its sole member and its manager; that Rock City was formed at Karum's request in connection with the Picture and was the "Lender" of Ancel's services under the Producer Agreement; and that on September 21, 2023, Rock City filed a Statement of Termination with the Illinois Secretary of State. The Ancel Defendants deny the remaining allegations in paragraph 9.

**10.** Defendant Candice Rose ("Rose") is an individual who is a citizen of and domiciled in the State of Wisconsin.

**ANSWER:** The allegations in paragraph 10 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**JURISDICTION AND VENUE**

**11.** Based upon the citizenship of their respective members (addressed above), Lakefront is deemed to be a citizen of the state of Illinois, and The Curse is deemed to be a citizen of the states of Illinois, New Jersey and Pennsylvania.

**ANSWER:** Admitted.

**12.** Based upon the citizenship of its respective members (addressed above), both Ancel International and Rock City are deemed to be citizens of the state of California.

**ANSWER:** Admitted.

**13.** None of the Plaintiffs are citizens of or domiciled in California or Wisconsin, and none of the Defendants are citizens of or domiciled in Illinois, New Jersey or Pennsylvania.

**ANSWER:** Admitted as to Plaintiffs and the Ancel Defendants. The allegations concerning Rose's citizenship are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**14.** Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

**ANSWER:** Paragraph 14 states a legal conclusion to which no response is required. To the extent a response is required, the Ancel Defendants admit that the Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1), and deny that Plaintiffs are entitled to recover any amount from them.

**15.** As set forth more fully below, Ancel, either individually or through Rock City and Ancel International, contracted with both Lakefront and The Curse in Illinois, stipulated to jurisdiction in Illinois on behalf of Ancel International, traveled repeatedly to Illinois, provided services in Illinois, directed tortious acts and conduct towards citizens of Illinois that have resulted in injury in Illinois, and Ancel has availed himself of the privilege of asserting claims in the Circuit Court of Cook County, Illinois.

**ANSWER:** Admitted that Rock City, as Lender, and Ancel, through the Artist's Inducement, contracted with The Curse; that Ancel International entered into the NDA with Lakefront, which speaks for itself (Dkt. 130, Ex. B ¶ 17); that Ancel traveled to Illinois and rendered services in Illinois in connection with the Picture's production; and that Ancel filed an action against Karum in the Circuit Court of Cook County. The Ancel Defendants do not contest the Court's personal jurisdiction over them in this action. The Ancel Defendants deny that they directed tortious acts or conduct toward anyone, deny that they caused injury in Illinois or elsewhere, and deny the remaining allegations in paragraph 15.

**16.** As set forth more fully below, Rose contracted with both Lakefront and The Curse, traveled repeatedly to Illinois and/or provided services in Illinois in connection with those

contracts, directed tortious acts and conduct towards citizens of Illinois that have resulted in injury in Illinois.

**ANSWER:** The allegations in paragraph 16 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**17.** Venue is therefore proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**ANSWER:** Paragraph 17 states a legal conclusion to which no response is required. To the extent a response is required, the Ancel Defendants do not contest that venue is proper in this District.

## FACTS COMMON TO ALL COUNTS

**18.** Karum is neuro-diverse, and on the autism spectrum. As a child on the autism spectrum, Karum was relentlessly teased and bullied in school by children who cruelly mocked her for not being "normal." These painful experiences during her youth fueled an interest in theater, which offered Karum a "safe space" where she could, at least act normal.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18 and therefore deny them.

**19.** Through theater, Karum began to develop a sense of confidence and belonging that eventually changed her outlook towards school and her ability to relate to and with her peers.

Karum remained active in theater throughout high school. Karum is a 2005 graduate of Ohio Wesleyan University where she studied theater and dance.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 and therefore deny them.

**20.** After graduating, Karum thrived in the workforce, harnessing her persistence to achieve success in various sales positions over the course of 18 years.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 20 and therefore deny them.

**21.** Although Karum is open about being neuro-diverse, and how it has impacted her, both as a person and an artist, most people who meet Karum would not assume or realize that she was on the spectrum, although Karum still struggles at times with certain social cues and is prone to a fixation on pleasing others.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21 and therefore deny them.

**22.** Despite her success in the workforce, Karum's passion remained in theater and a developing interest in film. Karum sought and booked acting opportunities, and while on set, she carefully studied and engaged with directors, assistant directors and producers to learn about all aspects of the film industry.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22 and therefore deny them.

**23.** Eventually, Karum left her sales job in order to focus on her passion for acting and film, determined to support and promote other neuro-diverse artists, and give voice to a group that is underrepresented in the film industry.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 and therefore deny them.

**24.** After landing several acting roles, Karum's interest in filmmaking intensified.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 and therefore deny them.

**25.** Karum met Atkins when she auditioned for a role on a project he was spearheading. At the time, Atkins had film credits as a cinematographer, director, and editor over the course of several years in the industry.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 and therefore deny them.

**26.** Karum and Atkins quickly developed a strong synergy, and they worked together to transform Atkins' working concept into a TV pilot for what came to be known as "Conrad," about a female detective on the autism spectrum.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 26 and therefore deny them.

**27.** Determined to get the Conrad pilot made, Karum and Atkins joined forces to form their own production company, Lakefront, with the stated mission of sharing untold stories from voices normally unheard.

**ANSWER:** Admitted that Karum and Atkins formed Lakefront. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 27 and therefore deny them.

**28.** After remaking the script for the Conrad pilot, Karum and Atkins, through their newly formed production company, Lakefront, developed a budget for the pilot, raised necessary capital, and aggressively promoted the script to various prominent actors, in an effort to best position the project to get "picked-up" by a studio.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 and therefore deny them.

**29.** Yet, despite the relative inexperience of its principals in the role of the producers, the strong script drew the attention of Eric Roberts (whose extensive film and TV credits include The Pope of Greenwich Village, The Expendables, and The Dark Knight), and Harry Lennix (The Blacklist, The Matrix series, Ray, etc.), and after speaking with Karum, learning about her story, and impressed by her passion and energy, both Roberts and Lennix signed onto the project.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 and therefore deny them.

**30.** Karum's and Atkins' first attempt at producing was both exhilarating and humbling, as the duo benefited immensely from direct hands-on experience that accelerated their learning curve, but also made their share of mistakes as they learned "on the job." On balance,

however, the experience producing Conrad, was invaluable, and validated the work of all of those involved with the project.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 and therefore deny them.

**31.** Karum and Atkins (with the assistance of others) prepared materials to pitch Conrad as a series, developing a three-season arc and an extensive show bible. The Conrad pilot earned substantial acclaim, and Netflix expressed interest in the series, although those discussions fizzled during COVID and the long ensuing shutdown of nearly all projects.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 and therefore deny them.

**32.** The experience and relative success of Conrad, however, became a springboard for new opportunities. Among other projects, Karum wrote, co-directed, and acted (supporting role) in a short film that Lakefront produced, a thriller released in 2018 called "The Nest," about a young woman who is tormented by premonitions about the fate of others around her.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 and therefore deny them.

**33.** Lakefront was also engaged by filmmakers to produce and/or direct several award-winning short films, bringing the valued resource of a complete, experienced and carefully vetted production crew that has worked repeatedly with Lakefront (including on The Unseen, a feature film discussed in detail below).

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 and therefore deny them.

**34.** Lakefront also began offering and offers an array of services for aspiring actors and filmmakers, including writing, directing and producing demo-scenes.

**ANSWER:** Admitted.

**Karum and Lakefront Create "The Unseen"**

**ANSWER:** This heading is not an allegation and requires no response. To the extent a response is required, the Ancel Defendants deny it.

**35.** In 2020, Karum also began working on the script for her first feature length film, The Unseen, a supernatural thriller, on which she began working after completing the Conrad pilot. Karum worked with Vincent Shade, a veteran producer and director, who mentored Karum through the script-writing process for a full-length film, and specifically with respect to scripts for the horror genre.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 35 and therefore deny them.

**36.** Karum and Atkins, through Lakefront, worked as the producers for The Unseen, handling all of the many underlying tasks involved with taking a script and turning it into a movie.

**ANSWER:** Admitted that Karum and Atkins were among the producers of the Picture. Denied that they were its only producers or that they handled "all" of the tasks involved in making it; Ancel was also a producer of the Picture. The Ancel Defendants deny the remaining allegations in paragraph 36.

**37.** Lakefront successfully raised capital to cover more than half of the film's proposed budget from outside investors and began casting for actors, mostly from the Chicagoland area.

**ANSWER:** Denied.

**38.** But to best position the film to secure broader distribution, and in keeping with Lakefront's mission of creating opportunity for an under-represented segment of the industry, Lakefront pitched the script and lead role in The Unseen to RJ Mitte, best known for his recurring role as "Walt Jr." on the highly acclaimed series, Breaking Bad, who like his character on the show, has cerebral palsy.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 and therefore deny them.

**39.** Through considerable effort, Lakefront secured Mitte's commitment to the film and turned attention to the considerable work involved with planning, preparation and martialing the resources to make a movie. Karum reserved a small supporting role in the film for herself (as Mitte's character's older sister).

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 and therefore deny them.

**40.** Lakefront also pre-cast two of the other major roles, including Rose, with whom Karum had attended classes, become friendly (scenes from Conrad were even filmed at Rose's home), and for whom Lakefront had produced a scene for her demo reel, and Rebekah Kennedy, with whom Karum connected after seeing her work on Law & Order, and developed a friendship borne of their respective mutual admiration for the other's work.

**ANSWER:** Admitted that Rose was cast in the Picture. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 40 and therefore deny them.

**41.** Among the lessons learned as newly minted producers on Conrad, Karum and Atkins experienced the challenges of wearing multiple hats in connection with a project, particularly in Karum's case, who juggled roles both in front of and behind the camera.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 and therefore deny them.

**42.** Atkins and Karum concurred that for The Unseen, Lakefront would bring in a dedicated Director, eventually hiring Vincent Shade, with whom they had worked (and was familiar with the script), and collectively, they all agreed to bring in an extra producer to help to manage the set when Karum was acting, so that she could otherwise focus on her role as producer (when not acting), and so that Atkins could focus primarily on cinematography.

**ANSWER:** Admitted that Vincent Shade directed the Picture and that Ancel was engaged as a producer of the Picture. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning discussions and agreements between Atkins and Karum and therefore deny them. The Ancel Defendants deny the remaining allegations in paragraph 42.

**Lakefront Contracts with Ancel to Serve as the Third Producer on The Unseen**

**ANSWER:** This heading is not an allegation and requires no response. To the extent a response is required, the Ancel Defendants deny it.

**43.** Eventually Lakefront reached out to Ancel to discuss the role of Producer.

**ANSWER:** Admitted.

**44.** Karum knew of Ancel before they ever worked together. Karum was part of a "Thriving Actors" Facebook Group in which Ancel offered coaching/mentoring services and the like to aspiring actors and touting his experience as a producer.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 and therefore deny them.

**45.** Ancel also touted to the Facebook Group that his wife was a prominent Hollywood agent, and he aggressively pitched himself as a valuable networking contact by members of the group seeking representation.

**ANSWER:** Denied.

**46.** At the time that Lakefront first reached out to Ancel about serving as a third producer on the film, Karum and Atkins had already been working on the project for well over a year, had completed the majority of the "development work" on the project, and had begun to focus on pre-production.

**ANSWER:** Denied.

**47.** When he was first approached by Lakefront, Ancel showed no interest in the project. In fact, it was not until he learned that Karum and Atkins had lined up Mitte as the lead actor that Ancel did a complete about-face and expressed serious interest in a producer role, hyping all that he could do to assist and train Karum and Atkins as producers.

**ANSWER:** Denied.

**48.** In reality, on information and belief, Ancel had little meaningful experience with or reputation for producing feature films, and he actually saw The Unseen as an opportunity to pad his resume (which, at the time, featured mostly short films and commercials), as well as his

opportunity to forge a relationship with a lead actor with established credits, that he could attempt to parlay into more opportunities to get involved with feature films.

**ANSWER:** Denied.

**49.** On or about May 31, 2021, Ancel, through Rock City, entered into a Producer Agreement with The Curse, a special purpose entity Managed by Lakefront that owned all of the intellectual property rights relating to The Unseen, to assist Karum/Atkins/LAKEFRONT, the film's primary producers. A copy of the Producer Agreement is submitted herewith as Exhibit A.

**ANSWER:** Admitted that The Curse, as "Production Company," and Rock City, as "Lender" for the services of Ancel, entered into the Producer Agreement, which is dated "[a]s of March 9, 2022"; that Ancel signed the Artist's Inducement, dated as of March 1, 2022; that Exhibit A is a copy of the Producer Agreement, the Artist's Inducement, and the Certificate of Engagement, which Ancel signed on behalf of Rock City as its authorized representative and individually; and that The Curse is a special-purpose entity, managed by Lakefront, that owns the rights to the Picture. The Producer Agreement speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny that the Producer Agreement was entered into on or about May 31, 2021, deny that Ancel's role was limited to assisting "primary producers," and deny the remaining allegations in paragraph 49.

**50.** Pursuant to the express terms of the Producer Agreement, Ancel was to receive a flat fee, and *provided he/Rock City was not in material breach of the Production Agreement*, would also be eligible to receive a small percentage of "Net Profits of the film (as that term was defined therein). Id. at par. 3.

**ANSWER:** The Producer Agreement (Dkt. 130, Ex. A) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. Admitted that paragraph 3.1

provides for a flat fee of $5,000 payable to Rock City, as Lender, in installments, and that paragraph 3.2 provides that Lender is entitled to three percent of 100 percent of the Picture's Net Profits, if any, on the conditions stated there. The Ancel Defendants deny the remaining allegations in paragraph 50.

**51.** The Producer Agreement also made clear, however, that The Curse was not obligated to use Ancel's services, or the results of such services in connection with the film, or to produce, release or distribute The Unseen after it was completed. Id. at par. 3.3.

**ANSWER:** The Producer Agreement (Dkt. 130, Ex. A) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny any allegation in paragraph 51 inconsistent with paragraph 3.3 of the Producer Agreement.

**52.** Significantly, the Producer Agreement also made clear that Ancel would only be entitled to earn third-producer credit, expressly stating that: "…provided Ancel performs all of his material services hereunder *and that neither [Rock City] nor Ancel is in material uncured breach hereof*, Production Company shall accord Ancel a "Producer" credit on-screen on either no less than the single third producers' card or, at Production Company's discretion, the second producers card, shared only with Ryan Atkins, in the main titles on all positive and/or digital prints of the Picture." (emphasis added). Id. at par. 4.

**ANSWER:** The Producer Agreement (Dkt. 130, Ex. A) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny that the Producer Agreement limited Ancel to "third-producer credit." Subject to the conditions stated in it, paragraph 4 provides that Production Company "shall accord Ancel a 'Producer' credit on-screen on either no less than the single third producers' card or, at Production Company's discretion, the second producers card, shared only with Ryan Atkins, in the main titles on all

positive and/or digital prints of the Picture," and that the credit be of the same size, type, duration, manner of placement, and boldness as all other similar credits. The Ancel Defendants deny the remaining allegations in paragraph 52.

**53.** Pursuant to the Producer Agreement, Ancel ceded to The Curse the sole and exclusive right to publicize Ancel's role with and services to the film, and to make any changes to the script for and characters in The Unseen. Id. at pars. 5, 6. Ancel further warranted that he would not "do anything which may impair any of the rights granted to [The Curse]." Id. at par. 10.

**ANSWER:** The Producer Agreement (Dkt. 130, Ex. A) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny that Ancel ceded any right to Lakefront, which is not a party to the Producer Agreement, and deny the remaining allegations in paragraph 53 to the extent they are inconsistent with paragraphs 5, 6, and 10 of the Producer Agreement.

**54.** Concurrently, Ancel, through Ancel International, also executed a Non-Disclosure Agreement with Lakefront (the "NDA"), a copy of which is submitted herewith as Exhibit B.

**ANSWER:** Admitted that Ancel International entered into the NDA with Lakefront; that Ancel signed the NDA as "CEO, Jordan Ancel Interntional [sic], LLC" on behalf of Ancel International, its "Recipient"; that the NDA states an Effective Date of May 6, 2021; and that Exhibit B is a copy of the NDA. The Ancel Defendants deny that the NDA was executed concurrently with the Producer Agreement, which is dated as of March 9, 2022; deny that Ancel is a party to the NDA in his individual capacity; and deny the remaining allegations in paragraph 54.

**55.** Pursuant to Ancel's NDA, he agreed not to disclose "Confidential Information" (id. at p. 1) and "not to discuss any information about the project, disparage or reveal prejudice whether deemed factual or opinion to 3rd parties over phone, in person, emails, social media, or any other electronic form of communication…" Id. at p. 5.

**ANSWER:** The NDA (Dkt. 130, Ex. B) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny that Ancel agreed to the NDA in his individual capacity; the Recipient under the NDA is Ancel International. The Ancel Defendants further state that the second quoted phrase comes from an initialed acknowledgment that applies only "if I am hired, and am subsequently terminated or voluntarily resign" (Dkt. 130, Ex. B at 5). The Ancel Defendants deny the remaining allegations in paragraph 55.

**56.** The NDA made clear that Ancel's breach thereof could result in his forfeiting credit for the film at the discretion of the primary producers. Id. Ancel actually initialed the referenced provision acknowledging that he understood that his credits could be forfeited.

**ANSWER:** The NDA (Dkt. 130, Ex. B) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. Admitted that the initials "JA" appear beside the two acknowledgments on page 5 of the NDA. The Ancel Defendants deny that the NDA provides for forfeiture of credit "at the discretion of the primary producers"; the acknowledgment states that credit "is at risk and could be forfeited at discretion of owners." The Ancel Defendants deny the remaining allegations in paragraph 56.

**Ancel's Time on the Set of The Unseen was an Unmitigated Disaster**

**ANSWER:** This heading is not an allegation and requires no response. To the extent a response is required, the Ancel Defendants deny it.

**57.** Ancel joined the film as a producer during the final portion of the "development phase" of the project and showed initial enthusiasm. Ancel introduced LAKEFRONT to additional investors who contributed capital, and during script meetings, offered helpful ideas that Karum incorporated into the script.

**ANSWER:** Admitted.

**58.** But after making a positive first impression, Ancel was frequently disengaged, missing numerous calls and meetings, and neglecting his responsibilities, apologetically citing various ongoing personal issues he was having, leaving Karum and Atkins to shoulder an outsized burden relative to the production.

**ANSWER:** Denied.

**59.** Given the film's limited budget (developed and managed by Lakefront working closely with an experienced line-producer, and in accordance with SAG requirements), all of the filming was set to take place in the Greater Chicago Metropolitan area over a three-week period, with one week of shooting in April 2022, after which they would resume and complete filming over a two-week period in June 2022.

**ANSWER:** Admitted that principal photography of the Picture was scheduled to take place in the Chicago metropolitan area over approximately three weeks, with one week in April 2022 and the remainder in June 2022. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning how the budget was developed and managed and therefore deny them. The Ancel Defendants deny the remaining allegations in paragraph 59.

**60.** Lakefront identified and secured substantially all of the site locations (homes, offices, restaurants, school, etc.) at which scenes were to be filmed.

**ANSWER:** Denied.

**61.** In light of the aggressive filming schedule, Karum and Atkins anticipated that the days on sets would be long, and that coordination among the producers would be critical to staying on time and on budget.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61 and therefore deny them.

**62.** Karum and Atkins reiterated to Ancel that his principal role would be to run the set on days when Karum would have to focus on her work in front of the camera and reasonably expected that Ancel would conduct himself professionally.

**ANSWER:** Denied.

**63.** As set forth more fully below, however, Ancel failed to perform competently or professionally, and even in the third-producer role, Ancel became far more of a distraction (particularly on the set) than he was an asset.

**ANSWER:** Denied.

**64.** Shortly after they began working together, Ancel began to confide in Karum about issues with his marriage, and about extra-marital affairs.

**ANSWER:** Denied.

**65.** While surprised that Ancel would only discuss personal and sensitive topics like his marriage and infidelity with anyone with whom he was supposed to have a professional

relationship, Karum was not bothered by it at first, as she viewed it as a sign that Ancel trusted her enough to confide in her. Thus, Karum tried to be understanding and sympathetic when Ancel confided in her.

**ANSWER:** Denied.

**66.** During pre-production and thereafter, however, Ancel's continued talk about his affairs became almost boastful in nature and thus increasingly off-putting. Karum felt particularly uneasy when Ancel told her about following a woman to a weekend yoga retreat in the hopes of rekindling an amorous relationship with her, which Karum considered "creepy" and "stalker-like."

**ANSWER:** Denied.

**67.** Karum asked Ancel to refrain from discussing his sex life with her any further, but after a brief respite, Ancel could not restrain himself and continued his objectionable chatter about sexual pursuits and conquests, which became particularly problematic when Ancel's inability to control his libido began impacting his work and the production set.

**ANSWER:** Denied.

**68.** As a producer, it is completely inappropriate to have any relationship, consensual or otherwise, with any member of crew or staff. Yet while on set, Ancel flirted incessantly with a young woman (the props manager) on the crew, even after Karum asked him to stop.

**ANSWER:** Denied.

**69.** Without regard to Karum's admonition, Ancel continued his amorous pursuit of the female crew member, even leaving the set early on occasion so that he could accompany the crew

member to her home, abdicating his responsibilities and leaving Karum and Atkins to handle the producers' responsibilities before filming resumed in the morning.

**ANSWER:** Denied.

**70.** Jordan also told Karum that he was "really attracted" to another young female staff member. Karum admonished Ancel to act professionally and asked him to focus on the work at hand, since all of the filming for The Unseen was going to be compressed into three weeks.

**ANSWER:** Denied.

**71.** Karum and Atkins continued to admonish Ancel about his behavior (and even privately considered terminating him for cause), prompting Jordan to threaten that "his investors" would pull their money out of the film if he were to be removed from his role as a producer.

**ANSWER:** Denied.

**72.** Given the already tight filming schedule, and the havoc that would result if investors even threatened to back out, Karum and Atkins elected not to terminate Ancel during filming.

**ANSWER:** Admitted that neither The Curse nor Lakefront terminated Ancel during filming. The Ancel Defendants deny the remaining allegations in paragraph 72, including the reasons alleged.

**73.** The text below was sent by Ancel to Karum, evidencing both that Ancel's discussed his affairs with Karum, as well as his threats (as the relationship soured) toward Karum discussed more fully below about telling anyone about his affairs. [Image of text messages omitted.]

**ANSWER:** The text messages depicted in paragraph 73 speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them and deny the remaining allegations in paragraph 73.

**74.** Once on set, Ancel showed little interest in fulfilling the third-producer role and responsibilities for which he was actually hired.

**ANSWER:** Denied.

**75.** While Ancel induced The Curse to hire him by touting his producer's experience as a valuable resource to Karum and Atkins, Ancel proved largely inept at anticipating even basic production needs or planning ahead for contingencies, instead spending most of his time away from the set glad-handing (rather than managing) the cast and crew.

**ANSWER:** Denied.

**76.** On one particular night on set at a suburban home location, Ancel simply decided to take a nap on the couch (alongside a young female member of the crew) during filming, while others worked into the night.

**ANSWER:** Denied.

**77.** Ancel took little initiative and routinely ignored basic administrative responsibilities of a producer. For instance, while shooting on location at a home, a door was damaged in Ancel's presence (Karum was acting, not producing on that date). Ancel was inexplicably combative with the homeowner, and rather than taking charge of the repair, he

attempted to first push off the responsibility to the crew, and then to Lakefront (without telling Lakefront), angering the home's owner when the door remained unrepaired for more than a month.

**ANSWER:** Denied.

**78.** Karum and/or Atkins had to prepare specific task lists for Ancel and regularly monitor his progress with respect to those tasks or they simply would not get done. And still, Karum, Atkins and sometimes Shade would have to pick up the slack from Ancel's neglect, making for extremely long days during pre-production and on set.

**ANSWER:** Denied.

**79.** On set, Ancel simply refused to accept the role of the third producer for which he was actually hired and looked for every opportunity to portray and comport himself as the film's primary producer.

**ANSWER:** Denied.

**80.** As with any low budget project with limited days allotted to film, Karum and Atkins anticipated that there would be mistakes, issues and frustrations, and they expected that collectively, the producers would discuss them privately and then present a united front in addressing the issues.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 80 and therefore deny them.

**81.** Instead, when cast or crew approached Ancel with any issue, he reflexively blamed others, mostly Karum and/or Atkins (even when it was his fault), abdicating any semblance of leadership or a willingness to make necessary decisions that were unpopular.

**ANSWER:** Denied.

**82.** But other times, when Ancel was eager to portray himself as the one in charge, he would act unilaterally and impulsively, including with respect to personnel decisions.

**ANSWER:** Denied.

**83.** Moreover, when he did not get his way, Ancel would fly off the handle and get aggressively angry, which he described as "going nuclear." On set, "You don't want to see me go nuclear," became a common and ominous refrain from Ancel in an effort to get his way, often threatening to have his minority investors "pull their funding" or to have the Screen Actors Guild (SAG) shut down the project.

**ANSWER:** Denied.

**84.** Ancel also displayed terrible professional judgment, by using marijuana on set—an express violation of SAG—and most disturbingly, giving cannabis-infused gummies to interns, including at least one who was below the legal age of consumption.

**ANSWER:** Denied.

**85.** Karum, who was not on location at the time of the incident, learned about it from other members of the crew, and she confronted Ancel about his actions. Ancel did not deny the allegations yet became indignant that Karum would even raise the issue, gaslighting her as if she was somehow wrong to insist upon compliance with SAG rules that otherwise put the entire production at risk. Ancel's texts below reflect the same: [Images of text messages omitted.]

**ANSWER:** The text messages depicted in paragraph 85 speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them. The Ancel Defendants deny the remaining allegations in paragraph 85.

**Second ¶ 73.** Ancel seemed to have a particular problem taking direction from Karum as a woman.

**ANSWER:** Denied.

**Third ¶ 73.** When Karum stood her ground, Ancel was misogynistic and verbally abusive, frequently engaging in tirades laced with grotesque profanity that should never be tolerated in any work environment.

**ANSWER:** Denied.

**Second ¶ 74.** Ancel also tried to weaponize Karum's autism, bullying her, and often doing so in front of the cast and crew to embarrass her and foment division on the set, creating an unnecessarily stressful work environment, and one that was particularly difficult for Karum (as someone who is neuro-diverse), who is hypersensitive about conflict and conflict resolution.

**ANSWER:** Denied.

**Second ¶ 75.** Other times, Ancel would cruelly mock Karum's autism, telling her and others that Karum merely "uses" autism as a crutch to excuse or justify her actions.

**ANSWER:** To the extent second paragraph 75 refers to text messages in Group Exhibit C, the text messages in Group Exhibit C speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them and any characterization of them taken out of context. The Ancel Defendants deny the remaining allegations in second paragraph 75.

**Second ¶ 76.** When he was not given access to budget details (to which he was not entitled), Ancel made deliberately false statements to investors and to Mitte's representation that Karum was misappropriating funds from the production budget (which was carefully monitored by the Unit Production Manager), so that they would demand a review of the books, causing

increasing tension and distrust. The investors' ensuing review of the books found no evidence of misappropriation.

**ANSWER:** Denied, except that the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning any review of the books by investors and its results, and therefore deny them.

**Second ¶ 77.** Ancel's disruptive behavior peaked during the final week of filming. As the writer of The Unseen, Karum and the film's Director discussed modest additions to the script (relating to Karum's role) which is both common in the industry, and something that the Director felt was necessary to tie together the storyline.

**ANSWER:** Denied.

**Second ¶ 78.** When he learned that the script had been modified without his consultation, Ancel "went nuclear" (to use his term) even though he had contractually agreed that Lakefront had the exclusive rights with respect to the script, and script revisions.

**ANSWER:** Denied.

**Second ¶ 79.** After Karum tersely told Ancel that she would make the changes to the script that she deemed appropriate, Ancel began to spread false rumors among the cast that the script changes were merely driven by Karum's ego, and although the change only involved a single line of dialogue, Ancel convinced members of the cast that the change to the script would adversely impact their role and screen time.

**ANSWER:** Denied.

**Second ¶ 80.** Ancel's false rumors set off a firestorm of concerns, which he stoked to make people believe that Karum's continued presence on set threatened production, the completion of the project, and payments to crew.

**ANSWER:** Denied.

**Second ¶ 81.** Blind-sided by these false rumors, Karum (unlike Ancel) chose to put the interests of her film before her own personal agenda and volunteered to step away from set for the day so as not to disrupt the already packed schedule for the final days.

**ANSWER:** Denied.

**Second ¶ 82.** Then, in the ultimate act of petulance by Ancel, and in an attempt to wrest control away from Lakefront so as to assume control over the final critical days of shooting, Ancel spread false rumors, first among the cast (and to the lead actor's mother), and among the crew to make them all believe that if Karum returned to the set, there would be an exodus of both cast and crew.

**ANSWER:** Denied.

**Second ¶ 83.** Exploiting the chaos he created, Ancel effectively forced Karum to stay away from her own set for the final five days of filming.

**ANSWER:** Denied.

**Second ¶ 84.** In her absence, Ancel relished the opportunity to curry favor with the crew, unilaterally approving overtime requests and hotel charges, without discussing it with Karum or Atkins, and without regard to the fact that the budget could not support such charges.

**ANSWER:** Denied.

**Second ¶ 85.** Before filming concluded, Karum learned that the Director slept in his car after a late night on set and arranged to get him a hotel room (something Ancel should have done).

**ANSWER:** Denied.

**86.** Karum, who had booked a block of rooms at the Allerton Hotel for Ancel and cast members who hailed from outside the Chicago area, called the hotel to add another room to the block. At the same time, she thought it would be a nice gesture to drop off goody bags of assorted snacks (that she purchased using personal funds) to allay tensions regarding her ouster from the set.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning Karum's communications with the hotel, her purchases, and her intentions, and therefore deny them. The Ancel Defendants deny the remaining allegations in paragraph 86, including any implication that Ancel caused any "ouster" of Karum.

**87.** When Karum arrived at the hotel, she asked the front desk to deliver the bags to various rooms but was told that as the person who booked the rooms and named on the reservation, she could be given access to each of the rooms to deliver them herself.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 87 and therefore deny them.

**88.** Karum, however, did not want to enter anyone's room, and asked that security handle the deliveries. The hotel instead proposed that she accompany hotel security to the rooms and direct the desired deliveries, to which Karum acquiesced.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 88 and therefore deny them.

**89.** The hotel security guard made the deliveries, but in doing so, erroneously used his keys to access the alternate door of the lead actor's hotel suite, startling people in the room. The guard apologized for his oversight and Karum (who was in the hall at the time) personally handed the bag to the person who greeted the security guard, and in the presence of the guard, was invited into the room by the lead actor's mother. Karum accepted the invitation and the two had a short but pleasant conversation.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 89 and therefore deny them.

**90.** When Ancel learned that Karum had engaged with the cast at the hotel, he texted Karum claiming that she had crossed the line, was a "psychopath," and threatened to call the police.

**ANSWER:** Denied.

**91.** In response, Karum advised Ancel that she had not entered any room, and that security had entered simply to deliver gifts, all of which the security guard confirmed.

**ANSWER:** Denied.

**92.** Nevertheless, despite knowing the truth, Ancel purposefully and falsely told the cast and crew that Karum had "broken into" cast hotel rooms, citing it as proof that she was vengeful and that her presence was "dangerous."

**ANSWER:** Denied.

**93.** Ancel also falsely advised the hotel that Karum was no longer involved with the project and that she should not be permitted to access any of the rooms in the block.

**ANSWER:** Denied.

**94.** Ancel then convinced cast and crew that it would be "dangerous" to attend official The Unseen "wrap-party" that had been planned and decided to have his own unofficial wrap-party from which Karum and Atkins would be banned from attending in the interests of "safety."

**ANSWER:** Denied.

**95.** At his unofficial party, Ancel made new and unwelcome advances towards at least one woman in the crew who complained to the film's Unit Production Manager that Ancel would not leave her alone at the party, even though the woman's boyfriend was present, and asked him to stay away from them.

**ANSWER:** Denied.

**96.** Ancel decided to fly home before filming had concluded, and rather than risk allowing Karum to speak directly to cast or crew outside his presence, announced that the final day of shooting (including a critically important scene) had been canceled, causing confusion among cast and crew that had planned to be on set to complete their final scenes/shots.

**ANSWER:** Denied.

**97.** Representatives of SAG had to intercede to make sure that cast and crew knew that shooting had not been cancelled, and that they were expected to be there to complete filming. Karum returned to the set without incident to oversee filming on that day.

**ANSWER:** Denied.

**Karum Advises Ancel That His Services Would Not Be Needed During Post-Production**

**ANSWER:** This heading is not an allegation and requires no response. To the extent a response is required, the Ancel Defendants deny it.

**98.** After filming ended, Ancel was advised by Lakefront that his services would no longer be necessary, relieving him of any post-production responsibilities. Instead, Karum and Atkins, as lead producers, oversaw all aspects of post-production.

**ANSWER:** Admitted that after principal photography ended, Lakefront told Ancel that his services would no longer be necessary and excluded him from post-production. The Ancel Defendants deny that Lakefront had authority under the Producer Agreement to do so without the written notice and opportunity to cure required by paragraph 11(b)(ii), and deny that Karum and Atkins were the Picture's only "lead producers." The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning who oversaw each aspect of post-production and therefore deny them.

**99.** Ancel demanded that he be included in the efforts to obtain distribution of the film but was again advised that his services were not necessary or desired and was expressly reminded that the Producer Agreement that he signed made clear that Lakefront had the exclusive right to control distribution.

**ANSWER:** Admitted that Ancel asked to participate in the efforts to obtain distribution of the Picture and that he was told his services were not necessary or desired. The Producer Agreement (Dkt. 130, Ex. A) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny that the Producer Agreement grants Lakefront, which is not a party to it, any right to control distribution, and deny the remaining allegations in paragraph 99.

**100.** Ancel became irate at his de facto termination, sending Karum a barrage of profanity-laced texts that were as vile and offensive as they were threatening, referencing his desire

to "burn her life down," and "ruin" her and her Company, including communications set forth in Group Exhibit C.

**ANSWER:** Admitted that, after Lakefront excluded him from post-production without the notice and opportunity to cure required by paragraph 11(b)(ii) of the Producer Agreement, Ancel and Karum exchanged text messages, some of which appear in Group Exhibit C. The text messages in Group Exhibit C speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them and any characterization of them taken out of context. The Ancel Defendants deny the remaining allegations in paragraph 100.

**101.** Moreover, despite contractually ceding to Lakefront the exclusive control over publicity of the film, Ancel began to reach out directly to media touting his role in The Unseen, called it the film that he produced, a claim he would regularly repeat across social media over the coming months in complete and total disregard of the express provisions of the Producer Agreement.

**ANSWER:** Denied. Ancel is a producer of the Picture. The Producer Agreement (Dkt. 130, Ex. A) speaks for itself, and the Ancel Defendants deny any characterization inconsistent with its terms. The Ancel Defendants deny that Ancel ceded any right concerning publicity to Lakefront, which is not a party to the Producer Agreement.

**102.** When The Unseen's actual publicist politely asked Ancel to refrain from contacting media on behalf of The Unseen, he attempted to bully her via texts submitted herewith as Exhibit D. She reported Ancel's attack to The Unseen's counsel and refused to have any further contact with him.

**ANSWER:** Exhibit D speaks for itself, and the Ancel Defendants deny any characterization inconsistent with it. The Ancel Defendants lack knowledge or information

sufficient to form a belief about the truth of the allegations concerning the publicist's communications with The Unseen's counsel and her later decisions, and therefore deny them. The Ancel Defendants deny the remaining allegations in paragraph 102.

**103.** Notably, when Ancel learned that the film's publicist was also the publicist for a prominent and coveted Los Angeles film festival (to which The Unseen was invited), he sheepishly apologized for what he admitted was his embarrassing behavior, explaining that he believed that she was someone aligned with Karum, effectively admitting that his actions were driven by his animus toward Karum, and highlighting his malicious intentions in targeting Karum.

**ANSWER:** Denied.

**104.** Ancel began to encourage The Curse's investors to do his bidding, directing "I think it's time to assert yourselves, but don't let on that it is coming from me," directing them to "look at the books" falsely claiming that certain expenses were "b.s. and that Lakefront was" up to something shady" and "trying to hide money."

**ANSWER:** Denied.

**105.** Ancel further encouraged investors to "scare the shit out of [Karum]," and boasting "I'm gonna bury that bitch."

**ANSWER:** Denied.

**106.** Ancel also obstructed efforts to get The Unseen's lead actor to promote the film, suggesting to investors that he the actor would only promote the film "if I ask him to…."

**ANSWER:** Denied.

**107.** Ancel then decided to make good on his threats to "ruin" Karum and LAKEFRONT, and to "burn her life down."

**ANSWER:** Denied.

**108.** On information and belief, Ancel told anyone who would listen that Karum was "dangerous," falsely telling people that she baselessly had accused him of sexual assault (which she did not) and "broken into" cast's hotel rooms.

**ANSWER:** Denied.

**109.** Ancel also commenced a suit against Karum sounding in False Light Invasion of Privacy and Defamation, specifically repeating the allegation that Karum wrongly accused him of sexual assault.

**ANSWER:** Admitted that Ancel filed an action against Karum in the Circuit Court of Cook County, No. 2023 L 004921, that included claims for defamation and false light invasion of privacy. The pleadings in that action speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them. The Ancel Defendants deny the remaining allegations in paragraph 109.

**110.** While Ancel's complaint alleges that Karum made false statements that painted him in a "false light," the truth is that it was Ancel who widely disseminated the complaint on social media, and even (via his counsel) to at least one industry publication (Reel Chicago) to spread the lie that Karum had falsely accused him of sexual assault.

**ANSWER:** Denied.

**111.** Then, portraying himself as the victim, Ancel boasted publicly that he had a strategy for "taking down" Karum "in an epic way."

**ANSWER:** Denied.

**112.** Ancel began to falsely represent across social media that there was a class action suit against Karum and/or Lakefront in the works, in an effort to mislead people into believing that Karum had a history of making false accusations and encouraging people to spread the word about it. He directed, encouraged or induced Rose to do the same and she willingly obliged.

**ANSWER:** Denied. To the extent paragraph 112 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**113.** As set forth above, Rose was an actor on The Unseen (cast by LAKEFRONT), who had previously engaged Lakefront to create a scene for her demo reel, and for which she gave Lakefront a glowing review: [Image omitted.]

**ANSWER:** Admitted that Rose was an actor in the Picture. To the extent paragraph 113 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**114.** Indeed, Rose and Karum stayed in regular communication after working together on the demo reel, discussing professional as well as personal matters.

**ANSWER:** The allegations in paragraph 114 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required,

the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**115.** More pertinent for purposes of this litigation, Rose and Karum had no issues while working on The Unseen. In fact, because their respective scenes were shot during different weeks, Rose *was never even on set with Karum*, and they remained in regular communication before and after filming, through the spring of 2023. See Group Exhibit E submitted herewith.

**ANSWER:** The allegations in paragraph 115 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**116.** But when Ancel began rallying sycophants to speak out against Karum on social media, Rose cut off all communications with Karum, and began willingly and maliciously echoing Ancel's false smears to casting directors and others about her experience, including that Karum is "dangerous."

**ANSWER:** The Ancel Defendants deny that Ancel rallied anyone to speak out against Karum, deny that Ancel made false statements about Karum, and deny that any statement by Rose echoed a false statement by Ancel. To the extent paragraph 116 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**117.** Rose and others continued to blindly maligned Karum on social media, even after Ancel was confronted in Court about the lack of any proof that Karum had ever made any such false allegation of assault against him.

**ANSWER:** The Ancel Defendants deny that Ancel was "confronted in Court" as alleged and deny that Ancel maligned Karum. To the extent paragraph 117 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**118.** Tellingly, Ancel dropped the allegations about Karum's accusation of sexual assault, tacitly admitting that the claim was baseless, yet neither Ancel nor Rose ever took steps to correct or clarify their sweeping public statements to the contrary, causing severe and substantial reputational harm to Karum.

**ANSWER:** Denied.

**119.** In fact, for three years running, Karum has been harassed and cyber bullied by Ancel, Rose and their friends and supporters.

**ANSWER:** Denied as to the Ancel Defendants. To the extent paragraph 119 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**120.** Any time that someone promotes an engagement or project with Lakefront, they are inundated with comments, messages and/or communications with a coordinated warning or theme—that working with Karum and Lakefront are "dangerous," and falsely claiming that Karum

had been blackballed in the Chicago film community, myths that Ancel started and has actively promulgated directly, and through his proxies, including Rose.

**ANSWER:** Denied.

**121.** Ironically, after the dust settled over Ancel's vicious rumors on set, substantially all of the cast and crew attended the premiers of The Unseen in both Los Angeles and Chicago with the allegedly "dangerous" Karum without any incident, while it was Ancel who was legally prohibited from attending either premier based upon the statements of multiple witnesses to his abusive and threatening behavior.

**ANSWER:** Admitted that the Picture premiered in Los Angeles. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation that it premiered in Chicago and therefore deny it. Admitted that Karum obtained an ex parte temporary restraining order from the Los Angeles Superior Court that barred Ancel from attending the Los Angeles premiere, and that she later let it lapse. The Ancel Defendants deny that the order rested on accurate statements, deny that Ancel engaged in abusive or threatening behavior, and deny that Ancel spread "vicious rumors." The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning who attended the premieres and therefore deny them. The Ancel Defendants deny the remaining allegations in paragraph 121.

**122.** And others have since come forward to relay similar accounts and experiences with Ancel citing his lack of professionalism, work ethic and volatile and otherwise inappropriate behavior.

**ANSWER:** Denied.

**123.** Yet Ancel, Rose and their friends and followers have brazenly continued to harass and malign Karum and Lakefront in messages and across social media (including in groups with tens of thousands of members). A small representative sample of the orchestrated and far-reaching smear campaign directed at or about Karum and Lakefront is set forth in Group Exhibit F submitted herewith.

**ANSWER:** Group Exhibit F speaks for itself, and the Ancel Defendants deny any characterization inconsistent with it. Denied as to the Ancel Defendants. To the extent paragraph 123 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**124.** The smear campaign has made it difficult for Karum and Lakefront to find work in the closely knit Chicago film industry. Indeed, when Karum sent a mass email to a networking event with an agent, one user responded by blocking her stating "No wonder you've been blacklisted in Chicago."

**ANSWER:** The Ancel Defendants deny that any of them conducted a smear campaign or made it difficult for Karum or Lakefront to find work. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 124 and therefore deny them.

**125.** During the Screen Actor's Guild Strike, film-makers were required to secure interim agreements in order to promote any film featuring union actors. Through diligence and strong relationships forged with SAG representatives, Lakefront was able to secure an interim agreement for one of its projects in a matter of days, while others waited weeks for approval of their interim agreements. When Lakefront offered, via social media, to assist others in expediting

the approval process (for which it would receive a nominal fee), Rose commented "Securing an interim agreement with SAG is NOT difficult, if you see a company advertising that they can help you with this….RUN!" Ancel "liked" Rose's comment. See Group Exhibit G.

**ANSWER:** Group Exhibit G speaks for itself, and the Ancel Defendants deny any characterization inconsistent with it. The allegations concerning Lakefront's interim agreements and Rose's comment are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them. Admitted that Group Exhibit G shows a heart reaction from Ancel's account on a post containing Rose's comment (Dkt. 130 at 99); Ancel does not recall reacting to it. Ancel did not write or post the comment. The Ancel Defendants deny the remaining allegations in paragraph 125.

**126.** As a result of the Ancel and Rose smear campaign, at least one Facebook Group expelled from its ranks any members that work with Karum or Lakefront, or even has Karum among their Facebook friends.

**ANSWER:** The Ancel Defendants deny that any of them took part in a smear campaign or caused any Facebook Group to expel anyone. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 126 and therefore deny them.

**127.** Other smears have been sent anonymously to Lakefront clients, prospects and partners using Gmail accounts under fictitious or truncated names to avoid detection.

**ANSWER:** The Ancel Defendants deny that any of them sent, directed, or caused any anonymous communication to Lakefront's clients, prospects, or partners. The Ancel Defendants

lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 127 and therefore deny them.

**128.** While Lakefront Pictures was working with a screenwriter to develop a new feature film, Rose sent a screen shot of the writer's post lauding Karum and Atkins, to Ancel with the message identifying the writer as "the girl I sent you the email for, she posted this on Facebook and tagged them." See Group Exhibit G.

**ANSWER:** Group Exhibit G speaks for itself, and the Ancel Defendants deny any characterization inconsistent with it. Admitted that on November 8, 2023, Rose sent Ancel a text message containing the text of a social-media post and the words "The girl I sent you the email for, she posted this on Facebook and tagged them." The message did not identify the post's author. Ancel did not reply to the message and did not contact the screenwriter. The Ancel Defendants deny that any of them requested, sent, directed, or caused any communication to the screenwriter. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning Lakefront's work with the screenwriter and Rose's conduct and therefore deny them.

**129.** That same day, an email was sent to the screenwriter from Chi-town-crsuader@protonmail.com purporting to warn her that Karum is known to stalk, bully, intimidate and harass anyone that she wants or gives her what she wants," and falsely alleged that "most of her 'good reviews' are from fake profiles."

**ANSWER:** The Ancel Defendants deny that any of them sent, directed, or caused the email described in paragraph 129. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 129 and therefore deny them.

**130.** And for good measure, the next day, another such email was sent to screenwriter by miller.e.brian.85@gmail.com (believed to be an alias) with the following message: "I recently heard about the possibility of Lakefront Productions handling your script, and I thought it was crucial to share some important information for your decision-making process. While Jennifer from Lakefront Productions may be a convincing salesperson, appearances can be deceiving. It's essential to dig into the company's reputation and track record. Currently, Lakefront Productions is facing a lawsuit, with more in the pipeline. This legal situation raises concerns about the company's business practices and ethics." He closed by stating that "I am part of the next lawsuit with investors, and the mismanagement of funds….."

**ANSWER:** The Ancel Defendants deny that any of them sent, directed, or caused the email described in paragraph 130. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 130 and therefore deny them.

**131.** Dozens of spoof emails have been sent via Gmail that are designed to appear to the recipient as if they had been sent by Karum or Atkins have been sent to multiple people, including Lakefront interns.

**ANSWER:** The Ancel Defendants deny that any of them sent, directed, or caused any "spoof" email. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 131 and therefore deny them.

**132.** On information and belief, Ancel and Rose are responsible for all or substantially all of the false and misleading smears against Karum and Lakefront, described above which have either been sent by or at their express direction by those seeking favors or opportunities in return.

**ANSWER:** Denied.

**133.** Rose and/or Ancel contacted actors Eric Roberts and Harry Lennox, in an effort to undermine the strong working relationship that Lakefront and Karum had maintained with both men. See Group Exhibit G.

**ANSWER:** Admitted that on September 5, 2023, Ancel sent an email to a talent representative for Harry Lennix, with whom Ancel served on an advisory board, about Lakefront's streaming of a pilot presentation in which Lennix had appeared. The email speaks for itself, and the Ancel Defendants deny any characterization inconsistent with it. Ancel did not contact Eric Roberts. The Ancel Defendants deny that Ancel acted in an effort to undermine any working relationship between Lakefront or Karum and either man, and deny the remaining allegations in paragraph 133 as to Ancel. To the extent paragraph 133 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**134.** Rose and/or Ancel also contacted Joseph Bowes, the Head of Production at Periscope Studio, with which Lakefront had a strong working relationship, but has since refused to work on any projects. See Id.

**ANSWER:** Denied that Ancel contacted Joseph Bowes or anyone else at Periscope Studio about Karum or Lakefront, and denied that any act of Ancel caused Periscope Studio to stop working with Lakefront. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning Lakefront's relationship with Periscope Studio and therefore deny them. The Ancel Defendants deny the remaining allegations in paragraph 134 as to Ancel. To the extent paragraph 134 alleges conduct by Rose or others, those allegations are

not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**135.** Rose even began reaching out to Karum's friends from high school, maligning Karum and requesting information that she could use to harass or humiliate Karum.

**ANSWER:** The allegations in paragraph 135 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**136.** Rose and/or Ancel directed, encouraged or induced Erica Arvold, a major casting director out of LA, not to permit Karum to attend a casting/audition workshop even though Karum had previously auditioned with Arvold on multiple occasions, and now refuses to even respond to calls and emails. See id.

**ANSWER:** Denied as to Ancel. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning Karum's history with Erica Arvold and Arvold's conduct and therefore deny them. To the extent paragraph 136 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**137.** Rose purposefully began spreading false rumors within the industry that in addition to suing her, Karum was suing 21 other film makers in Federal Court, telling her accomplices in a

group text that in telling that to a person named Kathy, "I acted like it was an afterthought" next to a villainous laughing emoji.

**ANSWER:** The allegations in paragraph 137 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**138.** Rose directed, induced or encouraged Shari Shaw not to permit Karum to attend an acting workshop that she hosted in Chicago even though Karum had been a paying client of Shaw's for a year. Rose reveled in a group text in the fact that Shaw simply ignored Karum's repeated requests to attend, telling the group of that if she ever saw her again in person, she would call her a vile slur, and mockingly asked Ancel "I can't get in trouble for that can I Jordan? It's just verbal abuse right?

**ANSWER:** The allegations in paragraph 138 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them. To the extent paragraph 138 alleges that a message in a group text was addressed to Ancel, the message speaks for itself, and the Ancel Defendants deny any characterization inconsistent with it and deny that Ancel directed, induced, or encouraged any of the conduct alleged.

**139.** Rose directed, induced or encouraged Bankston Talent, which had represented Karum for three years, and that had secured for her an acting appearance on Better Call Saul, to

drop Karum as a client. Days having dinner with Rose, Bankston's chief executive simply sent an email to Karum terminating the relationship.

**ANSWER:** The allegations in paragraph 139 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**140.** Rose also directed, induced or encouraged ERIS Talent to drop Karum as a client, sending an email to one of its representatives with the subject line, "Forewarned is forearmed" and falsely representing that there was a class action lawsuit in the works by the victims of her alleged "abuse." See id.

**ANSWER:** The allegations in paragraph 140 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**141.** On information and belief Rose has also bad-mouth Karum to Presley Talent, Smith Young Talent Agency, as well as other Chicago area filmmakers, casting agents and/or agencies. See id.

**ANSWER:** The allegations in paragraph 141 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**142.** Rose has solicited others on Facebook (including the private Lady K Castings group, in which Rose is a "Top Contributor") to join in the crusade against Karum, boasting to one user "we have a whole team that we would love you to join. I sent you a message on IG yesterday. The more the merrier. She has to be stopped. Too many lives are getting ruined, it's a horrible situation." See id.

**ANSWER:** The allegations in paragraph 142 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**143.** Rose also falsely told at least one other actor (Emma Jo Boyden) that the investors in The Unseen had sued Karum "for her misused funds," adding "I'm thrilled. Hope she goes down hard."

**ANSWER:** The allegations in paragraph 143 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**144.** Rose directed, induced or encouraged one or more of her supporters to contact Sarah Cayce, to get Karum disinvited from a Chicago film industry networking event, by telling Cayce that they did not "feel safe" around Karum.

**ANSWER:** The allegations in paragraph 144 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**145.** Rose also directed, induced or encouraged her friend Amanda Gecewicz to spread lies about Karum being dangerous and unsafe.

**ANSWER:** The allegations in paragraph 145 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**146.** On cue, Gecewicz posted in the Lady K Castings Facebook Group, falsely accruing Karum of cyberstalking her for two years, and falsely accusing her of also harassing other family members and concluding "Moral of the story-WARN EVERYONE YOU KNOW about this woman."

**ANSWER:** The allegations in paragraph 146 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**147.** Prompted by Rose, Gecewicz, an alum of DePaul University, also secretly called the University, from which Lakefront had consistently recruited interns, and persuaded the University to discontinue its internship pipeline to Lakefront, bragging to Rose in the process: "I told them to keep my name anonymous as it could cause serious issues for me," tacitly acknowledging the wrongful nature of her conduct.

**ANSWER:** The allegations in paragraph 147 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**148.** Rose also directed, induced or encouraged Gecewicz to seek to get Lakefront banned from the Columbia University internship programs (with which Lakefront had previously enjoyed a strong working relationship), telling her that interns that had worked on The Unseen filed complaints (that were prompted by Ancel).

**ANSWER:** The Ancel Defendants deny that Ancel prompted any complaint by any intern. To the extent paragraph 148 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**149.** Rose also directed, induced or encouraged Gecewicz to bad mouth Lakefront to the Independent Film Alliance—Chicago ("IFA"). In turn, Gecewicz directed or encouraged Winter Davis, then an employee of IFA, to contact Google (which she did) to remove Lakefront's business profile, which it did (although it has since been restored).

**ANSWER:** The allegations in paragraph 149 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**150.** Gecewicz also worked to get Lakefront kicked out of its offices at the IFA/Cinespace studios, telling the IFA representative that she wanted to join IFA, but did not feel safe doing so if Kaurm was a member. When IFA declined to renew Lakefront's membership, Gecewicz reported in a group text with Rose that she knows why Lakefront was "booted once and for all" next to a smiling emoji laughing hysterically.

**ANSWER:** The allegations in paragraph 150 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required,

the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**151.** As a result of the coordinated smear campaign against Karum and Lakefront, a number of Lakefront clients canceled their contracts with the company, including contracts to film and produce demo reels, contract to sponsor an industry event, and a contract for post-production editing.

**ANSWER:** The Ancel Defendants deny that any of them conducted a smear campaign or caused any client of Lakefront to cancel a contract. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 151 and therefore deny them.

**152.** At least one freelance engineer with which Lakefront had worked productively and without incident in the past, cut ties with Lakefront specifically citing what they heard (ostensibly by Ancel) was a lawsuit against Lakefront, when in fact, Lakefront had not been named in any suit, clearly suggesting that he had been told about a pending suit rather than having actually seen the complaint.

**ANSWER:** The Ancel Defendants deny that any of them told any freelance engineer that there was a lawsuit against Lakefront. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 152 and therefore deny them.

**153.** Another freelancer with which Lakefront had worked productively and without incident in the past, cut ties with Lakefront specifically citing threats that anyone who worked with Lakefront would be blackballed from work in the area.

**ANSWER:** The Ancel Defendants deny that any of them threatened that anyone who worked with Lakefront would be blackballed. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 153 and therefore deny them.

**154.** Similarly, at least one prospective partner in a project, with which discussions regarding investment and assistance with distributions had substantially advanced, precipitously ended negotiations citing to pending litigation "against the company," again suggesting that it had been told about a pending suit rather than having actually seen any complaint.

**ANSWER:** The Ancel Defendants deny that any of them caused any prospective partner to end negotiations with Lakefront. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 154 and therefore deny them.

**155.** Lakefront also was injured when interns that had accepted opportunities with the Company reversed their acceptances, citing the allegations made against Karum.

**ANSWER:** The Ancel Defendants deny that any of them caused any intern to reverse an acceptance. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 155 and therefore deny them.

**156.** Moreover, one independent casting agency has suddenly distanced itself from Lakefront and Karum, again citing the concern over "safety."

**ANSWER:** The Ancel Defendants deny that any of them caused any casting agency to distance itself from Lakefront or Karum. The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 156 and therefore deny them.

**157.** In a veiled effort to bolster the false narrative that Karum was "unsafe" or "dangerous," Rose directed or encouraged actor Jeff Zarinelli (with whom Karum had enjoyed a good working relationship) to file a police report and/or seek an order of protection against Karum who had made multiple attempts to contact him in an effort to restore their friendship. Rose lamented the news that the police officers "were pretty much laughing at him" that the notion that Karum's contact were actionable. See id.

**ANSWER:** The allegations in paragraph 157 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**158.** On information and belief, Rose and Ancel have directed, encouraged, incentivized and/or rewarded others not identified above who have piled on as part of this targeted smear campaign, Dyna Mitte, Karel Ramirez, Rosaleah Gonzalez, Aaron Hawkins, Kristi Gescheidler, Katherine Mraz, Joey Joelle, Analisa (Al) Vittuci, Barbara Roche, Kelli Tidmore, Emerson Cole, Beverly Moore, Nicole Frier, Kathy Byrnes and Samantha Spellman.

**ANSWER:** Denied as to Ancel. To the extent paragraph 158 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is

required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**159.** The widespread cyber-bullying and online harassment that Ancel and Rose put into motion continues to this day. After appearing in a recent episode of NBC's Chicago P.D., Karum took to social media, a Facebook Group called "Chicago film, actors, crew equipment and locations" where local actors seek work to promote her appearance, prompting a user with the screen name "FriendlyKoala1917" to comment, "I could have sworn this girl was banned from most sets in Chicago" touting his "pretty good sources" that Karum is involved "in a lot of scams and a lot of harassing people."

**ANSWER:** The Ancel Defendants deny that any of them put any cyberbullying or online harassment into motion or made or caused the comment by "FriendlyKoala1917". The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 159 and therefore deny them.

**160.** As a result, Ancel, Rose and those working in coordination with them have caused substantial damages to Lakefront and Karum, namely hundreds of thousands of dollars in lost revenue and profits to date, and an untold number of lost professional opportunities.

**ANSWER:** Denied.

**161.** Tacitly acknowledging the success of their coordinated and purposeful smear campaign, Rose advised Ancel that Lakefront had resorted to promoting demo reel services for

actors in Los Angeles, boasting that "she can't do it here anymore because everyone knows about her." See id.

**ANSWER: Admitted that on August 24, 2025, Rose sent Ancel text messages that include the language quoted in paragraph 161. The messages speak for themselves, and the Ancel Defendants deny any characterization inconsistent with them. The Ancel Defendants deny that they took part in any smear campaign and deny the remaining allegations in paragraph 161 as to them. To the extent paragraph 161 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.**

**162.** In addition, Lakefront and Karum have suffered substantial reputational harm that cannot be easily quantified or remedied and face the prospect of having to invest heavily in a lengthy public relation campaign to address the extensive disinformation propagated about Lakefront and Karum that has been spread by Ancel, Rose and/or their co-conspirators.

**ANSWER:** Denied.

**COUNT I**

**(Against Ancel for Defamation)**

**163.** Karum incorporates by reference the allegations of paragraphs 1-162 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 162, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 163 states any allegation that requires a further response.

**164.** As set forth above, Ancel made false statements about Karum, with full knowledge of their falsity, first in an effort to gain control of the project so that he could claim to have had a larger role than the third producer he contracted to fill, and then out of spite to embarrass, harass, and damage Karum's reputation after she excluded him from any post-production activities.

**ANSWER:** Denied.

**165.** Ancel's false representations to investors and others on set that Karum had misappropriated money from the budget was defamatory per se.

**ANSWER:** Denied.

**166.** Ancel's false statements to the cast that Karum had "broken into" hotel rooms were defamatory per se.

**ANSWER:** Denied.

**167.** And Ancel's false statements published to numerous third parties that Karum had wrongfully accused him of sexual assault, made before and after he filed his suit, were defamatory per se.

**ANSWER:** Denied.

**168.** All of these false and defamatory statements were made purposefully and with malice, with the intention of causing reputational and economic harm to Karum.

**ANSWER:** Denied.

**169.** Karum has been injured as a result of Ancel's defamatory statements.

**ANSWER:** Denied.

**170.** Ancel has acted willfully, justifying an award of punitive damages to punish him and dissuade such tortious conduct in the future.

**ANSWER:** Denied.

WHEREFORE, Karum prays for judgment in her favor and against Ancel as to Count I, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count I, or to any relief.

**COUNT II**

**ANSWER:** Count II is asserted only against Rose. No response is required from the Ancel Defendants.

**(Against Rose for Defamation)**

**171.** Karum incorporates by reference the allegations of paragraphs 1-170 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 170, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 171 states any allegation that requires a further response. Count II is asserted only against Rose and is not directed to the Ancel Defendants.

**172.** As set forth above, Rose made false statements about Karum, with full knowledge of their falsity.

**ANSWER:** The allegations in paragraph 172 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**173.** Rose's false representations that Karum had been sued for misappropriated money from the budget was defamatory per se.

**ANSWER:** The allegations in paragraph 173 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**174.** Rose false and defamatory statement were made purposefully and with malice, with the intention of causing reputational and economic harm to Karum.

**ANSWER:** The allegations in paragraph 174 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**175.** Karum has been injured as a result of Rose's defamatory statements.

**ANSWER:** The allegations in paragraph 175 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required,

the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**176.** Rose has acted willfully, justifying an award of punitive damages to punish her and dissuade such tortious conduct in the future.

**ANSWER:** The allegations in paragraph 176 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

WHEREFORE, Karum prays for judgment in her favor and against Rose as to Count II, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The prayer for relief following paragraph 176 is directed only to Rose. To the extent a response is required, the Ancel Defendants deny that Karum is entitled to any relief against them.

**COUNT III**

**(Against Ancel and Rose for False Light Invasion of Privacy)**

**177.** Karum incorporates by reference the allegations of paragraphs 1-176 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 176, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 177 states any allegation that requires a further response.

**178.** As set forth above, Ancel and Rose published claims about Karum, including across multiple social media channels.

**ANSWER:** Denied as to Ancel. To the extent paragraph 178 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**179.** Ancel's and Rose's statements regarding Karum were false, and placed Karum in a false light that is both offensive and unprofessional.

**ANSWER:** Denied as to Ancel. The Ancel Defendants deny that any statement by Ancel about Karum was false or placed her in a false light. To the extent paragraph 179 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**180.** Ansel and Rose published these statements with knowledge of their falsity, and with the express intention of harming Karum's reputation.

**ANSWER:** Denied as to Ancel. To the extent paragraph 180 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**181.** Ancel and Rose acted willfully, justifying an award of punitive damages to punish him and dissuade such tortious conduct in the future.

**ANSWER:** Denied as to Ancel. To the extent paragraph 181 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

WHEREFORE, Karum prays for judgment in her favor and against Ancel and Rose, jointly and severally, as to Count III, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count III, or to any relief.

**COUNT IV**

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2). Ancel International answers Count IV below.

**(Against Ancel International and Ancel for Breach of the NDA)**

**182.** Lakefront incorporates by reference the allegations of paragraphs 1-181 above.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 181, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 182 states any allegation that requires a further response.

**183.** The NDA is a valid and enforceable contract.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Admitted that the NDA is a contract between Lakefront and Ancel International. The remaining allegations in paragraph 183 state a legal conclusion to which no response is required. To the extent a response is required, Ancel International admits that the NDA is enforceable according to its terms, including the conditions and limits stated in it, and denies the remaining allegations.

**184.** Ancel Internation is a mere subterfuge formed by Ancel to shield himself from liability for his misconduct. There is a complete and total unity of interest between Ancel International and Ancel.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Denied.

**185.** On information and belief, Ancel International was at all times substantially undercapitalized, and the entity has since been dissolved.

**ANSWER: The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Denied that Ancel International was at any time substantially undercapitalized. Ancel International denies that it has been dissolved; it remains an existing California limited liability company. Ancel International denies the remaining allegations in paragraph 185.**

**186.** As set forth above, Ancel failed to perform his duties under the Agreement in a workmanlike manner and otherwise breached the Producer Agreement in the manner described above.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Denied. Ancel International further states that paragraph 186 concerns the Producer Agreement, to which Ancel International is not a party, and not the NDA.

**187.** As a direct and proximate cause of Ancel's breaches, The Curse has been damaged as described above.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Denied. Ancel International further states that The Curse is not a party to the NDA and does not assert Count IV.

**188.** The veil between Ancel Internation should be pierced, and they should be jointly and severally liable for the damages that they caused.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Paragraph 188 states a legal conclusion to which no response is required. To the extent a response is required, denied.

**189.** As set forth above, Ancel and Ancel International materially breached the NDA, both through social media, and by Ancel's filing an unsealed and unredacted complaint that

gratuitously discuss the project and disparages parties associated therewith, which he, in turn, widely circulated via social media and for which he actively sought publicity.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Denied.

**190.** In addition to forfeiting producer credit, Ancel's and Ancel International's material breach of the NDA has caused damage to Lakefront.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184 at 2), so no response is required from Ancel. Ancel International responds: Denied. Ancel International further states that the NDA does not give Lakefront any right to strip Ancel of the producer credit The Curse owes him under the Producer Agreement.

WHEREFORE, Lakefront prays for judgment in its favor and against Ancel International and Ancel, jointly and severally, as to Count IV, and an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Court dismissed Count IV as asserted against Ancel (Dkt. 184). The Ancel Defendants deny that Lakefront is entitled to any of the relief requested, or to any relief, against Ancel International or Ancel.

**COUNT V**

**ANSWER:** The Court dismissed Count V (Dkt. 184 at 2–3, 5). No response is required; to the extent one is required, the Ancel Defendants respond below.

**(Against Ancel and Rock City for Recission of the Producer Agreement)**

**191.** The Curse incorporates by reference the allegations of paragraphs 1-190 above.

**ANSWER:** The Court dismissed Count V (Dkt. 184 at 2–3, 5), so no response to paragraph 191 is required. To the extent a response is required, the Ancel Defendants restate and incorporate their responses to paragraphs 1 through 190.

**192.** The Producer Agreement is a valid and enforceable contract.

**ANSWER:** The Court dismissed Count V (Dkt. 184 at 2–3, 5), so no response to paragraph 192 is required. To the extent a response is required, admitted.

**193.** The Curse performed its obligations due to date pursuant to the Agreement.

**ANSWER:** The Court dismissed Count V (Dkt. 184 at 2–3, 5), so no response to paragraph 193 is required. To the extent a response is required, denied.

**194.** As set forth above, Rock City and Ancel failed to perform duties under the Agreement in a workmanlike manner, including among other things, violating SAG Rules regarding drug use on set, giving THC infused gummies to an underage intern, and disrupting production at every turn.

**ANSWER:** The Court dismissed Count V (Dkt. 184 at 2–3, 5), so no response to paragraph 194 is required. To the extent a response is required, denied.

**195.** There was a complete and total failure of consideration on Rock City's and Ancel's part with respect to the Producer Agreement, warranting a recission of the Agreement,

disgorgement of sums paid to Rock City, stripping Ancel of third-producer credits, and relieving The Curse from making any future payments to Rock City.

**ANSWER:** The Court dismissed Count V (Dkt. 184 at 2–3, 5), so no response to paragraph 195 is required. To the extent a response is required, denied.

WHEREFORE, The Curse prays for judgment in its favor and against Rock City as to Count V, rescinding the Producer Agreement for the complete failure of consideration, and ordering the disgorgement of all compensation and credit received by Ancel to date, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Court dismissed Count V (Dkt. 184). The Ancel Defendants deny that The Curse is entitled to rescission, disgorgement, or any other relief.

**COUNT VI**

**(Against Rock City and Ancel for Breach of the Producer Agreement)**

**196.** The Curse incorporates by reference the allegations of paragraphs 1-195 below.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 195, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 196 states any allegation that requires a further response. The Ancel Defendants further state that their responses to paragraphs 191 through 195 are made subject to the Court's dismissal of Count V (Dkt. 184).

**197.** The Producer Agreement is a valid and enforceable contract.

**ANSWER:** Admitted.

**198.** The Curse performed its obligations due to date pursuant to the Agreement.

**ANSWER:** Denied.

**199.** Rock City is a mere subterfuge formed by Ancel to shield himself from liability for his misconduct. There is a complete and total unity of interest between Rock City and Ancel.

**ANSWER:** Denied.

**200.** On information and belief, Rock City was at all times substantially undercapitalized, and the entity has since been dissolved.

**ANSWER:** Admitted that Rock City has been dissolved and terminated: on September 21, 2023, it filed a Statement of Termination with the Illinois Secretary of State stating that it "has been terminated." Denied that Rock City was at any time substantially undercapitalized. The Ancel Defendants deny the remaining allegations in paragraph 200.

**201.** As set forth above, Ancel failed to perform his duties under the Agreement in a workmanlike manner and otherwise breached the Producer Agreement in the manner described above.

**ANSWER:** Denied.

**202.** As a direct and proximate cause of Ancel's breaches, The Curse has been damaged as described above.

**ANSWER:** Denied.

**203.** The veil between Rock City and Ancel should be pierced, and they should be jointly and severally liable for the damages that they caused.

**ANSWER:** Paragraph 203 states a legal conclusion to which no response is required. To the extent a response is required, denied.

WHEREFORE, The Curse prays for judgment in its favor and against Rock City and Ancel, jointly and severally, as to Count VI, and an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count VI, or to any relief.

**COUNT VII**

**(Lakefront Against Ancel and Rose for Tortious Interference)**

**204.** Lakefront incorporates by reference the allegations of paragraphs 1-203 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 203, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 204 states any allegation that requires a further response.

**205.** Lakefront is a party to valid and enforceable contracts described above, and was in pursuit of additional prospective contracts, and in forging networking and referral relationships from which it had a reasonable expectation of profiting.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 205 and therefore deny them.

**206.** Lakefront had contracts with clients, as well as with Google and IFA, and a reasonable expectancy of continuing an internship pipeline with DePaul and Columbia Universities and continued professional hiring relationship with crew members.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 206 and therefore deny them.

**207.** Ancel and Rose, through their smear campaign and direct acts of interference described above, caused the termination of those contracts, and prevented the prospective contracts and relationships from being solidified.

**ANSWER:** Denied as to Ancel. To the extent paragraph 207 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**208.** As a direct and proximate result of the referenced interference, Lakefront has been injured.

**ANSWER:** Denied.

**209.** Ancel and Rose have acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:** Denied.

WHEREFORE, Lakefront prays for judgment in its favor and against Ancel and Rose, jointly and severally, as to Count VII, and an award of compensatory damages in an amount to be

proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count VII, or to any relief.

## COUNT VIII

## (Karum Against Ancel and Rose for Tortious Interference)

**210.** Karum incorporates by reference the allegations of paragraphs 1-209 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 209, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 210 states any allegation that requires a further response.

**211.** Karum had established and/or working relationships with casting directors and talent agencies as described above and had a reasonable expectation of landing acting roles through those agents and agencies.

**ANSWER:** The Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 211 and therefore deny them.

**212.** Ancel and Rose, through their smear campaign and direct acts of interference described above, caused the termination of those relationships, and prevented the prospective acting opportunities from being solidified.

**ANSWER:** Denied as to Ancel. To the extent paragraph 212 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**213.** As a direct and proximate result of the referenced interference, Karum has been injured.

**ANSWER:** Denied.

**214.** Ancel and Rose have acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:** Denied.

WHEREFORE, Lakefront prays for judgment in its favor and against Ancel and Rose, jointly and severally, as to Count VIII, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Karum or Lakefront (named in this prayer) is entitled to any of the relief requested, or to any relief, on Count VIII.

**COUNT IX**

**(Against Ancel and Rose for Intentional Infliction of Emotional Distress)**

**215.** Karum incorporates by reference the allegations of paragraphs 1-214 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 214, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 215 states any allegation that requires a further response.

**216.** Ancel's and Rose's conduct towards and treatment of Karum described above was both extreme and outrageous.

**ANSWER:** Denied as to Ancel. To the extent paragraph 216 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**217.** Ancel and Rose acted with actual malice, and as described above, acted with the express intention of causing severe emotional distress to Karum.

**ANSWER:** Denied as to Ancel. To the extent paragraph 217 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

**218.** Ancel and Karum were aware that Karum is on the autism spectrum, and they purposely exploited Karum's sensitivities and vulnerability associated with her being neuro-diverse.

**ANSWER:** Denied as to Ancel. The Ancel Defendants specifically deny that Ancel purposely exploited any sensitivity or vulnerability of Karum. To the extent paragraph 218 alleges conduct by Rose or others, those allegations are not directed to the Ancel Defendants; to the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about their truth and therefore deny them.

WHEREFORE, Karum prays for judgment in her favor and against Ancel and Rose, jointly and severally, as to Count IX, an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count IX, or to any relief.

**COUNT X**

**(Lakefront Against Ancel and Rose for Civil Conspiracy)**

**219.** Lakefront incorporates by reference the allegations of paragraphs 1-218 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 218, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 219 states any allegation that requires a further response.

**220.** As set forth above, Ancel and Rose conspired and agreed to engage in and jointly orchestrated a coordinated tortious campaign of harassment against Lakefront and interference with its business with the express purpose of injuring Lakefront.

**ANSWER:** Denied.

**221.** Ancel and Rose took acts, described above, in furtherance of the referenced conspiracy.

**ANSWER:** Denied.

**222.** Lakefront has suffered economic loss and reputational harm as a direct and proximate result of the referenced conspiracy.

**ANSWER:** Denied.

**223.** Ancel and Rose acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:** Denied.

WHEREFORE, Lakefront prays for judgment in its favor and against Ancel and Rose, jointly and severally, as to Count X, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count X, or to any relief.

**COUNT XI**

**(Karum Against Ancel and Rose for Civil Conspiracy)**

**224.** Karum incorporates by reference the allegations of paragraphs 1-223 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 223, including the second and third uses of paragraph number 73 and the second uses of paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 224 states any allegation that requires a further response.

**225.** As set forth above, Ancel and Rose conspired and agreed to engage in and orchestrated a coordinated tortious campaign against Karum, personally, with the express purpose of causing her to suffer financial injury and emotional distress.

**ANSWER:** Denied.

**226.** Ancel and Rose took acts, described above, in furtherance of the referenced conspiracy.

**ANSWER:** Denied.

**227.** Karum has suffered economic loss and reputational harm as a direct and proximate result of the referenced conspiracy.

**ANSWER:** Denied.

**228.** Ancel and Rose acted willfully, justifying an award of punitive damages to punish them and dissuade them from engaging in such tortious conduct in the future.

**ANSWER:** Denied.

WHEREFORE, Karum prays for judgment in her favor and against Ancel and Rose, jointly and severally, as to Count XI, and an award of compensatory damages in an amount to be proved at trial, together with an additional amount at least equal thereto as punitive damages, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The Ancel Defendants deny that Plaintiffs are entitled to any of the relief requested in the prayer for relief on Count XI, or to any relief.

**COUNT XII**

**ANSWER:** Count XII is asserted only against Rose. No response is required from the Ancel Defendants.

**(Against Rose for Breach of Contract)**

**229.** Lakefront incorporates by reference the allegations of paragraphs 1-228 above.

**ANSWER:** The Ancel Defendants restate and incorporate their responses to paragraphs 1 through 228, including the second and third uses of paragraph number 73 and the second uses of

paragraph numbers 74 through 85, as if fully set forth here. They deny that paragraph 229 states any allegation that requires a further response. Count XII is asserted only against Rose and is not directed to the Ancel Defendants.

**230.** Rose entered into a contract with Lakefront to create, write, produce, film, and edit a demo scene for her (the "Demo Agreement"). A copy of the Demo Agreement is submitted herewith as Exhibit H.

**ANSWER:** The allegations in paragraph 230 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**231.** Per the terms of the Demo Agreement, Rose agreed to, among other things, refrain from committing any act "which might tend to bring [Lakefront,] its members or owners into public disrepute, scandal or ridicule, or which might tend to reflect unfavorably on the company…or to injure the success of [Lakefront]."

**ANSWER:** The allegations in paragraph 231 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**232.** In 2021, Rose published a glowing review of Lakefront for its work on completed her demo scene.

**ANSWER:** The allegations in paragraph 232 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required,

the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**233.** In 2023, however, Rose began to slander and malign Lakefront on social media, in express breach of her obligations under the Demo Agreement.

**ANSWER:** The allegations in paragraph 233 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

**234.** As a direct and proximate result of Rose's breach of the Demo Agreement, Lakefront has been injured.

**ANSWER:** The allegations in paragraph 234 concern only Rose and are not directed to the Ancel Defendants, so no response is required from them. To the extent a response is required, the Ancel Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations and therefore deny them.

WHEREFORE, Lakefront prays for judgment in its favor and against Rose as to Count XIII, for an award of compensatory damages in an amount to be proved at trial, and for such additional relief that this Court deems just and appropriate.

**ANSWER:** The prayer for relief following paragraph 234 (which refers to "Count XIII") is directed only to Rose. To the extent a response is required, the Ancel Defendants deny that Lakefront is entitled to any relief against them.

## GENERAL DENIAL

The Ancel Defendants deny each allegation of the Amended Complaint not expressly admitted above, and deny that Plaintiffs are entitled to judgment, damages, punitive damages, rescission, disgorgement, or any other relief against any of them.

## AFFIRMATIVE DEFENSES

The Ancel Defendants state the following Affirmative Defenses to the Amended Complaint. By pleading a matter as an affirmative defense, the Ancel Defendants do not assume any burden of proof that the law places on Plaintiffs. Paragraph references are to the Amended Complaint and follow the conventions stated at the beginning of the Answer.

**First Affirmative Defense — Statute of Limitations (Counts I and III)**

1. An action for slander, libel, or "publication of matter violating the right of privacy" must be commenced "within one year next after the cause of action accrued." 735 ILCS 5/13-201. Plaintiffs filed this action on February 8, 2024 (Dkt. 1). Any claim in Counts I and III based on a statement published before February 8, 2023 is barred.

2. The Amended Complaint places the following alleged statements before February 8, 2023: (a) the statements to investors and to the lead actor's representatives that Karum was misappropriating production funds (second ¶ 76; ¶ 165); (b) the statements to cast and crew that Karum had "broken into" cast hotel rooms, which Plaintiffs tie to the final days of principal photography in June 2022 (¶¶ 59, 86–92, 166); and (c) any statement that Karum had falsely accused Ancel of sexual assault made before February 8, 2023 (¶¶ 108, 167).

3. Those publications were not hidden. Plaintiffs allege that when Ancel learned of the hotel episode, he texted Karum directly, accusing her of having "crossed the line," and that Karum answered him (¶¶ 90–91). They allege that investors reviewed the production books in

response to the budget statements (second ¶ 76). Counts I and III are barred to the extent they rest on statements published before February 8, 2023.

**Second Affirmative Defense — Absolute Litigation Privilege (Counts I, III, IV, and IX–XI)**

1. Ancel filed suit against Karum in the Circuit Court of Cook County, No. 2023 L 004921 (the "State Action") (¶ 109; Dkt. 130 at 97). Statements made in the pleadings, motions, and other filings in the State Action, and statements pertinent to that proceeding made to its parties, counsel, and the court, are absolutely privileged under Illinois law.

2. Counts I and III are barred to the extent they rest on statements in the State Action's pleadings and filings, including the allegations described in paragraphs 109 and 167. Counts IX through XI are barred to the same extent.

3. Count IV is barred to the extent it rests on Ancel's "filing an unsealed and unredacted complaint" in the State Action (¶ 189). Filing a complaint in court is conduct in, and pertinent to, a judicial proceeding.

**Third Affirmative Defense — California Civil Code § 47(b) and (d) (Counts I, III, and IV)**

1. The NDA on which Count IV rests "shall be governed by and construed in accordance with the laws of the State of California" (Dkt. 130, Ex. B ¶ 17). Ancel and Ancel International are citizens of California (¶¶ 7–8, 12).

2. To the extent California law governs, Count IV is barred by California's litigation privilege, Cal. Civ. Code § 47(b), insofar as it rests on the filing of the State Action complaint (¶ 189).

3. To the extent California law governs any statement made from California, Counts I, III, and IV are barred by California's fair-report privilege, Cal. Civ. Code § 47(d)(1), insofar as they rest on fair and true communications to a public journal, or reports, of the State Action and

its pleadings, including, to the extent it was made from California, any communication to an industry publication alleged in paragraph 110.

**Fourth Affirmative Defense — Qualified Privilege (Counts I and III)**

1. As a credited producer of the Picture, Ancel shared an interest with the Picture's investors in the use of production funds. He shared an interest with the cast, crew, and the production's hotel in the safety and orderly conduct of the production.

2. The Ancel Defendants deny that Ancel made the statements as Plaintiffs allege them. To the extent any statement alleged in second paragraph 76 or paragraph 104 was made, it was made to investors about the production budget and books; to the extent any statement alleged in paragraphs 92 through 94 was made, it was made to cast, crew, and the hotel about access to cast rooms and safety during the production. Each such statement was made on an occasion that created an interest or duty to communicate, to recipients who shared that interest.

3. Those statements are conditionally privileged. Counts I and III are barred to the extent they rest on them, unless Plaintiffs prove that Ancel abused the privilege.

**Fifth Affirmative Defense — Substantial Truth (Counts I and III)**

1. Count I alleges that Ancel falsely told cast and crew that Karum had "broken into" cast hotel rooms (¶¶ 92, 166).

2. Plaintiffs allege that Karum went to the hotel where the cast was staying and accompanied hotel security to the cast rooms. They allege that the security guard "erroneously used his keys to access the alternate door of the lead actor's hotel suite, startling people in the room," and that Karum, who was in the hall, was then "invited into the room by the lead actor's mother" and "accepted the invitation" (¶¶ 87–89). Plaintiffs also allege that Karum told Ancel she "had not entered any room" (¶ 91).

3. On Plaintiffs' own allegations, a door to the lead actor's suite was unlocked and opened with a hotel key, without the occupants' consent, while Karum was there directing the deliveries, and Karum then entered the suite. The gist and sting of the alleged statement — that Karum gained entry to a cast member's hotel room during the production — is substantially true. Counts I and III are barred to the extent they rest on that statement.

**Sixth Affirmative Defense — Failure of Conditions Precedent: Notice and Cure (Count VI)**

1. Paragraph 11(b)(ii) of the Producer Agreement provides that if Ancel "fails or refuses to perform or comply with any terms or conditions hereof other than by reason of Incapacity ('Default'), then prior to termination of this Agreement by Production Company based upon Default, Production Company shall notify Ancel in writing, specifying the nature of the Default, and Ancel shall have 24 hours after receipt of such notice to cure the Default" (Dkt. 130, Ex. A ¶ 11(b)(ii)). The Agreement's compensation and credit terms are conditioned on Ancel not being in "material uncured breach" (id. ¶¶ 3.1, 3.2, 4).

2. Under Federal Rule of Civil Procedure 9(c), the Ancel Defendants specifically deny that the conditions precedent to any claim that Ancel or Rock City was in Default, or in material uncured breach, occurred. The Curse never gave Ancel or Rock City written notice specifying any Default and never gave them the 24-hour opportunity to cure. Although The Curse denies the no-notice allegation, it has averred that "it did not terminate the Agreement and never invoked the cure period" (Dkt. 148 at 2 (quoting Dkt. 125 ¶ 26)).

3. Count VI is barred to the extent it depends on a Default or a material uncured breach.

**Seventh Affirmative Defense — Voluntary Payment (Count VI)**

1. The Producer Agreement fixed a $5,000 fee payable in installments: $2,500 at the start of principal photography on April 17, 2022; $2,000 at the start of the June 6, 2022 photography; and $500 on delivery of the final cut (Dkt. 130, Ex. A ¶ 3.1). Count VI incorporates paragraphs 1 through 195 (¶ 196), including the allegation that The Curse is entitled to "disgorgement of sums paid to Rock City" (¶ 195), and seeks compensatory damages for The Curse's loss "as described above" (¶ 202).

2. Most of the conduct The Curse now calls nonperformance occurred before or during the April and June 2022 periods of photography (¶¶ 57–97). The Curse paid all three installments. The second installment fell due at the start of the June 6, 2022 photography, after the April photography it now criticizes (Dkt. 130, Ex. A ¶ 3.1), and The Curse paid the final $500 installment after Ancel requested it on September 16, 2022, when all photography had ended. It made each payment with knowledge of the facts it now alleges, without protest, compulsion, or mistake of fact.

3. Count VI is barred to the extent it seeks, as damages or otherwise, to recover sums The Curse paid voluntarily.

**Eighth Affirmative Defense — The NDA's Own Conditions and Limits (Count IV)**

1. The NDA term on which Plaintiffs rely provides: "I understand that if I am hired, and am subsequently terminated or voluntarily resign, I am not to discuss any information about the project, disparage or reveal prejudice whether deemed factual or opinion to 3rd parties . . . and that any and all imdb credit, and title on production is at risk and could be forfeited at discretion of owners" (Dkt. 130, Ex. B at 5; ¶¶ 55–56).

2. That term never took effect. Lakefront did not hire Ancel; The Curse engaged Ancel's services through Rock City under the Producer Agreement (¶ 49). Ancel did not resign. The Curse avers that it did not terminate the Producer Agreement (Dkt. 148 at 2).

3. The term's stated consequence is that credit is "at risk and could be forfeited at discretion of owners." Ancel's producer credit is an obligation of The Curse under the Producer Agreement, not of Lakefront (Dkt. 130, Ex. A ¶ 4). Count IV is barred, or Lakefront's remedy is limited, to the extent it rests on that term.

## STATEMENT REGARDING SETOFF AND SINGLE RECOVERY

The Ancel Defendants do not plead setoff as an affirmative defense (see Dkt. 148 at 4), but they give notice of it. Plaintiffs seek recovery in Lakefront Pictures, LLC v. Gecewicz, No. 1:26-cv-04038 (N.D. Ill. filed Apr. 10, 2026), for alleged harm that overlaps the harm alleged here, including the loss of the DePaul internship relationship and the IFA and Google matters (compare ¶¶ 147–150, with Compl. ¶¶ 58, 61, 101, Gecewicz, ECF No. 1). Any recovery against the Ancel Defendants must be reduced as 740 ILCS 100/2(c) provides for any settlement of the same injury, and Plaintiffs may not recover twice for one injury.

## RESERVATION

The Ancel Defendants reserve the right to amend these defenses as discovery, which remains open (Dkt. 187), discloses additional facts.

## SECOND AMENDED COUNTERCLAIMS

Counter-Plaintiff Jordan Ancel states the following Second Amended Counterclaims against Counter-Defendant The Curse, LLC. Paragraph references in these counterclaims ("¶") are to the counterclaim paragraphs, unless the citation is to a docket entry.

## I. NATURE OF THE COUNTERCLAIMS

1. The Curse hired Ancel to produce its motion picture The Unseen (the "Picture"). In the Producer Agreement, The Curse promised, on stated conditions, to give Ancel his producer credit, and not to terminate his engagement for Default without written notice specifying the Default and 24 hours to cure it. It also promised to defend and indemnify him, including "reasonable outside attorneys' fees and costs in the defense and disposition of such matters," against claims arising from its own breaches and from "the development, production and exploitation of the Picture."

2. The Curse broke the first two promises and has ignored the third. It has also paid nothing on Ancel's share of the Picture's Net Profits. Together with its manager, Lakefront, and its managing member, Karum, The Curse has now spent more than two years suing Ancel over the Picture's production.

3. Each count below carries an express attorneys' fee term. Ancel seeks his damages and the reasonable value of the legal services The Curse's breaches and the production-related claims have forced him to buy. He and Ancel International also give notice of their right to prevailing-party fees under the nondisclosure agreement on which Lakefront sues, which they will seek by motion under Federal Rule of Civil Procedure 54(d)(2).

## II. PARTIES

4. Jordan Ancel is a film producer and an individual who is a citizen of and domiciled in California (Dkt. 130 ¶ 7).

5. Jordan Ancel International, LLC is a California limited liability company whose sole member is Ancel (Dkt. 130 ¶¶ 8, 12). Plaintiffs allege it has been dissolved (Dkt. 130 ¶ 185).

It has not. Ancel International has never been dissolved and remains an existing California limited liability company.

6. The Curse, LLC is an Illinois limited liability company. Its members are citizens of Illinois, New Jersey, and Pennsylvania, and Karum and Ryan Atkins are its managers (Dkt. 130 ¶¶ 6, 11). The Curse owns the Picture and is the "Production Company" under the Producer Agreement (Dkt. 130 ¶ 49; Ex. A at 1).

7. Lakefront Pictures, LLC is an Illinois limited liability company whose members and managers are Karum and Atkins (Dkt. 130 ¶ 5). Plaintiffs allege that The Curse is "a special purpose entity Managed by Lakefront" (Dkt. 130 ¶ 49).

## III. JURISDICTION AND VENUE

8. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1). Counter-Plaintiff is a citizen of California. Counter-Defendant is a citizen of Illinois, New Jersey, and Pennsylvania (Dkt. 130 ¶¶ 11–13). The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a). These counterclaims arise from the same agreements, the same production, and the same events that Plaintiffs' claims put at issue.

10. Venue is proper under 28 U.S.C. § 1391(b)(2), and Plaintiffs chose this forum.

## IV. FACTS

### A. The Producer Agreement, the Artist's Inducement, and the Certificate of Engagement

11. The Curse, as "Production Company," and Rock City, as "Lender" for the services of Ancel, entered into the Producer Agreement for the Picture. Plaintiffs attached it to the Amended Complaint as Exhibit A (Dkt. 130, Ex. A). The Curse alleges that the Producer Agreement "is a valid and enforceable contract" (Dkt. 130 ¶¶ 192, 197).

12. In the attached Artist's Inducement, Ancel agreed "to render all the required, material services" and "to be bound by and duly perform and observe each and all of the terms and conditions of said agreement regarding performance or compliance on the undersigned's part" (Dkt. 130, Ex. A, Inducement at 8).

13. The Court has held that the Producer Agreement treats Ancel as a party and names him as a beneficiary, and that Ancel may sue to enforce it (Dkt. 120 at 2).

14. Paragraph 4 provides that, "[i]n the event that the Picture is produced by Production Company and provided Ancel performs all of his material services hereunder and that neither Lender nor Ancel is in material uncured breach hereof," The Curse "shall accord Ancel a 'Producer' credit on-screen on either no less than the single third producers' card or, at Production Company's discretion, the second producers card, shared only with Ryan Atkins, in the main titles on all positive and/or digital prints of the Picture." Those credits "shall be of the same size, type, duration, manner of placement and boldness as all other similar credits and shall appear wherever and whenever any other similar credits on the Picture appear or are otherwise listed" (Dkt. 130, Ex. A ¶ 4).

15. Paragraph 11(b)(ii) requires The Curse, "prior to termination of this Agreement by Production Company based upon Default," to "notify Ancel in writing, specifying the nature of the Default," and to give Ancel "24 hours after receipt of such notice to cure the Default" (Dkt. 130, Ex. A ¶ 11(b)(ii)).

16. Paragraph 7 contains The Curse's defense and indemnity promise:

> "Likewise, Production Company will defend, indemnify and hold harmless Lender and Ancel, their successors and assignees, from and against any and all damages, costs, expenses, liabilities, claims

> and causes of action in any way arising by reason of the breach of any warranty or representation by Production Company hereunder or any other provision in this Agreement and the development, production and exploitation of the Picture, including, without limitation, reasonable outside attorneys' fees and costs in the defense and disposition of such matters."

(Dkt. 130, Ex. A ¶ 7.)

17. Paragraph 11(c) provides: "Subject to limitations otherwise provided herein, and whereby Ancel has not been terminated for Cause, termination of this Agreement, Ancel's right to indemnification and insurance coverage shall survive termination hereby" (Dkt. 130, Ex. A ¶ 11(c)).

18. In the Certificate of Engagement attached to the Producer Agreement, The Curse "agree[d] to defend and indemnify and hold Ancel [harmless] . . . against all liabilities, penalties, losses or expenses, including reasonable outside attorney's fees, imposed upon, sustained or incurred by Ancel arising out of the development, production, distribution, and exploitation of the Picture or any element thereof, except to the extent such claims, judgments, losses, expenses, and liabilities arise from Ancel's intentionally tortious acts or omissions, fraud or felony criminal matters, or which arise out of the breach of any of Ancel's material warranties, representations, agreements or obligations hereunder" (Dkt. 130, Ex. A, Certificate at 11). Paragraph 7 contains no such exception. The Certificate's exception applies only "to the extent" a claim or liability actually arises from Ancel's intentionally tortious acts or omissions, fraud or felony criminal matters, or his own breach of a material warranty, representation, agreement, or obligation; Plaintiffs' labels do not determine that extent. Karum's defamation claim does not require proof of intent: a private

individual may recover actual damages for a defamatory publication whose substantial danger to reputation is apparent on proof that the publication was false and that the defendant, believing it true, "lacked reasonable grounds for that belief." *Troman v. Wood*, 62 Ill. 2d 184, 198 (1975). Ancel denies that he committed any intentionally tortious act or breached any obligation to The Curse.

19. Paragraph 9 limits Ancel's remedy for The Curse's breach to "an action at law for damages" (Dkt. 130, Ex. A ¶ 9). Each count against The Curse below seeks damages only.

20. The Producer Agreement is governed by "the internal substantive laws of the State of Illinois" (Dkt. 130, Ex. A ¶ 15).

**B. Rock City and Ancel's Rights Under the Producer Agreement**

21. Rock City was organized as an Illinois limited liability company on March 29, 2022. Ancel was its sole member (Dkt. 130 ¶ 9) and its manager (Ex. 1). Ancel formed Rock City in Illinois at Karum's request: Karum told him that the production needed him to do so to obtain a tax credit for the Picture. The Curse admits that it and Rock City entered into a valid written Producer Agreement "effective as of March 9, 2022" (Dkt. 125 ¶ 59). After principal photography ended, Ancel asked The Curse's managers to pay the final installment of his fee to "my Illinois LLC," Rock City (Ancel email to Karum and Atkins, Sept. 16, 2022). The Curse paid it. The Amended Counterclaim alleged that Rock City "is a California limited liability company" (Dkt. 87 ¶ 1). That allegation was counsel's error, and the Ancel Defendants withdraw it. Rock City was organized under Illinois law. Because its sole member, Ancel, is a citizen of California, Rock City is a citizen of California for purposes of diversity jurisdiction, as Plaintiffs allege (Dkt. 130 ¶¶ 9, 12). *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007). The error does not affect the Court's jurisdiction.

22. On September 21, 2023, Ancel signed and filed a Statement of Termination for Rock City with the Illinois Secretary of State (Ex. 1). Such a statement is executed when a limited liability company "has been wound up." 805 ILCS 180/35-15.

23. Relying on that incorrect allegation, Plaintiffs argued that Rock City is a California company without authority to transact business in Illinois (Dkt. 111 at 3, citing Dkt. 87 ¶¶ 1–2), and the Court held that Rock City lacks capacity to assert the state-law claims in Counts I through III of the Amended Counterclaim (Dkt. 120 at 1–2). Rock City asserts no claim in these counterclaims.

24. Every right Ancel asserts in Counts I through IV runs to him by name; Count V is addressed in paragraph 72. Paragraph 4 requires The Curse to accord credit to "Ancel"; paragraph 11(b)(ii) requires notice to "Ancel" and an opportunity for "Ancel" to cure; paragraph 7 protects "Lender and Ancel"; and paragraph 11(c), on the conditions quoted in paragraph 17, preserves "Ancel's right to indemnification" (Dkt. 130, Ex. A ¶¶ 4, 7, 11(b)(ii), 11(c)). Ancel asserts each of those rights in his own right (Dkt. 120 at 2).

**C. Ancel Performs, and The Curse Never Gives Notice of Any Default**

25. Ancel rendered producing services on the Picture. Among other things, he introduced investors who contributed capital and contributed ideas that Karum incorporated into the script (Dkt. 130 ¶ 57), and he worked on set during principal photography in April and June 2022 (Dkt. 130 ¶¶ 59, 74–97).

26. Neither The Curse nor Lakefront ever gave Ancel or Rock City written notice specifying any Default, or any 24-hour opportunity to cure, under paragraph 11(b)(ii). The Curse denies that allegation but admits that "it did not terminate the Agreement and never invoked the

cure period" (Dkt. 125 ¶ 26; see Dkt. 148 at 2). The Producer Agreement, including The Curse's obligations under paragraph 7, therefore remains in force.

27. After photography ended, Lakefront told Ancel his services "would no longer be necessary" and excluded him from post-production and distribution (Dkt. 130 ¶¶ 98–99). Plaintiffs call this Ancel's "de facto termination" (Dkt. 130 ¶ 100). The Curse did not follow paragraph 11(b)(ii) before removing Ancel or before treating him as having forfeited his rights.

**D. The Curse Diminishes Ancel's Credit**

28. The Picture was completed, premiered in Los Angeles, and has been distributed (Dkt. 130 ¶ 121; Dkt. 125 ¶¶ 27, 34).

29. The Picture's opening credits name its cast, director, and writer, but no producer. The producer credits appear in the title cards at the Picture's close, before the end crawl. After the title card and the cards for the director and the writer, five single producer cards appear in this order: (1) "Produced by" Jennifer A. Goodman (Karum's professional name); (2) "Producer" RJ Mitte, the Picture's top-billed actor; (3) "Producer" Ryan Atkins; (4) "Producer" Vincent Shade, the Picture's director; and (5) "Producer" Jordan Ancel. Those cards are the Picture's main titles for its producer credits. Ancel's credit appears alone on the fifth and last producers' card. Only Karum's card reads "Produced by." Paragraph 4 required that Ancel's credit appear on no less than the single third producers' card or, at The Curse's discretion, on the second card shared only with Ryan Atkins, in the same size, type, duration, manner of placement, and boldness as all other similar credits. The Curse gave Ancel neither. It placed his credit last, behind separate cards for Mitte, Atkins, and Shade.

30. The Curse acts through its manager, Lakefront (Dkt. 130 ¶ 49). In October 2022, The Curse's managers circulated the Picture's poster to Ancel (Karum email to Ancel, Oct. 17,

2022, forwarding Atkins's "Updated poster"). The poster's billing block lists the Picture as "Produced by" Jennifer A. Goodman (Karum's professional name), Ryan Atkins, Vincent Shade, and then Ancel — placing Ancel's producer credit fourth, behind the Picture's director, rather than in the third position or the position shared only with Atkins that paragraph 4 requires.

31. The placement of Ancel's credit was not inadvertent or casual, and it was not the act of a third party. It reflects decisions by The Curse and its managers that diminished the credit for which Ancel contracted.

**E. The Curse and Its Managers Sue Ancel Over the Production, and The Curse Has Not Defended Him**

32. On February 8, 2024, The Curse, Lakefront, and Karum sued Ancel (Dkt. 1). The Amended Complaint asserts ten of its twelve counts against one or more of the Ancel Defendants (Dkt. 130 at 31–41).

33. Those claims rest in substantial part on the development, production, and exploitation of the Picture. Plaintiffs allege, among other things:

(a) Ancel's performance and conduct on set during principal photography (Dkt. 130 ¶¶ 57–97);

(b) statements about the production budget made to the Picture's investors (second ¶ 76; ¶¶ 104–105, 165);

(c) statements to the cast and crew during production (second ¶¶ 79–85; ¶¶ 86–97, 166);

(d) Ancel's publicity about his role in the Picture (¶¶ 101–103); and

(e) The Curse's own claim that Ancel breached the Producer Agreement (Count VI; the Court dismissed Count V, Dkt. 184 at 3).

34. Karum and Lakefront, which bring most of those claims, are not parties to the Producer Agreement. Their claims are third-party claims against Ancel arising from the development, production, and exploitation of the Picture.

35. The Curse has had actual notice of every one of those claims since it filed them as Karum's and Lakefront's co-plaintiff. Its managers, Karum and Atkins, are Lakefront's managers, and Karum is a plaintiff (Dkt. 130 ¶¶ 5–6).

36. On November 16, 2026, Ancel, through counsel, tendered to The Curse in writing his defense of the claims Karum and Lakefront assert against him in this action. He demanded that The Curse defend and indemnify him under paragraph 7, paragraph 11(c), and the Certificate of Engagement, and that it reimburse the defense costs he has incurred (Ex. 2). This pleading renews that tender.

37. The Curse has never defended Ancel, offered to defend him, or paid any part of his defense. It is instead prosecuting claims against him.

38. Ancel has retained counsel, and has incurred and continues to incur attorneys' fees and costs, to defend Plaintiffs' claims and to enforce his rights under the Producer Agreement.

**F. The Attorneys' Fees Owed Are Measured by Their Reasonable Value**

39. Paragraph 7 expressly includes "reasonable outside attorneys' fees and costs in the defense and disposition of such matters," and the Certificate of Engagement expressly includes "reasonable outside attorney's fees." Where a contract shifts fees, the court awards all reasonable fees. *J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship*, 325 Ill. App. 3d 276, 757 N.E.2d 1271, 1277 (5th Dist. 2001). An indemnity clause that covers counsel fees, and is not limited to third-party claims, can reach fees incurred in a direct action between the contracting parties. *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 735–36 (7th Cir. 2010) (Illinois law).

40. The measure of those fees is reasonableness. The factors include the skill and standing of counsel, the nature of the case, the novelty of the issues, the significance of the case, the degree of responsibility required, the customary charges for comparable services, the benefit to the client, and the reasonable connection between the fees sought and the amount involved. *J.B. Esker*, 757 N.E.2d at 1277.

41. That measure turns on the reasonable value of the services, not on how counsel's bills are stated or the form of the fee arrangement. Fees shifted by contract call for reimbursement of "commercially-reasonable fees no matter how the bills are stated." *Indigo Old Corp. v. Guido*, No. 1:19-cv-07491, slip op. at 3 (N.D. Ill. July 19, 2021) (quoting *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1027 (7th Cir. 2013) (quoting *Matthews v. Wis. Energy Corp.*, 642 F.3d 565, 572 (7th Cir. 2011))).

42. The same is true under the NDA, which California law governs. Under California Civil Code § 1717, reasonable fees are ordinarily fixed by the hours reasonably expended at the prevailing market rate for comparable services, not by counsel's actual cost or the amount the client paid. *PLCM Grp., Inc. v. Drexler*, 22 Cal. 4th 1084, 1095–97 & n.5 (2000).

43. Ancel will establish the amount of reasonable fees as follows. Fees incurred defending claims by others, and fees caused by The Curse's breaches, are damages and will be submitted to the trier of fact. Fees for the work in this case on the NDA will be presented by motion under Federal Rule of Civil Procedure 54(d)(2).

**G. The NDA and Its Prevailing-Party Fee Clause**

44. Lakefront and Ancel International entered into a Non-Disclosure Agreement (the "NDA"), which Plaintiffs attached to the Amended Complaint as Exhibit B (Dkt. 130, Ex. B). Ancel signed it as Ancel International's CEO (id. at 5).

45. The NDA provides: "If either party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses" (Dkt. 130, Ex. B ¶ 16). It is governed by California law (id. ¶ 17).

46. In Count IV, Lakefront sued Ancel International and Ancel to enforce the NDA (Dkt. 130 ¶¶ 182–190). It sued Ancel on the theory that he was Ancel International's alter ego. The Court dismissed Count IV as to Ancel (Dkt. 184 at 2).

47. Under California Civil Code § 1717(a), the party who prevails on the NDA is entitled to reasonable attorneys' fees, whether or not it is the party the clause names. A nonsignatory sued on the contract as an alter ego who prevails may recover fees if the plaintiff would have been entitled to them had it won. *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 128–29 (1979).

## COUNT I

### Breach of Contract — Credit and Notice-and-Cure

### (Ancel v. The Curse)

48. Counter-Plaintiff incorporates paragraphs 1 through 47.

49. The Producer Agreement is a valid and enforceable contract (Dkt. 130 ¶¶ 192, 197). The Producer Agreement treats Ancel as a party and names him as a beneficiary (Dkt. 120 at 2).

50. Ancel and Rock City performed their obligations, and any condition to The Curse's performance was satisfied or excused. The Curse never gave notice of Default or an opportunity to cure, so neither Ancel nor Rock City was ever in "material uncured breach."

51. The Curse breached paragraph 4 by placing Ancel's credit on the fifth and last producers' card in the main titles, rather than on the single third producers' card or the second card shared only with Atkins, and by listing him below the position paragraph 4 requires in the materials

where the other producers' credits appear or are otherwise listed (¶¶ 29–30). These failures were not inadvertent or casual and were not the failure of a third party.

52. In the alternative to paragraph 26 (Fed. R. Civ. P. 8(d)(2)), to the extent The Curse's exclusion of Ancel ended his engagement under the Producer Agreement, The Curse breached paragraph 11(b)(ii) by ending Ancel's engagement, excluding him from post-production and distribution, and treating him as having forfeited his rights, without written notice specifying a Default and without the 24-hour opportunity to cure.

53. As a direct and proximate result, Ancel has been damaged. His damages include the lost value of his contractual producer credit, lost professional and economic opportunities, and the reasonable attorneys' fees and costs he has incurred because of The Curse's breaches, which The Curse must bear under paragraph 7.

WHEREFORE, Ancel requests judgment against The Curse for: (a) compensatory damages in an amount to be proved at trial; (b) the reasonable attorneys' fees and costs incurred by reason of The Curse's breaches, under paragraph 7 of the Producer Agreement; (c) prejudgment and post-judgment interest as allowed by law; (d) costs under 28 U.S.C. § 1920; and (e) such other legal relief as the Court finds just.

## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Ancel v. The Curse)

54. Counter-Plaintiff incorporates paragraphs 1 through 47.

55. The Producer Agreement provides that "[a]ll other matters relating to credit shall be determined by Production Company in its sole and exclusive discretion and subject to the standards and operating policies and practices as established and determined by the network, studio

or similar party," and gives The Curse "the sole and exclusive right to issue publicity concerning Ancel with respect to the Services hereunder provided that no use by Production Company of Ancel's name in connection with the Picture shall be in any way derogatory or defamatory" (Dkt. 130, Ex. A ¶¶ 4, 5). Illinois implies in that grant of discretion a covenant that The Curse exercise it reasonably, and not arbitrarily, capriciously, or inconsistently with the parties' reasonable expectations.

56. The Curse exercised that discretion in bad faith. Through its manager, it structured the Picture's credits and its own promotional materials to diminish Ancel's producing role and attribute the Picture to Karum, Atkins, and Lakefront, including by reserving the main titles' only "Produced by" card for Karum and placing Ancel's credit last (¶ 29), in order to deny him the professional value of the credit he bargained for.

57. As a direct and proximate result, Ancel has been damaged, including through the diminished value of his credit and his lost opportunities.

WHEREFORE, Ancel requests judgment against The Curse for: (a) compensatory damages in an amount to be proved at trial; (b) the reasonable attorneys' fees and costs incurred by reason of The Curse's breach, under paragraph 7 of the Producer Agreement; (c) prejudgment and post-judgment interest as allowed by law; (d) costs; and (e) such other legal relief as the Court finds just.

## COUNT III

### Breach of the Contractual Duty to Defend

### (Ancel v. The Curse)

58. Counter-Plaintiff incorporates paragraphs 1 through 47.

59. Paragraph 7 and the Certificate of Engagement obligate The Curse to "defend" Ancel and Lender against claims "in any way arising by reason of the breach of any warranty or representation by Production Company hereunder or any other provision in this Agreement and the development, production and exploitation of the Picture" and against liabilities "arising out of the development, production, distribution, and exploitation of the Picture," subject to the Certificate's exception addressed in paragraphs 18 and 61. That obligation remains in force, because The Curse never terminated the Producer Agreement (Dkt. 125 ¶ 26). If the Agreement had been terminated, the obligation would survive under paragraph 11(c), because Ancel was never terminated for Cause.

60. A contractual duty to defend is triggered when the allegations against the indemnitee potentially fall within the defense obligation. *McNiff v. Millard Maint. Serv. Co.*, 303 Ill. App. 3d 1074, 715 N.E.2d 247, 252 (1st Dist. 1999).

61. The Certificate's exception for Ancel's intentionally tortious acts and breaches does not limit paragraph 7. Nor does it defeat the defense obligation under the Certificate, because Plaintiffs' claims may be established, in whole or in part, without proof that Ancel acted intentionally or breached any obligation (¶ 18 above).

62. The claims Karum and Lakefront assert against Ancel arise, in whole or in part, from the development, production, and exploitation of the Picture (¶¶ 32–34 above). They fall within The Curse's duty to defend. Count III seeks the defense of the claims Karum and Lakefront

assert (Counts I, III, and VII through XI of the Amended Complaint); it does not seek a defense of The Curse's own claims against Ancel.

63. The Curse has had notice of those claims since it filed them as a co-plaintiff, and Ancel has tendered his defense (¶ 36 above). The Curse has not defended Ancel and has not paid any part of his defense. It is in breach.

64. As a direct and proximate result, Ancel has been damaged in the amount of the reasonable attorneys' fees and costs of his defense, measured by their reasonable value as alleged in paragraphs 39 through 43, together with the fees and costs he will incur until The Curse performs.

WHEREFORE, Ancel requests judgment against The Curse for: (a) damages equal to the reasonable attorneys' fees and costs of his defense of the claims Karum and Lakefront assert against him, in an amount to be proved at trial; (b) prejudgment and post-judgment interest as allowed by law; (c) costs; and (d) such other legal relief as the Court finds just.

## COUNT IV

### Contractual Indemnification

### (Ancel v. The Curse)

65. Counter-Plaintiff incorporates paragraphs 1 through 47.

66. Paragraph 7 obligates The Curse to "indemnify and hold harmless Lender and Ancel . . . from and against any and all damages, costs, expenses, liabilities, claims and causes of action" arising by reason of The Curse's breach of "any other provision in this Agreement" and from "the development, production and exploitation of the Picture," "including, without limitation, reasonable outside attorneys' fees and costs in the defense and disposition of such matters." The Certificate of Engagement contains a parallel promise.

67. That indemnity is not limited to claims by third parties. *Water Tower Realty Co. v. Fordham 25 E. Superior, L.L.C.*, 404 Ill. App. 3d 658, 936 N.E.2d 1127, 1134 (1st Dist. 2010); *Rexam*, 620 F.3d at 735–36.

68. Ancel has suffered losses within paragraph 7 and the Certificate. These include (a) the reasonable attorneys' fees and costs he has already incurred, since February 8, 2024 and before his November 16, 2026 tender, defending the claims Karum and Lakefront assert, which arise from the development, production, and exploitation of the Picture; (b) the fees and costs he has incurred because of The Curse's breaches of paragraphs 4 and 11(b)(ii); (c) the fees and costs of enforcing paragraph 7, which arise by reason of The Curse's breach of that provision; and (d) any liability he incurs on those claims. Paragraph 7 says nothing about tender, notice, or control of the defense as a condition of indemnity. An indemnitee may recover fees incurred in prosecuting a claim for indemnification under an indemnity clause that covers attorneys' fees. *Montgomery Ward & Co. v. Wetzel*, 98 Ill. App. 3d 243, 252–53 (1st Dist. 1981).

69. The Curse has not indemnified Ancel.

WHEREFORE, Ancel requests judgment against The Curse for: (a) indemnification for all fees, costs, expenses, and liabilities within paragraph 7 and the Certificate of Engagement, including reasonable attorneys' fees measured as alleged in paragraphs 39 through 43, in an amount to be proved at trial; (b) prejudgment and post-judgment interest as allowed by law; (c) costs; and (d) such other legal relief as the Court finds just.

**COUNT V**

**Breach of Contract — Net Profits**

**(Ancel v. The Curse)**

70. Counter-Plaintiff incorporates paragraphs 1 through 47.

71. Paragraph 3.2 provides that, "upon the condition Ancel shall fully and faithfully complete all services that may be required hereunder and provided that neither Lender nor Ancel is in material uncured breach hereof, Lender shall be entitled to receive Three Percent of One Hundred Percent (3% of 100%) of the 'Net Profits' of the Picture, if any" (Dkt. 130, Ex. A ¶ 3.2). The Net Profits exhibit to the Producer Agreement defines Net Profits as the gross receipts actually received by The Curse, its affiliates, licensees, and assigns from the worldwide exploitation of the Picture that remain after the deductions it lists, including repayment of an amount equal to 120% of the financiers' at-risk capital contributions (id., Net Profits Ex. at 12).

72. The Court has held, citing paragraph 3.2 among other provisions, that the Producer Agreement treats Ancel as a party and names him as a beneficiary, and that Ancel may sue to enforce it (Dkt. 120 at 2). Rock City, the Lender, was Ancel's single-member company, and it has been wound up and terminated (¶¶ 21–22). Ancel asserts the Net Profits participation in his own right as a party to and beneficiary of the Producer Agreement.

73. Ancel fully and faithfully completed all services required of him, and neither he nor Rock City was in material uncured breach. The Curse never gave notice of any Default or an opportunity to cure (¶¶ 25–27).

74. The Picture has been commercially exploited. The Curse admits that the Picture "received a North American distribution agreement with Gravitas Ventures that included a minimum guarantee paid in installments, and foreign licensing agreements through international

sales agent The Coven," and that it "has been distributed on various platforms" (Dkt. 125 ¶¶ 27, 34).

75. On information and belief, the gross receipts that The Curse and its affiliates, licensees, and assigns have received from the exploitation of the Picture exceed the deductions the Net Profits exhibit permits, including repayment of 120% of the financiers' at-risk capital contributions, and the Picture has generated Net Profits. All conditions precedent to The Curse's obligation to pay the Net Profits participation have occurred or been performed. Fed. R. Civ. P. 9(c). These allegations supply what the Court found missing from the earlier net-profits claim (Dkt. 120 at 2–3).

76. The Curse has paid nothing on the Net Profits participation, to Ancel or to Rock City. It has breached paragraph 3.2.

77. As a direct and proximate result, Ancel has been damaged in the amount of 3% of 100% of the Picture's Net Profits, together with the reasonable attorneys' fees and costs he has incurred by reason of that breach, which The Curse must bear under paragraph 7.

WHEREFORE, Ancel requests judgment against The Curse for: (a) damages equal to 3% of 100% of the Net Profits of the Picture, in an amount to be proved at trial; (b) the reasonable attorneys' fees and costs incurred by reason of The Curse's breach, under paragraph 7 of the Producer Agreement; (c) prejudgment and post-judgment interest as allowed by law; (d) costs; and (e) such other legal relief as the Court finds just.

## NOTICE OF PREVAILING-PARTY FEE CLAIM UNDER THE NDA

Ancel International and Ancel do not assert a separate count for fees under the NDA. If either prevails on the NDA claim Lakefront asserted in Count IV of the Amended Complaint (Dkt. 130 ¶¶ 182–190), it will move for its reasonable attorneys' fees and expenses under paragraph 16

of the NDA and California Civil Code § 1717(a), measured as alleged in paragraphs 39 through 43, within the time Federal Rule of Civil Procedure 54(d)(2) allows.

**JURY DEMAND**

The Ancel Defendants and Counter-Plaintiff demand trial by jury on all issues so triable.

Dated: November 16, 2026

Respectfully submitted,

**JORDAN ANCEL, JORDAN ANCEL INTERNATIONAL, LLC, and ROCK CITY ROAD FILMS LLC**

By: /s/*Alexander N. Loftus*
One of Their Attorneys

Alexander N. Loftus (ARDC No. 6303484)
LOFTUS & EISENBERG, LTD.
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
(312) 899-6625
alex@loftusandeisenberg.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/*Alexander N. Loftus*
Alexander N. Loftus